**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FLUID MARKET INC., *et al.*,[1] | ) | Case No. 24-12363 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING DEBTORS TO (A) MAINTAIN EXISTING INSURANCE POLICIES
AND PAY ALL INSURANCE OBLIGATIONS ARISING THEREUNDER, AND
(B) RENEW, SUPPLEMENT, MODIFY, OR PURCHASE INSURANCE COVERAGE**

Fluid Market, Inc. and its affiliated debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of interim and final orders granting the relief described below. In support hereof, the Debtors rely on the *Declaration of T. Scott Avila in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration")[2] filed concurrently herewith, and further represent as follows:

**JURISDICTION AND VENUE**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Fluid Market Inc. (1365) and Fluid Fleet Services, LLC (5994). The Debtors' service address is 3827 Lafayette St., Suite #149, Denver, CO 80205.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these chapter 11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 363(b), 364(c), and 1112(b) of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1(m).

## RELIEF REQUESTED

4. The Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"): (i) authorizing the Debtors, in their discretion, to (a) maintain their existing insurance policies and pay all obligations arising thereunder or in connection therewith, and (b) renew, supplement, modify, or purchase insurance coverage; and (ii) granting related relief.

5. The Debtors further respectfully request that the Court schedule a final hearing to consider approval of this Motion on a final basis within thirty days following the Petition Date (defined below), or as soon thereafter as the Court's schedule permits (such period, the "Interim Period").

## BACKGROUND

6. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion

requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committee of unsecured creditors has been appointed in these chapter 11 cases.

7. The Debtors operate and manage a technology-based, peer-to-peer truck-sharing platform across the United States with a fleet of nearly 5,500 vehicles owned by their nondebtor affiliates or third-party owners who have elected to put their vehicles on the Debtors' platform, https://www.fluidtruck.com/. Customers have quick and easy access to the right vehicle whenever they need it via the Debtors' mobile app and website. Faced with severely constrained liquidity, and after multiple failed efforts to raise additional capital or debt financing, the Debtors, in an exercise of their business judgment, commenced these Chapter 11 Cases with the intention of pursuing a prompt sale of their assets to preserve their business as a going concern and maximize value for all their stakeholders.

8. Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

A. **INSURANCE POLICIES**

9. The Debtors maintain numerous insurance policies (as may be amended, modified, or supplemented as described herein and, together with any insurance policies that the Debtors may purchase after the date hereof, the "Insurance Policies") administered by multiple third-party insurance carriers (collectively, the "Insurance Carriers"). The Insurance Policies provide coverage for, among other things, directors and officers liability, fleet automobile liability,

workers' compensation, property liability, cyber liability, commercial general liability, and various related excess liability. A schedule of the Insurance Policies is attached hereto as **Exhibit C**.[3]

10. The Debtors generally pay premiums with respect to the Insurance Policies up front on an annual-basis to the Insurance Carriers. The Debtors intend to renew or replace any expiring Insurance Policies, keeping the coverage consistent with their present coverage but taking into consideration certain factors that may have affected the Debtors' business or the cost of the policies, such as, among other things, the changes in the insurance marketplace. The Debtors believe that approximately $10,000 is due and owing on the Petition Date related to premiums for the Insurance Policies, and request authority by this Motion to make such premium payments.

11. In connection with the Insurance Policies, the Debtors obtain insurance brokerage services from Marsh LLC and CAC Specialty (the "Brokerss"). The Broker assist the Debtors in obtaining comprehensive insurance coverage for the Debtors' operations by aiding with the procurement and negotiation of the Insurance Policies and enabling the Debtors to obtain those policies on advantageous terms at competitive rates. While the Debtors and the Brokers are not parties to any formal broker agreement, they are parties to a service agreement, whereby the Brokers collect commission payments for services rendered related to the Insurance Policies. The commission percentage is determined by the Insurance Carriers depending on the Debtors' line of business. The Debtors do not believe that any amounts are due and owing to the Brokers on the Petition Date. The Debtors request authority to pay any prepetition amounts that become due and

---

[3] The inclusion of an Insurance Policy, on or the omission of an Insurance Policy from **Exhibit C** does not indicate the Debtors' intention to, in the future renew or enter into new Insurance Policies not listed on **Exhibit C**. In addition, the Debtors reserve the right to amend, modify, or supplement **Exhibit C**. The descriptions of the Insurance Policies set forth in this Motion, including on **Exhibit C**, constitute a summary only. The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the description in this Motion. The Debtors request authority to honor existing Insurance Policies and to renew Insurance Policies, as applicable, regardless of whether the Debtors inadvertently failed to include a particular Insurance Policy on **Exhibit C**, and any such omitted Insurance Policy is hereby included in the defined term "Insurance Policies" as used herein and in the Interim and Final Orders.

owing to the Brokers on account of any such commissions on a postpetition basis in the ordinary course of business and consistent with past practices.

