### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FLUID MARKET, INC., *et al.*,[1] | ) | Case No. 24-12363 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### MOTION OF THE DEBTORS FOR ENTRY OF INTERIM
### AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
### TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL,
### (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
### EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY,
### (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

The above captioned debtors and debtors in possession (the "Debtors") file this *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (this "Motion"). In support of this Motion, the Debtors submit the *Declaration of T. Scott Avila in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"). In further support of this Motion, the Debtors respectfully represent as follows:

### I.  SUMMARY OF RELIEF REQUESTED

1.      Pursuant to sections 105, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 506, 507 and 552 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Fluid Market Inc. (1365) and Fluid Fleet Services, LLC (5994). The Debtors' service address is 3827 Lafayette St., Suite #149, Denver, CO 80205.

(the "Bankruptcy Rules"), and 2002-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors seek entry of interim and final orders, substantially in the form of the interim order attached hereto as **Exhibit 1** and a final order to be submitted at a later date (respectively, the "Interim Order" and "Final Order" and collectively, the "DIP Orders"):

(i)     Authorizing the Debtors to obtain postpetition financing (the "DIP Financing," and such loans thereunder, the "DIP Loans") on a senior secured superpriority basis on the terms set forth in the Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement substantially in the form attached to the Interim Order without exhibits or schedules (as such may be amended, in accordance with its terms and the Interim Order, and including the exhibits and schedules thereto, the "DIP Credit Agreement")[2] in an aggregate principal amount of up to $7,000,000 (the "DIP Facility"), including the Roll-Up Amount (as defined below) subject to entry of the Interim Order, from the lenders that are party to the DIP Credit Agreement (the "DIP Lenders"), incurring the DIP Obligations (as defined below) for which Bison Capital Partners V, L.P. ("Bison") will act as collateral agent for the DIP Lenders (in such capacity, the "DIP Agent," and collectively with the DIP Lenders, the "DIP Secured Parties"), which DIP Facility consists of (1) up to $5,731,000 new money multiple draw term loan (the "New Money Facility") consisting of up to $4,564,000 made available by the Non-Carbon Fleet Lender (defined below) and up to $1,167,000 made available by the Carbon Fleet Lender (defined below), and $3,333,000 of such New Money Facility is being sought on an interim basis, and (2) subject to entry of the Interim Order, a roll-up of $1,269,000 of the advances made prepetition under the Fluid Loan (defined below) (the "Roll-Up Amount");[3]

(ii)    Authorizing the Debtors to roll-up all of the Fluid Loan Obligations (as defined below) into DIP Financing up to an amount equal to the Roll-Up Amount on an interim basis, subject to entry of the Interim Order;

(iii)   Authorizing the Debtors to execute and deliver additional documentation consistent with the terms of (or as may be required by) the DIP Credit Agreement and to perform such other and further acts as may be necessary or appropriate in connection therewith, or otherwise required under the DIP Loan Documents (as defined in the Interim Order);

---

[2]   Terms not defined herein should have the meanings ascribed to them in the Motion or the DIP Credit Agreement, as applicable.

[3]   The DIP Financing is contingent on the Debtors reaching agreement on a stalking horse asset purchase agreement, which the Debtors are currently negotiating with the buyer. Pending such agreement, the Debtors will utilize Cash Collateral, as permitted under the proposed Interim Order.

(iv)    Authorizing the Debtors' use of proceeds of the DIP Financing and access of Cash Collateral (as defined below) as permitted in accordance with the DIP Loan Documents;[4]

(v)    Approving and authorizing the DIP Liens (as defined below) in favor of the DIP Agent for the benefit of DIP Agent and DIP Lenders encumbering the DIP Collateral (as defined below), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, and granting superpriority administrative expense status to the DIP Obligations (as defined below), in each case subject to the Carve-Out (as defined below), to secure the DIP Obligations, pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code;

(vi)    Vacating and modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the other DIP Loan Documents;

(vii)    Subject to entry of the Final Order, waiving the Debtors' ability to surcharge against any DIP Collateral or the Fluid Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors' under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(viii)    Scheduling a hearing to consider the Motion on a final basis pursuant to Bankruptcy Rule 4001(c)(2) (the "<u>Final Hearing</u>");

(ix)    Waiving any applicable stay with respect to the effectiveness and enforceability of the Order Orders (including under Bankruptcy Rule 6004); and

(x)    Granting the Debtors such other and further relief as is just and proper.

## II.  JURISDICTION AND VENUE

2.    The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") under 28 U.S.C. § 157 pursuant to the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules to

---

[4]    The Debtors periodically receive funds on behalf of vehicle owners that are segregated and do not belong to the Debtors.  In the ordinary course of business, the Debtors distribute such funds to their rightful owners and will continue to do so on a postpetition basis.

the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363(b), (c), and (e), 364(c), (d), and (e), 503, 507 and 552 of the Bankruptcy Code, Rules 2002(a)(2), 4001(b) and (c) Rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules.

### III.  BACKGROUND

#### A.      General Background

5.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committee of unsecured creditors has been appointed in these chapter 11 cases.

6.      The Debtors operate and manage a technology-based, peer-to-peer truck-sharing platform across the United States with a fleet of nearly 5,500 vehicles owned by their nondebtor affiliates or third-party owners who have elected to put their vehicles on the Debtors' platform, https://www.fluidtruck.com/.  Customers have quick and easy access to the right vehicle whenever they need it via the Debtors' mobile app and website.  Faced with severely constrained liquidity, and after multiple failed efforts to raise additional capital or debt financing, the Debtors,

in an exercise of their business judgment, commenced these Chapter 11 Cases with the intention of pursuing a prompt sale of their assets to preserve their business as a going concern and maximize value for all their stakeholders.

