## EXHIBIT A

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FLUID MARKET, INC., *et al.*,[1] | ) | Case No. 24-12363 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS
### TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL,
### (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
### EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY,
### (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Motion") (Docket No. [•]) of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), including Fluid Market, Inc. ("Fluid"), in the above-captioned cases (collectively, the "Cases"), requesting entry of an interim order (this "Interim Order") and a Final Order (as defined below) pursuant to sections 105, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 506, 507 and 552 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and 2002-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

1.      Authorizing the Debtors to obtain postpetition financing (the "DIP Financing," and such loans thereunder, the "DIP Loans") on a senior secured superpriority basis on the terms set forth in the Senior Secured, Super-Priority Debtor-In-Possession

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Fluid Market, Inc. (xxxx) and Fluid Fleet Services, LLC (xxxx).  The Debtors' service address is 3827 Lafayette Street, Suite 149, Denver, Colorado 80205.

Loan and Security Agreement substantially in the form attached hereto as **Exhibit A** without exhibits or schedules (as such may be amended, in accordance with its terms and this Interim Order, and including the exhibits and schedules thereto, the "<u>DIP Credit Agreement</u>")[2] in an aggregate principal amount of up to $7,000,000 (the "<u>DIP Facility</u>"), including the Roll-Up Amount (as defined below) subject to entry of this Interim Order, from the lenders that are party to the DIP Credit Agreement (the "<u>DIP Lenders</u>"), incurring the DIP Obligations (as defined below) for which Bison Capital Partners V, L.P. ("<u>Bison</u>") will act as collateral agent for the DIP Lenders (in such capacity, the "<u>DIP Agent</u>," and collectively with the DIP Lenders, the "<u>DIP Secured Parties</u>"), which DIP Facility consists of (1) up to $5,731,000 new money multiple draw term loan (the "<u>New Money Facility</u>") consisting of up to $4,564,000 made available by the Non-Carbon Fleet Lenders (defined below) and up to $1,167,000 made available by the Carbon Fleet Lender (defined below), and $3,333,000 of such New Money Facility is being sought on an interim basis (consisting of $3,000,000 advanced by the Non-Carbon Fleet Lenders and $333,000 advanced by the Carbon Fleet Lender), and (2) subject to entry of this Interim Order, a roll-up of $1,269,000 of the advances made prepetition under the Fluid Loan (defined below)  (such amount plus accrued interest, the "<u>Roll-Up Amount</u>");

2.     Authorizing the Debtors to roll-up all of the Fluid Loan Obligations (as defined below) into DIP Financing up to an amount equal to the Roll-Up Amount on an interim basis, subject to entry of this Interim Order;

3.     Authorizing the Debtors to execute and deliver additional documentation consistent with the terms of (or as may be required by) the DIP Credit Agreement and to perform such other and further acts as may be necessary or appropriate in connection therewith, or otherwise required under the DIP Loan Documents (as defined below);

---

[2]    Terms not defined herein should have the meanings ascribed to them in the Motion or the DIP Credit Agreement, as applicable.

4.      Authorizing the Debtors' use of proceeds of the DIP Financing and access Cash Collateral (as defined below) as permitted in accordance with the DIP Loan Documents;

5.      Approving and authorizing the DIP Liens (as defined below) in favor of the DIP Agent for the benefit of DIP Agent and DIP Lenders encumbering the DIP Collateral (as defined below), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, and granting superpriority administrative expense status to the DIP Obligations (as defined below), in each case subject to the Carve-Out (as defined below), to secure the DIP Obligations, pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code;

6.      Vacating and modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents;

7.      Subject to entry of the Final Order, waiving the Debtors' ability to surcharge against any DIP Collateral or the Fluid Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors' under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

8.      Scheduling a hearing to consider the Motion on a final basis pursuant to Bankruptcy Rule 4001(c)(2) (the "Final Hearing");

9.      Waiving any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

10.     Granting the Debtors such other and further relief as is just and proper.

The Court having held a hearing on the Motion on [•], 2024 (the "Interim Hearing"); the Court having considered all objections, if any, to the Motion; and upon the record made by the Motion and the exhibits attached thereto; (b) any declarations or other evidence admitted in support of the Motion; and (c) the Interim Hearing, and good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES AS FOLLOWS**:

A.      Petition Date. On [•], 2024 (the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and are continuing to operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

B.      Jurisdiction; Core Proceeding.  The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a) and this Court may enter a final order on the Motion (the "Final Order") consistent with Article III of the United States Constitution.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested in the Motion are (i) sections 105, 361, 362, 363(b), (c), and (e), 364(c), (d), and (e), 503, 507 and 552 of the Bankruptcy Code; (ii) Rules 2002(a)(2), 4001(b) and (c), 6004 and 9014 of the Bankruptcy Rules; and (iii) Rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules.

C.      Committee. As of the date of the Interim Hearing, an official committee of unsecured creditors, as provided for under section 1102, has not been appointed in the Cases.

D.      Notice. Notice of the Motion and Interim Hearing and the relief sought in the Motion, and the time fixed for filing objections to the Motion was good and proper and adequate under applicable rules and the circumstances of the Cases, and no further notice is necessary or appropriate prior to entry of this Interim Order granting the Motion.  A reasonable opportunity to object and be heard regarding the relief provided herein has been afforded to all parties-in-interest.

E.      Debtors' Stipulations.  The Debtors agree, admit, represent and stipulate for themselves and their estates, subject to the challenge rights of third parties set forth in paragraph 16 of this Interim Order, the following (collectively, the "Stipulations"):

1.      <u>Fluid Prepetition Loan</u>.  As of the Petition Date, Fluid was party to that certain Senior Secured Multi-Drawing Loan Agreement dated as of October 2, 2024, (such agreement, as amended and existing immediately prior to the Petition Date, the "<u>Fluid Loan Agreement</u>"), with the lenders party thereto (collectively, the "<u>Fluid Lenders</u>"), and Bison, as administrative agent (the "<u>Fluid Collateral Agent</u>"), and all other documents, instruments and agreements executed in connection with the Fluid Loan Agreement.  Fluid Fleet Services, LLC ("<u>Fluid Services</u>"), a Subsidiary of Fluid, executed a guaranty and security agreement in favor of the Fluid Collateral Agent guaranty and securing, respectively, the Fluid Loan Obligations.  The Fluid Lenders consist of (i) Carbon Fleet, LLC (the "<u>Carbon Fleet Lender</u>") under the advances of the Fluid Facility consisting of the "Incremental Administrative Fee Advances" (as defined in the Fluid Loan Agreement), and (ii) the lenders other than the Carbon Fleet Lender (the "<u>Non-Carbon Fleet Lenders</u>") under the "New Loan" (as defined in the Fluid Loan Agreement) of the Fluid Facility.  As of the Petition Date, under the Fluid Loan Agreement, Fluid was indebted to the Fluid Lenders, without defense, counterclaim, recoupment or offset of any kind, in the non-contingent liquidated amount of no less than $1,269,000, consisting of (i) $333,000 (such amount plus accrued interest, the "<u>Prepetition Carbon Fleet Amount</u>") on account of Incremental Administrative Fee Advances (as defined in the Fluid Loan Agreement) made by the Carbon Fleet Lender, and (ii) $936,000 (such amount plus accrued interest, the "<u>Prepetition Non-Carbon Fleet Amount</u>") on account of advances made by the Non-Carbon Fleet Lenders, plus other fees, costs, expenses and other amounts arising in respect of the Fluid Loan Agreement obligation existing immediately prior to the Petition Date (such obligations, the "<u>Fluid Loan Obligations</u>");

2.      <u>Fluid Loan Lien and Collateral</u>.  As of the Petition Date, the Fluid Loan Obligations were secured by valid, enforceable, properly perfected and unavoidable liens on

security interests (the "Fluid Liens") encumbering substantially all assets of Fluid and Fluid Services, including any cash or cash equivalents of Fluid and Fluid Services (the "Cash Collateral"), existing immediately prior to the commencement of the Cases, (the "Fluid Collateral"), which (a) secures timely performance and satisfaction of the Fluid Loan Obligations, (b) constitutes actual, legal, valid, enforceable, duly perfected and non-avoidable first and senior priority security interests and liens in and upon the Fluid Collateral in favor of Fluid Collateral Agent for the benefit of Fluid Collateral Agent and Fluid Lenders, subject only to certain Permitted Liens (as defined in the Fluid Loan Agreement) and (c) are not subject to any objection, defense, offset, avoidance, subordination, or other claim, cause of action, or challenge of any kind or nature, whether under the Bankruptcy Code or similar law, under non- bankruptcy law, or otherwise;

   F. <u>Findings Supporting the DIP Financing.</u>

   1. <u>DIP Financing.</u>  Debtors have requested the DIP Financing from DIP Agent and DIP Lenders upon the terms and conditions of the DIP Credit Agreement, this Interim Order, the Final Order and the other DIP Loan Documents.  The DIP Facility consists of (i) (a) advances by the Carbon Fleet Lender under the New Money Facility in the amount not to exceed $1,167,000 (not taking into account the roll-up of the Prepetition Carbon Fleet Amount) on account of the Incremental Administrative Fee the Debtors receive from the Carbon Fleet Lender and (b) advances under the New Money Facility by the Non-Carbon Fleet Lenders in the amount not to exceed $4,564,000 (not taking into account the roll-up of the Prepetition Non-Carbon Fleet Amount), plus (ii) the Roll-Up Amount.

   2. <u>Need for DIP Financing and Access to Cash Collateral.</u>  Debtors have an immediate and continuing need to obtain the DIP Financing and use Cash Collateral to, among other purposes, fund the continuation of the operation of the Debtors' businesses, minimize the

disruption of their business operations, manage and preserve the assets of their bankruptcy estates in these Cases under section 541 of the Bankruptcy Code, and undertake a sale process under Section 363 of the Bankruptcy Code.  Debtors do not have sufficient and available resources of working capital to operate their businesses in these Cases in the ordinary course without the DIP Financing and access o Cash Collateral.  Debtors' ability to maintain business relationships with vendors, to pay employees, to fund business operations, to maintain and preserve assets and to fund the marketing and sale process of the assets is essential to Debtors' viability and preservation of the value of their businesses.

3.    <u>No Credit Available on More Favorable Terms</u>.  Despite diligent efforts, Debtors have been unable to obtain financing on more favorable terms from sources other than as contemplated under the DIP Loan Documents from DIP Agent and DIP Lenders pursuant to, and for the purposes set forth in, this Interim Order and the DIP Loan Documents, and have been unable to obtain unsecured credit under section 503(b)(1) of the Bankruptcy Code.  The Debtors are also unable to obtain secured credit allowable under section 364 of the Bankruptcy Code without granting the DIP Liens and the DIP Superpriority Claims (as defined below) under sections 364(c) and 364(d) of the Bankruptcy Code on the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

4.    <u>Roll-Up</u>.  The conversion or roll-up of Fluid Loan Obligations owed to DIP Agent and DIP Lenders into DIP Obligations in connection with the DIP Financing is compensation for, in consideration of, and solely for account of, the agreement of DIP Agent and DIP Lenders to fund amounts under the DIP Credit Agreement, not as payments under, adequate protection for, or otherwise on account of the Fluid Loan Obligations.  Pursuant to the requested roll-up, (i) the Prepetition Carbon Fleet Amount will be deemed as part of the Carbon Fleet Loan

(as defined in the DIP Credit Agreement) under the DIP Facility and allocated to the Carbon Fleet Lender and (ii) the Prepetition Non-Carbon Fleet Amount will be deemed as part of the Non-Carbon Fleet Loan (as defined in the DIP Credit Agreement) under the DIP Facility and allocated to the Non-Carbon Fleet Lenders.

5.     Approved Budget.  The Debtors have delivered to the DIP Lenders a 13-week cash flow forecast of receipts and disbursements (as defined in the DIP Credit Agreement), attached to this Interim Order as **Exhibit B** (the "Approved Budget"), which Approved Budget is reasonably acceptable to the DIP Lenders in accordance with the DIP Loan Documents.  The DIP Secured Parties and the Fluid Lenders are relying upon the Approved Budget in entering into the DIP Loan Documents and authorizing use of Cash Collateral.

6.     Corporate Authority.  Each Debtor has the requisite corporate power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

7.     No Liability to Third Parties.  Subject to entry of the Final Order, the Debtors stipulate and the Court finds that in making decisions to advance loans to the Debtors, in administering any DIP Loans, in accepting the Approved Budget, or in taking any other actions permitted by this Interim Order or the DIP Loan Documents in their respective capacities as DIP Lenders or DIP Agent, none of the DIP Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

8.     Reliance.  DIP Agent and DIP Lenders are willing to provide the DIP Loans to Debtors and the Fluid Lenders consent to the Debtors' use of Cash Collateral, but only upon the terms and conditions set forth in the DIP Loan Documents, including this Interim Order.  Absent

entry of this Interim Order and entry into the DIP Loan Documents by Debtors, DIP Agent and DIP Lenders would not provide the DIP Financing and the Fluid Lenders would not consent to the Debtors' use of Cash Collateral.

9. <u>Good Faith</u>. Based upon the record presented at the Interim Hearing, the DIP Financing has been negotiated in good faith and at arm's length between the Debtors, on the one hand, and the DIP Secured Parties, on the other. All of the DIP Obligations, including all DIP Loans made pursuant to the DIP Loan Documents and all other liabilities and obligations of the Debtors under this Interim Order, owing to the DIP Secured Parties shall be deemed to have been extended by the DIP Secured Parties in "good faith," as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The DIP Secured Parties shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed, or modified, on appeal.

10. <u>Good Cause</u>. Good cause has been shown for the entry of this Interim Order and authorization for: (a) the DIP Lenders to provide the Debtors with the DIP Loans and the Debtors to access Cash Collateral and (b) the Debtors to accept, incur, and undertake the DIP Obligations pursuant to the DIP Loan Documents. The Debtors' need for financing of the type afforded by the DIP Loan Documents and access to Cash Collateral is critical. Entry of this Interim Order will preserve the value of the assets of the Debtors' estates and is in the best interests of the Debtors, their creditors and their estates. The terms of the DIP Financing and use of Cash Collateral are fair and reasonable, including the interest rates, fees and expenses owed thereunder, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

11.    <u>Immediate Entry</u>.  Based upon the evidence presented in support of the Motion and the record at the Interim Hearing, sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

NOW, THEREFORE, upon the record made before the Court at the Interim Hearing, after due consideration, there is good and sufficient cause to grant the Motion as set forth in this Interim Order; and

**IT IS HEREBY ORDERED AS FOLLOWS**:

1.    <u>Motion Granted</u>.  The Motion is hereby granted as and to the extent provided herein, and the Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Credit Agreement, use of Cash Collateral as set forth herein, and all instruments, security agreements, assignments, pledges, mortgages, licenses, sublicenses, reaffirmations, and other documents referred to therein or reasonably requested by the DIP Secured Parties and the Fluid Lenders to give effect to the terms thereof and as will be drafted and executed as contemplated therein, in each case, in final form and substance consistent with this Interim Order and otherwise reasonably acceptable to the DIP Secured Parties, the Fluid Lenders, and the Debtors (collectively, this Interim Order, the DIP Credit Agreement, the Approved Budget, and any other document delivered to any DIP Secured Party in connection with any of the foregoing, in each case, as the same may be amended, restated, or otherwise modified from time to time in accordance with the terms of this Interim Order and the DIP Credit Agreement, are referred to herein as the "<u>DIP Loan Documents</u>").  For the avoidance of doubt, the rights of all parties in interest to object to the entry of the Final Order are fully reserved.

2.    <u>Authorization</u>.  The Debtors are authorized and empowered to execute and perform under the DIP Credit Agreement and use Cash Collateral, which is approved on an interim basis

pursuant to this Interim Order, and incur indebtedness and obligations to DIP Agent and DIP Lenders, including "Obligations" as such term is defined in the DIP Credit Agreement, and collectively with the Fluid Loan Obligations, the "DIP Obligations".  Nothing in this Interim Order shall prejudice the rights of the Debtors to seek approval of the full amount of the DIP Loan or use of Cash Collateral with whatever revisions the Debtors may propose at the Final Hearing, or the rights of any party-in-interest in these Cases to object thereto.

3.     Approval.  The DIP Loan Documents, and the terms, conditions, covenants and provisions therein, are approved and constitute sufficient and conclusive evidence of the DIP Financing, the DIP Obligations (including the DIP Lender Expense Obligations (as defined below)), the DIP Liens and the other rights, interests, liens, claims, benefits, privileges and protections granted, provided, afforded, conferred, recognized or acknowledged by this Interim Order and the other DIP Financing Documents.  Upon execution and delivery of the DIP Loan Documents and entry of this Interim Order, the DIP Loan Documents shall constitute valid and binding contracts and agreements of and by Debtors, enforceable against each Debtor and their respective estates, and the Debtors are authorized to borrow up to an interim aggregate principal amount of $3,333,000 on an interim basis, subject to any conditions and limitations on availability in the DIP Loan Documents, plus all interest, fees, and other charges payable in connection with the DIP Loans as provided in the DIP Credit Agreement and the other DIP Loan Documents.

