## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| FLUID MARKET, INC., *et al.*,[1] | ) |
| | ) Case No. 24-12363 (CTG) |
| Debtors. | ) |
| | ) (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF ORDERS: (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE AGREEMENT AND TO PROVIDE BID PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES AND (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (II)(A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF</u>**

The above captioned debtors and debtors in possession (the "<u>Debtors</u>"), hereby file this motion (the "<u>Motion</u>") with the Court for the entry of: (i) an order substantially in the form attached hereto as **<u>Exhibit A</u>**, (the "<u>Bidding Procedures Order</u>"), (a) approving bidding procedures, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 1</u> (the "<u>Bidding Procedures</u>"), to be used in connection with the sale (the "<u>Sale</u>") of substantially all of the Debtors' assets as further described herein (the "<u>Assets</u>") to Kingbee Rentals, LLC or its designee (the "<u>Stalking Horse Bidder</u>"), or alternatively, to such other bidder that submits the highest and best bid for the Assets at auction, (b) authorizing the Debtors to provide an expense reimbursement, as provided in the Stalking Horse Agreement (defined below), (c) scheduling an auction of the Assets

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Fluid Market Inc. (1365) and Fluid Fleet Services, LLC (5994). The location of the Debtors' service address is: 3827 Lafayette St., Suite #149, Denver, CO 80205.

and scheduling the hearing to approve the Sale, (d) approving the form and manner of notices of the proposed sale hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, (e) authorizing procedures governing the potential assumption and assignment of certain of the Debtors' executory contracts and unexpired leases in connection with the Sale, (each a "Potential Assumed Contract" and together, the "Potential Assumed Contracts"); and (f) approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under an applicable Potential Assumed Contract and (B) certain other information regarding the potential assumption and assignment of Potential Assumed Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as Exhibit 3; and (ii) an order (a) authorizing the sale of the Assets free and clear of all liens, claims, interests, and encumbrances provided with such liens, claims, interests and encumbrances to attach to the proceeds of such sale, (b) authorizing the assumption and assignment of Potential Assumed Contracts; and (c) granting related relief.

The Debtors entered into that certain *Asset Purchase Agreement*, dated October 30, 2024 (the "Stalking Horse Agreement") with the Stalking Horse Bidder attached as **Exhibit B** to this Motion and pursuant to which the Debtors have agreed to sell substantially all of their Assets, subject to higher and better offers.

In further support of this Motion, the Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

1.      The Debtors believe the proposed Bidding Procedures will best facilitate a value maximizing sale of the Assets for the benefit of the Debtors' estates. The Bidding Procedures likewise will allow the Debtors additional time to continue to market the Assets,

receive and evaluate bids, and hold an auction (if necessary) to determine the highest or otherwise best bid.  In addition, the marketing process and the Bidding Procedures proposed herein are aligned with the sale milestones (the "<u>Milestones</u>") approved by the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III)Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "<u>Interim DIP Order</u>").

2.      The Debtors believe that their continued marketing efforts, aided by the Bidding Procedures, will provide an efficient postpetition sale process for the Assets, and that approval of the Bidding Procedures in the form attached as <u>Exhibit 1</u> to the Bidding Procedures Order and the related relief requested in this Motion is in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

## <u>JURISDICTION AND VENUE</u>

3.      The United States District Court for the District of Delaware has jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.      The Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the

parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a), 363(b), 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, 9006-1 and 9013-1(m).

## **INTRODUCTION**

7.      On October 16, 2024 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' chapter 11 cases. On October 28, 20204, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee").

8.      The Debtors operate and manage a technology-based, peer-to-peer truck-sharing platform across the United States with a fleet of nearly 5,500 vehicles owned by their nondebtor affiliates or third-party owners who have elected to put their vehicles on the Debtors' platform, https://www.fluidtruck.com/.  Customers have quick and easy access to the right vehicle whenever they need it via the Debtors' mobile app and website.

9.      Faced with severely constrained liquidity, and after multiple failed efforts to raise additional capital or debt financing, the Debtors, in an exercise of their business judgment, commenced these Chapter 11 Cases with the intention of pursuing a prompt sale of

their assets to preserve their business as a going concern and maximize value for all their stakeholders.

10. The factual background regarding the Debtors, including their business and the events precipitating their chapter 11 filings, is set forth in detail in the *Declaration of T. Scott Avila in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 13] (the "First Day Declaration") which is fully incorporated herein by reference.

## RELIEF REQUESTED

11. Pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules, the Debtors hereby seek:

(a) entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, granting the following relief:

(i) authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1, to be used in connection with the sale of the Assets, through the proposed Sale;

(ii) establishing the following dates and deadlines in connection with the Bidding Procedures:

a. Bid Deadline: **December 9, 2024 at 12:00 noon** (prevailing Eastern time), as the deadline by which all bids to purchase the Assets must be actually received by the Debtors pursuant to the Bidding Procedures (the "Bid Deadline");

b. Auction: **December 11, 2024 at 10:00 a.m.** (prevailing Eastern time), as the date by which the Debtors will conduct an auction pursuant to the Bidding Procedures (the "Auction"), if necessary; and

c. Sale Objection Deadline: **December 6, 2024 at 4:00 p.m.** (prevailing Eastern time), as the deadline for parties to file objections to proposed Sale to Stalking Horse Bidder or Successful Bidder.

d. <u>Sale Hearing</u>: **December [13], 2024** as the date for the Court to consider approval of the Sale (the "<u>Sale Hearing</u>").

(iii)    authorizing the Debtors to provide the Stalking Horse Bidder and in accordance with the Stalking Horse Agreement, with an expense reimbursement not to exceed $487,350 on account of expenses incurred by the Stalking Horse Bidder in connection with the Sale (the "<u>Bid Protection</u>");

(iv)    approving the form and manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "<u>Sale Notice</u>");

(v)    approving procedures for the assumption and assignment of the Potential Assumed Contracts in connection with the Sale (the "<u>Assumption and Assignment Procedures</u>");

(vi)    approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract (each, a "<u>Counterparty</u>" and collectively, the "<u>Counterparties</u>") of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under the applicable Potential Assumed Contracts (the "<u>Cure Amounts</u>") and paid by the Stalking Horse pursuant to the terms of the Stalking Horse Agreement, and (B) certain other information regarding the potential assumption and assignment of Potential Assumed Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "<u>Potential Assumption and Assignment Notice</u>"); and

(b) following entry of the Bidding Procedures Order, approval of a proposed order (the "<u>Sale Order</u>") at the Sale Hearing, authorizing and approving the following:

(i)    the Sale of the Assets to the Stalking Horse Bidder or, alternatively, to the Successful Bidder (as defined below) free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse Agreement or the asset purchase agreement with the otherwise Successful Bidder, as applicable;

(ii)    authorizing the assumption and assignment of the Potential Assumed Contracts in connection with such Sale; and

(iii)    granting related relief.