**B.     FLEET COVERAGE INSURANCE**

12.     In the ordinary course of business, the Debtors provide insurance coverage for fleet liability through primary insurance placed with Crum and Forster d/b/a US Fire Insurance Company ("US Fire Insurance") and reinsurance placed with a wholly-owned subsidiary of Fluid Market Inc., Nereus Insurance Company ("Nereus").[4] Nereus is a captive insurer formed under the District of Columbia Captive Insurance Companies Act (2004) (D.C. Code, Title 31, Chapter 39A, as amended).  Nereus serves as a re-insurer for the Debtors' potential liabilities related to the operation of its rental trucking fleet.  Nereus was launched in March of 2023 and began insuring certain of the Debtors' fleet vehicles on April 1, 2023.

13.     The Debtors offer their customers the option to purchase insurance as part of the rental agreement.  This direct insurance option provides the Debtors' smaller customers (who typically rent on a single vehicle) with access to insurance without requiring the customer to provide their own certificate of insurance for vehicles.  In return for the up-front insurance premium payment made by customers as part of the rental agreement, US Fire Insurance provides primary coverage associated with the operation of the vehicle (subject to certain terms and limitations).  On an annual basis, Nereus enters into an agreement with US Fire for reinsurance coverage for the potential liabilities related to fleet operations.  The current terms of both primary insurance and reinsurance run through 4/1/2025.

14.     The Debtors currently pay US Fire Insurance a monthly premium dependent upon (a) the number of vehicles on the Debtors' rental platform and (b) the projected costs of

---

[4]  Nereus is not a debtor in these Chapter 11 cases.

reinsurance.  Currently, the Debtors pay approximately $260,000 a month to US Fire Insurance.  As of the Petition Date, the Debtors have paid US Fire Insurance the premium for the month of September, but owe approximately $150,000 for the premiums due for the October period through the Petition Date.  The Debtors request authority to pay US Fire Insurance up to $150,000 for prepetition premiums and to continue to pay post-petition premiums to US Fire Insurance in the ordinary course of business and consistent with past practices.[5]

## BASIS FOR RELIEF

### A. THE COURT SHOULD AUTHORIZE THE DEBTORS TO HONOR THEIR INSURANCE OBLIGATIONS, AND RENEW, SUPPLEMENT, MODIFY, AND PURCHASE ADDITIONAL INSURANCE COVERAGE

15.    Pursuant to this Motion, the Debtors are seeking authority to (a) honor their insurance-related obligations (the "Insurance Obligations"),[6] and (b) extend or modify their Insurance Policies, or to enter into new insurance policies and premium financing agreements, as applicable, in the ordinary course of business.  The Debtors' ability to maintain their existing insurance program as needed in the ordinary course of business is essential to the preservation of the value of the Debtors' business, operations, and assets.  If the Debtors are unable to make any payments owed for the Insurance Obligations, the unpaid Insurance Carriers may seek relief from the automatic stay to terminate such Insurance Policies.  The Debtors would be required to obtain replacement insurance on an expedited basis and at significant expense to the estates, likely incurring costs exceeding the amounts owed under the current insurance program.  Even if these

---

[5] As described in the First Day Declaration, the Debtors are party to certain Carbon Fleet Facility Documents in connection with the Carbon Fleet Facility.  Under the Carbon Fleet Facility Documents, the Debtors are required to deposit in the Carbon Fleet Collection Account certain insurance proceeds arising from theft, damage, or similar events with respect to the Carbon Fleet Vehicles.  Nothing herein or in the Interim Order or the Final Order is intended to prejudice the rights of Carbon Fleet, the Carbon Fleet Lenders, or Goldman Sachs (as Agent for the Carbon Fleet Facility) with respect to such proceeds.

[6] "Insurance Obligations" do not include, and Debtors are not at this time seeking authority to pay, any deductibles or self-insured retentions on account of any claims that arose prior to the Petition Date.