7.     Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

**B.     Prepetition Secured Debt**

8.     _Fluid Prepetition Facility_.  As of the Petition Date, Debtor Fluid Market, Inc. ("Fluid") was party to that certain Senior Secured Multi-Drawing Loan Agreement dated as of October 2, 2024, (such agreement, as amended and existing immediately prior to the Petition Date, the "Fluid Loan Agreement"), with the lenders party thereto (collectively, the "Fluid Lenders"), and Bison, as administrative agent (the "Fluid Collateral Agent"), and all other documents, instruments and agreements executed in connection with the Fluid Loan Agreement. Debtor Fluid Fleet Services, LLC ("Fluid Services") executed a guaranty and security agreement in favor of the Fluid Collateral Agent guarantying and securing, respectively, the Fluid Loan Obligations.  The Fluid Lenders consist of (i) Carbon Fleet, LLC (the "Carbon Fleet Lender") under the advances of the Fluid Facility consisting of the "Incremental Administrative Fee Advances" (as defined in the Fluid Loan Agreement), and (ii) the lenders other than the Carbon Fleet Lender (the "Non-Carbon Fleet Lenders") under the "New Loan" (as defined in the Fluid Loan Agreement) of the Fluid Facility.  As of the Petition Date, under the Fluid Loan Agreement, Fluid was indebted to the Fluid Lenders, without defense, counterclaim, recoupment or offset of any kind, in the non-contingent liquidated amount of no less than $1,269,000, consisting of

(i) $333,000 (the "Prepetition Carbon Fleet Amount") on account of Incremental Administrative Fee Advances (as defined in the Fluid Loan Agreement) made by the Carbon Fleet Lender, and (ii) $936,000 (the "Prepetition Non-Carbon Fleet Amount") on account of advances made by the Non-Carbon Fleet Lenders, plus other fees, costs, expenses and other amounts arising in respect of the Fluid Loan Agreement obligation existing immediately prior to the Petition Date (such obligations, the "Fluid Loan Obligations").

9.    Fluid Loan Lien and Collateral.  As of the Petition Date, the Debtors submit the Fluid Loan Obligations were secured by valid, enforceable, properly perfected and unavoidable liens on security interests (the "Fluid Liens") encumbering substantially all assets of Fluid and Fluid Services, including any cash or cash equivalents of Fluid and Fluid Services (the "Cash Collateral"), existing immediately prior to the commencement of the Cases, (the "Fluid Collateral"), which (a) secures timely performance and satisfaction of the Fluid Loan Obligations, (b) constitutes actual, legal, valid, enforceable, duly perfected and non-avoidable first and senior priority security interests and liens in and upon the Fluid Collateral in favor of Fluid Collateral Agent for the benefit of Fluid Collateral Agent and Fluid Lenders, subject only to certain Permitted Liens (as defined in the Fluid Loan Agreement) and (c) are not subject to any objection, defense, offset, avoidance, subordination, or other claim, cause of action, or challenge of any kind or nature, whether under the Bankruptcy Code or similar law, under non- bankruptcy law, or otherwise.

## IV.  PROPOSED DIP FINANCING

10.    The Debtors' operations are not currently profitable.  The Debtors have limited liquidity to continue business in the ordinary course and satisfy accruing administrative expenses.  The Debtors require debtor-in-possession financing and use of Cash Collateral to fund their proposed sale process and ensure the administrative solvency of these estates.  Absent

immediate access to Cash Collateral and the funding available under the DIP Financing, the Debtors would be unable to sustain operations, pay their employees or vendors, or achieve a successful restructuring through the chapter 11 process.  Accordingly, the Debtors have an urgent and immediate need for entry of the Interim Order as requested herein.

11.    Against that backdrop, the Debtors negotiated with the Fluid Lenders and the DIP Lenders to develop an Approved Budget and a sale timeline that would induce the DIP Lenders to commit to the DIP Financing and the Fluid Lenders to consent to the use of their Cash Collateral in light of the Debtors' circumstances.  After good faith and arms' length negotiations, the Debtors, the DIP Lenders, and the Fluid Lenders ultimately agreed on the terms of the DIP Financing and consensual use of Cash Collateral.  The Debtors believe that the financing available under DIP Financing, along with consensual access to Cash Collateral, all in accordance with the projections in the Approved Budget, is adequate and that the funding contemplated thereunder is reasonable and on market terms that will allow the Debtors to have adequate liquidity to satisfy their accruing administrative expenses during the course of these Chapter 11 Cases while they pursue a sale of their assets.

**A.    Financing Efforts**

12.    In the summer of 2024, the Debtors retained Asterisk Capital, LLC, acting through Odeon Capital Group LLC ("Asterisk") to seek financing alternatives to address the Debtors' deteriorating financial situation.  Asterisk reached out to 40 prospective parties as part of its capital raise efforts.  Eight entities gained access to Asterisk's data room after executing NDAs. Ultimately, however, Asterisk's capital raise efforts were unsuccessful when no party determined to proceed with a transaction.  The Debtors' Board then authorized other stakeholders to locate

capital sources.  Ultimately, the Fluid Lenders and the DIP Lenders were the only parties willing to lend money to the Debtors to bridge them through a sale process and bankruptcy filing.

13.     Leading up to the Petition Date, the Debtors and the Debtors' advisors engaged in vigorous, arms-length negotiations with the DIP Lenders and the Fluid Lenders regarding the proposed terms of a DIP facility and use of cash collateral.