4.     Lender Obligations.  The DIP Loan Documents constitute and evidence the DIP Obligations, which indebtedness and obligations shall be binding and enforceable against Debtors and each of their respective successors and assigns, including, without limitation, any trustee or examiner appointed under section 1104 in these Cases, a trustee appointed in these Cases converted to a chapter 7 case, or any trustee, fiduciary, or administrator of a liquidating trust established

pursuant to a confirmed chapter 11 plan of reorganization in these Cases.  The DIP Obligations are authorized and approved, including, without limitation, the accrual of interest at rates provided in the DIP Credit Agreement, and the fees, costs, expenses, and other charges, and any obligation for the reimbursement thereof, as provided in the DIP Loan Documents, including, without limitation, all present and future attorneys' fees and costs (to the extent permitted under the DIP Credit Agreement), consultants' fees and costs, advisors' fees and costs, appraiser's fees and costs, other professionals' fees and other fees, costs, charges and expenses paid or incurred by DIP Agent or DIP Lenders all in accordance with the DIP Credit Agreement (the "DIP Lender Expense Obligations"), all of which shall be and are included as part of the principal amount of the DIP Obligations at the time such DIP Lender Expense Obligation is accrued or incurred; provided that any professional fees and expenses included in the DIP Lender Expense Obligations shall be payable by the Debtors only after at least ten (10) business days' notice thereof is provided by the DIP Secured Parties to the Debtors, any Committee, and the Office of the U.S. Trustee.  If any objection is asserted during such notice period, then the Debtors shall not pay the professional fees and expenses that are the subject of such objection pending a resolution of such objection or order of the Court.

5.    Roll-Up.  Effective upon entry of this Interim Order and subject to the rights of certain parties in interest pursuant to paragraph 16 of this Interim Order, the Fluid Loan Obligations in the amount of the Roll-Up Amount shall be automatically converted and constitute DIP Obligations.

6.    DIP Liens.  As security for the timely performance and satisfaction of the DIP Obligations, (a) pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1), DIP Agent, for the benefit of DIP Lenders, shall have and is hereby granted a valid, binding, perfected, enforceable, and non-

avoidable lien and security interest (the "DIP Liens") in and on all now owned or hereafter acquired assets and property of the Debtors (including the Fluid Collateral), including, without limitation, all assets consisting of personal property and real property, including, without limitation, goods, accounts, instruments, intercompany obligations, partnerships and joint venture interests, contract rights, documents, chattel paper, general intangibles, goodwill, equipment, machinery, inventory, investment property, copyrights, trademarks, trade names, insurance policies, insurance proceeds, Cash Collateral, deposit accounts, all items on deposit in or otherwise held in or credited to any deposit account, money, commercial tort claims, letters of credit, letter of credit rights, real property, leases, and all rents, issues, profits, products, offspring, and proceeds of and recoveries, substitutions, and replacements on account of the foregoing, all as more particularly described in the DIP Loan Documents, and any and all rents, issues, products, offspring, proceeds, and profits generated by any item of the foregoing, without the necessity of any further action of any kind or nature by DIP Lenders in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits (collectively, the "DIP Collateral"), including, subject to entry of the Final Order, the proceeds and recoveries from any and all avoidance power claims or causes of action under Sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code ("Avoidance Actions"), but not the Avoidance Actions themselves.

7.      DIP Liens Priority.  Pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1), the DIP Liens shall be and shall continue to be first and senior in priority to all other interests, liens, encumbrances, rights and claims with respect the DIP Collateral of every kind and nature, whether created consensually, by operation of law, by an order of any court including this Court or otherwise, including, without limitation, all other interests, liens or claims granted or acknowledged in favor of any other person or entity under section 363, 364 or any other section

of the Bankruptcy Code; provided, however, the DIP Liens shall be (a) subject to the Carve-Out, (b) subject and immediately junior only to the Fluid Lien and to any security interests and liens existing as of the Petition Date that, as of the Petition Date, were senior in priority and not subordinated to the Fluid Lien and only to the extent that such security interest or lien or the obligation secured by such security interest or lien is and continues to be: (i) not subordinated in priority, whether under section 510 or by contract, at law or in equity, as to any obligation or lien in favor of DIP Agent and DIP Lenders, (ii) valid, properly perfected (including any security interest or lien that was properly perfected subsequent to the Petition Date pursuant to section 546(b)) and enforceable, (iii) securing obligations that remain outstanding, valid and not otherwise avoided, and (iv) not subject to avoidance or subordination pursuant to any provisions of the Bankruptcy Code or any other applicable law ((a)(i) through (iv) shall be referred to herein as "Permitted Liens"), and (c) otherwise first and senior in priority, and not be subject or subordinate to any interest, lien, or claim that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code.

8.     DIP Superpriority Claims.  In addition, the DIP Agent, for itself and the benefit of the DIP Lenders, is hereby granted superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code (the "DIP Superpriority Claims"), provided that such DIP Superpriority Claims shall be subject to the Carve-Out and shall not be payable from the proceeds and recoveries of Avoidance Actions pending entry of the Final Order.

9.     Carve-Out.  The DIP Liens, DIP Superpriority Claims, DIP Obligations, Fluid Liens, Fluid Loan Obligations, and all other claims and liens granted pursuant to this Interim Order and the Final Order (as applicable), shall each be subject to payment of the Carve-Out.  As used here, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court

and all statutory fees payable to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, which amounts shall not be limited by any budget (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (and any monthly, restructuring, or sale fees to the extent earned prior to the date of the Carve-Out Trigger Notice (as defined below)) (the "Allowed Professional Fees") incurred by (or payable to) persons or firms retained by the Debtors and any Committee pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Estate Professionals") at any time before the date of delivery of the Carve-Out Trigger Notice by the DIP Agent (at the direction of the DIP Lenders), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (which amount shall not exceed an aggregate amount set forth in the Approved Budget for Allowed Professional Fees incurred prior to the delivery of a Carve-Out Trigger Notice); and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $100,000 incurred on or after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post Carve-Out Trigger Notice Cap").  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the DIP Lenders) to the Debtors, its restructuring counsel (Pachulski Stang Ziehl & Jones LLP), any Committee, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below), stating that the Post Carve-Out Trigger Notice Cap has been invoked.  The Debtors shall, on a weekly basis

commencing after the first week of the Approved Budget, transfer cash proceeds of the DIP Credit Agreement or Cash Collateral into a segregated account (which may be the trust account of Debtors' counsel), not subject to the control of the DIP Agent or the DIP Lenders (the "Professional Fees Account") in an amount equal to the amount budgeted for Estate Professionals for the preceding week in the Approved Budget.  Upon the delivery of the Carve-Out Trigger Notice, the Debtors shall deposit all available cash on hand into the Professional Fees Account until such amounts therein equal the Carve-Out.  The Professional Fees Account, and all funds held therein, shall remain property of the Debtors' estates unless and until they are paid to the Estate Professionals following Court approval of a fee application seeking approval of the same (if required), and shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent and the DIP Lenders (i) shall not sweep or foreclose on any such available cash of the Debtors until the Professional Fees Account is fully funded, and (ii) shall have a security interest on any residual interest in the Professional Fees Account available following satisfaction in cash of all Carve-Out expenses.

10.     Maturity.  Subject to the terms and conditions set forth in this Interim Order, the Debtors are authorized to use the DIP Loans and access Cash Collateral solely in accordance with the Approved Budget through the earlier to occur of (i) the Stated Maturity Date (as defined in the DIP Credit Agreement) and (ii) the Termination Date (as defined in the DIP Credit Agreement) (such date, the "Maturity Date").

11.     Event of Default.  The occurrence of any of the following events shall, unless waived by the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement), constitute an "Event of Default" under this Interim Order: (i) the Debtors shall fail to comply with

the provisions of this Interim Order, or (ii) the occurrence of any "Events of Default" (as defined in the DIP Credit Agreement).

12.    <u>Rights and Remedies Upon Default</u>.  Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from this Court, but subject to the terms of this Interim Order, subject to the Remedies Notice Period (as defined below), the DIP Agent, at the direction of the Required Lenders (any such declaration shall be referred to herein as a "<u>DIP Termination Declaration</u>"), may declare (i) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (ii) the termination, reduction, or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility, access to Cash Collateral, and the DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the Carve-Out is triggered, through the delivery of the Carve-Out Trigger Notice to the Debtors (the date on which a DIP Termination Declaration is delivered to counsel to the Debtors, counsel to any Committee, and the U.S. Trustee, the "<u>DIP Termination Date</u>").  The automatic stay in the Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Fluid Lenders is hereby modified so that five (5) business days after the DIP Termination Date (the "<u>Remedies Notice Period</u>"): the DIP Agent, at the direction of the Required Lenders, shall be entitled to exercise its rights and remedies in accordance with the DIP Loan Documents and this Interim Order to satisfy the DIP Obligations, DIP Superpriority Claims, and DIP Liens, subject to the Carve-Out.  During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing within the Remedies

Notice Period with this Court for the sole purpose (unless this Court orders otherwise) of contesting whether an Event of Default has occurred or is continuing.  Unless this Court orders otherwise before the expiration of the Remedies Notice Period, the automatic stay, as to all of the DIP Agent, DIP Lenders, and Fluid Lenders shall automatically be terminated at the end of the Remedies Notice Period without further notice or order; *provided, however*, that in the event that the Court is not available to enter an order by the end of the Remedies Notice Period, the termination of stay shall be tolled to allow the Court to enter such order.  Upon expiration of the Remedies Notice Period, the DIP Agent, at the direction of the Required Lenders, shall be permitted to exercise all remedies set forth herein, and in the DIP Documents, and as otherwise available at law without further order of or application or motion to this Court consistent with this Interim Order.

13.    <u>Modification of the Automatic Stay</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to implement the provisions of this Interim Order and the DIP Loan Documents, thereby permitting the DIP Agent, as and to the extent provided herein, to receive proceeds of the DIP Collateral for application to the DIP Obligations, to file or record any UCC-1 financing statements, mortgages, deeds of trust, assignments, pledges, security deeds, or other instruments and documents evidencing or validating the perfection of any DIP Liens, to enforce any DIP Liens; and as and to the extent provided herein, to receive adequate protection.

14.    <u>Survival</u>.  If an order dismissing the Cases is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that (a) the DIP Liens and DIP Superpriority Claims shall continue in full force and effect and shall maintain their relative priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full and that such DIP Liens and DIP Superpriority

Claims shall, notwithstanding such dismissal, remain binding on all parties in interest and (b) this Court shall retain jurisdiction, to the extent allowed by applicable law, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to and provided for in this Interim Order.

15.     <u>No Modification or Stay of this Interim Order</u>.   The DIP Liens and DIP Superpriority Claims and all other rights and remedies of the DIP Agent and the DIP Lenders granted by the provisions of this Interim Order shall survive, and shall not be modified, impaired or discharged by (a) the entry of an order converting the Cases to cases under chapter 7 of the Bankruptcy Code, or (b) the entry of an order confirming a plan of reorganization or liquidation in the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors waive any discharge as to any remaining DIP Obligations.   The terms and provisions of this Interim Order shall continue in these Cases or in any superseding chapter 11 case or chapter 7 case under the Bankruptcy Code, and the DIP Liens and DIP Superpriority Claims and all other rights and remedies of the DIP Agent and DIP Lenders granted pursuant to this Interim Order shall continue in full force and effect.

16.     <u>Challenge Claims</u>.   Subject to the Challenge Period (as defined herein), the Stipulations, admissions, waivers, and releases in favor of the Fluid Lenders contained in this Interim Order shall be binding upon the Debtors and their estates in all circumstances and for all purposes and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.   The Stipulations, admissions, and waivers contained in this Interim Order shall be binding upon all other parties in interest, including any person acting on behalf of the Debtors' estate, unless and to the extent that a party in interest with proper standing granted by order of the Court, has timely and properly filed an adversary proceeding or contested

matter under the Bankruptcy Rules: (i) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations herein, including regarding, (a) the validity, enforceability, extent, priority, or perfection of the security interests and liens of the Fluid Lenders, (b) the validity, enforceability, allowability, priority, secured status, or amount of the Fluid Loan Obligations, and (c) asserting or prosecuting any so-called "lender liability" claims, avoidance actions or any other claim, counter claim, cause of action, objection, contest or defense, of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable law or otherwise, against the Fluid Lenders or their representatives (any such claim, a "Challenge") setting forth the particular basis for such Challenge; and (ii) in which the Court enters a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed Challenge.  A Challenge must be filed on or prior to the earlier of: (a) seventy-five (75) days following entry of this Interim Order and (b) five (5) business days prior to the date of the hearing to approve a sale of substantially all of the Debtors' assets (as such deadline may be extended in writing by the Fluid Collateral Agent in its sole discretion or by the Court for cause, the "Challenge Period" and the date of expiration of the Challenge Period, the "Challenge Period Termination Date"); *provided, however*, that if a chapter 11 trustee is appointed or the Cases are converted to cases under chapter 7 prior to the Challenge Period Termination Date, the chapter 11 or chapter 7 trustee, as applicable, shall have until the later of (1) the Challenge Period Termination Date or (2) the fourteenth (14th) day after the appointment of the chapter 11 trustee or the conversion of the Cases to cases under chapter 7, as applicable, to commence a Challenge; *provided, further*, that the timely filing of a motion seeking standing to file a Challenge before the expiration of the Challenge Period, which attaches a draft complaint or other pleading setting forth the legal and factual bases of the proposed Challenge, shall toll the Challenge Period only as to the party that

timely filed such standing motion until two (2) business days after such standing motion is resolved or adjudicated by the Court, or such other time period ordered by the Court in approving the standing motion, and solely as to the Challenges for which standing is sought (as set forth in such motion).   For the avoidance of doubt, a chapter 7 trustee has automatic standing to pursue a Challenge pursuant to section 323 of the Bankruptcy Code.   To the extent the Stipulations, admissions, waivers and releases contained in this Interim Order are (x) not subject to a Challenge timely and properly commenced prior to the expiration of the Challenge Period Termination Date or (y) subject to a Challenge timely and properly commenced prior to the expiration of the Challenge Period Termination Date, but such Challenge does not result in a final and nonappealable judgment or order of the Court that is inconsistent with the stipulations, admissions, waivers and releases contained in this Interim Order, then, without further notice, motion, or application to, or order of, or hearing before, this Court and without the need or requirement to file any proof of claim: (a) any and all such Challenges by any party (including any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in this case, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any successor case) shall be deemed to be forever barred; (b) the Fluid Loan Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any successor case; (c) the Fluid Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected liens and security interests, not subject to recharacterization, subordination, or avoidance (other than pursuant to the terms of the Roll-Up); and (d) all of the Debtors' stipulations and admissions contained in this Interim Order as to the priority, extent, and validity as to the Fluid Lenders' claims, liens, and interests contained in this Interim Order shall be of full force and effect

and forever binding upon the Debtors, their estates, and all creditors, interest holders, and other parties in interest in these Cases and any successor case.  For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases shall, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Interim Order.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates, including any Challenge.

17.    <u>DIP Proceeds Restrictions</u>.  Notwithstanding anything in this Interim Order or in any other order by this Court to the contrary, no portion of cash, if any, of the DIP Loans or the DIP Collateral may be used: (a) for any purpose that is prohibited under the Bankruptcy Code; (b) to finance any action which with the giving of notice or passing of time would result in an Event of Default under the this Interim Order; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lenders and the approval of this Court; and/or (d) for any purpose or in any manner not approved in the Approved Budget; <u>provided</u> <u>that</u> up to $25,000 of the DIP Loans and Cash Collateral may be used by the Committee (if appointed) to investigate the liens and claims of the Fluid Lenders and the Stipulations relating thereto.

18.    <u>Release</u>. Subject to the rights and limitations set forth in paragraph 16 of this Interim Order, each of the Debtors and their estates, on their own behalf and on behalf of each of

their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Secured Parties and the Fluid Lenders, each in any capacity, including as a secured party, lender, shareholder, fiduciary, and management member or otherwise, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the Debtors, including their operations, the Debtors' estates, the DIP Obligations, the DIP Liens, the DIP Loan Documents, the Fluid Loan Obligations, the Fluid Liens, or the Fluid Loan Agreement, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Fluid Lenders; provided that nothing in this paragraph shall in any way limit or release the obligations of any DIP Secured Party under the DIP Loan Documents.

19.    <u>No Marshaling</u>.  Subject to entry of the Final Order, in no event shall any DIP Secured Party be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any DIP Collateral.

20.    <u>Good Faith</u>.  DIP Agent and DIP Lenders are entitled to the protections under section 364(e) of the Bankruptcy Code.