## SALE TIMELINE

12.    The Bidding Procedures and the Debtors' proposed timeline for this sale process are a product of good-faith, arm's length negotiations and reflect the best option available for the Debtors to maximize the value of their Assets under the circumstances. Specifically, and in accordance with the Milestones, the Debtors have agreed, subject to the Court's approval and availability, to, among others, the following proposed key dates and deadlines to govern the sale process in the proposed Interim DIP Order:[2]]

| SALE PROCESS PROPOSED KEY DATES AND DEADLINES | |
|---|---|
| **November 12, 2024 at 4:00 p.m. (prevailing Eastern Time)** | Deadline to object to proposed Bidding Procedures (including proposed Bid Protection) and entry of Bidding Procedures Order |
| **November 18, 2024 at 2:30 p.m. (prevailing Eastern Time)** | Hearing to consider approval of Bidding Procedures (including proposed Bid Protection) and entry of Bidding Procedures Order |
| **On or before three (3) Business Days after entry of Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Notice |
| **On or before three (3) Business Days after entry of Bidding Procedures Order** | Deadline for Debtors to file and serve Potential Assumption and Assignment Notice for Potential Assumed Contracts |
| **As soon as practicable after entry of the Bidding Procedures Order, the Debtors may publish the information contained in the Sale Notice once in either the national edition of *USA Today* or such publication with similar national circulation** | Deadline to publish notice of Sale if Debtors choose publication notice |

---

[2] Capitalized terms used in this Motion but not previously defined herein shall have the respective meanings ascribed to such terms later in this Motion, either of the Bidding Procedures attached hereto as Exhibit 1, the Bidding Procedures Order, or Stalking Horse Agreement, as applicable.

| | |
|---|---|
| **December 6, 2024, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for parties to file objections to proposed Sale to Stalking Horse Bidder or Successful Bidder ("<u>Sale Objection Deadline</u>") |
| **December 6, 2024, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Counterparties to file objections to Potential Assumption and Assignment Notice for Potential Assumed Contracts |
| **December 9, 2024, at 12:00 noon (prevailing Eastern Time)** | Bid Deadline |
| **December 10, 2024, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to select Qualified Bid(s) |
| **December 10, 2024 at 5:00 p.m. (prevailing Eastern Time)** | Deadline to notify Bidders if they are selected as Qualified Bidders and provide them with notice of Auction |
| **December 11, 2024 at 10:00 a.m. (prevailing Eastern Time)** | Auction (if necessary) |
| **As soon a reasonably practicable following the closing of the Auction but no later than one day following such closing** | Notice of Auction Results |
| **December 13, 2024 at [●]. (prevailing Eastern Time) (subject to Court availability)** | Sale Hearing |

13.     The Debtors, with the assistance of their advisors, have, and will, continue to market the Assets to potential purchasers as more particularly described below.  As such, the Debtors believe that prospective bidders will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the timeline proposed herein.

14.     Completion of the sale process in a timely manner will also maximize the value of the Assets obtained through the proposed Sale.  The proposed dates governing the Sale, marketing, and auction process are within the Milestones provided under the Interim DIP Order.  Failure to adhere to the Milestones with respect to the sale of the Assets would constitute a default under the Interim DIP Order.  Accordingly, it is in the Debtors' and their stakeholders' best interests to complete a robust sale process as swiftly as possible to consummate the Sale within the parameters set by the Milestones.  In view of the foregoing, the Debtors respectfully submit that the Court should grant the relief requested herein and approved proposed timeline for completing the sale, marketing, and auction process for the Assets.

## DESCRIPTION OF THE ASSETS

15.     As discussed in the First Day Declaration, the Debtors offer businesses and individuals access to various trucks, vans, electric vehicles and other vehicles for rent via a proprietary mobile app and website (the "Business").

16.     The Debtors propose to sell to the Stalking Horse Bidder, subject to higher and better bids, all of the tangible and intangible properties and assets, wherever and however located, owned, held or used in the conduct of the Business (except to the extent constituting Excluded Assets), including:

a)     Receivables;

b)     Owned Intellectual Property;

c)     Purchased Contracts;

d)     Tangible Personal Property;

e)     Purchased Avoidance Actions;

f)     the portion of IT Systems owned by the Debtors;

g)     all of the Debtors' Equity Interest in Nereus Insurance Company;

h)     all Documents that are used in, held for use in or intended to be used in, or that arise out of, the Business or any of the Purchased Assets;

i)     all Permits, to the extent assignable or transferable;

j)     to the extent assignable, all rights (including the rights to enforce) of the Debtors under non-disclosure or confidentiality, non-compete, non-solicitation or similar agreements with any Employees and agents of the Debtors or with third parties, other than any such rights of the Debtors to the extent pertaining primarily to any Excluded Assets;

k)     to the extent assignable, all rights (whether choate or inchoate, known or unknown, contingent or non-contingent) of the Debtors under or pursuant to all warranties, representations, indemnities and guarantees made by suppliers, manufacturers and contractors to the extent relating to Products sold, or services provided, to the Debtors and affecting any Purchased Assets;

l)     all goodwill associated with the Business and the Purchased Assets;

m)     to the extent not prohibited or otherwise materially restricted by applicable Law, all personnel files and employment records of the Transferred Employees (including, without limitation, I-9 forms and attachments); and

n)     any rights, demands, claims, credits, allowances, rebates, or rights of setoff (other than against the Debtors or any of their Affiliates) arising out of or relating to any of the Purchased Assets.

17.    "Excluded Assets" include:

a)     the insurance claims receivables over one hundred eighty (180) days past due;

b)     Excluded Contracts;

c)     any books and records that the Debtors are required by Law or Contract to retain or that are necessary to retain;

d)     all cash, cash equivalents, securities and negotiable instruments;

e)     all Avoidance Actions except the Purchased Avoidance Actions;

f)     the Equity Interests or other ownership interest in the Debtors;

g)     all directors or officers liability insurance policies owned by the Debtors (in each case of the foregoing, including any tail policies or coverage thereon),

together with all rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

h)        professional retainers paid by any Debtor to its advisors or representatives in connection with the Bankruptcy Cases;

i)        the portion of any deposits and prepaid charges and expenses of any Debtor primarily related to any Excluded Asset (including any Excluded Contract) or Excluded Liability, including, without limitation, (i) security deposits with third-party suppliers, vendors, or service providers; (ii) rebates, (iii) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes); and (iv) pre-payments;

j)        any claim, right or interest of the Debtors in or to any refund, rebate, abatement or recovery of any Taxes, together with interest thereon and any refund of any penalties in respect thereof;

k)        all claims or causes of action that relate primarily to any Excluded Asset or Excluded Liability (including without limitation, claims or causes of actions against the equity holders of the Debtors, against the Debtors' current or former directors, officers, managers and employees, against lenders or other third parties, and/or against any of the Affiliates, agents or representatives of the foregoing)

l)        all prepayments, good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

m)        all other assets listed in Schedule 2.2 to the Stalking Horse Agreement;

n)        the Purchase Price and any rights of Sellers under this Agreement;

o)        any other assets of the Sellers that are not lawfully transferable; and

p)        all contracts with FVIP Owners.

## PREPETITION AND POSTPETITION MARKETING PROCESS

18.        As discussed in the First Day Declaration, the Debtors, through their advisors and significant stakeholders, worked in the months leading up to the Petition Date on parallel paths to raise capital and identify parties with an interest in purchasing the Debtors' assets.  Only the Stalking Horse emerged as a viable potential buyer, particularly here, where the Debtors needed a stalking horse bidder willing to participate in and facilitate the provision of financing to provide the prepetition runway to the commencement of these Chapter 11 Cases.