Insurance Carriers were not permitted to terminate the agreements, any interruption of payment would have an adverse effect on the Debtors' ability to obtain future policies at reasonable rates.

**B.    HONORING THE INSURANCE OBLIGATIONS IN THE ORDINARY COURSE IS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGEMENT**

16.    Section 363(b) of the Bankruptcy Code permits a debtor to use estate property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted) (requiring that the debtor show a "sound business purpose" to justify its actions under section 363 of the Bankruptcy Code); *see also In re Phoenix Steel Corp.,* 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Further, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.,* 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

17.    The Debtors have determined, in the sound exercise of their business judgment, that honoring the Insurance Obligations in the ordinary course of business is critical to the success of these chapter 11 cases.

18.    First, the coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many instances, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations.  Indeed, section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance

that poses a risk to the estate or to the public," is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C). Moreover, maintenance of insurance policies is required by the operating guidelines established by the Office of the United States Trustee. *See* 3 United States Trustee Manual, § 3-3.2.3 (Oct. 1998) ("A debtor must obtain appropriate insurance coverage, and documentation regarding the existence of the coverage must be provided to the Office of the United States Trustee as early in the case as possible.").

19. Second, if the Debtors fail to pay the Insurance Obligations, the Insurance Carriers might seek to void the Debtors' coverage under the Insurance Policies.[7] Such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks, including but not limited to: (a) direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers; (b) material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Policies; (c) the inability to obtain similar types of insurance coverage; and (d) higher costs for re-establishing lapsed policies or obtaining new insurance coverage. Any or all of these consequences could cause serious harm to the Debtors' business. Granting the relief requested herein will enhance the likelihood of the Debtors' successful rehabilitation, thereby furthering the goals of chapter 11, which is to "facilitat[e] the continued operation and rehabilitation of the debtor." *In re Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).

20. The Debtors may also need to renew or replace certain of the Insurance Policies during the course of the chapter 11 cases, or enter into new policies. If the Debtors do not pay the

---

[7] The Debtors reserve all rights with respect to the Insurance Policies, including the right to oppose any effort by any Insurance Carriers to terminate any of the Insurance Policies.

Insurance Obligations, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies.

21. Although the Debtors believe that any renewal, modification, or new execution of the Insurance Policies would constitute ordinary course transactions, which do not require Court approval, the Debtors nevertheless seek authority to continue to renew and modify the Insurance Policies consistent with their past practices to assure the Insurance Carriers that the Debtors have full authority with respect to new or modified arrangements without the need to obtain further approval from the Court.

**C.    THE COURT ALSO MAY GRANT THE MOTION PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND THE DOCTRINE OF NECESSITY**

22. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may permit payments of prepetition obligations prior to confirmation of a plan and emergence from chapter 11 when essential to the continued operation of a debtor's business. Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "doctrine of necessity."

23. Under the "doctrine of necessity," bankruptcy courts may authorize the payment of prepetition claims if such payment is essential to the continued operation of the debtor. *In re Lehigh and New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (recognizing necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or

materials essential to the conduct of the business until its pre-reorganization claims have been paid"); *In re Just for Feet, Inc.,* 242 B.R. 821, 824–25 (D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.,* 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

24. Although the "doctrine of necessity" predates the Bankruptcy Code, *see Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 309 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a) and 1108. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (fiduciary duties implicit in section 1107(a) of the Bankruptcy Code justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value). The doctrine, largely unchanged from the Court's reasoning in *Miltenberger*, is a widely accepted component of bankruptcy jurisprudence. *See Just for Feet, Inc.*, 242 at 826 (approving payment of key inventory suppliers' prepetition claims when such suppliers could destroy the debtor's business by refusing to deliver new inventory on the eve of debtor's key sales season); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (affirming order authorizing payment of prepetition wages, salaries, expenses and benefits); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546–47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agreed to provide postpetition trade credit).

25. As described above, honoring the Insurance Obligations is necessary to preserve the value of the Debtors' assets, thereby ensuring the adequate protection of the Debtors' property for any party in interest, and to minimize the estates' exposure to risk. Failing to honor the Insurance Obligations may have a material adverse effect on the ability of the Debtors to maximize

the value of their estates. One or more of the Insurance Carriers could decline to renew their Insurance Policies or refuse to enter into new insurance agreements with the Debtors in the future. If the Insurance Policies are permitted to lapse or are otherwise terminated, the Debtors could face significant postpetition liability for personal or property damage, which, in turn, could harm all parties in interest. The Debtors would then be forced to obtain replacement insurance coverage on an emergency basis and at significant cost.