14.     The proposed DIP Financing and the authorization to use Cash Collateral as offered by the DIP Secured Parties and the Fluid Lenders are the best financing option that the Debtors could obtain under the circumstances.  Fully unsecured postpetition financing was not available to the Debtors.  Other potential sources of debtor in possession financing for the Debtors, including on a junior secured basis, were also nonexistent.  As noted above, however, the Debtors were able to obtain (i) financing from the DIP Secured Parties on the terms of the proposed DIP Financing and (ii) the consent of the Fluid Lenders to use Cash Collateral, all on the terms set forth herein.

15.     The Debtors believe that it is essential to the success of their Chapter 11 Cases, and the culmination of their sale process, that the Debtors receive immediate authority to use the Cash Collateral and access to the DIP Financing.[5]

B.     **Summary of Essential Terms of DIP Financing**

16.     In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2(a)(i)-(iii), below is a summary[6] of the essential terms of the proposed financing and use of cash collateral and the location of the same in the proposed Interim Order and/or the DIP Credit Agreement:

---

[5]     As noted above, the DIP Financing is contingent on the Debtors reaching agreement on a stalking horse asset purchase agreement, which the Debtors are currently negotiating with the buyer.  Pending such agreement, the Debtors will utilize Cash Collateral, as permitted under the proposed Interim Order.

[6]     The summary and descriptions of the terms and conditions for the proposed financing and use of cash collateral and the provisions of the proposed Interim Order and the Final Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms

| | |
|---|---|
| **Borrower:** | Fluid Market, Inc. (the "<u>Borrower</u>"), in its capacity as debtor and debtor-in-possession. |
| **Guarantor** | Fluid Fleet Services, LLC in its capacity as debtor-and-debtor-in-possession in the Chapter 11 Cases. |
| **DIP Lenders:** | Bison Capital Partners V, L.P., Bison Capital Partners V-A, L.L., Ingka Investments Ventures US BV, Carbon Fleet, LLC and Kingbee Rentals, LLC (the "<u>DIP Lenders</u>"). |
| **DIP Agent:** | Bison Capital Partners V, L.P. (the "<u>DIP Agent</u>"). |
| **DIP Financing:** | The DIP Financing shall consist of a senior secured super priority term loan in a principal amount of up to $7,000,000, consisting of: |

(a) up to $5,731,000 new money multiple draw term loan (consisting of $4,564,000 made available by the Non-Carbon Fleet Lender hereunder and $1,167,000 made available by the Carbon Fleet Lender hereunder) and

(b) subject to entry of the Interim Order and the terms thereof, $1,269,000 that will be rolled up into the DIP Facility by converting the Prepetition Carbon Fleet Amount and the Prepetition Non-Carbon Fleet Amount into Obligations under the DIP Credit Agreement. *See* DIP Credit Agreement Recitals.

"<u>DIP Obligations</u>" comprise all indebtedness and obligations to the DIP Agent and DIP Lenders, including "Obligations" as such term is defined in the DIP Credit Agreement, and the Fluid Loan Obligations.  Interim Order ¶2.

| | |
|---|---|
| **Fees:** | None. |
| **Interest Rate:** | 8.0% per annum, payable monthly in-kind; additional 2% default rate.  DIP Credit Agreement §4, §13(b). |
| **Use of Proceeds:** | Subject to usual and customary provisions to be set forth in the DIP Orders and the DIP Credit Agreement, and in and up to the amounts listed in the Approved Budget (or according to deviations from the Approved Budget expressly approved by the Required Lenders in writing), proceeds of the DIP Loans and Cash Collateral will be used only for working capital and general corporate purposes.  Interim Order ¶2. |

---

thereof.  The summaries and descriptions are qualified in their entirety by the proposed Interim Order, the Final Order, and the DIP Loan Documents.  In the event there is any conflict between this Motion and the Interim Order, the Final Order, or the DIP Loan Documents, the Interim Order, the Final Order, and the DIP Loan Documents will control in all respects.

| | |
|---|---|
| **Maturity:** | No later than December 31, 2024, with customary earlier maturity dates.  DIP Credit Agreement, Definition of "Stated Maturity Date". |
| **Collateral / Priority:** | DIP Agent, for the benefit of DIP Lenders, shall have a valid, binding, perfected, enforceable, and non-avoidable lien and security interest (the "<u>DIP Liens</u>") in and on all now owned or hereafter acquired assets and property of the Debtors (including the Fluid Collateral), including, without limitation, all assets consisting of personal property and real property, including, without limitation, goods, accounts, instruments, intercompany obligations, partnerships and joint venture interests, contract rights, documents, chattel paper, general intangibles, goodwill, equipment, machinery, inventory, investment property, copyrights, trademarks, trade names, insurance policies, insurance proceeds, Cash Collateral, deposit accounts, all items on deposit in or otherwise held in or credited to any deposit account, money, commercial tort claims, letters of credit, letter of credit rights, real property, leases, and all rents, issues, profits, products, offspring, and proceeds of and recoveries, substitutions, and replacements on account of the foregoing, all as more particularly described in the DIP Loan Documents, and any and all rents, issues, products, offspring, proceeds, and profits generated by any item of the foregoing, without the necessity of any further action of any kind or nature by DIP Lenders in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits (collectively, the "<u>DIP Collateral</u>"), including, subject to entry of the Final Order, the proceeds and recoveries from any and all avoidance power claims or causes of action under Sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code ("<u>Avoidance Actions</u>"), but not the Avoidance Actions themselves.   Interim Order ¶6. |