21.    <u>Debtors' Waivers</u>.  Until the DIP Obligations have been indefeasibly paid in full in cash and the commitment and obligations of DIP Agent and DIP Lenders to provide any further DIP Financing have permanently terminated, Debtors shall not, and irrevocably waive any right to, (a) seek or obtain entry of an order approving or authorizing (under section 105 or 364, or otherwise) (i) a granting of liens on DIP Collateral or any portion thereof to any party other than DIP Agent for the benefit of DIP Lenders, which liens are senior to or *pari passu* with the DIP Liens and the DIP Lender 364(c)(1) Claim in favor of DIP Agent and DIP Lenders or (ii) the obtaining of credit or the incurring of indebtedness that is entitled to a claim that has a priority that is *pari passu* with or superior to the DIP Agent and DIP Lenders, unless in connection with any transaction with respect to clause (i) or (ii) of this section, such request by Debtors contemplates and authorizes the indefeasible payment and satisfaction in full in cash of the DIP Obligations and the permanent termination of the commitment and obligations of DIP Agent and DIP Lenders and (b) to propose or support a Chapter 11 plan that is inconsistent with the DIP Financing Documents; unless, in connection with any transaction cited in clauses (a) and (b) of this section, such request by Debtors or plan seeks to authorize and direct that the full amount of the DIP Obligations shall first be paid indefeasibly and in full.

22.    <u>No Requirement to File Claim for DIP Obligations</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including any order

establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, no DIP Secured Party or Fluid Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations or Fluid Loan Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents applicable thereto without the necessity of filing any such proof of claim or request for payment of administrative expenses; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents or any DIP Obligations or Fluid Loan Obligations arising at any time thereunder, or prejudice or otherwise adversely affect any DIP Secured Party's rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Interim Order, or applicable law.

23.    <u>Automatic Perfection of Liens</u>.    The DIP Liens are effective, valid, binding, enforceable, and duly perfected upon entry of this Interim Order.  None of the DIP Secured Parties shall be required to file any UCC-1 financing statement, mortgage, deed of trust, assignment, pledge, security deed, notice of lien, or any similar document or instrument in any jurisdiction or take any other action (including taking possession of any of the DIP Collateral) in order to validate the perfection of any DIP Liens, but all of such filings and other actions are hereby authorized by the Court.  If the DIP Agent in its discretion, chooses to file or record any such mortgage, deed of trust, assignment, pledge, security deed, notice of lien, or UCC-1 financing statement, or takes any other action in any jurisdiction to evidence the perfection of any part of the DIP Liens, the Debtors and their respective officers are authorized and directed to use commercially reasonable efforts to execute, file, and record any documents or instruments as the DIP Agent, as applicable, may reasonably request, and all such documents and instruments shall be deemed to have been filed or

recorded at the time and on the date of entry of this Interim Order. The DIP Agent may, in its reasonable discretion, file a certified copy of this Interim Order in any filing office in any jurisdiction in which the Debtors are organized or have or maintain any DIP Collateral or an office, and each filing office is directed to accept such certified copy of this Interim Order for filing and recording. The DIP Agent or the DIP Lenders may require the Debtors to enter into non-U.S. security documentation with respect to such DIP Collateral located in non-U.S. jurisdictions, and the Debtors and their respective officers are authorized and directed to use commercially reasonable efforts to execute, file, and record any documents or instruments as the DIP Agent or the DIP Lenders may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

24. **Payments Free and Clear**. All payments or proceeds remitted to the DIP Agent or DIP Secured Parties by or on behalf of the Debtors pursuant to the DIP Loan Documents, the provisions of this Interim Order, or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

25. **Section 506(c) Claims**. Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration shall be imposed upon any DIP Secured Party or any Fluid Lender or on any DIP Collateral or Fluid Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of such DIP Secured Party or Fluid Lender, as applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any DIP Secured Party or any Fluid Lender. Further, subject to entry of the Final

Order, the Debtors waive, and shall not assert in these Cases or any successor case, any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise with respect to the DIP Obligations, the DIP Liens, the Fluid Loan Obligations or the Fluid Collateral.

26.     <u>Order Effectiveness</u>.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, this Interim Order shall be immediately effective and enforceable upon its entity and there shall be no stay of execution or effectiveness of this Interim Order.

27.     <u>Indemnity</u>.  Debtors shall indemnify and hold harmless DIP Agent and DIP Lenders, and each of their respective partners, members, officers, directors, employees, affiliates, successors, assigns, agents, attorneys, consultants, advisors, agents and representatives, solely in their capacities as such (collectively, "<u>Indemnified Parties</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with (a) the DIP Financing, the transactions contemplated thereby and in the DIP Loan Documents, and any use made or proposed to be made with the proceeds thereof and (b) the Cases.

28.     <u>Inconsistency</u>.  If there is any inconsistency between the terms of any DIP Loan Document (other than this Interim Order) and the provisions of this Interim Order, the provisions of this Interim Order shall control to the extent of such inconsistency.

29.    <u>Further Hearing and Response Dates</u>.  The Court shall retain jurisdiction to interpret and enforce the provisions of the DIP Credit Agreement and this Interim Order and the rights of the parties set forth therein and herein.

30.    The Final Hearing on the Motion shall be held on **[•]. (prevailing Eastern Time)**.

31.    The deadline to file a written objection to the relief requested by the Debtors to be entered by this Court in the Final Order shall be no later than **[•]. (prevailing Eastern Time).**

32.    Nothing in this Interim Order shall in any way be construed or interpreted to constitute the Court's approval of any chapter 11 plan terms or provisions.

####

# **EXHIBIT A**

## **Loan and Security Agreement**

## SENIOR SECURED, SUPER-PRIORITY
## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT (this "**Agreement**"), dated as of October [___], 2024, is entered into by and among FLUID MARKET, INC., a Delaware corporation (the "**Company**"), each of the Subsidiaries signatory hereto, the lenders party hereto (collectively, the "**Lenders**"), and BISON CAPITAL PARTNERS V, L.P., a Delaware limited partnership, as Collateral Agent for the Lenders.

WHEREAS, on October [__], 2024 (the "**Petition Date**"), the Company and certain of its Subsidiaries commenced voluntary bankruptcy proceedings, under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), which cases are subject to pending motions for joint administration under the lead case filed by Fluid Market, Inc., Case No. _____ (each, a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**").

WHEREAS, the Company remains in possession of their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Company owns Dynamic Metal, LLC, a Delaware limited liability company ("**Dynamic**"), which in turn owns Carbon Fleet, LLC, a Delaware limited liability company (the "**Carbon Fleet Lender**"), but neither Dynamic nor the Carbon Fleet Lender has filed a petition under the Bankruptcy Code with the Bankruptcy Court;

WHEREAS, the Carbon Fleet Lender is the borrower under the Carbon Fleet Credit Agreement with Goldman and Midtown, and the Company is the guarantor under the credit facility thereunder;

WHEREAS, the Company receives a certain fee under one or more Services Agreements with one or more of its Affiliates, including Carbon Fleet (such fee, the "**Administrative Fee**");

WHEREAS, prior to Petition Date, the Lenders (consisting of the Non-Carbon Fleet Lenders and the Carbon Fleet Lender) provided financing to the Company pursuant to that certain Senior Secured Multi-Drawing Loan Agreement dated as of October 2, 2024 (the "**Prepetition Credit Agreement**"), which financing is secured pursuant to, among other things, that Security Agreement dated as of October 2, 2024 by the Company and Fluid Fleet Services, LLC ("**Fluid Services**");

WHEREAS, the Carbon Fleet Lender participated as a lender under the Prepetition Credit Agreement through the increase of the Administrative Fee the Company receives under the Services Agreements with the Carbon Fleet Lender or with respect to the Carbon Fleet Lender's vehicles from 20% to 45% (such increase is defined in the Prepetition Credit Agreement as "Incremental Administrative Fee"), which increase required the consent of Goldman and Midtown in their respective capacities as agents for the applicable lenders to the Carbon Fleet Lender under the Carbon Fleet Credit Agreement;

-1-

WHEREAS, pursuant to the Prepetition Credit Agreement, (i) the aggregate Incremental Administrative Fee that was made available to the Company is up to $1,500,000, $333,000.00 available for the period prior to the Petition Date, was advanced prior to such date and remains outstanding as of the Petition Date (such amount plus accrued interest thereon, the "**Prepetition Carbon Fleet Amount**"), with the balance available for the period after the Petition Date in accordance with the terms of this Agreement, and (ii) the Non-Carbon Fleet Lenders advanced to the Company by the Petition Date an aggregate amount of up to $936,000, which remains outstanding as of the Petition Date (such amount plus accrued interest thereon, the "**Prepetition Non-Carbon Fleet Amount**");

WHEREAS, the Obligations under and as defined in the Prepetition Credit Agreement, are secured by a security interest in substantially all of the existing and after-acquired assets of the Company and Fluid Services as more fully set forth in the Prepetition Loan Documents, and such security interest is perfected and, with certain exceptions, as described in the Prepetition Loan Documents, has priority over other security interests;

WHEREAS, the Company has requested that Lenders provide financing to the Company consisting of a senior secured super priority term loan in a principal amount of up to Seven Million Dollars ($7,000,000) (the "**DIP Facility**"), consisting of (1) up to $5,731,000 new money multiple draw term loan (the "**New Money Facility**") (consisting of $4,564,000 made available by the Non-Carbon Fleet Lender hereunder and $1,167,000 made available by the Carbon Fleet Lender hereunder) and (2) subject to entry of the Interim Order and the terms thereof, $1,269,000 (such amount plus accrued interest thereon, the "**Roll-Up Amount**") that will be rolled up into the DIP Facility by converting the Prepetition Carbon Fleet Amount and the Prepetition Non-Carbon Fleet Amount into Obligations under this Agreement;

WHEREAS, the Company is executing this Agreement as borrower and each of the Subsidiaries (other than the Excluded Subsidiaries) agreed to guaranty the Obligations hereunder and execute this Agreement to evidence such guaranty;

WHEREAS, Lenders have indicated their willingness to agree to extend the DIP Facility to Company, all on terms and conditions set forth herein and in the other Transaction Documents and in accordance with Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code, so long as the Obligations are (i) secured by senior Liens on the Collateral granted by the Company and the Subsidiaries signatory hereto as hereinafter provided, and (ii) given superpriority status as provided in the Interim Order and Final Order as applicable;

WHEREAS, each of the Company and each Subsidiary (other than the Excluded Subsidiaries) has agreed to grant to the Collateral Agent, for the benefit of the Lenders, a priming security interest in all their assets as Collateral, and has further agreed that the Collateral Agent shall have superpriority claims in their Chapter 11 Cases for the repayment of the Obligations pursuant to the Interim Order and the Final Order, subject to the approval of the Bankruptcy Court; and

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

FOR VALUE RECEIVED, the Company hereby promises to pay to the order of the Lenders the aggregate principal amount up to the Maximum Amount, or, if less, the outstanding principal amount of all Advances made by the Lenders under this Agreement, plus all interest thereon (including any payment in kind interest) and all other amounts payable hereunder at the times and on the dates set forth herein.  Certain capitalized terms used but not defined herein have the meanings set forth in Annex A attached hereto.

1.      The Loan.  Subject to the terms and conditions of this Agreement, the Lenders agree to make Advances to the Company as follows:

(a)      Non Carbon Fleet Loan.  The Non-Carbon Fleet Lenders, on a several basis, will make Advances under the New Money Facility up to the Maximum Non-Carbon Fleet Loan Amount (such Advances, the "**Non-Carbon Fleet Loan**").  The projected amounts of Advances under the Non-Carbon Fleet Loan shall be reflected in the Approved Budget.

(b)      Carbon Fleet Lender Loan.  Subject to the occurrence of the Effective Date, the Carbon Fleet Lender agrees to participate in the New Money Facility by increasing the Administrative Fee collected by the Company under the Services Agreement from 20% to 45% (such 25% increase, the "**Incremental Administrative Fee**" or the "**Carbon Fleet Loan**") and treating the Carbon Fleet Loan as loan advances to the Company evidenced hereby; *provided*, *however*, that the aggregate Advances under the Carbon Fleet Loan shall be available as follows:(i) $667,000 available for the period from the Petition Date until the date of entry of the Final Order authorizing the DIP Facility (the "**Final DIP Order**"), and (ii) $500,000 available for the period from the date of entry of the Final DIP Order to the Closing Date; and *provided further*, to the extent any amount of the Carbon Fleet Loan for any such period is not actually received during such period, such amount may be carried forward and received in a subsequent period.  Such increase shall continue until the aggregate Incremental Administrative Fee collected by the Company is in an amount equal to One Million Five Hundred Thousand Dollars ($1,500,000.00) (which maximum takes into account the Prepetition Carbon Fleet Amount of $333,000 that is part of the Roll-Up Amount; otherwise, such maximum is in an amount equal to $1,167,000 under the New Money Facility) (or such greater amount as the Required Lenders agree to in writing).  The projected amounts of Advances made as part of the Incremental Administrative Fee shall be reflected in the Approved Budget.

2.      Advances Under the Non-Carbon Fleet Loan.

(a)      Initial Advance.  Pursuant to a written request heretofore delivered by the Company, the Non-Carbon Fleet Lenders, in accordance with their respective loan percentage as set forth on Annexure I (the "**Non-Carbon Fleet Pro Rata Percentages**"), shall on the date of this Agreement severally advance under the New Money Facility to the Company the principal sum reflected in the Approved Budget, which amount shall not exceed $3,000,000 without the consent of the Non-Carbon Fleet Lenders (the "**Initial Non-Carbon Fleet Loan Advance**"), by wire transfer of immediately available funds to the Company Account, subject to the terms and conditions of the Interim Order and when each of the following conditions shall have been satisfied (the date on which such condition is satisfied in Collateral Agent's sole discretion, the "**Effective Date**"):

-3-

(i)  The Collateral Agent shall have received the following

(A)  executed counterparts of this Agreement and any other Transaction Documents to be executed and delivered on or prior to such date, from each party hereto or thereto, as applicable, signed on behalf of such party;

(B)  a certificate in a form approved by the Collateral Agent and executed by an Authorized Officer of the Company certifying that (A) the representations and warranties set forth in Section 9 are true and correct on the date of the Initial Non-Carbon Fleet Loan Advance, (B) no Event of Default exists on the date of the Initial Non-Carbon Fleet Loan Advance or would exist by reason of the Initial Non-Carbon Fleet Loan Advance and (C) the Transaction Documents and the transactions contemplated thereby have been duly approved by the board of directors of the Company, by the board of directors, sole member or manager, as applicable, of each other Group Company, which resolutions or written consents remain in full force and effect; and

(C)  an initial Budget, in form and substance satisfactory to the Required Lenders.

(D)  if requested by the Collateral Agent in its sole and absolute discretion, such Security Documents, in each case, duly executed by the Group Companies and any other parties party thereto; and

(E)  such other certificates, documents or consents as Collateral Agent may require.

(ii)  The Petition Date shall have occurred.

(iii)  The Bankruptcy Court shall have entered the Interim Order within three (3) Business Days following the Petition Date, which Interim Order (i) shall have been entered on the docket of the Bankruptcy Court and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Required Lenders.

(iv)  The Collateral Agent shall have received (i) a schedule of all "first day" motions and proposed orders to be filed with the Bankruptcy Court in connection with the commencement of the Chapter 11 Cases and (ii) copies of each of the "first day" motions and proposed orders that affect the rights or duties of the Lenders.

(v)  All Obligations shall be secured by a perfected Lien and security interest on all assets of the Company pursuant to, and such Lien and security interest shall have the priorities set forth in, the DIP Order.

(vi)  The Collateral Agent shall have received satisfactory evidence that a final form of the Kingbee APA has been agreed upon by the parties thereto, subject to Bankruptcy Court approval.

(b)  <u>Additional Advances Under the Non-Carbon Fleet Loan</u>.

4878-6006-8336.1

(i)      From time to time following the date of the Initial Non-Carbon Fleet Loan Advance and entry of the Final Order and until the earlier of (A) the Stated Maturity Date (as defined in Annex A), (B) the prepayment of the Obligations in accordance with the terms hereof, or (C) the Termination Date (as defined in Annex A), the Company may deliver to the Collateral Agent written notice requesting the Non-Carbon Fleet Lenders to advance to the Company, in accordance with the Non-Carbon Fleet Lender's respective Non-Carbon Fleet Pro Rata Percentages, Advances under the New Money Facility of the remaining principal amount of the Non-Carbon Fleet Loan in accordance with the Approved Budget, each for such period under the Approved Budget agreed to by Collateral Agent in its sole and absolute discretion (each request, a "**Requested Non-Carbon Fleet Loan Additional Advance**") and setting forth the date by which the Requested Non-Carbon Fleet Loan Additional Advance is to be made (the "**Additional Non-Carbon Fleet Loan Advance Date**") (which Additional Non-Carbon Fleet Loan Advance Date shall be no less than three (3) Business Days following the delivery of the notice) (unless waived in the Collateral Agent's sole and absolute discretion); *provided, however*, that the maximum aggregate of all Requested Non-Carbon Fleet Loan Additional Advances under the New Money Facility *plus* the Initial Non-Carbon Fleet Loan Advance shall not exceed the Maximum Non-Carbon Fleet Loan Amount.