19.     In October, 2024, the Debtors engaged SSG Advisors, LLC ("SSG") as their investment banker to assist with their sale efforts.  The Debtors and SSG immediately began to market the Assets postpetition with the goal of fostering a competitive auction for the sale of the Assets consistent with terms of the proposed forms of Bidding Procedures.  SSG prepared a teaser for broad distributions as well as confidential information memorandum ("CIM") to distribute to potential bidders who executed non-disclosure agreements ("NDAs").  To date, SSG has contacted more than 120 parties consisting of 97 strategic and 27 financial parties.  Seven (7) parties have requested NDAs.  All parties that have executed an NDA have been granted access to a virtual data room and the CIM.  The Debtors, with SSG's assistance, will continue to pursue interest from third parties to solicit offers for the sale of the Assets.

20.     No later than three (3) Business Days after entry of the Bidding Procedures Order, the Debtors will (to the extent not already provided), send notice of this Motion or serve the Sale Notice to all parties that they believe may be potentially interested in acquiring the Assets, including to the parties contacted prepetition.  The Debtors will assist interested parties who either have, or will, execute confidentiality agreements acceptable to the Debtors to conduct diligence on the Assets, in accordance with the Bidding Procedures.  The Debtors believe that the marketing of the Assets over the period contemplated by the Bidding Procedures, in addition to the marketing activities that have taken place to date, and will continue, will result in the highest and best purchase price for the Assets and maximize value for all of the Debtors' constituents.

21.     Given the Debtors' liquidity and operational constraints, the timing of the Sale proposed herein is reasonable under the circumstances in order to effectuate the sale of the Assets.  Thus, the Debtors believe that the Bidding Procedures proposed hereby will enable

the efficient consummation of the sale of the Assets at an auction to the highest or best bidder.

## THE PROPOSED BIDDING PROCEDURES

### A.    Summary of Proposed Bidding Procedures

22.    The Bidding Procedures are designed to promote a competitive and expedient sale process to consummate the Sale.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the sales of the Assets on a schedule consistent with the Milestones.

23.    As the Bidding Procedures are attached to the Bidding Procedures Order, they are not herein restated in their entirety.  Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding Procedures for the Assets are highlighted in the chart below.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders** Local Rule 6004-1(c)(i)(A) | To receive due diligence information and to receive additional non-public information regarding the Debtors, a potential bidder must (x) not be in breach of any agreement with any Debtor, (y) execute and deliver to SSG Advisors, LLC, Attn: Michael S. Goodman (mgoodman@ssgca.com) and Matthew Arden (marden@ssgca.com), an executed Confidentiality Agreement on terms acceptable to the Debtors, which Confidentiality Agreement shall, among other terms, contain customary provisions regarding:  (i) the nondisclosure of confidential information, (ii) prohibitions on contacting third parties in connection with a Transaction, (iii) covenant to not solicit employees of the Debtors, (iv) prohibitions on purchasing or otherwise acquiring the Debtors' debt and equity securities, and (v) the survival of certain provisions of the Confidentiality Agreement and (z) identify the potential bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction.  A potential bidder complying with (x), (y) and (z) in the immediately preceding sentence shall be an "Acceptable Bidder". |
| **Provisions Governing Qualification of Bidders** Local Rule 6004-1(c)(i)(B) | Each Bid submitted by an Acceptable Bidder must be submitted in writing and satisfy the following requirements (collectively, the "Bid Requirements," unless otherwise modified by the Debtors (except for the requirement set forth in II(d) below), in their discretion:<br><br>a.  Bid Deadline. A Bid must be received no later than the Bid Deadline, unless otherwise extended by the Debtors in their sole discretion.<br><br>b.  Marked Agreement.  A Bid must include an executed asset purchase agreement (a "Competing APA"), together with all exhibits and |

schedules (the "<u>Transaction Documents</u>"), pursuant to which the Acceptable Bidder proposes to effectuate the contemplated transaction, which Competing APA must be similar in form and substance to the Stalking Horse Agreement and be marked to reflect the differences between the Stalking Horse Agreement and the Bidder's Competing APA, including, without limitation, specification of the proposed purchase price, any assumed liabilities, and any changes to any exhibits or schedules to the Competing APA. A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Transaction Documents. The Transaction Documents must include a commitment to close by no later than the closing date provided in the Stalking Horse Agreement.  A Bid should propose a contemplated transaction involving all or substantially all of the Assets; *provided, however,* that the Debtors in their discretion may consider proposals for less than substantially all the Assets, *provided further* that the Debtors will evaluate all Bids, in their sole discretion, subject to prior consultation with the Consultation Parties, to determine whether such Bid or combination of Bids maximizes the value of the Debtors' estates as a whole in light of any factors regarding such bid which the Debtors, in their discretion, determine are appropriate to be considered in evaluating Bids.

c.  <u>Purpose</u>.  Each Acceptable Bidder must state that the Bid includes an offer by the Acceptable Bidder to purchase some or all of the Assets and state which Assets with reasonable specificity.  Each Acceptable Bid must clearly identify the following:  (i) contracts to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; (ii) the liabilities, if any, to be assumed; (iii) leases of equipment or stores to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; and (iv) which employees or groups thereof will be offered employment.

d.  <u>Purchase Price</u>.  The consideration proposed by a Bid may include cash and/or other consideration acceptable to the Debtors in an amount of no less than the sum of (i) the Purchase Price (as defined in the Stalking Horse Agreement) <u>plus</u> (ii) the Expense Reimbursement <u>plus</u> (iii) $250,000, subject to the Debtors' right to aggregate bids as described below.  For the avoidance of doubt, the value of the Purchase Price in the Stalking Horse Agreement shall be determined by giving dollar for dollar credit for all Assumed Liabilities defined therein, including but not limited to, the outstanding balance of the DIP Facility (as defined in the Stalking Horse Agreement) and all accrued interest, fees, and other charges thereon.

e.  <u>Forms of Consideration</u>. Each Bid must (a) indicate (x) whether it is an all-cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid and/or the assumption of liabilities; and (y) the liabilities to be assumed, if applicable; and (b) provide sufficient cash consideration for the payment of the Expense Reimbursement. The Debtors may request that any Bid include the allocation of the Purchase

Price among the Assets to be acquired.

f.  <u>Deposit</u>.  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash and non-cash consideration (with the deposit amount for the non-cash consideration determined by the Debtors in their discretion) of the Bid to be held in an escrow account to be identified and established by the Debtors (the "<u>Deposit</u>"); *provided that* that the Debtors reserve the right to increase the amount of the Deposit in their discretion, including, without limitation, the right to request an additional Deposit in the event an Acceptable Bidder increases the amount of its Bid.

g.  <u>Irrevocable</u>.  All Bids must be irrevocable until the Debtors' selection of the Successful Bid and Backup Bid; *provided however*, that the Bids selected as either the Successful Bid or the Backup Bid (defined below) must be irrevocable and remain open for acceptance by the Debtors until three (3) Business Days after the closing of the Transaction with the Successful Bidder or the Backup Bidder, as applicable.