D.   **THE DEBTORS CAN HONOR THEIR INSURANCE OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS WITHOUT NEED FOR COURT APPROVAL**

26.   Section 363(c)(1) of the Bankruptcy Code provides that a chapter 11 debtor in possession "may enter into transactions . . . [or] may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The Bankruptcy Code does not define "ordinary course of business." *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992). In determining whether a transaction is in the ordinary course of business, the Third Circuit has adopted the two-part "horizontal" dimension and "vertical" dimension test. *Id.* First, the transaction must be analyzed on the horizontal dimension, where the court looks at whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry. *Id.* at 953. Second, the transaction must be analyzed on the vertical dimension, where the court looks at the transaction from the perspective of a hypothetical creditor and asks whether the transaction subjects such a creditor to different economic risks from those he accepted when he decided to extend credit. *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 797 (Bankr. D. Del. 2007). "In other words, the vertical analysis looks at the 'debtor's pre-petition business practices and conduct.'" *In re Blitz U.S.A., Inc.*, 475 B.R. 209, 214 (Bankr. D. Del. 2012) (quoting *Nellson*, 369 B.R. at 797).

27.     Here, the Debtors seek only to honor their Insurance Obligations in the ordinary course of their prepetition business on a postpetition basis.  Such obligations include, among other things, renewing the Insurance Policies when they expire and paying insurance premiums when they come due.  The Debtors believe that honoring their Insurance Obligations on a postpetition basis is in the ordinary course of business and, pursuant to section 363(c)(1) of the Bankruptcy Code, does not require notice and a hearing.  As noted above, the Debtors are required to maintain adequate insurance, and therefore the Debtors are required to honor their Insurance Obligations to avoid substantial disruption to their day-to-day operations.  Based on the foregoing, the Debtors respectfully submit that honoring their Insurance Obligations should be authorized under sections 105(a) and 363(b) of the Bankruptcy Code to the extent such activities are deemed outside the ordinary course of the Debtors' business.

28.     Courts in this district have routinely granted similar relief.  *See, e.g., In re FB Debt Financing Guarantor, LLC*, No. 23-10025 (KBO) (Jan. 13, 2023) (authorizing debtors to continue their current insurance policies, pay prepetition premiums and amounts related thereto, and enter into new insurance policies); *In re OSG Group Holdings, Inc., et al.*, No. 22-10718 (JTD) (Aug. 29, 2022) (same); *In re Enjoy Technology, Inc.*, No. 22-10580 (JKS) (Bankr. D. Del. July 20, 2022) (same); *In re TPC Group Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. July 7, 2022) (same); *In re PWM Property Management LLC*, No. 21-11445 (MFW) (Bankr. D. Del. Dec. 1, 2021) (same).[8]

### AUTHORIZING THE BANKS IS APPROPRIATE

29.     The Debtors also request that the Court authorize the Debtors' banks and other financial institutions (collectively, the "Banks") when requested by the Debtors, in their discretion,

---

[8] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

to receive, process, honor, and pay all checks or electronic fund transfers drawn on the Debtors' bank accounts presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date, provided that sufficient funds are available in the applicable bank accounts to cover the checks and electronic fund transfers. The Debtors also request that the Banks be authorized to rely on the Debtors' designation or representation that any particular check or electronic payment request has been approved pursuant to the Interim Order and the Final Order.

30. The Debtors have sufficient liquidity to pay the amounts set forth in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid out except as authorized by this Court. The Debtors therefore submit that the payment-processing procedures described in this Motion are appropriate.

**IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY**

31. The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Bankruptcy Rule 6003; *In re First NLC Fin. Servs., LLC*, 2008 Bankr. LEXIS 1466, 54 (Bankr. S.D. Fla. 2008). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the Third Circuit has instructed that irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

32. The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than

cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

33. Nothing in this Motion: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtors.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

34. The Debtors will provide notice of this Motion to: (a) United States Trustee for the District of Delaware; (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (e) counsel to the prepetition lender; (f) counsel to the postpetition lender; (g) the Insurance Carriers; (h) the Broker;

and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order and the Final Order, substantially in the form annexed hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: October 16, 2024

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
email: ljones@pszjlaw.com
    dbertenthal@pszjlaw.com
    tcairns@pszjlaw.com

*Proposed Counsel for Debtors and Debtors in Possession*