The DIP Liens shall be and shall continue to be first and senior in priority to all other interests, liens, encumbrances, rights and claims with respect the DIP Collateral of every kind and nature, whether created consensually, by operation of law, by an order of any court including this Court or otherwise, including, without limitation, all other interests, liens or claims granted or acknowledged in favor of any other person or entity under section 363, 364 or any other section of the Bankruptcy Code; <u>provided</u>, <u>however</u>, the DIP Liens shall be (a) subject to the Carve-Out, (b) subject and immediately junior only to all security interests and liens existing as of the Petition Date that, as of the Petition Date, were senior in priority and not subordinated to the Fluid Lien and only to the extent that such security interest or lien or the obligation secured by such security interest or lien is and continues to be: (i) not subordinated in priority, whether under section 510 or by contract, at law or in equity, as to any obligation or lien in favor of DIP Agent and DIP Lenders, (ii) valid, properly perfected (including any security interest or lien that was properly perfected subsequent to the Petition Date pursuant to

section 546(b)) and enforceable, (iii) securing obligations that remain outstanding, valid and not otherwise avoided, and (iv) not subject to avoidance or subordination pursuant to any provisions of the Bankruptcy Code or any other applicable law ((a)(i) through (iv) shall be referred to herein as "<u>Permitted Liens</u>"), and (c) otherwise first and senior in priority, and not be subject or subordinate to any interest, lien, or claim that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code.  Interim Order ¶7.

|  |  |
|---|---|
| **Superpriority Claim** | The DIP Agent, for itself and the benefit of the DIP Lenders, shall be granted superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code (the "<u>DIP Superpriority Claims</u>"), provided that such DIP Superpriority Claims shall be subject to the Carve-Out and shall not be payable from the proceeds and recoveries of Avoidance Actions pending entry of the Final Order.  Interim Order ¶8. |
| **Carve-Out / Professional Fees Account** | The DIP Liens, DIP Superpriority Claims, DIP Obligations, Fluid Liens, Fluid Loan Obligations, and all other claims and liens granted pursuant to the Interim Order and the Final Order (as applicable), shall each be subject to payment of the Carve-Out.  As used here, the "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and all statutory fees payable to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, which amounts shall not be limited by any budget (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (and any monthly, restructuring, or sale fees to the extent earned prior to the date of the Carve-Out Trigger Notice (as defined below)) (the "<u>Allowed Professional Fees</u>") incurred by (or payable to) persons or firms retained by the Debtors and any Committee pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "<u>Estate Professionals</u>") at any time before the date of delivery of the Carve-Out Trigger Notice by the DIP Agent (at the direction of the DIP Lenders), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (which amount shall not exceed an aggregate amount set forth in the Approved Budget for Allowed Professional Fees incurred prior to the delivery of a Carve-Out Trigger Notice); and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $100,000 incurred on or after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post Carve-Out Trigger Notice Cap</u>"). Interim Order ¶9. |

For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the DIP Lenders) to the Debtors, its restructuring counsel (Pachulski Stang Ziehl & Jones LLP), any Committee, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below), stating that the Post Carve-Out Trigger Notice Cap has been invoked. Interim Order ¶9.

The Debtors shall, on a weekly basis commencing after the first week of the Approved Budget, transfer cash proceeds of the DIP Credit Agreement or Cash Collateral into a segregated account (which may be the trust account of Debtors' counsel), not subject to the control of the DIP Agent or the DIP Lenders (the "Professional Fees Account") in an amount equal to the amount budgeted for Estate Professionals for the preceding week in the Approved Budget. Upon the delivery of the Carve-Out Trigger Notice, the Debtors shall deposit all available cash on hand into the Professional Fees Account until such amounts therein equal the Carve-Out. The Professional Fees Account, and all funds held therein, shall remain property of the Debtors' estates unless and until they are paid to the Estate Professionals following Court approval of a fee application seeking approval of the same (if required), and shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent and the DIP Lenders (i) shall not sweep or foreclose on any such available cash of the Debtors until the Professional Fees Account is fully funded, and (ii) shall have a security interest on any residual interest in the Professional Fees Account available following satisfaction in cash of all Carve-Out expenses. Interim Order ¶9.

| | |
|---|---|
| **Affirmative Covenants:** | Customary for transactions of this type including budget covenants, weekly reporting and compliance with the Milestones. DIP Credit Agreement §10. |
| **Milestones:** | (a) By no later than three (3) Business Days following the Petition Date, the Bankruptcy Court shall enter the Interim Order. |
| | (b) By no later than ten (10) Business Days following the Petition Date, the Company shall have filed a motion seeking approval of a bidding procedures order (the "Bidding Procedures Order") for the Kingbee 363 Sale Transaction, in form and substance acceptable to the Required Lenders. |
| | (c) By no later than thirty (30) days following the Petition Date, the Bankruptcy Court shall enter the Final Order authorizing the DIP Facility, in form and substance acceptable to the Required Lenders. |

(d) By no later than days forty (40) days following the Petition Date, the Company shall have obtained entry of the Bidding Procedures Order, in form and substance acceptable to the Required Lenders.

(e) By no later than fifty-five (55) days following the Petition Date, the Company shall have obtained receipt of any Qualified Bids (as defined in the Bidding Procedures Order or equivalent term used therein).

(f) By no later than sixty (60) days following the Petition Date, the Company shall have obtained entry of an order from the Bankruptcy Case approving the Kingbee 363 Sale Transaction.

(g) By no later than two (2) days prior to the Sale Hearing, the Company shall conduct the Auction (as defined in the Bidding Procedures Order or equivalent term used therein) in accordance with the Bidding Procedures Order.