(ii)      On or before the Additional Non-Carbon Fleet Loan Advance Date, each Non-Carbon Fleet Lender shall advance to the Company, by wire transfer of immediately available funds to the Company Account, an amount equal to the product of (x) the Requested Non-Carbon Fleet Loan Additional Advance and (y) such Non-Carbon Fleet Lender's Non-Carbon Fleet Pro Rata Percentage (the amounts so advanced by the Non-Carbon Fleet Lenders, the "**Additional Non-Carbon Fleet Loan Advance**"); *provided, however*, that in no event shall any Non-Carbon Fleet Lender be obligated to do so unless on or before the Additional Non-Carbon Fleet Loan Advance Date the Company delivers to the Collateral Agent (i) a certificate in a form approved by the Collateral Agent and executed by an Authorized Officer of the Company certifying that (A) the representations and warranties set forth in Section 9 are true and correct on the Additional Non-Carbon Fleet Loan Advance Date and (B) no Event of Default exists on the Additional Non-Carbon Fleet Loan Advance Date or would exist by reason of the Additional Non-Carbon Fleet Loan Advance.

(c)      Roll-Up.  Subject to the terms and conditions of the applicable DIP Order, and without any further action by any party to this Agreement, the Roll-Up Amount (including accrued and unpaid interest thereon) shall be deemed Advances made under this Agreement, shall be administered hereunder, subject to the terms and conditions set forth herein and subject to the following: (i) the Prepetition Carbon Fleet Amount shall be deemed outstanding as part of the Carbon Fleet Loan and (ii) the Prepetition Non-Carbon Fleet Amount shall be deemed outstanding as part of the Non-Carbon Fleet Loan.  The Advances represented by the Roll-Up Amount under this Section 2(c) may be prepaid or repaid but may not be reborrowed.

(d)      Use of Proceeds.  The Company shall use the proceeds of the Advances in accordance with Section 10(a); *provided, however*, that the Company shall not use or permit to be used any part of the proceeds for the benefit of any Excluded Subsidiary or be in the possession or deposited with any Excluded Subsidiary (or any bank account in any Excluded Subsidiary's name), except, in each case, as may be agreed to in writing by the Principal Lenders.

(e)     <u>No Reborrowing</u>.  Any Advances that have been repaid may not be reborrowed.

(f)     <u>No Joint and Several Liability</u>.  In no event will any Lender have any liability for the obligations of any other Lender under this <u>Section 2</u> or any other provision of this Agreement (it being understood and agreed that the liabilities of the Lenders are several (and not joint or joint and several)).

3.      <u>Advances under the Carbon Fleet Loan</u>.

(a)     The Carbon Fleet Lender agrees to increase the Administrative Fee collected by the Company under the Services Agreement by the amount of the Incremental Administrative Fee and that the amounts of the Incremental Administrative Fee collected by the Company from the date hereof through the earlier of (A) the Stated Maturity Date, (B) the prepayment of the Obligations in accordance with the terms hereof, or (C) the Termination Date (the "**Carbon Fleet Loan Advances**") constituting part of the indebtedness evidenced hereby. Each Carbon Fleet Loan Advance shall be deemed made on the date the corresponding amount of the Incremental Administrative Fee is collected by the Company.

(b)     The Carbon Fleet Lender hereby designates and appoints Goldman (the "**Carbon Fleet Lender Representative**") as its representative and agent on its behalf for all purposes hereunder, including receipt of any notices and consents related to this Agreement and the other Transaction Documents, the collateral information under the Transaction Documents, information and any matters related to the Company or its Subsidiaries, the giving of instructions or consents by the Carbon Fleet Lender in relation to any matters related to this Agreement, the other Transaction Documents, the Company or its Subsidiaries, the making of the Carbon Fleet Loan Advances, any distribution of proceeds, receiving all other notices hereunder or under any of the other Transaction Documents and taking all other actions on behalf of the Carbon Fleet Lender under the Transaction Documents.  The Carbon Fleet Lender Representative hereby accepts such appointment.  The Collateral Agent and the Lenders may regard any notice or other communication pursuant to any Transaction Document to or from the Carbon Fleet Lender Representative as a notice or communication to or from the Carbon Fleet Lender.  Each warranty, covenant, agreement and undertaking made on behalf of the Carbon Fleet Lender by the Carbon Fleet Lender Representative shall be deemed for all purposes to have been made by the Carbon Fleet Lender and shall be binding upon and enforceable against the Carbon Fleet Lender to the same extent as if the same had been made directly by the Carbon Fleet Lender.  In accordance with the foregoing, at any time, with respect to the determination at any time of the Carbon Fleet Loan Advances made by the Carbon Fleet Lender, the Collateral Agent and the Lenders shall be able to rely on the statement from the Carbon Fleet Lender Representative as to the amount of such Carbon Fleet Loan Advances made as of such date and shall not be required inquire further about such amount with the Carbon Fleet Lender or the Company or otherwise.

4.      <u>Interest</u>.

(a)     <u>Rate</u>. Each Advance shall bear interest from the time made until paid at the rate of eight percent (8%) per annum, compounded monthly on each Interest Payment Date.

Interest shall be computed on the basis of a 365 or 366 day year, as the case may be, and the actual days elapsed.

(b)    Payment.  Interest shall be due and payable in arrears on the first (1st) Business Day of each calendar month following the date hereof and the Maturity Date (each such scheduled date for interest payment, an "**Interest Payment Date**"), and shall be paid in kind by automatically increasing the principal amount outstanding under this Agreement by an amount equal to the interest payable in kind on each Interest Payment Date; *provided, however*, that, solely if the Company elects, the Company may instead on the Interest Payment Date pay the outstanding interest in cash.

5.    Maturity.  All principal, interest, fees, Costs and other amounts payable under this Agreement shall be due and payable on the date (the "**Maturity Date**") that is the earlier of (i) the Stated Maturity Date and (ii) the Termination Date.

6.    Prepayment.  The Company may prepay all, but not less than all, of the principal balance of this Agreement within three (3) days' prior written notice to the Collateral Agent.  Once repaid, no further amounts may be borrowed under this Agreement.

7.    Late Charges.  In the event that the Company fails to make any payment of principal, interest, fees, Costs or other amounts payable under this Agreement within ten (10) days of the date required hereunder (whether by maturity, acceleration or otherwise), the Company shall pay a late charge to compensate the Lenders for the incurred costs caused by such delay in payment.  It is acknowledged by the Company and the Lenders that the actual amount necessary to adequately compensate the Lenders in such case would be impracticable and extremely difficult to calculate.  The Company and the Lenders, therefore, agree that the amount of such late charge shall be three percent (3%) of the amount of such payment, which the Company and the Lenders agree represents a reasonable sum considering all of the circumstances existing as of the date of this Agreement and represents a fair and reasonable estimate of the costs that the Lenders will incur by reason of late payment.  Acceptance of any late charge shall not constitute a waiver of the default with respect to overdue amount and shall not prevent the Lenders from exercising any of the other rights and remedies available to the Lenders.

8.    Application and Manner of Payments.  Subject to Section 13(d), all payments hereunder to the Lenders are to be applied first to the payment of accrued interest, and thereafter to the payment of principal.  Except as otherwise expressly provided herein, all principal, interest, fees, Costs and other amounts payable under this Agreement shall be payable (a) to the Lenders in accordance with their respective Pro Rata Percentages, (b) by wire transfer of immediately available funds to the account of each Lender as designated by such Lender to the Company in writing and (c) in lawful currency of the United States of America.

9.    Representations and Warranties of the Company.  The Company represents and warrants, and shall cause each Group Company, as applicable, to, represent and warrant to the Lenders as follows:

(a)    Due Organization and Authorization; No Conflicts; Binding Obligations.

-7-

(1)     Each Group Company is duly organized and existing and in good standing under the laws of the jurisdiction of its organization and the laws of those jurisdictions in which it is qualified to do business.

(2)     Subject to the Bankruptcy Court's entry of the applicable DIP Order, the execution, delivery, and performance by each Group Company of the Transaction Documents to which such Group Company is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary action of such Group Company, as applicable.

(3)     The execution, delivery, and performance by each Group Company of the Transaction Documents to which such Group Company is a party and the consummation of the transactions contemplated thereby do not and will not, (i) violate the governing documents of such Group Company or, subject to the Bankruptcy Court's entry of the applicable DIP Order, any Law applicable to any Group Company or, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contract of any Group Company or (iii) result in or require the creation or imposition of any Lien upon any properties or assets of any Group Company (other than pursuant to the Transaction Documents).

(4)     Subject to the Bankruptcy Court's entry of the applicable DIP Order, each Transaction Document to which a Group Company is a party, when executed and delivered such Group Company, will be the legally valid and binding obligations of such Group Company, enforceable against such Group Company in accordance with their respective terms.

(5)     Subject to the Bankruptcy Court's entry of the applicable DIP Order, this Agreement has been duly authorized and duly and validly issued.

(b)     _Governmental Consents_.  Subject to the Bankruptcy Court's entry of the applicable DIP Order, the execution, delivery and performance by the each Group Company and the consummation of the transactions contemplated by the Transaction Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority, except (a) such as have been obtained and are in full force and effect and (b) for filings and recordings with respect to the Collateral to be made, or otherwise delivered to the Collateral Agent for filing and/or recordation, as of the date of this Agreement.

(c)     _Litigation_.  There are no actions, suits, proceedings or investigations pending or threatened against any Group Company by any Person seeking to restrain, prevent or change the transactions contemplated by any Transaction Document or questioning the validity or legality of any of such transactions.

(d)     [Reserved].

(e)     _Title_.  The Group Companies have good, sufficient and legal title to the Collateral.  Except as permitted by this Agreement, the Collateral is free and clear of Liens.

(f)     _Margin Stock_.  The Company is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of any Advance made to or for the benefit of the Company will be used to purchase or carry any Margin Stock or to extend credit to others for the

-8-

purpose of purchasing or carrying any Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors, as in effect from time to time or any other regulation thereof or to violate the Exchange Act.

(g)     <u>Investment Company</u>.  No Group Company is an "investment company" required to register under the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder.

(h)     <u>Disclosure</u>.  No representation or warranty of any Group Company contained in any Transaction Document or in any other documents, certificates or written statements furnished to the Lenders by or on behalf of the Company for use in connection with the transactions contemplated hereby, taken as a whole, contains any untrue statement of a material fact or omits to state a material fact (known to the Company, in the case of any document not furnished by them) necessary in order to make the statements contained herein or therein, taken as a whole, not materially misleading in light of the circumstances in which the same were made. Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Company to be reasonable at the time made, it being recognized by the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.  There are no facts known (or which should upon the reasonable exercise of diligence be known) to the Company (other than matters of a general economic nature) that have not been disclosed herein or in such other documents, certificates and statements furnished to the Lenders for use in connection with the transactions contemplated hereby.

(i)     <u>Compliance with Laws</u>.  Each Group Company is in compliance with all applicable Laws (except for certain unpaid Taxes) in respect of the conduct of its business and the ownership of its property.  Without limiting the foregoing, no Group Company is in violation of and shall not violate any of the country or list based economic and trade sanctions administered and enforced by OFAC that are described or referenced at http://ustreas.gov/offices/enforcement/ofac/ or as otherwise published from time to time.

(j)     <u>Brokers; Finders</u>.  No Group Company has utilized the services of any broker or finder in connection with obtaining financing from the Lenders under this Agreement and no Person is or will be entitled to any payment or consideration as a result of obtaining financing from the Lenders under this Agreement, including any brokerage commissions, finder's fees or bonuses to employees, officers, managers or directors.

10.     <u>Affirmative Covenants</u>.  The Company hereby covenants and agrees that it shall, and shall cause each Group Company, as applicable, to, perform, comply with and observe each of the following covenants:

(a)     <u>Budget</u>.  The Company shall operate its business pursuant to the Approved Budget, and may use the proceeds of the Advances for the purposes described in and up to the amounts listed in the Approved Budget (or according to deviations from the Approved Budget expressly approved by the Required Lenders in writing) solely for the working capital and general corporate purposes of the Company.  The Approved Budget shall not be amended, modified or supplemented without the prior written approval of the Required Lenders, which approval may be

-9-

granted, withheld or conditioned in their respective sole discretion, and no such updated, modified or supplemented Budget shall be effective until so approved and if so approved shall be deemed the "Approved Budget."

(b)    <u>Financial Covenants</u>.  Comply with the following financial covenants:

(1)    Without the prior written consent of the Collateral Agent and the Carbon Fleet Lender in their respective sole and absolute discretion, the Company shall not make disbursements during any week except for the disbursements for the line items provided for in the Approved Budget for such week;

(2)    the Company may not make (i) disbursements for any line item under the "Total Operating Disbursement" category in the Approved Budget during any week that are more than 115% of the disbursements projected for such line item for such week in the Approved Budget and (ii) expenditures for estate professional fees in excess of 100% of the amount allocated for such expenditures in the Approved Budget for such period;

(3)    the Company shall not use any amounts allocated to a particular line item in the Approved Budget to pay any expenses under any other line item(s) in the Approved Budget without the prior express written consent of the Required Lenders in their respective sole and exclusive discretion;

(4)    the Company may carry forward any unused amounts contained in any line item in the Approved Budget for any week to any subsequent week for that same line item in the Approved Budget; and

(5)    the amount of the actual "Total Receipts" line item for any week shall not be less than 80% of the projected "Total Receipts" as set forth in the Approved Budgets with respect to such week;

(c)    <u>Variance Report</u>.  The Company shall deliver to the Collateral Agent, by 5:00 p.m. (Eastern Time) on Wednesday of each week, commencing with the first Wednesday following the date of this Agreement, line-by-line variance reports (in form and scope reasonably acceptable to the Collateral Agent) by week for the immediately preceding weekly period and on a cumulative basis from the beginning of the Budget period comparing actual cash disbursements to cash disbursements forecasted in the Budget for such period on a line-by-line basis.  The variance report will include explanations of any variances of 5% or greater.

(d)    <u>Notices</u>

(1)    <u>Notice of Default</u>.  Promptly upon any Authorized Officer of any Group Company obtaining knowledge of any Default or Event of Default or that notice has been given to such Group Company with respect thereto, the Company shall deliver to Collateral Agent a certificate of its Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action such Group Company has taken, is taking and proposes to take with respect thereto.

-10-

(2)      Notice Re: Money Laundering.  The Company shall immediately notify the Collateral Agent if any Group Company is convicted on, pleads nolo contendere to, is indicted on, or is arraigned and held over on, charges involving money laundering or predicate crimes to money laundering.

(3)      Other Information.  Such other information and data with respect to each Group Company as from time to time may be reasonably requested by the Lenders.

(e)      Existence.  The Company will, and will cause each Group Company, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business.

(f)      Chapter 11 Milestones.  The Company will satisfy each Chapter 11 Milestone in accordance with the terms applicable to such Chapter 11 Milestone set forth in Annex B hereto.

(g)      Insurance.  The Company will, and will cause each Group Company to, maintain directors' and officers' liability insurance in an amount acceptable to the Collateral Agent.

(h)      Books and Records.  The Company will, and will cause each Group Company to, keep proper books of record and accounts in which full, true and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities.

(i)      Compliance with Laws.  Each Group Company will comply, and shall cause each other Group Company to comply, with the requirements of all applicable Laws (except for the payment of certain Taxes).

(j)      Further Assurances.  At any time or from time to time upon the request of the Principal Lenders, the Group Companies will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Principal Lenders may reasonably request in order to effect fully the purposes of the Transaction Documents.

11.      Negative Covenants.  The Company hereby covenants and agrees that it shall, and shall cause each Group Company, as applicable to, perform, comply with and observe each of the following covenants:

(a)      Indebtedness.  No Group Company shall directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(1)      the Obligations;

(2)      Indebtedness under the Prepetition Credit Agreement or any related documents;

(3)      Indebtedness of any Group Company to any other Group Company; *provided*, all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, is reasonably satisfactory to the Lenders;

(4)      Indebtedness that may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business or in respect of workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(5)      Indebtedness of any Group Company in respect of netting services, overdraft protections and otherwise in connection with deposit, securities, and commodities accounts arising in the ordinary course of business;

(6)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, such Indebtedness is extinguished within five (5) Business Days after its incurrence;

(7)      Indebtedness consisting of unpaid insurance premiums (not in excess of one year's premiums) owing to insurance companies and insurance brokers incurred in connection with the financing of insurance premiums in the ordinary course of business;

(8)      guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of any Group Company;

(9)      guaranties by the Company of Indebtedness of any other Group Company with respect, in each case, to Indebtedness otherwise permitted to be incurred pursuant to this Section 11(a); *provided*, if the Indebtedness that is being guarantied is unsecured and/or subordinated to the Obligations, then such guaranty shall also be unsecured and/or subordinated to the Obligations; and

(10)      Indebtedness of any Group Company described in Schedule 11(a).