h.  <u>Committed Financing</u>.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's purchase price and other obligations under its Bid.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

i.  <u>Unconditional Offer / Contingencies</u>.  A statement that the Bid is formal, binding, and unconditional and is not subject to any further due diligence or financing contingency, and is irrevocable until the Debtors notify the Acceptable Bidder that such Bid is not a Successful Bid or a Backup Bid.

j.  <u>Non-Reliance</u>.  A Bid must include a written acknowledgement and representation of the Acceptable Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets and Assumed Liabilities (as defined in the Stalking Horse Agreement) prior to making its Bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction.

k.  <u>Identity</u>.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder, including if such Acceptable Bidder is an entity formed for the

|  | purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation. Each Bid must fully disclose any relationships, connections or agreements with the Debtors, the Stalking Horse Bidder, any other Potential Bidder or any other related individuals or entities. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s), counsel and other advisors whom the Debtors' Advisors should contact regarding such Bid. Nothing herein shall preclude multiple Acceptable Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein. |
|--|--|
|  | l. <u>Adequate Assurance</u>. Each Bid must contain evidence acceptable to the Debtors in their discretion that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under section 365(b)(1) and 365(b)(3) of the Bankruptcy Code. Such evidence may include audited and unaudited financial statements, tax returns, bank account statements, a description of the proposed business to be conducted at the premises and/or any other documentation that the Debtors further request. |
|  | m. <u>Authorization</u>. Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the closing of the Transaction contemplated in such Bid. |
|  | n. <u>No Fees Payable to Qualified Bidder</u>. Except with respect to the Expense Reimbursement payable to the Stalking Horse Bidder in accordance with the Stalking Horse Agreement, a Bid may not request or entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue any break-up fee, termination fee, expense reimbursement or similar type of payment, or substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bidding Procedures. |
| **Provisions Providing Bid Protections to Stalking Horse Bidder** Local Rule 6004- 1(c)(i)(C) | To provide the Stalking Horse Bidder with an incentive to participate in a competitive process and to compensate the Stalking Horse Bidder for (i) performing substantial due diligence and incurring the expenses related thereto and (ii) entering into the Stalking Horse Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to provide the Stalking Horse Bidder, subject to the terms of the Stalking Horse Agreement and pursuant to the terms thereof, the Expense Reimbursement, subject to a cap of $487,350. Payment of the Expense Reimbursement (to the extent payable under the Stalking Horse Agreement and Bidding Procedures Order) shall be a component of any Qualified Bid submitted by a Qualified Bidder (other than the Stalking Horse Bidder). The Expense Reimbursement shall be payable as provided for pursuant to the terms of the |

| | |
|---|---|
| | Bidding Procedures Order, the Sale Order (as defined in the Bidding Procedures Order) and the Stalking Horse Agreement. |
| **Modification of Bidding Procedures** Local Rule 6004-1(c)(i)(D) | The Debtors reserve their rights to modify these Bidding Procedures in their business judgment in any manner that will best promote the goals of these Bidding Procedures or impose at or prior to the Auction, additional customary terms and conditions on a Transaction, including, without limitation:   (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) waiving such existing procedural rules or requirements that are reasonably necessary or advisable under the circumstances for conducting the Auction; (e) canceling the Auction; and (f) rejecting any or all Bids or Qualified Bids (other than the Stalking Horse Bid).  Notwithstanding the foregoing, the Debtors shall not be permitted to modify these Bidding Procedures in any way that permits the submission of Bids after the close of the Auction. |
| **Closing with Alternative Backup Bidders** Local Rule 6004-1(c)(i)(E) | a.  Notwithstanding anything in the Bidding Procedures to the contrary, if the Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the conclusion of the Auction for the Assets or any sub-group thereof, as determined by the Debtors in the exercise of their business judgment, shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>") with respect to the Assets until the earlier of (i) such time that the Transaction is consummated and (ii) 30 days from entry of the Sale Order, subject to the terms of such Backup Bidder's Competing APA, including but not limited to any deadlines to close in such Backup Bidder's Competing APA.  Each Qualified Bidder shall agree and be deemed to agree to be a Backup Bidder if so designated by the Debtors, subject to the terms of such Backup Bidder's Competing APA. |
| | b.  The identity of a Backup Bidder and the amount and material terms of the Qualified Bid of such Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder related thereto.  Such Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of (i) the closing of the sale with the Successful Bidder approved by the Court (the "<u>Approved Transaction</u>"), and (ii) 30 days from entry of the Sale Order; provided, if the Stalking Horse Bidder is selected as the Backup Bidder, such date shall not be later than the Outside Date (as defined in the Stalking Horse Agreement).  Each Backup Bidder's Deposit shall be held in escrow (which may be held in escrow by Pachulski Stang Ziehl & Jones LLP) until the earlier of (i) three (3) Business Days after the closing of the Approved Transaction or (ii) 30 days from entry of the Sale Order, subject to the terms of such Backup Bidder's Competing APA. |
| | c.  If a Successful Bidder fails to consummate the Approved Transaction contemplated by its Successful Bid, the Debtors may select the Backup Bidder with respect to the Assets or sub-group of the Debtors' Assets or business as the Successful Bidder, and such Backup Bidder shall be |

| | |
|---|---|
| | deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance. |
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Stalking Horse Bidder shall be deemed the Successful Bidder; provided however, the Debtors may, in their discretion, open the Auction solely for the purpose of reflecting on the record that no other Qualified Bids were received other than the Stalking Horse Bid. |
| | If the Debtors receive a Qualified Bid for the Assets (other than the Stalking Horse Bid), the Debtors will conduct the Auction to determine both the Successful Bidder and the Backup Bidder with respect to such Assets.  The Auction shall take place **December 11, 2024, at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE. 19801 (or by video conference to the live proceeding at this location), or such later date and time as selected by the Debtors (following consultation with the Consultation Parties); *provided that* such modification shall be subject to the Milestones in the Interim DIP Order. |
| | No later than the day before the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, or, if multiple bids are received in respect of non-overlapping Assets, the highest or best Qualified Bid(s) received in relation to each group of Assets, in each case as determined in the Debtors' business judgment (each such bid, a "<u>Baseline Bid</u>"). The Debtors will provide copies of the Competing APAs submitted to all Qualified Bidders and the Consultation Parties.  The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtors, in consultation of the Consultation Parties, deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, which may include, among other things:  (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a Transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed (collectively, the "<u>Bid Assessment Criteria</u>"). |
| | The Auction shall be conducted pursuant to the following procedures: |
| | a.   The Debtors Shall Conduct the Auction |
| | The Debtors and the Debtors' Advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the |

Baseline Bid(s). All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders and the Consultation Parties. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, the Successful Bid(s), and any Backup Bid(s).