(h) By no later than December 31, 2024, the Kingbee 363 Sale Transaction hall have closed.  DIP Credit Agreement, Annex B.

| | |
|---|---|
| **Negative Covenants:** | Customary for transactions of this type including: limitations on indebtedness, liens, guarantees, investments, fundamental changes, affiliate transactions.  DIP Credit Agreement §11. |
| **Prepayments:** | Optional on the part of the Debtors and without penalty.  DIP Credit Agreement §6. |
| **Conditions Precedent:** | Entry of DIP Orders and execution of requisite documents.  DIP Credit Agreement §2. |
| **Events of Default:** | Carbon Fleet owns less than 1500 Financed Vehicles; the replacement of the Company with Vervent, Inc. or another backup servicer without the Principal Lenders' consent; termination of the Carbon Fleet Forbearance Agreement; failure to agree on a servicing agreement in connection with the sale agreement upon terms satisfactory to its parties; and other customary events of default for transactions of this type including: failure to make any payment when due; failure to comply with material terms of DIP Credit Agreement; violation of the Interim Order or Final Order; conversion of the Debtors' chapter 11 cases; amendment of the Interim or Final Order in a manner adverse to the DIP Lenders; filing a plan of reorganization that does not propose to repay the DIP Financing in full; appointment of a trustee or examiner with special powers, termination of the Debtors' exclusivity, allowance of any 506(c) claim against the Collateral, entry of an order limiting the DIP Agent from credit bidding, entry of an order granting |

standing to any party to pursue a claim against the DIP Lenders, and failure to satisfy the Milestones.  DIP Credit Agreement §13.

| | |
|---|---|
| **Remedies** | The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Fluid Lenders is hereby modified so that five (5) business days after the DIP Termination Date (the "<u>Remedies Notice Period</u>"): the DIP Agent, at the direction of the Required Lenders, shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and the Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve-Out.  During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period with this Court for the sole purpose (unless this Court orders otherwise) of contesting whether an Event of Default has occurred or is continuing.  Unless this Court orders otherwise before the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, and Fluid Lenders shall automatically be terminated at the end of the Remedies Notice Period without further notice or order; *provided, however*, that in the event that the Court is not available to enter an order by the end of the Remedies Notice Period, the termination of stay shall be tolled to allow the Court to enter such order.  Upon expiration of the Remedies Notice Period, the DIP Agent, at the direction of the Required Lenders, shall be permitted to exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with the Interim Order.  Interim Order ¶12. |
| **Expenses:** | The Debtors will be responsible for the DIP Lenders' and DIP Agent's costs and expenses.  Interim Order ¶4. |
| **Other Terms** | Other customary terms for DIP financing of this type, including customary stipulations and waivers subject to standard challenge provisions.  Interim Order Recital E, ¶16. |

## C.   <u>Additional Required Disclosures</u>

17.    Pursuant to Local Rule 4001-2(a)(i), a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing.  The debtor in possession must also justify the inclusion of certain such provisions.  Set forth below are the disclosures required in accordance with Local Rule 4001-2(a)(i)(A)-(X) (most of which are also disclosed in the summary above):

(i) Local Rule 4001-2(a)(i)(A) requires a debtor to disclose the amount of cash collateral the debtor seeks permission to use or the amount of credit the debtor seeks to obtain under the proposed loan agreement, including the committed amount of the proposed loan agreement and the amount of new funding that will actually be available for borrowing by the debtor.

**Amount of Cash Collateral to be used is set forth in the Approved Budget. The amount of the DIP Facility is set forth above.**

(ii) Local Rule 4001-2(a)(i)(B) requires the disclosure of pricing and economic terms, including letter of credit fees, commitment fees, and any other fees, provided that when any such terms are sought to be filed under seal, they shall not be disclosed in the Financing Motion itself, but shall be set forth in a separate document filed pursuant to the procedures set forth in Local Rule 9018-1(d), the filing of which shall be disclosed in the Financing Motion.

**The economic terms of the DIP Financing and the applicable paragraphs of the proposed Interim Order and/or DIP Credit Agreement, as applicable, are disclosed above and below. There are no credit, commitment or similar fees associated with the DIP Facility. There are no terms sought to be filed under seal.**

Local Rule 4001-2(a)(i)(C) requires the disclosure of provisions that specifically limit the Court's power or discretion to enter future orders in the case.

**None, except those inconsistent with the DIP Orders.**

(iii) Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for the funding of non-debtor affiliates with cash collateral or proceeds of the loan, as applicable, and the approximate amount of such funding.

**Not applicable.**

(iv) Local Rule 4001-2(a)(i)(E) requires disclosure of material conditions to closing and borrowing, including budget provisions.

**The material conditions to closing and borrowing are summarized above and set forth in detail in the DIP Credit Agreement. [DIP Credit Agreement §2]**

(v) Local Rule 4001-2(a)(i)(F) requires disclosure of any carve-outs from liens or superpriority claims, including the material terms of any professional fee carve-out.

**The provisions of the Carve-Out are set forth in the Interim Order. [Interim Order ¶9]**

(vi) Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for postpetition liens on unencumbered assets, including the identification of such assets.

**The DIP Liens would attach to unencumbered assets, except the proceeds of Avoidance Actions pending entry of the Final Order. [Interim Order ¶6]**

(vii) Local Rule 4001-2(a)(i)(H) requires disclosure of provisions that establish any sale or plan milestones.

**The sale milestones are set forth above in Annex B to the DIP Credit Agreement.**

(viii) Local Rule 4001-2(a)(i)(I) requires disclosure of provisions that provide for a prepayment penalty or other provisions that affect the debtor's right or ability to repay the financing in full during the course of the chapter 11 case.