(b)      Liens.  No Group Company shall directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of such Group Company, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state or under any similar recording or notice statute, except:

(1)      Liens in favor of the Collateral Agent granted pursuant to any Transaction Document or the Prepetition Credit Agreement or any related documents;

-12-

(2)      Liens for Taxes with respect thereto and statutory Liens for Taxes not yet due and payable;

(3)      statutory Liens of landlords, carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by Law (other than any such Lien imposed pursuant to Section 430(k) of the Internal Revenue Code or a violation of Section 436 of the Internal Revenue Code), in each case incurred in the ordinary course of business (i) for amounts not yet overdue or (ii) for amounts that are overdue and that (in the case of any such amounts overdue for a period in excess of five (5) days) are being contested in good faith by appropriate proceedings, so long as such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made for any such contested amounts;

(4)      customary rights of set off, bankers' liens, refunds or charge backs, under deposit agreements, the UCC or common law, of banks or other financial institutions where the such Group Company maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

(5)      Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money or other Indebtedness), so long as (i) any Liens that secure surety bonds attach only to the contracts in respect of which such surety bonds are posted and, as to any other properties, such Liens are junior to the Liens in favor of the Collateral Agent on the same properties that constitute Collateral under the Security Documents, and (ii) no foreclosure, sale or similar proceedings have been commenced with respect to any portion of the Collateral on account thereof;

(6)      easements, rights-of-way, restrictions (including zoning restrictions), encroachments, covenants, licenses, protrusions, and other similar charges or encumbrances and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of such Group Company;

(7)      any interest or title of a lessor or sublessor under any lease permitted hereunder of any real estate asset;

(8)      Liens created in the ordinary course of business on deposits to secure liability for premiums to insurance carriers or securing insurance premium financing arrangements;

(9)      Liens arising in connection with conditional sale, title retention, consignment or similar arrangements for the sale of goods in the ordinary course of business;

(10)      Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted hereunder;

-13-

(11)    purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(12)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(13)    any zoning or similar Law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property;

(14)    non-exclusive outbound licenses of patents, copyrights, trademarks and other intellectual property rights granted in the ordinary course of business and not interfering in any respect with the ordinary conduct of or materially detracting from the value of the business of the grantor thereof; and

(15)    Liens described in Schedule 11(b).

(c)    No Further Negative Pledge.  No Group Company shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired, to secure the Obligations without the prior written consent of the Collateral Agent (which consent may be withheld, delayed or conditioned in its sole and absolute discretion).

(d)    Investments.  No Group Company shall, directly or indirectly, make or own any Investment in any Person except Investments in or constituting:

(1)    cash and cash equivalents in the ordinary course of business;

(2)    equity interests by a Group Company in any Subsidiary of the Company;

(3)    Investments in any Group Company;

(4)    accounts receivable arising and trade credit granted in the ordinary course of business;

(5)    (i) Securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such account debtors, (ii) deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of the Group Companies; and (iii) Securities of trade creditors or customers that are received in settlement of bona fide disputes;

(6)    Investments made in the ordinary course of business consisting of negotiable instruments held for collection in the ordinary course of business and lease, utility and other similar deposits in the ordinary course of business;

(7)    intercompany loans to the extent permitted under Section 11(a)(3);

-14-

(8)     Capital Expenditures; and

(9)     Investments described in Schedule 11(d).

(e)     Fundamental Changes; Disposition of Assets; Acquisitions.  No Group Company shall enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, license, exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed or acquire by purchase or otherwise (other than purchases or other acquisitions of inventory, materials and equipment and the licensing of intellectual property, in each case, in the ordinary course of business) the business, property or fixed assets of, or equity interests in, any Person or any division or line of business or other business unit of any Person, except:

(1)     (i) any Group Company may be merged with or into the Company or any other Group Company, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to the Company; provided, in the case of such a merger with the Company, the Company shall be the continuing or surviving Person; and

(2)     sales, leases, licenses, exchanges, transfers or other dispositions of assets in the ordinary course of business.

(f)     Disposal of Subsidiary Interests.  No Group Company shall (a) directly or indirectly sell, assign, pledge or otherwise encumber (except for Permitted Liens) or dispose of any equity interests of any of its Subsidiaries, except to qualified members of the board of directors if required by applicable Law; or (b) permit any Subsidiary of the Company directly or indirectly to sell, assign, pledge or otherwise encumber (except for Permitted Liens) or dispose of any equity interests of any of its Subsidiaries, except to the Company (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualified members of the board of directors if required by applicable Law.

(g)     Transactions with Affiliates.  No Group Company shall directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of such Group Company; provided, so long as the Company is in compliance with the financial covenants with respect to the Approved Budget as set forth in Sections 10(a) and 10(b), the foregoing restriction shall not apply to:

(1)     any transaction between a Group Company and a Lender;

(2)     (i) any transaction between any Group Company and (ii) any transaction between any Group Company and any Excluded Subsidiary, in each case, not otherwise restricted hereunder;

(3)      reasonable and customary indemnities provided to, and reasonable and customary fees paid to, members of the board of directors or board of managers, as applicable, of the Group Companies; and

(4)      reasonable and customary compensation arrangements for officers and other employees of the Group Companies entered into in the ordinary course of business.

(h)      <u>Conduct of Business</u>.  From and after the date of this Agreement, no Group Company shall engage in any business other than (a) the businesses engaged in by such Group Company on the date of this Agreement and similar or related businesses and (b) such other lines of business as may be consented to by the Principal Lenders.

(i)      <u>No Dividends or Distributions</u>.  No Group Company shall make (x) any dividend or other distribution, directly or indirectly, on account of the capital stock, membership interests or any other equity interests of such Group Company now or hereafter outstanding, or (y) any redemption, retirement, purchase or other acquisition for value, directly or indirectly, of the capital stock, membership interests or any other equity interests of such Group Company now or hereafter outstanding.

(j)      <u>Legal Fees</u>.  No Group Company shall reimburse or pay (directly or indirectly via offset against any Advance hereunder) any fees, costs or expenses of counsel incurred by any Lender, Goldman or Atalaya prior to the date of this Agreement, the Carbon Fleet Credit Agreement, the Carbon Fleet Forbearance Agreement or in connection with the transactions contemplated by this Agreement, the Carbon Fleet Credit Agreement or the Carbon Fleet Forbearance Agreement without the prior written consent of the Lenders.

12.      <u>Security and Guaranty</u>.  To secure the payment and performance of the Obligations, the Company and each other Group Company hereby agree as follows:

(a)      <u>Security</u>.  Such Group Company hereby grants, pledges and collaterally assigns to the Collateral Agent, and its successors and assigns, for the benefit of the Lenders, a continuing Lien and security interest in all of such Group Company's right in, title and interest to and under, the Collateral of such Group Company.  Each Group Company acknowledges and agrees that, upon entry of the DIP Order and the delivery and execution of this Agreement, the Obligations shall at all times be secured and perfected pursuant to, and have the DIP Superpriority Claims (defined in the DIP Order) and DIP Liens (defined in the DIP Order) as set forth in, the DIP Order.

(b)      <u>Guaranty</u>.  Each Group Company other than the Company unconditionally and irrevocably guarantees to the Collateral Agent, for the benefit of the Lenders, the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations as set forth in <u>Exhibit C</u> hereto.  In furtherance thereof, each such Group Company agrees to the terms of such guaranty set forth on <u>Exhibit C</u> hereto and that each such term is applicable to such Group Company as of the Effective Date.

13.      <u>Event of Default</u>.

(a)     The occurrence of any one or more of the following conditions or events shall constitute an "Event of Default":

(1)     any failure by any Group Company to pay any principal, interest, fees or other amounts payable under this Agreement when due;

(2)     failure of any Group Company to perform or comply with any term or condition contained in Section 10(a), Section 10(b), Section 10(c), Section 10(e), Section 10(d) (as it relates to the existence of the Company), Section 10(f), or Section 11;

(3)     the breach of any other provision of this Agreement or any other Transaction Document, and such breach is not cured, if capable of being cured (it being understood that if such breach is not capable of being cured then no cure period shall apply) within two (2) Business Days of such breach;

(4)     any representation, warranty or certification made or deemed made by any Group Company in any Transaction Document or in any statement or certificate at any time given by such Group Company in writing pursuant hereto or thereto or in connection herewith or therewith shall be incorrect or misleading in any material respect as of the date made or deemed made;

(5)     (i) failure of any Group Company to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 11(a)(1)) in an individual or aggregate principal amount of $250,000 or more beyond the grace period, if any, provided therefor; or (ii) breach or default by any Group Company with respect to any other material term of (A) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (B) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; *provided* that this clause (5) does not apply to any pre-petition Indebtedness to the extent the enforcement of remedies in connection with such pre-petition Indebtedness is stayed by the application of the Bankruptcy Code;

(6)     The occurrence of any of the following:

(i)      Any Chapter 11 Milestone is not satisfied in accordance with the terms relating to such Chapter 11 Milestone set forth in Annex B hereto;

(ii)     The Company fails to observe or comply in any material respect with the terms of the Interim Order and Final Order, as applicable;

(iii)    The Bankruptcy Court enters any order or orders granting relief from any stay of proceeding (including, without

-17-

limitation, the automatic stay under the Chapter 11 Cases) so as to allow a third party or third parties to proceed against assets of any the Company or any other Group Company valued in excess of $250,000;

(iv)  Except upon the prior written consent of the Required Lenders, the Company or any Subsidiary shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim Order, the Final Order or any of the Transaction Documents;

(v)  Unless otherwise agreed in writing by the Required Lenders, the Company or any of its Subsidiaries shall file any motion to approve any sale or other disposition of assets or shall obtain approval of a sale (other than pursuant to the Kingbee APA) that does not provide for the payment in full of the DIP Loan;

(vi)  The filing of a chapter 11 plan in the Bankruptcy Cases that does not propose to pay in full in cash all Obligations on the effective date of said plan;

(vii)  The Interim Order or the Final Order, as applicable, shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(viii)  The Interim Order or the Final Order, as applicable, is modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of the Required Lenders;

(ix)  The occurrence of any default or event of default under the Interim Order or the Final Order, as applicable, and the continuance thereof after any grace or cure period provided in such order or granted by order of a court in the Bankruptcy Cases;

(x)  Conversion of any of the Chapter 11 Cases to a Chapter 7 case under the Bankruptcy Code, or dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily and the Obligations are not simultaneously indefeasibly paid in full;

(xi)  A trustee or an examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code;

(xii) The Company's "exclusive period" under section 1121 of the Bankruptcy Code for the filing of a chapter 11 plan terminates;

(xiii) The Company petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility or any Subsidiary petitions the Bankruptcy Court to obtain any financing;

(xiv) The allowance of any claim or claims under section 506(c) of the Bankruptcy Code against any of the Collateral;

(xv) Any order is entered precluding or otherwise limiting the Collateral Agent from "credit bidding"; and

(xvi) Entry of an order by the Bankruptcy Court in favor of any statutory committee appointed in the Bankruptcy Cases by the U.S. Trustee, any ad hoc committee, or any other party in interest, (i) granting such party standing to pursue any claims against the Lenders, (ii) sustaining an objection to claims of the Lenders, (iii) avoiding any Liens held by the Collateral Agent or the Lenders under the DIP Facility, or (iv) avoiding any Liens held by any Collateral Agent except as otherwise agreed by the Collateral Agent and each Lender adversely effected thereby in writing (provided, that the foregoing shall not be deemed to prohibit the investigation by any such committee of any such claims or liens under the Prepetition Credit Agreement).

(7) the termination of the Kingbee APA for any reason, including as a result of the failure of a condition to closing of the transaction thereunder;

(8) any money judgment, writ or warrant of attachment involving (i) in any individual or aggregate at any time an amount in excess of $250,000 (in each case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Group Company thereof or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder);

(9) a Change of Control shall occur;

(10) the removal, resignation or termination of (i) the Independent Director from the board of directors of the Company or (ii) Scott Avila as interim Chief Executive Officer of the Company; *provided, however,* that the resignation of either the Independent Director or Scott Avila as interim Chief Executive Officer of the Company shall not constitute an Event of Default so long as the Independent Director or Scott Avila, as applicable, is replaced within five (5) days following such resignation with a replacement independent director for the board of

-19-

directors of the Company or a replacement Chief Executive Officer of the Company, as applicable, in each case, with such replacement reasonably acceptable to the Required Lenders;

(11)    any action or inaction taken by the common stockholders of the Company that results in an increase in the number of members serving on the board of directors of the Company to an amount greater than five (5) members;

(12)    at any time after the execution and delivery thereof, (i) the DIP Facility, this Agreement or any Security Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or the Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Security Documents with the priority required by the relevant Security Document, in each case for any reason other than the failure of the Collateral Agent to take any action within its control, or (ii) any Group Company shall contest the validity or enforceability of any Transaction Document in writing or deny in writing that it has any further liability, including with respect to future advances by the Lenders, under any Transaction Document to which it is a party, or (iii) any Group Company shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Security Documents;

(13)    any of the following (a) the failure to agree on a servicing agreement among Goldman, Midtown and Kingbee in connection with the Kingbee 363 Sale Transaction upon terms satisfactory to its parties or (b) any developments which would prevent such servicing agreement from going into effect upon Bankruptcy Court approval of the Kingbee 363 Sale Transaction;

(14)    the Carbon Fleet Subsidiary, any Group Company and/or any other Subsidiary of a Group Company shall cause the Carbon Fleet Subsidiary to own less than 1,500 Financed Vehicles (as defined in the Carbon Fleet Credit Agreement) at any time;

(15)    the replacement of the Company with Vervent Inc. or another backup servicer without the Principal Lenders' prior written consent; or

(16)    the termination of the forbearance under the Carbon Fleet Forbearance Agreement.

(b)    <u>Default Interest</u>.  In addition to the regular interest payable under this Agreement, but subject to applicable Law and clause (c) of <u>Section 13</u>, upon and during the occurrence of any Event of Default, this Agreement shall bear interest, from the date of the occurrence of such Event of Default until such Event of Default is cured or waived at a rate equal to the interest rate otherwise in effect *plus* two percent (2%) *per annum* (the "**Default Interest**"). Default Interest shall be payable in cash or in kind, at the election of the Collateral Agent, in its sole discretion.  If the Collateral Agent elects to have the Default Interest paid in cash, such Default Interest shall be payable on demand by the Collateral Agent.  If the Collateral Agent elects to have the Default Interest paid in kind, the principal amount outstanding under this Agreement will automatically be increased by an amount equal to such Default Interest.

-20-

(c)    <u>Acceleration and Remedies</u>.  Upon the occurrence of any Event of Default, and without further application to the Bankruptcy Court, subject to the DIP Order, the Collateral Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions, and the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Collateral Agent to take any of the following actions, at the same or different times:

(1)    declare the Obligations, whether evidenced by this Agreement or by any of the other Transaction Documents immediately due and payable, whereupon the same shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Company;

(2)    upon notice to the Company and the Company's bankruptcy counsel, terminate the Company's ability to use of the Lenders' cash collateral;

(3)    charge interest at the Default Interest;

(4)    obtain and liquidate the Collateral.  If notice of disposition of Collateral is required by law, ten (10) days prior notice by the Collateral Agent to the Company designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and the Company waives any other notice.  The Collateral Agent may bid for and purchase the Collateral at any public sale.  The Collateral Agent may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(5)    require the Company to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;

(6)    take possession of all Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and

(7)    exercise any of its other rights under the Transaction Documents, any rights granted under the applicable DIP Order and applicable law.

To the extent an Event of Default occurs as a result of the Company's failure to indefeasibly satisfy the Obligations in full by the Stated Maturity Date, the Company waives any right (a) to any notice period set forth in this clause (c) above and (b) to challenge (i) whether or not the Maturity Date or an Event of Default has occurred, (ii) the Collateral Agent's exercise of its rights and remedies against the Collateral, including without limitation, any foreclosure through a state court proceeding, and (iii) the applicability of the Default Interest.

(d)    <u>Application of Payments and Proceeds</u>. Upon the occurrence and during the continuance of an Event of Default and after the acceleration of the principal amount of any of the Advances, all payments and proceeds in respect of any of the Obligations received by the Lenders under any Transaction Document, including any proceeds of any sale of, or other realization upon, all or any part of the Collateral, shall be applied as follows:

-21-

(1)      *first*, to all fees, costs, indemnities, liabilities, obligations, and expenses incurred by or owing to the Lenders with respect to this Agreement, the other Transaction Documents or the Collateral;

(2)      *second*, to accrued and unpaid interest on the Obligations (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts);

(3)      *third*, to the principal amount of the Obligations;

(4)      *fourth*, to any other Indebtedness or obligations of the Company owing to the Lenders under the Transaction Documents; and

(5)      *fifth*, to the Company or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct;

In carrying out the foregoing, (a) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (b) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its pro rata share of amounts available to be applied pursuant thereto for such category.  The Company irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lenders from or on behalf of the Company, and, as between the Company on the one hand and the Lenders on the other, the Lenders shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as the Lenders may deem advisable notwithstanding any previous application by the Lenders.

14.    Maximum Lawful Rate of Interest.   The rate of interest payable under this Agreement shall in no event exceed the maximum rate permissible under applicable Law.  If the rate of interest payable on this Agreement is ever reduced as a result of this Section 14 and at any time thereafter the maximum rate permitted under applicable Law exceeds the rate of interest provided for in this Agreement, then the rate provided for in this Agreement shall be increased to the maximum rate provided for under applicable Law for such period as is required so that the total amount of interest received by Lenders is that which would have been received by Lenders but for the operation of the first sentence of this Section 14.

15.    Costs.   In accordance with Section 8, but subject to Section 11(j), the Company shall pay all Costs upon demand of any Lender or the Collateral Agent incurring same.