Only (i) Qualified Bidders, (ii) the Consultation Parties, and (iii) the members of any official committee of unsecured creditors appointed in these cases (the "Committee"), and each of their respective legal and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person (live or on videoconference) and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to make any subsequent bids at the Auction; provided, however that any creditor who wishes to physically attend the Auction (other than (i) the parties set forth in the Bidding Procedures (including the Qualified Bidders), and (ii) such other parties the Debtors deem appropriate, shall provide at least two (2) days' notice of such attendance prior to the Auction by sending an email to counsel to the Debtors. Such email notice shall identify the name of each party and such party's connection to the Debtors.

b. Terms of Overbids

"Overbid" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(i)     Minimum Overbid Increment. Any initial Overbid to the initial Baseline Bid at the start of the Auction shall be in an increment of no less than a value equal to $250,000 unless otherwise determined by the Debtors in an exercise of their business judgment; provided, however, that to the extent that the Baseline Bid constitutes the Stalking Horse Bid, the bidding for such Assets at the first round of bidding will start at an amount equal to the sum of: (i) the value of the Baseline Bid, (ii) the amount of the Expense Reimbursement, and (iii) $250,000. Subsequent bidding shall be in minimal incremental increases of $100,000.

(ii)     Conclusion of Each Overbid Round. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

(iii)     Overbid Alterations. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

(iv)     No Round-Skipping. Round-skipping, as described herein, is explicitly prohibited. To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid

in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Assets.

(v)   Announcing Highest Bid.  With respect to the Auction, the Debtors shall, subsequent to each Overbid Round Deadline, announce whether the Debtors in consultation with the Consultation Parties have identified (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid in respect of the Assets that are the subject of the Auction or (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

c.   Consideration of Overbids

For the purpose of evaluating the value of the consideration provided by any Bid subsequent to the Baseline Bid, the Debtors will at each round of bidding, give effect to the Expense Reimbursement payable to the Stalking Horse under the Stalking Horse Agreement.

The Debtors reserve the right, in their business judgment, to adjourn the Auction one or more times, to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require that the Qualified Bidder has sufficient internal approvals and resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Transaction at the prevailing Overbid amount.

d.   Closing the Auction

The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their discretion following consultation with the Consultation Parties, to be the highest or otherwise best Qualified Bid for the Assets.  Such Qualified Bid shall be declared the "Successful Bid," and such Qualified Bidder, the "Successful Bidder," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of such Successful Bid is conditioned upon approval by the Court of such Successful Bid.  For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their fiduciary duties under applicable law.  As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid, and, as applicable, cause such definitive documentation to be filed with the Court.

e.   No Collusion; Good Faith Bona Fide Offer

| | Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any bids submitted or not submitted in connection with the Sale, and (ii) its Qualified Bid is a good faith bona fide offer and it intends to consummate the proposed Transaction if selected as the Successful Bidder. |
|---|---|

### B.    Material Terms of the Sale[3]

24.    The pertinent terms of the Stalking Horse Agreement, including the provisions required by Local Rule 6004-1(b) to be highlighted, are summarized below.  The description below only summarizes certain provisions of the Stalking Horse Agreement.  The terms of the Stalking Horse Agreement control in the event of any inconsistency.

| **Purchased Assets** | The Purchased Assets are described in paragraph 16 above |
|---|---|
| **Purchase Price** | The Purchase Price consists of the Stalking Horse's assumption of the Assumed Liabilities.  The Assumed Liabilities include:  (a) all DIP Obligations, (b) Debtors' obligations under the Purchased Assets arising after Closing or prior to Closing to the extent payable after Closing, including all Cure Amounts; (c) certain obligations owed to Nereus Insurance Company in the amount of $1,350,000; and (d) Purchaser's Prorated Taxes. <br><br> Stalking Horse Agreement, § 3.1, 2.3 |
| **Sale to Insider** <br> Local Rule 6004-1(b)(iv)(A) | Bison Capital Partners V, L.P. ("Bison") and Ingka Investments Ventures US BV ("Ingka"), who are prepetition lenders and DIP Lenders, and who have representatives who sit on the Debtors' board of directors, will take an investment interest in the Stalking Horse as part of the Sale. <br><br> Stalking Horse Agreement, § 4.4 |
| **Agreements with Management** <br> Local Rule 6004-1(b)(iv)(B) | The Stalking Horse Agreement contemplates the ability of the Stalking Horse Bidder to solicit and hire certain of Debtors' Employees. <br><br> Stalking Horse Agreement, § 9.1. |

---

[3] Unless otherwise noted, capitalized terms used in this section of the Motion have the meanings ascribed in the Stalking Horse Agreement.

| | |
|---|---|
| **Releases** Local Rule 6004-1(b)(iv)(C) | The Stalking Horse Agreement does not provide for releases between the Stalking Horse Bidder and the Debtors. |
| **Private Sale/No Competitive Bidding** Local Rule 6004-1(b)(iv)( D) | The Bidding Procedures Order provides for a potential auction if the Debtors receive at least one Qualified Bid (in addition to the Stalking Horse Agreement). <br><br> Stalking Horse Agreement, § 7.2. |
| **Closing** Local Rule 6004-1(b)(iv)(E) | The Stalking Horse Agreement provides that the Outside Closing Date is December 20, 2024. <br><br> Stalking Horse Agreement, § 4.4. |
| **Deposit** Local Rule 6004-1(b)(iv)(F) | The Stalking Horse Agreement does not require the Stalking Horse Bidder to post a deposit. |
| **Interim Arrangements with Proposed Purchaser** Local Rule 6004-1(b)(iv)(G) | None. |
| **Use of Proceeds** Local Rule 6004-1(b)(iv)(H) | None. |
| **Tax Exemption** Local Rule 6004-1(b)(iv)(I) | The Sale Motion and the Stalking Horse Agreement do not seek to have any taxes declared exempt under section 1146(a) of the Bankruptcy Code. |
| **Record Retention** Local Rule 6004-1(b)(iv)(J) | The Stalking Horse Agreement provides that the Debtors and Stalking Horse shall retain records relating to the Purchased Assets for a period of five (5) years from the Closing Date, subject to certain exceptions. <br><br> Stalking Horse Agreement, § 8.6. |
| **Sale of Avoidance Actions** Local Rule 6004-1(b)(iv)(K) | The Stalking Horse Agreement provides that the Stalking Horse will purchase Avoidance Actions against Transferred Employees and Critical Vendors in their capacities as such. <br><br> Stalking Horse Agreement, § 2.1(e). |
| **Requested Findings as to Successor Liability** Local Rule 6004-1(b)(iv)(L) | The Sale Order includes findings and provisions providing that there is no successor liability. |

| | |
|---|---|
| **Sale Free and Clear of Unexpired Leases** Local Rule 6004-1(b)(iv)(M) | The Stalking Horse Agreement provides that the Sale Order shall approve the Sale free and clear of interests. Stalking Horse Agreement, § 2.1, 2.6. |
| **Credit Bid** Local Rule 6004-1(b)(iv)(N) | The Bidding Procedures would permit a secured creditor to credit bid.  The Interim DIP Order provides it is an event of default if any order prohibits credit bidding by the DIP Lenders. |
| **Relief From Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | The Sale Order may provide that notwithstanding Bankruptcy Rules 6004 and 6006, the Sale Order shall be effective and enforceable immediately upon entry. |
| **Assumed Liabilities** | The Stalking Horse Agreement provides for the assumption of certain Assumed Liabilities which are described above. Stalking Horse Agreement, § 2.3. |
| **Termination of Stalking Horse Agreement** | The Stalking Horse Agreement provides for certain termination rights by both the Stalking Horse Bidder and the Debtors. Stalking Horse Agreement, § 4.4. |
| **Conditions to Parties' Performance Obligations** | The Stalking Horse Agreement provides for conditions precedent to closing for both the Stalking Horse Bidder and the Debtors including Stalking Horse's inability to enter into the Requisite Support Agreements. Stalking Horse Agreement, § 10.1 -10.3. |

25.     The Debtors have determined that, in light of their financial situation and liquidity needs that a more viable alternative to a sale of the Assets does not exist and that the Stalking Horse Agreement is the best option, subject to the process under the Bidding Procedures.   The Debtors believe that the Sale of the Assets pursuant to this Motion optimizes value for their economic stakeholders.