**The Debtors may prepay the DIP Facility and there are no prepayment penalties.**

(ix) Local Rule 4001-2(a)(i)(J) requires disclosure of provisions, in jointly administered cases, that govern joint liability of the debtors, including any provisions that would cause one jointly administered debtor to become liable for the prepetition debt of another jointly administered debtor for which it was not previously subject to.

**No provisions of the proposed DIP Orders or the DIP Credit Agreement make any debtor liable for any prepetition debt of another debtor for which it was not previously liable.**

(x) Local Rule 4001-2(a)(i)(K) requires disclosure of provisions that require the debtor to pay an agent's or lender's expenses and attorneys' fees in connection with the proposed financing or use of cash collateral, without any notice or review by the Office of the United States Trustee, the committee appointed under section 1102 of the Bankruptcy Code (if formed) or, upon objection by either of the foregoing parties, the Court.

**The provisions regarding payment of the fees and expenses of the DIP Lenders and DIP Agent are disclosed in the Interim Order. The DIP Secured Parties must give 10 days' notice to the Debtors, the U.S. Trustee, and any Committee appointed. [Interim Order ¶4]**

(xi) Local Rule 4001-2(a)(i)(L) requires disclosure of provisions that prohibit the use of estate funds to investigate the liens and claims of the prepetition lender.

**The Interim Order provides for up to $25,000 for a Committee to investigate the Fluid Lenders' claims and liens. [Interim Order ¶17]**

(xii) Local Rule 4001-2(a)(i)(M) requires disclosure of any termination or default provisions concerning the use of cash collateral or the availability of credit.

**Default and termination provisions are set forth above and in the proposed Interim Order and the DIP Credit Agreement. [Interim Order ¶11, 12; DIP Credit Agreement §13]**

(xiii) Local Rule 4001-2(a)(i)(N) requires disclosure of any provisions that grant cross-collateralization protection or elevate prepetition debt to administrative expense (or higher) status or that secure prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law).

**There is a roll-up of $1,269,000 of the advances made prepetition under the Fluid Loan. [Interim Order ¶5; DIP Credit Agreement §2(c)]**

(xiv) Local Rule 4001-2(a)(i)(O) requires disclosure of any provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise have the effect of converting (or "rolling up") prepetition debt to postpetition debt.

**See above.**

(xv) Local Rule 4001-2(a)(i)(P) requires disclosure of any provisions that immediately prime valid, perfected and non-avoidable liens existing immediately prior to the petition date or that are perfected subsequent to the petition date as permitted by section 546(b) of the Bankruptcy Code, in each case that are senior to the lender's prepetition liens under applicable law, without the consent of the affected secured creditors, and the proposed notice to be provided to such affected secured creditors.

**The proposed DIP Orders do not provide for the priming of any pre-existing secured liens.**

(xvi) Local Rule 4001-2(a)(i)(Q) requires disclosure of any provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest, including, but not limited to, any official committee appointed in these cases, at least seventy-five (75) days from the entry of the initial interim order to investigate such matters or (ii) limit the Court's ability to grant relief in the event of a successful challenge.

**The proposed DIP Orders provide that any stipulations by the Debtors relating to the validity and amount of the Fluid Loan Obligations and claims of the Fluid Lender are subject to challenges by parties in interest within the earlier of (i) 75 days of entry of the Interim Order or (ii) 5 days before a sale hearing**

**[Interim Order ¶16). No provisions in the proposed DIP Orders limit the ability of the Court to grant relief in the event of a successful challenge.**

(xvii) Local Rule 4001-2(a)(i)(R) requires disclosure of any provisions that immediately approve all terms and conditions of the underlying loan agreement (provided that provisions in the order that provide that the debtor is authorized to enter into and be bound by the terms and conditions of such loan agreement do not need to be summarized).

**The DIP Loan Documents and the authority of the Debtors to enter into same are approved upon entry of the Interim Order, except as to certain provisions (liens on Avoidance Action Proceeds and certain waivers), which are only approved upon entry of the Final Order.**

(xviii) Local Rule 4001-2(a)(i)(S) requires disclosure of any provisions that modify or terminate the automatic stay or permit the lender to enforce remedies following an event of default that do not require at least five (5) days' written notice to the trustee or debtor in possession, the Office of the United States Trustee and each committee appointed under sections 1102 and 1114 of the Bankruptcy Code (the "Remedies Notice Period"), prior to such modification or termination of the automatic stay or the enforcement of the lender's remedies.

**Termination of the automatic stay to enable the DIP Agent, the DIP Lenders and the Fluid Lenders to enforce remedies is subject to a five (5) business day Remedies Notice Period. [Interim Order ¶12]**

(xix) Local Rule 4001-2(a)(i)(T) requires disclosure of any provisions that seek to limit what parties in interest (other than the debtor) may raise at any emergency hearing scheduled during the Remedies Notice Period.

**The DIP Orders provide that, unless the Court orders otherwise, parties in interest may only raise whether an Event of Default has occurred or is continuing at any emergency hearing scheduled during the Remedies Notice Period. [Interim Order ¶12]**

(xx) Local Rule 4001-2(a)(i)(U) requires disclosure of any provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code or, in each case, the proceeds thereof.

**Liens on proceeds of Avoidance Action are effective only upon entry of the Final Order. [Interim Order ¶ 6]**

(xxi) Local Rule 4001-2(a)(i)(V) requires disclosure of any provisions that immediately waive the debtor's rights under section 506(c) of the Bankruptcy Code.

**Section 506(c) waiver effective upon entry of Final Order. [Interim Order ¶ 25]**

18

(xxii) Local Rule 4001-2(a)(i)(W) requires disclosure of any provisions that immediately seek to affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code.