16.    Extension of Time.   The Collateral Agent, with the consent of the Required Lenders, may extend the time for payment of the Obligations, postpone the enforcement hereof, or grant any other indulgences (which indulgences may be granted by Collateral Agent's discretion if other Lender approval is not explicitly required hereunder) without affecting or diminishing the Lenders' right to recourse against the Company, which right is expressly reserved.  The Company hereby consents to any and all renewals, replacements, and/or extensions of time for payment of this Agreement before, at, or after maturity.

17.     <u>Company's Waivers</u>.  The Company hereby waives presentment for payment, demand, protest, notice of protest and notice of dishonor hereof, and all other notices of any kind to which it may be entitled under applicable Law or otherwise.  All payments under this Agreement shall be made without setoff, counterclaim or deduction of any kind.

18.     <u>General</u>.

(a)     <u>Notices</u>.     Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given: (i) on the date of delivery, if personally delivered by hand; (ii) upon the third (3rd) Business Day after such notice is deposited in the United States mail, if mailed by registered or certified mail, postage prepaid, return receipt requested; (iii) upon the date scheduled for delivery after such notice is sent by a nationally recognized overnight express courier if the delivery date is a Business Day or otherwise the next Business Day; or (iv) when sent, if sent, by electronic mail before 5:00 p.m. on a Business Day at the location of receipt, or otherwise on the next Business Day, in each case to the addresses set forth in <u>Exhibit A</u> attached hereto.

(b)     <u>Governing Law</u>. In all respects, including matters of construction, validity and performance, this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York applicable to contracts made and performed in that state (without regard to the choice of law or conflicts of law provisions thereof that would require the application of the law of any other jurisdiction).

(c)     <u>SUBMISSION TO JURISDICTION</u>.  THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT COLLATERAL AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE COLLATERAL AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.

(d)     <u>WAIVER OF VENUE</u>.  THE COMPANY, ON BEHALF OF ITSELF AND EACH GROUP COMPANY, IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT IN ANY COURT REFERRED TO IN <u>SECTION 18(c)</u>, AND WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(e)     <u>SERVICE OF PROCESS</u>.  THE COMPANY, ON BEHALF OF ITSELF AND EACH GROUP COMPANY, HEREBY IRREVOCABLY CONSENTS TO SERVICE OF

PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 18(a)</u>.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(f)     <u>Waiver of Trial by Jury</u>.  EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF.  EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF SUCH PARTY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MIGHT BE FILED IN ANY COURT AND THAT MAY RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, INCLUDING ALL COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY FURTHER REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, MODIFICATIONS, SUPPLEMENTS OR RESTATEMENTS HEREOF.

(g)     <u>Cumulative Remedies</u>.  All rights and remedies of any party are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

(h)     <u>Further Assurances</u>.  The Company shall from time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions (including obtaining any consents, exemptions, authorizations, or other actions by, or giving any notices to, or making any filings with, any Governmental Authority or any other Person), as the Collateral Agent may reasonably request, for the purposes of implementing or effectuating the provisions of this Agreement, Liens on the Collateral in connection herewith.

(i)     <u>Severability</u>.  If any one or more of the provisions contained in this Agreement, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions of this Agreement.  The parties hereto further agree to replace such invalid, illegal or unenforceable provision of this Agreement with a valid, legal and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid, illegal or unenforceable provision.

(j)     <u>Successors and Assigns</u>.  All of the covenants and provisions of this Agreement shall bind and inure to the benefit of the parties' respective successors and permitted assigns hereunder.  Any Principal Lender may assign any of its rights hereunder to any Person.

-24-

No other Lender or the Company may assign any of its rights, or delegate any of its obligations, under this Agreement without the prior written consent of the Principal Lenders, and any such purported assignment by the Company without such consent shall be null and void and of no force or effect.  There are no intended third party beneficiaries of this Agreement.

(k)     Entire Agreement.  This Agreement and the other Transaction Documents constitutes the entire agreement among the Company, the Collateral Agent and the Lenders with respect to the subject matter hereof and thereof and supersede any contemporaneous or prior understandings, agreements or representations by or among the Company, the Collateral Agent and the Lenders with respect to the subject matter hereof and thereof.

(l)     Amendment; Waiver.

(i)     Except as expressly provided elsewhere herein, no amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, or any consent to any departure by any party from the terms of any provision of this Agreement, shall be effective (A) only if it is made or given in writing and signed by the Principal Lenders and the Carbon Fleet Lender Representative (and, in the case of an amendment that would increase any Lender's obligation to make Advances, by such Lender, on the one hand, and the Company, on the other hand, and (B) only in the specific instance and for the specific purpose for which it is made or given.  No amendment, supplement or modification of or to any provision of this Agreement, or any waiver of any such provision or consent to any departure by any party from the terms of any such provision may be made orally.  Except where notice is specifically required by this Agreement, no notice to or demand on the Company in any case shall entitle the Company to any other or further notice or demand in similar or other circumstances.

(ii)     No failure or delay on the part of the Collateral Agent or any Lender in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

(m)     Time of the Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

(n)     Interpretation.  All Exhibits and Annexes hereto are incorporated in and made a part of this Agreement as if set forth in full herein.  The descriptive headings of this Agreement are for convenience of reference only, do not constitute a part of this Agreement and are not to be considered in construing or interpreting this Agreement.  All section, clause and party references are to this Agreement unless otherwise stated.  No party, nor its counsel, shall be deemed the drafter of this Agreement for purposes of construing the provisions of this Agreement, and all provisions of this Agreement shall be construed in accordance with their fair meaning, and not strictly for or against any party.  References to "Dollars" and "$" shall be to United States Dollars, unless otherwise specified.  The words "including" and "includes" and words of similar import when used in this Agreement shall not be limiting and shall mean "including without limitation" or "includes without limitation," as the case may be.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

-25-

(o)     Publicity.  Except as may be required by applicable Law, none of the parties hereto shall issue a publicity release or announcement or otherwise make any public disclosure concerning this Agreement or the transactions contemplated hereby, without prior approval of the Company and the Principal Lenders; *provided* that the foregoing limitation shall not apply to the filing or disclosure of this Agreement in the Chapter 11 Cases.

(p)     Federal Anti-Money Laundering Law.  To help the government fight the funding of terrorism and money laundering activities, federal law requires financial institutions (which may include each Lender and its Affiliates) to obtain, verify and record information that identifies each person who opens an account or other formal customer relationship.  Accordingly, in connection with this Agreement, each applicable Lender and its Affiliates may require the Company to provide certified copies of its certificate of formation, operating agreement or other similar identifying documents.  Further, the Company confirms that its legal name and address, as set forth in this Agreement, are true, complete and correct and covenants and agrees to provide such other information as may be necessary to allow each applicable Lender and its Affiliates to comply with such Laws.

(q)     Delivery.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by telecopy or by electronic delivery in Adobe Portable Document Format or other electronic format based on common standards will be effective as delivery of a manually executed counterpart of this Agreement.

19.     Collateral Agent; Agreements Among Lenders.  Exhibit B attached hereto contains certain terms relating to the Collateral Agent and certain agreements as among the Lenders.

[SIGNATURE PAGE FOLLOWS]

-26-

IN WITNESS WHEREOF, this Senior Secured Loan Agreement is executed by the Company as of the date first above written.

"Company"

Fluid Market, Inc.,
a Delaware corporation

By: _____
    Name:
    Title:

"Guarantor"

Fluid Fleet Services, LLC
a Colorado limited liability company

By: _____
    Name:
    Title:

*Accepted and Agreed:*

"Lenders"

BISON CAPITAL PARTNERS V, L.P.,
a Delaware limited partnership


By:_____
      Name: Andreas Hildebrand
      Title: Managing Member of the General
      Partner


BISON CAPITAL PARTNERS V-A, L.P.,
a Delaware limited partnership


By: _____
Name:
Title:

INGKA INVESTMENTS VENTURES US BV


By: _____
Name:
Title:


By: _____
Name:
Title:

CARBON FLEET, LLC
a Delaware limited liability company


By: _____
Name:
Title:

KINGBEE RENTALS, LLC


By: _____
Name:
Title:

"Collateral Agent"

BISON CAPITAL PARTNERS V, L.P.,
a Delaware limited partnership


By:_____
    Name:
    Title:

Acknowledged solely as to <u>Sections 3(b)</u> and <u>11(j)</u>:

GOLDMAN SACHS BANK USA

By: _____
Name:
Title:

## **Schedule 11(a)**

Permitted Indebtedness

None

4878-6006-8336.1

**Schedule 11(b)**

Permitted Liens

    Lien asserted by Union Leasing Trust against Fluid Market, Inc., as reflected in the UCC financing statement filed with the Delaware Department of State on June 24, 2022 (filing number 2022 5293808).

--

## **Schedule 11(d)**

Permitted Investments

None

4878-6006-8336.1

**Annex A**
**Definitions**

In this Agreement and any exhibits thereto, the following terms shall have the meanings assigned below:

(a)     "<u>Advances</u>" means, with respect to the New Money Facility, the Initial Non-Carbon Fleet Loan Advance, the Carbon Fleet Loan Advances and the Additional Non-Carbon Fleet Loan Advances, and with respect to the DIP Facility, but subject to entry of the Interim Order, all such Advances and the Advances outstanding as part of the Roll-Up Amount.

(b)     "<u>Affiliate</u>" means, with respect to any subject Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such subject Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

(c)     "<u>Approved Budget</u>" means (x) the initial Budget delivered to the Collateral Agent in connection with the execution and effectiveness of this Agreement and approved by the Required Lenders or (y) the then most current Budget prepared by the Company and approved by the Required Lenders pursuant to, and in accordance with, <u>Section 10(a)</u>, as applicable.

(d)     "<u>Authorized Officer</u>" means, as applied to any Group Company, any individual holding the position of the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of such Group Company.

(e)     "<u>Avoidance Actions</u>" means any and all avoidance power claims or causes of action under Sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code.

(f)     "<u>Bankruptcy Case</u>" means the case filed by the Company seeking relief under chapter 11 of the Bankruptcy Code.

(g)     "<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy" as now and hereafter in effect, or any successor statute.

(h)     "<u>Budget</u>" means the thirteen (13) week budget prepared by the Company and furnished to the Collateral Agent on or before the date of this Agreement, as the same may or shall, as applicable, be updated, modified and/or supplemented thereafter from time to time as permitted pursuant to <u>Section 10(a)</u>, which budget shall include a weekly cash budget, including information on a line item basis as to (a) the Company's critical near-term operational needs, (b) payments to professionals in order to prepare the Company for bankruptcy by filing a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code, (c) fees, costs and expenses (both operational and restructuring related) through a period of 4 weeks post-closing a sale of substantially all of the Company's assets under Section 363 of the Bankruptcy Code and (d) payments, on a vendor-by-vendor basis, of (i) projected total cash receipts (which includes sales

and other receipts) and (ii) projected total disbursements (including ordinary course operating expenses and Capital Expenditures), bankruptcy-related fees and expenses (including fees and expenses budgeted for the case professionals), if any, and fees and expenses of the Lenders and any other fees and expenses relating to the Transaction Documents.

(i)      "Budget Period" the period covered by the Approved Budget until the closing of the sale under Section 363 of the Bankruptcy Code involving the Company.

(j)      "Business Day" means shall mean any day other than a Saturday, Sunday or other days on which commercial banks in Connecticut or New York are authorized or required by law or executive order to close.

(k)      "Capital Expenditures" means, for any period, the aggregate of all expenditures of the Group Companies during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items reflected in the statement of cash flows of the Group Companies.

(l)      "Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

(m)     "Carbon Fleet Credit Agreement" means that certain Revolving Credit and Security Agreement, dated as of December 22, 2021, by and among the Carbon Fleet Subsidiary, certain Subsidiaries of the Company party thereto from time to time, Goldman, as administrative agent, Midtown, as a lender, and the other lenders party thereto from time to time, as the same may be amended, restated, supplemented or otherwise modified from time to time (including by that certain Forbearance Agreement with respect thereto dated as of October 2, 2024 (the "**Carbon Fleet Forbearance Agreement**").

(n)      "Carbon Fleet Lender" means the Carbon Fleet Subsidiary, in its capacity as a Lender under this Agreement.

(o)      "Carbon Fleet Lender's Pro Rata Percentage" means, as of the date of determination, the percentage amount equal to (i) the sum of the aggregate principal amount of the Carbon Fleet Loan Advances advanced by the Carbon Fleet Lender as of such date *plus*, subject to entry of the Interim Order, the Prepetition Carbon Fleet Amount, (ii) divided by the aggregate principal amount of all Advances advanced by the Lenders under the DIP Facility as of such date.

(p)      "Carbon Fleet Subsidiary" means Carbon Fleet, LLC, a Delaware limited liability company.

(q)      "Change of Control" means (i) a change in more than fifty percent (50%) of the ordinary voting power or economic interests held by the holders of outstanding equity interests of the Company, (ii) any change in the ordinary voting power held by the holders of outstanding equity interests of the Company resulting in any Person (including Affiliates thereof) having the ability to elect a majority of the board of directors of the Company and/or (iii) a sale of more than ten percent (10%) of the assets of the Company as of the date of determination.

(r)    "Chapter 11 Milestones" has the meaning set forth on Annex B hereto.

(s)    "Closing Date" the date on which the closing of the Kingbee 363 Sale Transaction occurs.

(t)    "Collateral" means, collectively, all pre-petition and post-petition real property and all pre-petition and post-petition tangible and intangible personal property of the Company and each other Group Company each, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, leases and leaseholds and rents, together with all proceeds of each of the foregoing, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable), and, subject to Final Order, including the proceeds and recoveries from Avoidance Actions, but excluding Avoidance Actions themselves.

(u)    "Collateral Agent" means Bison, in its capacity as the Collateral Agent hereunder, or any successor thereto in such capacity.

(v)    "Company" has the meaning set forth in the Recitals above.

(w)    "Company Account" means a deposit account designated by the Company.

(x)    "Costs" mean the reasonable costs and expenses, including the fees and expenses of any attorneys, accountants and other experts retained by any Lender or the Collateral Agent, which are expended or incurred by such Lender or the Collateral Agent in connection with: (a) the issuance of this Agreement, including reasonable attorneys' fees and expenses and fees or charges for due diligence conducted by third-party consultants; (b) the disbursement of funds to or for the account of any Group Company (by wire transfer or otherwise); (c) advising, structuring, drafting, reviewing or administering, the Transaction Documents; (d)  the enforcement of any Transaction Document or the collection of any sums due thereunder, whether or not suit is commenced; (e) any actions for declaratory relief in any way related to any Transaction Document; (f) the protection or preservation of any rights of the Lenders or the Collateral Agent under any Transaction Document; (g) any actions taken by the Lenders or the Collateral Agent in negotiating any amendment, waiver, consent or release of or under any Transaction Document; (h) any actions taken in reviewing the Company's or any other Group Company's financial affairs, including the following actions: (i) inspecting the facilities of the Company and any other Group Company or conducting audits or appraisals of the financial condition of the Company and any other Group Company; (ii) having an accounting firm chosen by the Collateral Agent review the books and records of the Company and any other Group Company and perform a thorough and complete examination thereof; and (iii) undertaking any other action that Collateral Agent reasonably believes is necessary to assess accurately the financial condition and prospects of the Company and any other Group Company; (i) the Lenders' or the Collateral Agent's participation in any refinancing, restructuring, bankruptcy or insolvency proceeding involving the Company, any other Group Company or any other Affiliate of the Company; (j) verifying, maintaining, or perfecting any security interest or other Lien granted to the Lenders in any Collateral; (k) any effort by the Lenders to protect, assemble, complete, collect, sell, liquidate or otherwise dispose of any

-3-

Collateral, including in connection with any action or proceeding; or (l) any refinancing or restructuring of this Agreement, including, without limitation, any restructuring in the nature of a "work out" or in any insolvency or bankruptcy proceeding.

(y)    "Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

(z)    "Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

(aa)    "DIP Order" means the Interim Order and/or the Final Order, as applicable.

(bb)    "Exchange Act" means the Securities Exchange Act of 1934, and any successor statute.

(cc)    "Excluded Subsidiary" means (i) the Carbon Fleet Subsidiary, (ii) Fluid Asset Ventures, LLC, a Delaware limited liability company, (iii) Edison Coil Fund I, LLC, a Colorado limited liability company, (iv) Edison Coil Fund II, LLC, a Colorado limited liability company, (v) Dynamic Metal, LLC, a Delaware limited liability company, (v) Nereus Insurance Company, and (vii) any Subsidiary of the Company organized under the laws of a foreign country outside the United States.

(dd)    "Final Order" means a final order of the Bankruptcy Court authorizing and approving the Company's entry into this Agreement and the other Transaction Documents, which such order in form and substance satisfactory to the Required Lenders, on a final basis and entered following a final hearing.

(ee)    "GAAP" means the United States generally accepted accounting principles in effect as of the date of determination thereof.

(ff)    "Goldman" means Goldman Sachs Bank USA.

(gg)    "Governmental Authority" means any foreign, federal, state, local, or other governmental or administrative body, instrumentality, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

(hh)    "Group Companies" means the Company and its Subsidiaries (other than any Excluded Subsidiary).