## C.     Sale Noticing and Objection Procedures

26.     The "Sale Process Key Dates and Deadlines" chart set forth above summarizes the proposed noticing and objection procedures and requirements with respect to service of the Sale Notice, the Sale Objection Deadline, and the deadline to publish the Sale

Notice (collectively, the "Sale Noticing and Objection Procedures").  The Debtors submit that the Sale Noticing and Objection Procedures constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the sale process, including the Sale Objection Deadline and the Sale Hearing.  The Sale Notice also provides parties with information on how to obtain copies of the Motion, sets forth the Bid Deadline and the time and place of the Auction.   No later than three (3) Business Days after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice on the following parties:  (i) counsel to the Committee; (ii) the U.S. Trustee; (iii) counsel to the Stalking Horse Bidder; (iv) counsel to the Debtors' prepetition and postpetition lenders (the "Lenders"); (v) all known creditors of the Debtors (for whom identifying information and addresses are available to the Debtors); (vi) the Internal Revenue Service; (vii) all applicable federal, state, and local taxing authorities; (viii) all persons and entities known by the Debtors to have expressed an interest to the Debtors in the Assets; (ix) all persons and entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors); (x) Counterparties to Potential Assumed Contracts; (xi) any governmental authority known to have a claim against the Debtors in the Chapter 11 Cases; (xii) the United States Securities and Exchange Commission; (xiii) the United States Attorney's Office for the District of Delaware; (xiv) United States Attorney General's Office for the District of Delaware; (xvii) the Office of the Attorney General and the Secretary of State in each state in which the Debtors operate; (xviii) all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and (xiv) all other parties as directed by the Court.

27.     The Debtors also propose that any objections to the Sale must be in writing, state, with specificity, the legal and factual bases thereof, be filed with the Court by the

Sale Objection Deadline and be served on the following parties: (1) proposed counsel for the Debtors; (2) counsel to the Committee; (3) the U.S. Trustee; (4) counsel to the Lenders; (5) counsel to the Stalking Horse Bidder; and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

28.     The Sale Notice also provides information on how to obtain copies of the Motion and other sale related information directly from the case website (the "Case Management Website"), maintained by the Debtors' claims agent, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/case/fluidtruck/info.

29.     Accordingly, the Debtors request that the Court approve the form of Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

### D.     Potential Assumption and Assignment Notice and Proposed Assumption and Assignment Procedures for Contracts

30.     At the closing of the Sale, the Debtors will seek to assume and assign to the Successful Bidder all or certain of the Potential Assumed Contracts.[4]

31.     The Debtors will serve the Potential Assumption and Assignment Notice substantially in the form attached to the Bidding Procedures Order as Exhibit 3 on all Counterparties to Potential Assumed Contracts. The Assumption Assignment Notice provides notice of, *inter alia*, the possible assumption and assignment of the Potential Assumed

---

[4] The inclusion of any agreement in the list of Potential Assumed Contracts does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included in the list of Potential Assumed Contracts.

Contracts, the Debtors' proposed Cure Amounts, the applicable deadlines to object to the assumption and assignment of the Potential Assumed Contracts with respect to disputed Cure Amounts and/or on the basis of adequate assurance of future performance. The Potential Assumption and Assignment Notice also provides information on how to access the Bidding Procedures and Bidding Procedures Order from the Case Management Website. Accordingly, the Debtors request that the Court approve the form of Potential Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 3, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 6006 and Local Rule 2002-1.

32.     The Successful Bidder shall be responsible for payment of any Cure Amounts that may be owed to any counterparty to the Potential Assumed Contracts. The Successful Bidder shall also be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b)(1) of the Bankruptcy Code in connection with the proposed assignment of any Potential Assumed Contracts. The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Potential Assumed Contracts pursuant to section 365(b)(1) of the Bankruptcy Code at the Sale Hearing, or as such other hearing as may be scheduled by the Court.

33.     The Debtors request that the Court approve the proposed Assumption and Assignment Procedures, including with respect to objections by any Counterparty to the proposed assumption or assignment of its Potential Assumed Contract, the Debtors' proposed Cure Amounts with respect to such Potential Assumed Contract, if any, or the ability of the Stalking Horse Bidder or any other potential bidder to provide adequate assurance of future

performance (collectively, an "<u>Assumption and Assignment Objection</u>").  The Debtors propose that all Assumption and Assignment Objections must be in writing, comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount the Counterparty believes is required to cure defaults (as that concept is contemplated by section 365(b)(1) of the Bankruptcy Code) under the relevant Potential Assumed Contract, and be filed by the Assumption and Assignment Objection Deadline.

34.     If a Counterparty files a timely Assumption and Assignment Objection, the Debtors propose that the Court hear and determine such objection either at the Sale Hearing or such other date that the Debtors and the Successful Bidder shall determine (subject to the Court's calendar).  If a Counterparty fails to file with the Court and serve a timely Assumption and Assignment Objection, the Counterparty shall be barred from asserting any such objection with regard to the assumption or assignment of its Potential Assumed Contract. In such event, notwithstanding anything to the contrary in the Potential Assumed Contract, or any other document, the Debtors request that the Cure Amounts set forth in the Potential Assumption and Assignment Notice be controlling and shall be the only amount necessary to cure outstanding defaults under the applicable Potential Assumed Contract under section 365(b)(1) of the Bankruptcy Code arising out of or related to the Potential Assumed Contract following the assumption and assignment of the Potential Assumed Contract.  Moreover, if a Counterparty fails to file with the Court and serve a timely Assumption and Assignment Objection, the Debtors request that the Counterparty be forever barred from asserting any cure or other pre-assignment amounts in excess of the Cure Amount set forth in the applicable Potential

Assumption and Assignment Notice with respect to such Potential Assumed Contract against the Debtors, the Successful Bidder or the property of any of them.

35.     Any Successful Bidder for the Assets will be responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any Potential Assumed Contract.

36.     Finally, the Debtors request that, following any Auction, if the Stalking Horse Bidder is not the Successful Bidder, each Counterparty may raise any objections to such Successful Bidder's ability to provide adequate assurances of future performance under section 365(b)(1) at the Sale Hearing provided that any objections relating to (i) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance with respect to any Potential Assumed Contract or (ii) the Cure Amounts that must be cured by either the Stalking Horse Bidder or any Successful Bidder that is not the Stalking Horse Bidder with respect to the Potential Assumed Contract, must be filed by Assumption and Assignment Objection Deadline as provided above.

37.     The Debtors submit that the proposed procedures governing the assumption and assignment of Potential Assumed Contracts are reasonable and should be approved.