**Equities of the case exception effective upon entry of Final Order. [Interim Order ¶ 24]**

(xxiii) Local Rule 4001-2(a)(i)(X) requires disclosure of any provisions that immediately shield the lender from the equitable doctrine of "marshalling" or any similar doctrine.

**These provisions are subject to entry of the Final Order as they relate to the DIP Secured Parties. [Interim Order ¶ 19].**

D.     **Need for Financing and Use of Cash Collateral**

18.     As addressed earlier, the Debtors have an immediate and critical need to use Cash Collateral and obtain the DIP Financing to, among other things: (a) permit the orderly operation of their business; (b) maintain business relationships; (c) satisfy working capital, operational, and general corporate needs; (d) fund costs and expenses related to the Chapter 11 Cases. The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers requires the availability of working capital from the DIP Financing and Cash Collateral, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary course throughout the Chapter 11 Cases without access to the DIP Financing and authorized use of Cash Collateral. In the absence of the DIP Financing and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm. Access to the DIP Financing and Cash Collateral will provide the Debtors with sufficient working capital and liquidity to operate during these Chapter 11 Cases and is vital to the continuation of the Debtors' ongoing sale process. Without access to the DIP Financing and Cash Collateral, the Company would run out of money and its ability to maintain going concern operations and value will be significantly impaired.

19. The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties, the DIP Liens and the DIP Superpriority Claims (each as defined in the Interim Order), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in the Interim Order and the DIP Loan Documents.

## V.   BASIS FOR RELIEF

**A.    The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

20. Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

21. In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

    a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

    b.    the credit transactions are necessary to preserve assets of the estate;

    c.    the terms of the credit agreement are fair, reasonable, and adequate;

    d.    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and

    e.    the proposed financing agreement adequately protects the DIP Lender.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

22.     For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing in the Chapter 11 Cases on a senior secured superpriority basis as to the DIP Collateral under sections 364(c)(1), (2), and (d)(1) of the Bankruptcy Code.

**B.     The Debtors are Unable to Obtain Financing on More Favorable Terms.**

23.     As discussed above, the Debtors carefully considered their financing options.  Ultimately, the Debtors determined that the DIP Financing provides the Debtors with the best postpetition financing option available and should be approved by this Court.

24.     The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.     The Proposed DIP Financing is Necessary to Maximize the**
**Value of the Debtors' Estates.**

25.     The Debtors seek to use the DIP Financing to for general working capital purposes, ordinary business expenses such as payroll, and bankruptcy-related costs and expenses, in accordance with the Budget, to maximize value through an orderly sale process.  The DIP Financing represents the best economic alternative for a new debtor-in-possession lending arrangement.

26.     Simply put, without immediate use of Cash Collateral and access to DIP Financing, the Debtors cannot continue to operate their business, which would irreparably damage the Debtors' efforts to effectuate a going concern sale for the benefit of all constituents.

Accordingly, the Debtors urge the Court to authorize the Debtors to use Cash Collateral and access the DIP Financing on the terms contemplated herein.

**D.** **The Terms of the Proposed DIP Financing, Including the Roll-Up, are Fair, Reasonable, and Appropriate.**

27.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

28.    The terms of the DIP Financing were negotiated in good faith and at arm's-length between the Debtors, the DIP Secured Parties and the Fluid Lenders, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets. The Debtors submit that the proposed terms of the DIP Financing are fair, reasonable, and appropriate under the circumstances. *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets). Further, the DIP Secured Parties consent to the DIP Financing on the terms set forth in the DIP Documents and the Fluid Lenders consent to the use of their Cash Collateral.

29.    As to the proposed roll-up of Fluid Loan Obligations compared to the new money to be provided under the DIP Financing, the Debtors submit that the roll-up of the Roll-Up Amount is fair, equitable, and in the best interest of the Debtors' estates and should be approved

through the DIP Orders. The Debtors' acceptance of the Roll-Up Amount is also a sound exercise of the Debtors' business judgment.

30.    Courts in this District have regularly approved roll-ups made pursuant to new money debtor-in-possession financings, including on an interim basis, in recognition of the fact that such terms are often needed for chapter 11 debtors to secure favorable postpetition financing. *See, e.g., In re Sientra, Inc.*, Case No. 24-10245 (JTD) (Bankr. D. Del. Feb. 14, 2024) (interim order authorizing $22 million new money loans and $35 million in roll-up loans); *In re Nogin, Inc.*, No. 23-11945 (CTG) (Bankr. D. Del. Dec. 7, 2023) (authorizing $19.2 million of total financing through interim order, inclusive of a refinancing of $8.5 million of prepetition debt); *In re Phoenix Services Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) (authorizing $25 million in new money on an interim basis with an additional $25 million funding into escrow on an interim basis available for draw and a roll-up of approximately $75 million pursuant to interim order); *In re TPC Group Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. June 3, 2022) (authorizing $32 million in new money and a roll-up of $59 million pursuant to interim order); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. March 17, 2021) (authorizing $13 million in new money and a roll-up of $39 million pursuant to interim order); *In re True Religion Apparel, Inc.*, No. 20-10941 (CSS) (Bankr. D. Del. Apr. 15, 2020) [D.I. 78] (authorizing a DIP facility comprising (among other things) $1,700,000 in new money to be provided following the entry of an interim order, $6,700,000 of new money to be provided following the entry of the final order and a rollup of approximately $45 million in prepetition obligations pursuant to interim order); *In re APC Automotive Techs. Intermediate Hldgs., LLC*, Case No. 20- 11466 (CSS) (Bankr. D. Del. June 4, 2020) (authorizing a full roll-up of approximately $90 million of an asset-based lending (ABL) facility upon entry of an interim

order); *In re Blackhawk Mining LLC*, Case No. 19-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019)

(authorizing an approximately $240 million DIP that included a roll-up of $70 million in

prepetition term loan debt and up to $82 million of prepetition ABL debt pursuant to interim order);

*In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an

approximately $1.23 billion DIP which included a full roll-up of the prepetition ABL outstanding

principal of $639 million pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-

10684 (BLS) [Bank. D. Del. Apr. 16, 2018] [D.I. 177] (authorizing the roll-up of prepetition loans

provided by an insider of the debtor on an interim basis, applying the business judgment standard);

*In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing

full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim

order).