(ii)    "Indebtedness", as applied to any Person, means, without duplication, (i) indebtedness for borrowed money; (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (iii) notes payable and drafts accepted representing extensions of credit, regardless of whether representing obligations for borrowed money; (iv) any obligation owed for all or any part of the deferred

-4-

purchase price of property or services (excluding accounts payable incurred in the ordinary course of business that are not overdue by more than ninety (90) days); (v) indebtedness secured by a Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vi) the face amount of any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (vii) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another; (viii) any obligation of such Person the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (ix) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (a) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (b) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (a) or (b) of this clause (ix), the primary purpose or intent thereof is as described in clause (viii) above; and (x) obligations of such Person in respect of any exchange traded or over the counter derivative transaction, whether entered into for hedging or speculative purposes.

(jj)    "Interim Order" means that interim order entered by the Bankruptcy Court authorizing and approving the Company's entry into this Agreement and the other Transaction Documents, in form and substance satisfactory to the Required Lenders.

(kk)    "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute, together with the regulations promulgated thereunder from time to time.

(ll)    "Investment" means (i) any direct or indirect purchase or other acquisition by any Group Company of, or of a beneficial interest in, any of the Securities of any other Person; (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Group Company from any Person, of any equity interests of such Person; and (iii) any direct or indirect loan, advance or capital contribution by any Group Company to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

(mm)    "Kingbee APA" means that certain asset purchase agreement by and between the Company, as seller, and Kingbee Rentals, LLC or an Affiliate or designee thereof, as stalking horse bidder, with respect a sale of assets under Section 363 of the Bankruptcy Code subject to the Bankruptcy Court's approval.

(nn)    "Kingbee 363 Sale Transaction" means the sale to under the Kingbee APA, subject to overbid pursuant to the Bidding Procedures Order (defined on Annex A) which, for

avoidance of doubt, shall provide for the assumption and assignment of the DIP Facility; provided that an overbidder shall only be considered a qualified bidder if its bid provides for the payment in full of the DIP Facility.

(oo)    "Law" means any constitution, law, statute, ordinance, rule, regulation, regulatory requirement, code, order, judgment, injunction or decree enacted, issued, promulgated, enforced or entered by a Governmental Authority or securities exchange.

(pp)    "Lenders" means each of the following Persons: (i) Bison Capital Partners V, L.P., a Delaware limited partnership ("Bison"), (ii) Bison Capital Partners V-A, L.P., a Delaware limited partnership ("Bison V-A"), (iii) Ingka Investments Ventures US BV, a private company with limited liability incorporated under the laws of the Netherlands ("Ingka"), (iv) the Carbon Fleet Lender and (v) Kingbee Rentals, LLC, a Utah limited liability company ("Kingbee").

(qq)    "Lien" means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, whether such interest is based on the common law, statute, or contract, whether such interest is recorded or perfected, and whether such interest is contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances, including the lien or security interest arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, security agreement, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also including reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting real property.

(rr)    "Margin Stock" means as defined in Regulation U of the Board of Governors as in effect from time to time.

(ss)    "Maximum Amount" means an amount equal to (i) the Maximum Non-Carbon Fleet Loan Amount plus (ii) the aggregate amount advanced by the Carbon Fleet Lender as Carbon Fleet Loan Advances pursuant to Section 1(b) (which, subject to entry of the Interim Order, includes the Prepetition Carbon Fleet Amount that is part of the Roll-Up Amount).

(tt)    "Maximum Non-Carbon Fleet Loan Amount" means an amount up to (i) Four Million Five Hundred Sixty-Four Thousand Dollars ($4,564,000) on account of Advances by the Non-Carbon Fleet Lenders on a several basis under the New Money Facility and (ii) subject to entry of Interim Order (ii) Five Million Five Hundred Thousand Dollars ($5,500,000) in the aggregate under the DIP Facility (i.e., taking into account the Prepetition Non-Carbon Fleet Amount that is part of the Roll-Up Amount).

(uu)    "Midtown" means Midtown Madison Management LLC.

(vv)    "Prepetition Non-Carbon Fleet Amount" has the meaning set forth in the Recitals above.

(ww)    "Non-Carbon Fleet Lenders" means the Lenders other than the Carbon Fleet Lender.

-6-

(xx)    "Non-Carbon Fleet Pro Rata Percentage" means, with respect to each Non-Carbon Fleet Lender in relation to making the Initial Non-Carbon Fleet Loan Advance and any Additional Non-Carbon Fleet Loan Advance, the percentage for such Non-Carbon Fleet Lender as reflected on Annexure I.

(yy)    "Obligations" means all obligations of every nature of any Group Company from time to time owed to the Collateral Agent and the Lenders under any Transaction Document, whether for principal, interest (including interest which, but for the filing of a petition in any proceeding under any Debtor Relief Law with respect to any Group Company, would have accrued on any Obligation, whether or not a claim is allowed against such Group Company for such interest in such proceeding), fees, expenses, indemnification or otherwise.

(zz)    "OFAC" means the US Department of Treasury Office of Foreign Assets Control, or any successor thereto.

(aaa)    "Permitted Liens" means each of the Liens permitted pursuant to Section 11(b).

(bbb)    "Person" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited partnership, joint venture, trust, land trust, business trust, or other organization, irrespective of whether they are legal entities or Governmental Authorities.

(ccc)    "Petition Date" has the meaning set forth in the Recitals hereof.

(ddd)    "Prepetition Carbon Fleet Amount" has the meaning set forth in the Recitals above.

(eee)    "Prepetition Credit Agreement" has the meaning set forth in the Recitals above.

(fff)    "Prepetition Loan Documents" means the Prepetition Credit Agreement and the Transaction Documents (as defined herein).

(ggg)    "Principal Lenders" means, collectively, Bison and Ingka.

(hhh)    "Pro Rata Percentage" means, as of the date of determination, (i) with respect to each Non-Carbon Fleet Lender, the percentage amount equal to (a) the principal amount of the Advances advanced by a Non-Carbon Fleet Lender as of such date plus, subject to entry of the Interim Order, the Prepetition Non-Carbon Fleet Amount allocated to such Non-Carbon Fleet Lender, (b) divided by the aggregate principal amount of all Advances advanced by the Non-Carbon Fleet Lenders under the DIP Facility as of such date and (ii) with respect to the Carbon Fleet Lender, the Carbon Fleet Lender's Pro Rata Percentage as of such date.

(iii)    "Required Lenders" means, collectively, the Principal Lenders and the Carbon Fleet Lender.

(jjj)    "Sale Hearing" means the initial hearing scheduled in the Bankruptcy Case to consider approval of the Kingbee 363 Sale Transaction.

(kkk)    "Securities" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

(lll)    "Security Documents" shall mean, without limitation, the security documents, account control agreements, and guarantees in the applicable forms substantially consistent with the Security Documents used for the Prepetition Credit Agreement with such modifications acceptable to the Collateral Agent.

(mmm) "Services Agreement" means, collectively, the existing management and services agreements among any Group Company and the Carbon Fleet Subsidiary.

(nnn)    "Stated Maturity Date" means December 31, 2024.

(ooo)    "Subsidiary" of a Person shall mean a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly (including through one or more subsidiaries) owns or controls the capital stock having ordinary voting power to elect a majority of the board of directors or managers (or appoint other comparable managers) of such corporation, partnership, limited liability company, or other entity.

(ppp)    "Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (together with interest, penalties and other additions thereto) of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed.

(qqq)    "Termination Date" means the earliest of (i) if the Final Order has not been entered by the Bankruptcy Court, thirty (30) days following the Petition Date; (ii) the closing of the Kingbee 363 Sale Transaction; and (iii) the acceleration of the outstanding Obligations as a result of the occurrence and continuation of an Event of Default.

(rrr)    "Transaction Documents" shall mean, collectively, this Agreement, the Security Documents, the DIP order and such other documents, certificates and instruments to be entered into by any Group Company, any Lender or the Collateral Agent pursuant to the terms of this Agreement or any Security Document.

(sss)    "UCC" shall mean the Uniform Commercial Code, as in effect from time to time, of state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.

-8-

### Annex B

### Chapter 11 Milestones

By the times and dates set forth below (as any such time and date may be extended with the consent of the Collateral Agent (at the direction of the Required Lenders)), the Company shall cause the following to occur (collectively, the "**Chapter 11 Milestones**"):

(a)     By no later than three (3) Business Days following the Petition Date, the Bankruptcy Court shall enter the Interim Order.

(b)     By no later than ten (10) Business Day following the Petition Date, the Company shall have filed a motion seeking approval of a bidding procedures order (the "**Bidding Procedures Order**") for the Kingbee 363 Sale Transaction, in form and substance acceptable to the Required Lenders.

(c)     By no later than thirty (30) days following the Petition Date, the Bankruptcy Court shall enter the Final Order authorizing the DIP Facility, in form and substance acceptable to the Required Lenders.

(d)     By no later than days forty (40) days following the Petition Date, the Company shall have obtained entry of the Bidding Procedures Order, in form and substance acceptable to the Required Lenders.

(e)     By no later than fifty-five (55) days following the Petition Date, the Company shall have obtained receipt of any Qualified Bids (as defined in the Bidding Procedures Order or equivalent term used therein).

(f)     By no later than sixty (60) days following the Petition Date, the Company shall have obtained entry of an order from the Bankruptcy Case approving the Kingbee 363 Sale Transaction.

(g)     By no later than two (2) days prior to the Sale Hearing, the Company shall conduct the Auction (as defined in the Bidding Procedures Order or equivalent term used therein) in accordance with the Bidding Procedures Order.

(h)     By no later than December 31, 2024, the Kingbee 363 Sale Transaction shall have closed.

-1-

## ANNEXURE I

## PRE-PETITION LOAN & DIP LOAN ADVANCES

Pre-Petition Loan and DIP Schedule ($000s)

| | | *Pre Petition Loan* | | | DIP (Timing of draws TBD) | Total Pre-Petition Loan and DIP |
|---|---|---|---|---|---|---|
| | | Total Loan | Ist Draw (Oct 4th) | 2nd Draw (Oct 15th) | | |
| Kingbee | | $ 70,250 | $ 50,000 | $ 20,250 | $ 429,750 | $ 500,000 |
| Bison | | 519,850 | 370,000 | 149,850 | 2,480,150 | 3,000,000 |
| Ingka | | 345,900 | 246,000 | 99,900 | 1,654,100 | 2,000,000 |
| Total | | $ 936,000 | $ 666,000 | $ 270,000 | $ 4,564,000 | $ 5,500,000 |
| GS/Atalaya | | $333,000 | $333,000 | 0 | $1,167,000 | $1,500,000 |
| Grand Total | | $ 1,269,000 | $ 999,000 | $ 270,000 | $5,731,000 | $7,000,000 |
| | | | | | | |
| Kingbee | | 7.51% | 7.51% | 7.50% | 9.4% | 9.1% |
| Bison | | 55.54% | 55.56% | 55.50% | 54.3% | 54.5% |
| Ingka | | 36.96% | 36.94% | 37.00% | 36.2% | 36.4% |
| Total | | 100.00% | 100.00% | 100.00% | 100.0% | 100.0% |

-1-

**Exhibit A**
**Notice Information**

| Party | Address |
|-------|---------|

<u>Party</u>                              <u>Address</u>

If to the Company to:               Fluid Market Inc.
                                    3827 Lafayette Street, Suite 149
                                    Denver, CO 80205

                                    With a copy (which shall not constitute notice) to:

                                    Pachulski Stang Ziehl & Jones LLP
                                    919 N. Market Street, 17th Floor
                                    Wilmington, DE 19801
                                    Attention: Laura Davis Jones
                                    Email: ljones@pszjlaw.com

If to the Collateral Agent          Bison Capital Partners V, L.P.,
to:                                 as the Collateral Agent
                                    233 Wilshire Boulevard, Suite 425
                                    Santa Monica, California  90401
                                    Attention: Andreas Hildebrand
                                    E-mail: ahildebrand@bisoncapital.com

                                    With a copy (which shall not constitute notice) to:

                                    Sheppard, Mullin, Richter & Hampton LLP
                                    333 South Hope Street
                                    Forty-Third Floor
                                    Los Angeles, CA 90071
                                    Attention:      David Sands
                                    E-mail:         dsands@sheppardmullin.com

If to Bison or Bison V-A:            Bison Capital Partners V, L.P.,
                                    233 Wilshire Boulevard, Suite 425
                                    Santa Monica, California  90401
                                    Attention: Andreas Hildebrand
                                    E-mail: ahildebrand@bisoncapital.com

                                    With a copy (which shall not constitute notice) to:

                                    Sheppard, Mullin, Richter & Hampton LLP
                                    333 South Hope Street
                                    Forty-Third Floor
                                    Los Angeles, CA 90071

-1-

Attention:    David Sands
E-mail:        dsands@sheppardmullin.com

If to Ingka:            Ingka Investments Ventures US B.V.
Bargelaan 20,
2333 CT Leiden,
the Netherlands
Attention: Cees Aanhaanen / Eva van den Berg
Email: cees.aanhaanen@ingka.com
eva.van.den.berg@ingka.ikea.com

With a copy (which shall not constitute notice) to:

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street
Forty-Third Floor
Los Angeles, CA 90071
Attention:    David Sands
E-mail:        dsands@sheppardmullin.com

If to Carbon Fleet:    Carbon Fleet, LLC
3827 Lafayette Street, Suite 149
Denver, CO 80205

With a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Attention: Laura Davis Jones
Email: ljones@pszjlaw.com

If to Kingbee:       Kingbee Rentals, LLC
2272 South 5600 West
West Valley City, Utah 84120
Attention: Chris Johnson
Email: chris.johnson@kingbee-vans.com

With a copy (which shall not constitute notice) to:

Bennett Tueller Johnson & Deere, LLC
3165 East Millrock Drive, Suite 500
Salt Lake City, Utah 84121
Attention:    Brent Hawkins
E-mail:       bhawkins@btjd.com

-2-

If to Goldman:                   Goldman Sachs Bank USA
200 West Street
New York, NY 10282
Attention: Mortgage Trading/Warehouse Lending
        and IBD Structured Finance Group
Telephone No.: (212) 902 0974
Email: gs-sf-consumer-ny@gs.com;
gs-asset-financing@gs.com
gs-consumer-am@gs.com

-3-

## Exhibit B
## Collateral Agent

1.      Appointment, Authority and Duties of the Collateral Agent.

(a)      Appointment and Authority.  Each Lender appoints and designates Bison as the Collateral Agent.  The Collateral Agent may, and each Lender authorizes the Collateral Agent to, enter into all Transaction Documents to which the Collateral Agent is intended to be a party and accept all Security Documents, for the Collateral Agent's benefit and the pro rata benefit of the Lenders.  Each Lender agrees that any action taken by the Collateral Agent in accordance with the provisions of the Transaction Documents, and the exercise by the Collateral Agent of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all the Lenders.  Without limiting the generality of the foregoing, the Collateral Agent shall have the sole and exclusive authority to: (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Transaction Documents, though it is under no duty to act as such a disbursing or collateral agent; (ii) execute and deliver as the Collateral Agent each Transaction Document, including any intercreditor or subordination agreement, and accept delivery of each Transaction Document from the Company or any other Person; (iii) act as collateral agent for the Lenders for purposes of perfecting and administering Liens under the Transaction Documents, and for all other purposes stated therein; (iv) manage, supervise or otherwise deal with Collateral; and (v) take any enforcement action or otherwise exercise any rights or remedies with respect to any Collateral under the Transaction Documents, applicable Law or otherwise.  The duties of the Collateral Agent shall be ministerial and administrative in nature, and the Collateral Agent shall not have a fiduciary relationship with any Lender, the Group Companies, or any other Person, by reason of any Transaction Document or any transaction relating thereto or otherwise.

(b)      Action by Principal Lenders.  In no event shall the Collateral Agent take any material action without the approval of the Principal Lenders.

(c)      Duties.  The Collateral Agent shall not have any duties except those expressly set forth in the Transaction Documents.  The conferral upon the Collateral Agent of any right shall not imply a duty on the Collateral Agent's part to exercise such right, unless instructed to do so by the applicable Lenders in accordance with this Agreement.

(d)      The Collateral Agent Professionals.  The Collateral Agent may perform its duties through agents and employees.  The Collateral Agent may consult with and employ attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts ("**Collateral Agent Professionals**") in connection with its duties, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by a the Collateral Agent Professional.  The Collateral Agent shall not be responsible for the negligence or misconduct of any agents, employees or the Collateral Agent Professionals selected by it.

(e)      Instructions of Lenders.  The rights and remedies conferred upon the Collateral Agent under the Transaction Documents may be exercised without the necessity of joinder of any other party, unless required by applicable Law.  The Collateral Agent may request

instructions from the Lenders or Principal Lenders, as applicable, with respect to any act (including the failure to act) in connection with any Transaction Documents, and may seek assurances to its satisfaction from the Lenders of their indemnification obligations under Section 5 of this Exhibit B against all Losses that could be incurred by the Collateral Agent in connection with any act. "**Losses**" mean any and all claims, damages, decline or diminution in value, judgements, liabilities, losses (including punitive, exemplary, consequential or indirect damages and liabilities of any kind), lost profits, penalties, settlement payments, arbitration awards, taxes and costs and expenses (including reasonable attorneys', consultants' and experts' fees and expenses and other costs of defending, investigating or settling claims or enforcing rights to indemnification hereunder); in each case, whether or not involving a third party claim. The Collateral Agent shall be entitled to refrain from any act until it has received such instructions or assurances, and the Collateral Agent shall not incur liability to any Person by reason of so refraining. In no event shall the Collateral Agent be required to take any action that, in its opinion, is contrary to applicable Law or any Transaction Documents or could subject any Collateral Agent Indemnitee (as defined below) to personal liability.