## **ARGUMENT**

### A.     **The Bidding Procedures Are Fair, Appropriate, and in the Best Interests of the Debtors and Their Stakeholders**

38.     The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of a debtor's property—maximizing the value of sale proceeds received by the estate.  *See Burtch et al. v. Ganz, et al. (In re*

*Mushroom Co.*), 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (debtor has "fiduciary duty to maximize the value of the bankruptcy estate"); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (citing *Metro. Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494 (7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.")).   Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); I*n re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("[C]ourt-imposed rules for the disposition of assets . . .  [should] provide an adequate basis for comparison of offers, and [should] provide for fair and efficient resolution of bankrupt estates.").

39.   The Bidding Procedures provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers in connection with the Sale of the Assets.  The Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets and Other Assets.  The Bidding Procedures will allow the Debtors to conduct any Auction in a fair and transparent

manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely sale or sales.

40.     Courts in this District routinely approve procedures substantially similar to the proposed Bidding Procedures. *See*, *e.g.*, *In re Sientra, Inc.*, Case No. 24-10245 (JTD) (Bankr. D. Del. March 5, 2024); *In re GigaMonster Networks, LLC*, Case No. 23-10051 (JKS) (Bankr. D. Del. February 9, 2023); *In re RTI Holding Co., LLC*, Case No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020); *In re BL Restaurants Holding, LLC*, Case No. 20-10156 (MFW) (Bankr. D. Del. Feb. 28, 2020); *In re Consolidated Infrastructure Group, Inc.*, No. 19-10165 (BLS) (Bankr. D. Del. Apr. 24, 2019).

41.     Accordingly, the Bidding Procedures should be approved, not just because they are aligned with the circumstances of the Debtors' chapter 11 cases, but also because they are consistent with procedures approved by courts in this District in cases of similarly-situated debtors and are otherwise reasonable, appropriate, and in the best interests of the Debtors, their estates and all parties in interest.

**B.     The Proposed Bid Protection Is Necessary, Reasonable, and Appropriate**

42.     As indicated above, the Debtors hereby request that the Court approve the Expense Reimbursement.  The Stalking Horse Bidder is not seeking a separate break-up fee. The maximum Expense Reimbursement represents less than five percent 5%[5] of the value provided under the Stalking Horse Agreement, which is in line with bid protections approved in this jurisdiction.  The Debtors and Stalking Horse Bidder believe that the amount of the Expense Reimbursement is reasonable, given the benefits to the Debtors' estates of having a

---

[5] The value includes the Purchase Price, including all Assumed Liabilities, and an estimated $4 million in reduction of claims against the Debtors' estates as a result of the Stalking Horse Bidder's plan to enter into new agreements with FVIPs, for a total of over $10,000,000 in value.

"stalking horse" bidder by virtue of the definitive Stalking Horse Agreement, and the risk to the Stalking Horse Bidder that a third-party offer may ultimately be accepted, and that approval of the Expense Reimbursement under the terms of the Stalking Horse Agreement is necessary to preserve and enhance the value of the Debtors' estates.  The Debtors believe that the agreement to pay the Expense Reimbursement on the terms of the Stalking Horse Agreement is necessary to induce the Debtors to enter into the transactions encompassed by the Stalking Horse Agreement and sets an appropriate floor for the value of the Assets, thus enabling the Debtors to obtain the highest and best possible price for the Assets.  Finally, the Debtors believe that the Expense Reimbursement is fair and reasonable under the circumstances of these cases.

43.     Providing a stalking horse bidder with certain bidding protections in connection with a sale of significant assets under section 363 of the Bankruptcy Code has become standard practice in chapter 11 cases.  In the Third Circuit, break-up fees and expense reimbursements are considered administrative expenses and must be necessary to preserve the value of a debtor's estate.  *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999).  In *O'Brien*, the Third Circuit provided two examples of a potential benefit accruing from the payment of a break-up fee.  *See id.*  First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537.  Second, bidding protections encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*  Termination and similar fees are effective mechanisms for protecting bidders in connection with an asset sale and can be "important tools to encourage bidding and to maximize the value of the

[d]ebtors' assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Put differently, these bidding protections enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity to generate even greater value through an auction process. *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted) (internal quotation marks omitted).

44.    In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award bid protections:

a.    the presence of self-dealing or manipulation in negotiating the break-up fee;

b.     whether the fee harms, rather than encourages, bidding;

c.    the reasonableness of the break-up fee relative to the purchase price;

d.    whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.    the correlation of the fee to a maximum value of the debtor's estate;

g.    the support of the principal secured creditors and creditors' committees of the break-up fee;

h.    the benefits of the safeguards to the debtor's estate; and

i.    the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

45.     As set forth above, the Bid Protection is necessary to preserve the value of the Debtors' estates because it will enable the Debtors to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than as provided under the Stalking Horse Agreement—a clear benefit to the Debtors' estates.

46.     As described above, the maximum requested Bid Protection represents less than 5% of the value provided under the Stalking Horse Agreement.  The Debtors submit that this is market for a transaction of this size and nature. *See, e.g.*, *In re The Rockport Co., LLC*, (No. 18-11145) (LSS) [Docket No. 146] (Bankr. D. Del. June 5, 2018) (approving break-up fee and expense reimbursement equal to approximately 4.3% of the purchase price); *In re Orexigen Therapeutics, Inc.*, (No. 18-10518) (KG) [Docket No. 231] (Bankr. D. Del. April 23, 2018) (approving break-up fee and expense reimbursement equal to approximately 7.3% of the purchase price); *In re The Weinstein Company Holdings LLC*, (No. 18-10601) (MFW) [Docket No. 190] (Bankr. D. Del. Apr. 6, 2018) (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re ATopTech, Inc.*, (No. 17-10111) (MFW) [Docket No. 234] (Bankr. D. Del. Apr. 21, 2017) (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re Phoenix Brands LLC*, (No. 16-11242) (BLS) [Docket No. 136] (Bankr. D. Del. June 8, 2016) (approving break-up fee and expense reimbursement greater than 5% of the purchase price).

47.     Most importantly, absent approval of the Bid Protection, the Debtors may lose the opportunity to obtain the highest and otherwise best offers for the Assets through the Auction process.  If the Court does not approve the proposed Bid Protection, the success of the sale process could be compromised, the competitive nature of any Auction could be undermined, and the estates could suffer accordingly.  The Bid Protection was negotiated at

arm's length and in good faith with the Stalking Horse Bidder.  Accordingly, the Debtors request that the Court approve the Bid Protection pursuant to and in accordance with the terms of the Bidding Procedures Order and the Stalking Horse Agreement, as such bid protection will be in the best interest of the Debtors and their estates.

### C.    Approval of the Proposed Sale Is Warranted Under Section 363 of the Bankruptcy Code

48.    Section 363 of the Bankruptcy Code provides, in relevant part, that the debtor may, "after notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts routinely authorize a sale if it is based upon the debtor's sound business judgment.  *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

49.    Courts typically consider the following factors in determining whether a sale under section 363 of the Bankruptcy Code passes muster under the business judgment standard:  (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (citing *Guilford Transp. Indus., Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound

business purpose for an asset sale)).  As such, it follows that when a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

### D.     The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale

50.     A sound business justification exists where the sale of a debtor's assets are necessary to preserve the value of the debtor's estate for the benefit of creditors and interest holders.  *See*, *e.g.*, *Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn., Inc.)*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . . ."); *In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale).