   31. For the Debtors to obtain the benefits of the DIP Financing, the Debtors and

the DIP Secured Parties agreed to the terms of the roll-up as incorporated into the DIP Financing.

The DIP Secured Parties would not otherwise extend credit to the Debtors without such roll-up

provisions.  Accordingly, the proposed roll-up is an appropriate exercise of the Debtors' business

judgment and should be approved.

**E.** **The Carve-Out is Appropriate.**

   32. The DIP Liens are subject and subordinate to the Carve-Out. The Carve-

Out contains similar terms to others that this Court has found to be reasonable and necessary to

ensure that a debtor's estate and any statutory committee can retain assistance from their advisors.

Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the

services for which professionals may be compensated are restricted. *See In re Ames Dep't Stores,*

*Inc*., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for

professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of the U.S. Trustee fees and professional fees.  Accordingly, the Carve-Out is appropriate and should be approved.

**F.      The DIP Secured Parties Should Be Deemed Good Faith Lenders.**

33.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

34.     Here, the Debtors believe the DIP Financing embodies the most favorable terms on which the Debtors could obtain postpetition financing.  All negotiations of the terms of the DIP Financing with the DIP Lenders were conducted in good faith and at arms' length.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance with the DIP Orders and the DIP Loan Documents, including the Budget.  Any consideration being provided to any of the DIP Secured Parties is described herein.  Accordingly, the Court should find that the DIP Secured Parties are "good faith" lenders within the meaning of

section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**G.     The Proposed DIP Financing Reflects the Debtors' Sound Business Judgment.**

35.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

36.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

37.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Associates*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and

asset-based facility based upon prudent business judgment of the debtor).  Generally courts will

not second-guess a debtor in possession's business decisions involving "a business judgment made

in good faith, upon a reasonable basis, and within the scope of his authority under the Code."

*Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

      38.    The Debtors believe that the economics underlying the DIP Financing are

fair and reasonable and consistent with, or better than, market norms.  For these reasons and those

set forth above, the Debtors' sound business judgment clearly supports approval of the DIP

Financing.  Use of Cash Collateral and access to the DIP Financing will allow the Debtors to

continue to operate, thus maximizing value for all of their constituents.

**H.    Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral.**

      39.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor in

possession may not use cash collateral unless (A) each entity that has an interest in such cash

collateral provides consent, or (B) the court approves the use of cash collateral after notice and a

hearing.  *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on request

of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in

possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate

protection of such interest."  11 U.S.C. § 363(e).

      40.    Here, the DIP Secured Parties and the Fluid Lenders consent to the use of

Cash Collateral on the terms set forth in the Interim Order and Final Order.

      41.    Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for

use of cash collateral during the 14-day period following the filing of a motion requesting

authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable

harm to the estate pending a Final hearing."  Bankruptcy Rule 4001(b)(2).  In examining requests

for interim relief under this rule, courts apply the same business judgment standard applicable to

other business decisions.  *See, e.g., In re Simasko Production Co.*, 47 B.R. at 449; *see also In re Ames Dep't Stores Inc.,* 115 B.R. at 38.  After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

42.    As previously noted, in order to continue operating and satisfy accruing administrative expenses, the Debtors require access to the DIP Financing and the use of Cash Collateral.  Such use will provide the Debtors with the necessary funds to remain administratively solvent, while the Debtors pursue a going concern sale of their assets.

43.    Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm.  The Debtors would likely be forced to cease operations and convert these Chapter 11 Cases to ones under chapter 7.  Jobs would be lost and substantial value destroyed.  Thus, immediate access to Cash Collateral is essential to the Debtors' ability to maximize value for the benefit of all constituents.

## I.    Interim Order and Final Hearing

44.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court schedule a Final Hearing within approximately thirty (30) calendar days of the commencement of the Chapter 11 Cases to consider approval of this Motion on a final basis.

45.    The urgent need to avoid immediate and irreparable harm to the Debtors' estates makes it imperative that the Debtors be authorized to access the DIP Financing and use Cash Collateral pending the Final Hearing, in order to allow the Debtors to operate and administer these Chapter 11 Cases on a postpetition basis.  Without the ability to make draws under the DIP Financing and use Cash Collateral, the Debtors would be unable to satisfy accruing postpetition obligations, including payroll, and would not be able to conduct a value-maximizing sale process, thus causing irreparable harm to the Debtors and the value of these estates.  Accordingly, the

Debtors respectfully request that, pending the Final Hearing, the Interim Order be approved and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

**J.      Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

46.      To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## VI.   NOTICE

47.      The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Secured Parties and the Fluid Lenders; (d) the United States Attorney's Office for the District of Delaware; (e) any known party that asserts a lien in the Debtors' assets; and (f) any party that requests service pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).

## VII.  NO PRIOR REQUEST

48.      The Debtors have not made any prior request for the relief sought herein to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and, after Final Hearing, the Final Order, granting the relief requested herein and such other relief as is just and proper.

Dated:   October 16, 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email: ljones@pszjlaw.com
         dbertenthal@pszjlaw.com
         tcairns@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*