2.      Agreements Regarding Collateral and Field Examination Reports.

(a)      Lien Releases; Care of Collateral. The Lenders authorize the Collateral Agent to release any Lien with respect to any Collateral upon payment in full of the Agreement or with the written consent of the Lenders. The Collateral Agent shall have no obligation to assure that any Collateral exists or is owned by any of the Group Companies, or is cared for, protected or insured, nor to assure that the Collateral Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral.

(b)      Possession of Collateral. The Collateral Agent and the Lenders appoint each Lender as agent (for the benefit of the Collateral Agent and the Lenders) for the purpose of perfecting Liens in any Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control. If any Lender obtains possession or control of any Collateral, it shall notify the Collateral Agent thereof and, promptly upon the Collateral Agent's request, deliver such Collateral to the Collateral Agent or otherwise deal with it in accordance with the Collateral Agent's instructions.

(c)      Reliance By the Collateral Agent. The Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone or e-mail) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and upon the advice and statements of the Collateral Agent Professionals.

3.      Action Upon Default. The Collateral Agent shall not be deemed to have knowledge of any Event of Default unless it has received written notice from a Lender or the Company specifying the occurrence and nature thereof. If any Lender acquires knowledge of an Event of Default, then it shall promptly notify the Collateral Agent in writing. Each Lender agrees that, except as otherwise provided in any Transaction Document or with the written consent of the Collateral Agent and the Principal Lenders, such Lender will not take any enforcement action, accelerate the Agreement, or exercise any right that it might otherwise have under applicable Law

-2-

to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral. Notwithstanding the foregoing, however, a Lender may take action to preserve or enforce its rights against any of the Group Companies where a deadline or limitation period is applicable that would, absent such action, bar enforcement of any indebtedness held by such Lender, including the filing of proofs of claim in an insolvency proceeding.

4.     Ratable Sharing.  If any Lender obtains any payment under the Agreement in excess of its Pro Rata Percentage, then such Lender shall remit such amount to the other Lenders in accordance with their relative Pro Rata Percentages.

5.     Indemnification of the Collateral Agent Indemnitees.  Each Lender shall indemnify and hold harmless the Collateral Agent and its officers, directors, employees, affiliates, agents and attorneys (the "**Collateral Agent Indemnitees**"), to the extent not reimbursed by the Group Companies (but without limiting the indemnification obligations of the Group Companies under any Transaction Document), in accordance with their respective Pro Rata Percentages, against all Losses that may be incurred by or asserted against any Collateral Agent Indemnitee, provided that the Loss relates to or arises from a Collateral Agent Indemnitee acting as or for the Collateral Agent (in its capacity as the Collateral Agent).  In the Collateral Agent's discretion, it may reserve for any such Losses made against a Collateral Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of Collateral or payments under the Agreement prior to making any distribution of Collateral proceeds to the Lenders.  If the Collateral Agent is sued by any receiver, bankruptcy trustee, debtor-in-possession or other Person for any alleged preference or fraudulent transfer, then any monies paid by the Collateral Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to the Collateral Agent by each Lender to the extent of its Pro Rata Percentage.  Notwithstanding the foregoing, Kingbee's liability under this Section 5, together with its Non-Carbon Fleet Pro Rata Percentage of outstanding Advances under the New Money Facility and the amount allocated to it under the Prepetition Non-Carbon Fleet Amount, shall not exceed $500,000.

6.     Limitation on Responsibilities of the Collateral Agent.  The Collateral Agent shall not be liable to the Lenders for any action taken or omitted to be taken under the Transaction Documents, except for losses directly and solely caused by the Collateral Agent's gross negligence or willful misconduct.  The Collateral Agent does not assume any responsibility for any failure or delay in performance or any breach by any of the Group Companies or the Lenders of any obligations under the Transaction Documents.  The Collateral Agent does not make to the Lenders any express or implied warranty, representation or guarantee with respect to any indebtedness of Group Companies, Collateral, Transaction Documents, or any of the Group Companies.  No Collateral Agent Indemnitee shall be responsible to the Lenders for: (i) any recitals, statements, information, representations or warranties contained in any Transaction Documents; (ii) the execution, validity, genuineness, effectiveness or enforceability of any Transaction Documents; (iii) the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; (iv) the validity, enforceability or collectability of any indebtedness of any of the Group Companies; or (v) the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any of the Group Companies.  No Collateral Agent Indemnitee shall have any obligation to any Lender to ascertain or inquire into the existence of any Event of Default, the observance or

-3-

performance by any of the Group Companies of any terms of the Transaction Documents, or the satisfaction of any conditions precedent contained in any Transaction Documents.

7.    <u>Successor Collateral Agent and Co-the Collateral Agents</u>.

(a)    <u>Resignation; Successor the Collateral Agent</u>.  Subject to the appointment and acceptance of a successor Collateral Agent as provided below, the Collateral Agent may resign at any time by giving at least thirty (30) days written notice thereof to the Lenders and the Company.  Upon receipt of such notice, the Principal Lenders shall have the right (by written agreement among them) to appoint a successor Collateral Agent which shall be (i) a Lender or an Affiliate of a Lender; (ii) a commercial bank that is organized under the laws of the United States or any state or district thereof, has a combined capital surplus of at least $200,000,000; or (ii) any Person approved by all of the Lenders.  If no successor Collateral Agent is appointed prior to the effective date of the resignation of the Collateral Agent, then the Collateral Agent may appoint a successor Collateral Agent from among the Lenders (and the Lenders hereby agree to such appointment).  Upon acceptance by a successor Collateral Agent of an appointment to serve as the Collateral Agent hereunder, such successor Collateral Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Collateral Agent without further act, and the retiring Collateral Agent shall be discharged from its duties and obligations hereunder but shall continue to have the benefits of the indemnification set forth in <u>Section 5</u> of this <u>Exhibit B</u>.  Notwithstanding any Collateral Agent's resignation, the provisions of this <u>Exhibit B</u> shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by the Collateral Agent.  Any successor to Bison, by merger or acquisition of stock or otherwise, shall continue to be the Collateral Agent hereunder without further act on the part of the parties hereto, unless such successor resigns as provided above.

(b)    <u>Separate Collateral Agent</u>.  It is the intent of the parties that there shall be no violation of Law denying or restricting the right of financial institutions to transact business in any jurisdiction.  If the Collateral Agent believes that it may be limited in the exercise of any rights or remedies under the Transaction Documents due to applicable Law, the Collateral Agent may appoint an additional Person who is not so limited, as a separate collateral agent or co-collateral agent.  If the Collateral Agent so appoints a collateral agent or co-collateral agent, each right and remedy intended to be available to the Collateral Agent under the Transaction Documents shall also be vested in such separate agent.  Every covenant and obligation necessary to the exercise thereof by such agent shall run to and be enforceable by it as well as the Collateral Agent.  The Lenders shall execute and deliver such documents as the Collateral Agent deems appropriate to vest any rights or remedies in such agent.  If any collateral agent or co-collateral agent shall die or dissolve, become incapable of acting, resign or be removed, then all of the rights and remedies of such agent, to the extent permitted by applicable Law, shall vest in and be exercised by the Collateral Agent until appointment of a new agent.

8.    <u>Due Diligence and Non-Reliance</u>.  Each Lender acknowledges and agrees that it has, independently and without reliance upon the Collateral Agent or any other Lender, and based upon such documents, information and analyses as it has deemed appropriate, made its own credit analysis of each of the Group Companies and its own decision to enter into this Agreement.  Each Lender has made such inquiries concerning the Transaction Documents, the Collateral, each of the Group Companies as such Lender feels necessary.  Each Lender further acknowledges and agrees

-4-

that the other Lenders and the Collateral Agent have made no representations or warranties concerning any of the Group Companies, any Collateral or the legality, validity, sufficiency or enforceability of any Transaction Documents or the indebtedness of any of the Group Companies.

9.      <u>Notice</u>.  The Collateral Agent shall furnish to each Lender any notices, reports or certificates furnished to the Collateral Agent by the Company as required by this Agreement or the other Transaction Documents.  Except for the foregoing, the Collateral Agent shall have no duty or responsibility to provide any Lender with any notices, reports or certificates furnished to the Collateral Agent by any of the Group Companies or any credit or other information concerning the affairs, financial condition, business, assets or any other property of any of the Group Companies (or any of their respective Affiliates) which may come into possession of the Collateral Agent or any of the Collateral Agent's Affiliates.

10.     <u>Recovery of Payments</u>.  If the Collateral Agent pays any amount to a Lender in the expectation that a related payment will be received by the Collateral Agent from any of the Group Companies and such related payment is not received, then the Collateral Agent may recover such amount from each Lender that received it.  If the Collateral Agent determines at any time that an amount received under any Transaction Document must be returned to one of the Group Companies or paid to any other Person pursuant to applicable Law or otherwise, then, notwithstanding any other term of any Transaction Document, the Collateral Agent shall not be required to distribute such amount to any Lender.  If any amounts received and applied by the Collateral Agent to any indebtedness of any of the Group Companies are later required to be returned by the Collateral Agent pursuant to applicable Law, each Lender shall pay to the Collateral Agent, on demand, such Lender's Pro Rata Percentage of the amounts required to be returned.

11.     <u>The Collateral Agent in its Individual Capacity</u>.  Each of the Collateral Agent and its Affiliates may invest in, lend money to, serve as financial or other advisor to, and generally engage in any kind of business with any of the Group Companies or any of their respective Affiliates, as if the Collateral Agent were any other financial advisor or institution, without any duty to account therefor (including any fees or other consideration received in connection therewith) to the Lenders.  In their individual capacity, the Collateral Agent and its Affiliates may receive information regarding any of the Group Companies and their respective Affiliates, and each Lender agrees that the Collateral Agents and its Affiliates shall be under no obligation to provide such information to the Lenders, if acquired in such individual capacity and not as the Collateral Agent hereunder.

12.     <u>The Collateral Agent Titles</u>.  Each Lender that is designated (on the cover page of this Agreement or otherwise) as "the Collateral Agent" of any type shall not have any right, power, responsibility or duty under any Transaction Documents other than those applicable to all Lenders and those expressly set forth therein, and shall in no event be deemed to have any fiduciary relationship with any other Lender.

13.     <u>No Third Party Beneficiaries</u>.  This <u>Exhibit B</u> is an agreement solely among the Lenders and the Collateral Agent, and shall survive full payment of the Agreement.  This <u>Exhibit B</u> does not confer any rights or benefits upon any of the Group Companies or any other Person.  As between any of the Group Companies, on the one hand, and the Collateral Agent, on the other

hand, any action that the Collateral Agent may take under any Transaction Documents or with respect to any indebtedness of any of the Group Companies shall be conclusively presumed to have been authorized and directed by the Lenders.

## Exhibit C

## Guaranty Provisions

Each Group Company other than the Company (a "**Guarantor**") hereby agrees as follows (such agreement, this "**Guaranty**"):

1.    Guaranty.    Each Guarantor unconditionally and irrevocably guarantees to the Collateral Agent the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations (the "**Guarantied Obligations**").Separate Obligation.  Each Guarantor acknowledges and agrees that, in providing benefits to the Company, the Collateral Agent and Lenders are relying upon the enforceability of this Guaranty and the Guarantied Obligations.  The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of the Company and Guarantors and shall in no way impair or adversely affect the rights or benefits of the Collateral Agent and Lenders under this Guaranty.Liability of Guarantors.  The liability of each Guarantor under this Guaranty shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that might constitute a discharge of a surety or Guarantor other than the indefeasible payment and performance in full of all Guarantied Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:such Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Guarantor and shall not be contingent upon the Collateral Agent's exercise or enforcement of any remedy it may have against the Company or any other Person, or against any Collateral or any security for any Guarantied Obligations;

(b)    this guarantee is a guaranty of payment when due and not merely of collectability;

(c)    such Guarantor's payment of a portion, but not all, of the Guarantied Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guarantied Obligations remaining unsatisfied; and

(d)    such Guarantor's liability with respect to the Guarantied Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Guarantor be exonerated or discharged by, any of the following events:

(1)    any proceeding under the Bankruptcy Code;

(2)    any limitation, discharge, or cessation of the liability of the Company or any other Person for any Guarantied Obligations due to any applicable law, or any invalidity or unenforceability in whole or in part of any of the Guarantied Obligations or the Transaction Documents;

(3)    any merger, acquisition, consolidation or change in structure of the Company, any Subsidiary thereof or any other Guarantor or Person, or any sale, lease, transfer or other disposition of any or all of the assets of the Company or any other Person;

-1-

(4)     any assignment or other transfer, in whole or in part, of the interests of the Collateral Agent and Lenders in and rights under this Agreement (including this Guaranty) or the other Transaction Documents;

(5)     any claim, defense, counterclaim or setoff, other than that of prior performance, that the Company, such Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Transaction Documents;

(6)     the amendment, modification, renewal, extension, cancellation or surrender of any Transaction Document or any Guaranteed Obligations; or

(7)     the exercise or non-exercise by the Collateral Agent or any Lender of any power, right or remedy with respect to any Guaranteed Obligations.

4.     <u>Consents of Guarantors</u>.  Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Guarantor: the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of the Company under the Transaction Documents may be incurred and the time, manner, place or terms of any payment under any Transaction Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Transaction Document or otherwise;

(b)     the time for the Company's (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Transaction Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as the Collateral Agent and Lenders may deem proper;

(c)     the Collateral Agent and Lenders may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(d)     the Collateral Agent and Lenders may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against the Company.

5.     <u>Guarantor's Waivers</u>.  Each Guarantor waives and agrees not to assert: any defense arising by reason of any lack of corporate or other authority or any other defense of the Company, such Guarantor or any other Person;

(b)     any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations.  The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred

-2-

and permitted to exist in reliance upon this Guaranty. Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon the Company, each Guarantor or any other Person with respect to the Guaranteed Obligations.

6.    <u>Continuing Guaranty</u>. This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Guarantor until payment and performance in full of the Guarantied Obligations.<u>Reinstatement</u>. This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guarantied Obligations by or on behalf of the Company (or receipt of any proceeds of Collateral) shall be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to the Company, its estate, trustee, receiver or any other Person (including under the Bankruptcy Code), or must otherwise be restored by the Collateral Agent and Lenders in the Chapter 11 Case of the Company.

4878-6006-8336.1

# EXHIBIT B

## Budget

**Fluid Truck**
**DIP Cash Flow Projections**

| Week #<br>Week Ending | 1<br>10/19 | 2<br>10/26 | 3<br>11/2 | 4<br>11/9 | TOTAL |
|---|---|---|---|---|---|
| **CASH FLOW** | | | | | |
| Receipts | 238 | 779 | 837 | 887 | 2,740 |
| Operating Disbursements | - | 449 | 2,375 | 873 | 3,697 |
| **Net Cash Flow from Operations** | **238** | **330** | **(1,539)** | **14** | **(957)** |
| *Cumulative Net Cash Flow from Operations* | *238* | *568* | *(971)* | *(957)* | *(957)* |
| Non-Operating Receipts | 48 | 48 | 50 | 54 | 199 |
| Non-Operating Disbursements | 134 | 233 | 1,028 | 492 | 1,887 |
| **Net Cash Flow** | **151** | **145** | **(2,517)** | **(424)** | **(2,645)** |
| *Cumulative Net Cash Flow* | *151* | *296* | *(2,221)* | *(2,645)* | *(2,645)* |
| **LIQUIDITY** | | | | | |
| **Cash Balance** | | | | | |
| Beginning Cash Balance | 941 | 1,093 | 1,237 | 1,554 | 941 |
| Net Cash Flow | 151 | 145 | (2,517) | (424) | (2,645) |
| Non-Carbon Fleet Financing | - | - | 2,500 | 500 | 3,000 |
| Carbon Fleet Financing | - | - | 333 | - | 333 |
| **Ending Cash Balance** | **1,093** | **1,237** | **1,554** | **1,629** | **1,629** |
| Accrued Personnel Costs | 753 | 998 | 897 | 1,135 | 1,135 |
| **Ending Cash, Less Accrued Payroll** | **340** | **240** | **657** | **494** | **494** |
| **DIP Balance** | | | | | |
| Non-Carbon Fleet | - | - | 2,500 | 3,000 | 3,000 |
| Carbon Fleet | - | - | 333 | 333 | 333 |
| **Total DIP (excluding Roll-Up)** | **-** | **-** | **2,833** | **3,333** | **3,333** |
| **Rx Professional Fee Rollforward** | | | | | |
| Beginning Balance | - | 289 | 527 | - | - |
| Add: Fee Accrual | 289 | 239 | 364 | 239 | 1,130 |
| Less: Paid Fees | - | - | (891) | (239) | (1,130) |
| **Ending Professional Fee Balance** | **289** | **527** | **-** | **-** | **-** |