51.     As set forth above, a strong business justification exists for a sale of the Assets.  In light of the Debtors' financial condition, an orderly but expeditious Sale of the Assets is critical to maximizing recoveries for all of the Debtors' stakeholders.  Moreover, a timely closing of the Sale is necessary under the Interim DIP Order, without which Debtors would not have been able to execute an orderly and value-maximizing sale process or fund these chapter 11 cases.

**E.      The Proposed Sale Will Yield a Fair and Reasonable Purchase Price for the Assets**

52.     As set forth above, the Debtors believe that the Sale governed by the Bidding Procedures will yield a fair and reasonable price for the Assets.  The Bidding Procedures were designed to facilitate a robust and competitive bidding process and provide significant flexibility to do so.  The Debtors also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire sale process within the parameters of the Milestones.  The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare one or more bids for the Assets and to engage with bidders on an arm's length basis to work to improve the quality of their bids for the benefit of all parties in interest.

53.     A sale governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining a fair and reasonable purchase price for the Assets.  This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties in interest in the chapter 11 cases.

**F.      The Successful Bidder(s) Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

54.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) embodies the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely."  *See Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *Abbotts Dairies*, 788 F.2d at 147)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

55.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Diaries*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)) (other citations omitted); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

56.     As set forth above, the Bidding Procedures were designed with the goal of producing a fair and transparent sale process that will yield the highest or otherwise best value for the Assets. The Stalking Horse Bidder has engaged separate counsel to represent its interests in the negotiation of the Stalking Horse Agreement and in the sale process generally. The Debtors submit, and the testimony presented at the Sale Hearing will demonstrate, that the terms and conditions of the Sale will have been negotiated by the Debtors and the Stalking Horse Bidder or Successful Bidder, as applicable, at arm's length and in good faith, with the assistance of the Debtors' professional advisors, and that the parties did not engage in any

conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.

57.     The Debtors submit that the Stalking Horse Bidder is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in the Auction will be required confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Assets.  Any purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's length and in good faith.  As such, the Debtors request a finding that any Successful Bidder (including the Stalking Horse Bidder if it is the Successful Bidder) is a good-faith purchaser and is entitled to the full protections afforded under section 363(m) of the Bankruptcy Code.

58.     In view of the foregoing, the Debtors have demonstrated that the proposed sale of their Assets should be approved as a sound exercise of their business judgment.

**G.     The Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code**

59.     In the interest of attracting the best offers, the Court should authorize the Debtors to sell the Assets free and clear of any liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

60.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

61.     The Debtors submit, and to the extent necessary will demonstrate at the Sale Hearing, that the sale of the Assets free and clear of all liens, claims, interests, and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  The proposed Sale satisfies one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of Assets.  For example, the Assets are subject to the liens of the Lenders, each of whom either have consented or are

expected to consent to the Sale. Additionally, any parties with junior liens on the Assets can be compelled to accept a money satisfaction of their interests, but also would be adequately protected by such liens attaching to the proceeds of the Sale in the order of their respective priority.

62.     Moreover, the Debtors will send the Sale Notice to any other purported prepetition lienholders. If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, or encumbrance on any of the Assets timely objects to this Motion as it relates to the Sale (and not the Bidding Procedures), such party shall be deemed to have consented to any Sale approved at the Sale Hearing. *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein). Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances attaching to the proceed thereof in the same order of relative priority, with the same validity, force, and effect as prior to such.

**H.     The Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code**

63.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease. *See*, *e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that

assumption or rejection of a lease "will be a matter of business judgment . . . ."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice).  In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

64.     The proposed Sale will provide the Successful Bidder with the opportunity to designate the Potential Assumed Contracts for assumption and assignment in connection with its Qualified Bid.  Assumption and assignment of any Potential Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such contracts in connection with the Sale is an essential element in the Debtors' ability to maximize the value of the Assets—particularly so when a Potential Assumed Contract is integral to the ownership or operation of the Assets to be acquired.  Further, the ability to assume and assign necessary Potential Assumed Contracts will increase the likelihood that the Debtors will be able to sell the Assets, thereby avoiding needless value-destruction through a liquidation of otherwise marketable operating assets.

65.     The consummation of the Sale involving the assignment of a Potential Assumed Contract will be contingent upon the Debtors' and the Successful Bidder(s)' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that any outstanding defaults under the Potential Assumed Contracts to be

assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured.  *See* 11 U.S.C. § 365(b)(1).  The Debtors' assumption and assignment of any Potential Assumed Contracts will be dependent upon the Stalking Horse Bidder's payment of Cure Amounts and effective only upon the closing of the Sale.  As set forth above, subject to the Court's approval, the Debtors will file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice setting forth the Debtors' calculation of the Cure Amounts for each Potential Assumed Contract that could be assumed in connection with a Sale.

66.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance ... whether or not there has been a default in such contract." 11 U.S.C. § 365(f)(2).  While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language ... from Section 2609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations.").  While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance." *In re Carlisle Homes, Inc.*, 103 B.R. at 538 (citations omitted); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

67.     Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business, and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

68.     The Bidding Procedures expressly specify that for a bid to qualify as a Qualified Bid a prospective bidder must include with its bid adequate assurance information regarding the prospective bidder's ability to perform the applicable obligations under any Potential Assumed Contracts that may be included in the bid.  Accordingly, the proposed Assumption and Assignment Procedures are carefully designed to ensure that Counterparties receive timely and sufficient notice with respect to the disposition of their Potential Assumed Contracts.  In light of the foregoing, the Debtors' assumption and assignment of any Potential Assumed Contracts in accordance with the proposed Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

69.     Finally, in order to facilitate the assumption and assignment of Potential Assumed Contracts in furtherance of maximizing the value of the Assets, the Debtors further request that the Court find that any anti-assignment provision included in any Potential Assumed Contract, whether such provision expressly prohibits, or has the effect of restricting or limiting assignment of a Potential Assumed Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[6]

---

[6]Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease .... " 11 U.S.C. § 365(f)(1).  Further, section 365(f)(3) provides that

## REQUESTS FOR IMMEDIATE RELIEF & WAIVER OF STAY

70.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Bidding Procedures Order, and the Sale Order, as well as any other separate order authorizing the assumption or assumption and assignment of a Potential Assumed Contract in connection with the Sale.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

71.     As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders.  Accordingly, the Debtors submit that ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## NOTICE

72.     The Debtors have or will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Lenders; (d) counsel to the Stalking Horse Bidder; (e) the United States Attorney's Office for the District of Delaware;

---

"[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

(f) the state attorneys general for all states in which the Debtors conduct business; (g) any known party asserting a lien on the Debtors' assets; (h) all persons and entities known by the Debtors to have expressed an interest to the Debtors in the Assets; and (i) any party that requests service pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

73.     No prior request for the relief sought herein has been made to this Court or any other court in connection with the chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in this Motion, enter the Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, and grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  October 31, 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
          dbertenthal@pszjlaw.com
          tcairns@pszjlaw.com

Proposed Counsel to the Debtors and Debtors in Possession