# EXHIBIT B

## APA

**ASSET PURCHASE AGREEMENT**

**AMONG**

**FLUID MARKET, INC.,**

**FLUID FLEET SERVICES, LLC**

**AND**

**KINGBEE RENTALS, LLC**

**DATED AS OF OCTOBER 30, 2024**

TABLE OF CONTENTS

ARTICLE I DEFINITIONS ....................................................................................................1

    1.1      Certain Definitions.................................................................................................1

    1.2      Other Definitional and Interpretive Matters.........................................................9

ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES.....................10

    2.1      Purchase and Sale of Assets.................................................................................10

    2.2      Excluded Assets...................................................................................................11

    2.3      Assumption of Liabilities.....................................................................................12

    2.4      Excluded Liabilities.............................................................................................12

    2.5      Assignment and Assumption of Contracts...........................................................13

    2.6      Bulk Transfer Laws .............................................................................................14

ARTICLE III CONSIDERATION .........................................................................................14

    3.1      Purchase Price......................................................................................................14

ARTICLE IV CLOSING AND TERMINATION ........................................................................15

    4.1      Closing Date .........................................................................................................15

    4.2      Deliveries by the Sellers .......................................................................................15

    4.3      Deliveries by Purchaser .........................................................................................15

    4.4      Termination of Agreement....................................................................................15

    4.5      Consequences of Termination...............................................................................17

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLERS .................................18

    5.1      Organization and Good Standing..........................................................................18

    5.2      Authorization of Agreement.................................................................................18

    5.3      Conflicts; Consents of Third Parties ...................................................................18

    5.4      Title to Purchased Assets .....................................................................................19

    5.5      Real Property .......................................................................................................19

    5.6      Intellectual Property.............................................................................................19

    5.7      Material Contracts................................................................................................20

    5.8      Litigation..............................................................................................................21

    5.9      Compliance with Laws; Permits ..........................................................................21

    5.10    Insurance .............................................................................................................21

    5.11    Related Party Transactions ..................................................................................21

    5.12    Customers and Suppliers .....................................................................................21

    5.13    Excluded Entities ................................................................................................22

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER .................................22

    6.1      Organization and Good Standing..........................................................................22

i

6.2     Authorization of Agreement ................................................................................22

6.3     No Contravention ................................................................................................22

6.4     Consents and Approvals .....................................................................................22

6.5     Litigation............................................................................................................22

6.6     Financial Advisors .............................................................................................22

6.7     Sufficient Funds; Adequate Assurances .............................................................23

6.8     Acknowledgements; "As Is" "Where Is" Transaction ........................................23

ARTICLE VII BANKRUPTCY COURT MATTERS ..........................................................23

7.1     Expense Reimbursement.....................................................................................23

7.2     Bankruptcy Court Orders and Related Matters....................................................24

ARTICLE VIII COVENANTS...............................................................................................25

8.1     Due Diligence; Access to Information .................................................................25

8.2     Conduct of the Business Pending the Closing .....................................................25

8.3     Consents..............................................................................................................27

8.4     Further Assurances .............................................................................................27

8.5     Confidentiality ....................................................................................................27

8.6     Preservation of Records ......................................................................................28

8.7     Further Disclosure...............................................................................................28

8.8     Publicity .............................................................................................................28

8.9     Tax Matters ........................................................................................................29

8.10    Use of Name .......................................................................................................29

8.11    No Control ..........................................................................................................29

8.12    WARN Act .........................................................................................................29

8.13    Mail and Receivables..........................................................................................29

8.14    Communication with FVIP Owners.....................................................................30

ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFITS ...............................................30

9.1     Transferred Employees .......................................................................................30

9.2     Employee Benefits ..............................................................................................31

ARTICLE X CONDITIONS TO CLOSING ..........................................................................31

10.1    Conditions Precedent to Obligations of Purchaser ..............................................31

10.2    Conditions Precedent to Obligations of Sellers ..................................................32

10.3    Conditions Precedent to Obligations of Purchaser and Sellers.............................32

10.4    Frustration of Closing Conditions.......................................................................33

ARTICLE XI MISCELLANEOUS ........................................................................................33

11.1    Expenses ............................................................................................................33

11.2      Attorneys' Fees ...................................................................................................33

11.3      Risk of Loss .........................................................................................................33

11.4      Dispute Resolution; Consent to Jurisdiction .......................................................33

11.5      Submission to Jurisdiction; Consent to Service of Process ...............................34

11.6      WAIVER OF RIGHT TO TRIAL BY JURY........................................................34

11.7      Specific Performance ..........................................................................................34

11.8      Entire Agreement; Amendments and Waivers.....................................................34

11.9      Governing Law ....................................................................................................35

11.10    Notices ................................................................................................................35

11.11    Severability .........................................................................................................36

11.12    Binding Effect; Assignments ...............................................................................36

11.13    Survival ...............................................................................................................36

11.14    Counterparts; Electronic Signatures ...................................................................36

11.15    No Interpretation Against Drafter........................................................................36

11.16    Appointment of Sellers' Representative ...............................................................36

11.17    Non-Recourse .....................................................................................................37

11.18    Personally Identifiable Information ......................................................................37

## **EXHIBITS**

Exhibit A              Form of Bidding Procedures Order

Exhibit B              Form of Sale Order

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of October 30, 2024 (as amended, supplemented, amended and restated or otherwise modified from time to time, this "<u>Agreement</u>"), by and among Fluid Market, Inc., a Delaware corporation (the "<u>Company</u>") and Fluid Fleet Services, LLC a Colorado limited liability company (together with the Company, the "<u>Sellers</u>" and each a "<u>Seller</u>"), and Kingbee Rentals, LLC, a Utah limited liability company (the "<u>Purchaser</u>").

A.        The Sellers filed voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "<u>Bankruptcy Code</u>"), on October 16, 2024 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") (such cases, collectively, the "<u>Bankruptcy Cases</u>").

B.        The Sellers offer businesses and individuals access to various trucks, vans, electric vehicles and other vehicles for rent via a proprietary mobile app and website (together with all other services and offerings as currently conducted by the Sellers as of immediately prior to the Closing, the "<u>Business</u>").

C.        On the terms and subject to the conditions hereof, the Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from the Sellers, certain specified assets and certain specified liabilities of the Business, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363, 365, 1123, as applicable, and other applicable provisions of the Bankruptcy Code.

D.        The board of directors, board of managers, managing member or other applicable governing body of each respective Seller has determined that a sale of the assets of such Seller is necessary to maximize value and that it is advisable and in the best interests of their respective entities and the beneficiaries of such entities to consummate the transactions provided for herein and has approved this Agreement.

E.        The board of managers of Purchaser has approved and authorized Purchaser to enter into this Agreement.

F.        The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bidding Procedures (as defined below) and, if Purchaser is the Successful Bidder, the Sale Order (as defined below) to be entered by the Bankruptcy Court in the Bankruptcy Cases.

NOW THEREFORE, intending to be legally bound, and in consideration of the above-recited premises and the mutual promises, covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## <u>DEFINITIONS</u>

1.1      <u>Certain Definitions</u>. For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>. "<u>Administration Agreement</u>" means that certain Administration Agreement, dated on or before the Closing Date, by and between Carbon Fleet, Purchaser, and Goldman Sachs Bank USA, pursuant to which vehicles owned by Carbon Fleet and financed by Goldman Sachs Bank USA  will be made available to Purchaser for use in its fleet of commercial vehicles.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such

Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble hereto.

"Alternative Transaction" means a sale of all or substantially all of the Purchased Assets to a Person or Persons other than Purchaser or an Affiliate of Purchaser pursuant to the Auction, if an Auction is conducted pursuant to the Bidding Procedures Order.

"Ancillary Agreement" means any other agreement, document or instrument that any Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby (including the Seller Documents and the Purchaser Documents).

"Assignable Contract" means any Contract to which any Seller is a party, but excluding, in each case, this Agreement and the Ancillary Agreements, the Sale Order, the DIP Facility and any ancillary agreements related thereto, any engagement letters or agreements between the Company and any professionals retained by it, and any Contract that cannot be assigned in accordance with Section 2.5(a) (including, without limitation, any Contract that cannot be assigned because of the failure to obtain a consent which is required notwithstanding the effect of the Sale Order).

"Assignment and Assumption Agreement" means one or more assignment and assumption agreements to be entered into by Sellers and Purchaser concurrently with the Closing in a form mutually agreed to by the Parties, evidencing the assignment to and assumption by Purchaser of the Purchased Assets on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means, if applicable, the auction for the Purchased Assets to be conducted on the Auction Date in the event of the submission of one or more competing qualified bids in accordance with the terms and provisions of the Bidding Procedures Order as expressly defined in the Bidding Procedures.

"Auction Date" means the date the Auction, if applicable, is scheduled by the Bankruptcy Court and set forth in the Bidding Procedures Order.

"Avoidance Actions" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller arising under Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) and all proceeds thereof.

"Backup Bidder" means, if an Auction is conducted, the party that is the next highest or otherwise best bidder at the Auction after the Successful Bidder.

"Bankruptcy Cases" has the meaning set forth in the Recitals hereto.

"Bankruptcy Code" has the meaning set forth in the Recitals hereto.

"Bankruptcy Court" has the meaning set forth in the Recitals hereto.

"Bidding Procedures" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Bidding Procedures Motion" means the motion filed in the Bankruptcy Cases, which motion shall be in form and substance reasonably satisfactory to Sellers and Purchaser (together with all exhibits thereto), (i) seeking approval of the Bidding Procedures and scheduling certain dates, deadlines

and forms of notice in connection therewith; (ii) authorizing the payment of the Expense Reimbursement to Purchaser; and (iii) granting other related relief.

"Bidding Procedures Order" means the order of the Bankruptcy Court approving the Bidding Procedures Motion and the Bidding Procedures, and granting the relief requested therein in substantially the form set forth hereto as Exhibit A with changes thereto being in form and substance reasonably acceptable to Sellers and Purchaser, which shall include, without limitation, approval of the Purchaser as a stalking horse purchaser and approval of the Expense Reimbursement.

"Business" has the meaning set forth in the Recitals hereto.

"Business Day" means any day of the year other than a Saturday, Sunday, or a day on which national banking institutions in Salt Lake City, Utah or New York, New York are required or authorized to close.

"Carbon Fleet" means Carbon Fleet, LLC, a Delaware limited liability company.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble hereto.

"Confidential Information" means all information in any form or medium that relates to the Business, the Purchased Assets or the Assumed Liabilities, including financial information, projections, pricing structures, technical data, Trade Secrets, know-how, ideas, inventions, designs, research, development plans, identities of, and arrangements with, customers and suppliers, software and databases, but shall not include any information that at the time of disclosure thereof is generally available to the public (other than as a result of disclosure in violation of this Agreement).

"Consent" means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Body or other Person.

"Contract" means any contract, agreement, indenture, note, bond, lease (including any Personal Property Lease or Real Property Lease), license, purchase or sale order, warranties, commitments, or other written or oral agreement.

"Critical Vendors" means certain vendors identified by Purchaser (in writing to Sellers) prior November 15, 2024 whose payment is necessary to release, repair, maintain or otherwise make available vehicles for inclusion in Purchaser's platform for vehicles available to lease or rent.

"Cure Amount Overage" has the meaning set forth in Section 2.5(b).

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure defaults, if any, under the Purchased Contracts so that they may be assumed and assigned to Purchaser pursuant to sections 363, 365, and/or 1123 of the Bankruptcy Code.

"Cure Schedule" has the meaning set forth in Section 2.5(b).

"Default" has the meaning set forth in the DIP Order.

"Designated Employees" has the meaning set forth in Section 9.1. Designated Employees shall not include any employee that is no longer employed by Sellers as of the date of this Agreement.

"DIP Agent" means Bison Capital Partners V, L.P., as administrative agent under the DIP Facility.

"DIP Facility" that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement by and among the Company, certain subsidiaries of the Company party thereto, the DIP Agent, the guarantors party thereto and the lenders party thereto, as may be amended, restated, amended and restated, supplemented or modified from time to time.

"DIP Order" means any order of the Bankruptcy Court then in-effect authorizing Sellers to obtain post-petition financing in the Bankruptcy Cases, pursuant to the DIP Facility.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, stationery, forms, labels, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, catalogs, flyers, pamphlets, web pages, art work, photographs, etc.), and other similar materials owned or used by any Seller, in each case, whether or not in electronic form.

"Employee Benefit Plans" means all "employee benefit plans," as defined in section 3(3) of ERISA, and all other employee benefit arrangements or payroll practices, including, without limitation, bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs maintained by any of the Sellers or to which any Seller contributed or is obligated to contribute thereunder for current or former employees of the Sellers or under which any Seller has any liability.

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by any Seller (for clarity, excluding any contractors), together with individuals who are hired as employees by any Seller after the date hereof and prior to the Closing, and excluding individuals who are terminated or otherwise no longer employed by a Seller prior to the Closing.

"Equipment" means the tangible personal property owned by any Seller and related to the Business, including, but not limited to, the physical assets and all equipment, machinery, tools, tooling, GPS devices and related telematics equipment, raw materials; vehicle partitions, office furniture, fixtures, supplies, vehicles, artwork, any and all computer and computer-related hardware (including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks, copiers, and telecommunication equipment), and miscellaneous office materials (wherever located and whether or not carried on a Seller's books), and all maintenance records and other documents relating thereto.

"Equity Interests" means, with respect to any Person, (i) capital stock of, partnership interests, membership interests or other equity interests in, such Person, (ii) securities or other rights exercisable, convertible into or exchangeable for shares of capital stock, partnership interests, membership interests, voting securities or other equity interests in such Person and (iii) options, warrants, calls, commitments or other rights to acquire any of the foregoing described in clauses (i) and (ii), whether fixed or contingent, matured or unmatured, contractual, legal, equitable or otherwise.

"Event of Default" has the meaning set forth in the DIP Order.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" means any Seller Contract which is not a Purchased Contract.

"Excluded Entities" means Fluid Truck LTD, an Irish private company limited by shares; Fluid Truck CA ULC, a Canadian unlimited liability corporation; Fluid Fleet Services CA ULC, a Canadian unlimited liability corporation; ElectroLeaf Vehicles ULC, a Canadian unlimited liability corporation; Fluid Asset Ventures, LLC, a Delaware limited liability company, Edison Coil Fund I, LLC, a Colorado limited liability company, and Edison Coil Fund II, LLC, a Colorado limited liability company.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Taxes" means all Taxes other than any Transfer Taxes, Purchaser's Prorated Taxes and any Taxes attributable to the Purchaser's payment of a Cure Amount, if any, pursuant to Section 2.5(b).

"Expense Reimbursement" means all reasonable and documented actual out-of-pocket expenses, including all professional fees and expenses and travel expenses, incurred by Purchaser in connection with the diligence, negotiation, execution, delivery, performance and enforcement of this Agreement and the transactions contemplated hereby, which aggregate total amount shall not, in any event, exceed $487,350.

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and effect, as to which no appeal is pending and which has not been, and is not subject to being, reversed, stayed, modified or amended; provided, however, that any potential for modification or amendment pursuant to Federal Rules of Bankruptcy Procedure 9023 and/or 9024 shall not be considered in determining whether an order is a Final Order.

"FVIP" means Fluid Vehicle Investor Program or Fluid Truck Vehicle Investor Program.

"FVIP Owner" means an owner of a vehicle or vehicles that such owner, as of the date of this Agreement, leases or makes available to any Seller for use in the Business.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof, consistently applied with the Financial Statements.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, regional or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Indebtedness" of any Person means, without duplication, (i) the principal, interest and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iii) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (iv) all obligations of the type referred to in clauses (i) through (iii) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all intellectual property rights anywhere in the world, including, without limitation, all intellectual property rights arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof (collectively, "Marks"), (iii) copyrights and registrations and applications therefor, (iv) trade secrets and confidential business information that derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others, and (v) Internet domain names and all rights in social media accounts and other websites.

"Intellectual Property Licenses" means any Contract to which any Seller is a party, pursuant to which (i) any Seller grants to any third Person any right to use any of the Owned Intellectual Property or Licensed Intellectual Property, and (ii) any Seller receives from any third Person any right to use such third Person's Intellectual Property.

"Inventory" means all of the Sellers' inventory, if any, (including, without limitation, merchandise, supplies, and spare parts) owned by any of the Sellers and related to the Business.

"IRS" means the Internal Revenue Service.

"IT Systems" means all information technology, computers, computer systems and communication systems owned, operated, leased or licensed by any Seller.

"Knowledge of Sellers" means, as of the relevant date, the actual knowledge (without any duty of inquiry or investigation) possessed by any officers of the Sellers identified on Schedule 1.1(a).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Legal Proceeding" means any claim, liability, action, complaint, suit, citizen suit, litigation, arbitration, appeal, petition, demand, inquiry, hearing, proceeding, investigation or other dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Body and any appeal from any of the foregoing; provided, that, the Bankruptcy Cases shall not be considered a "Legal Proceeding".

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including all costs and expenses relating thereto.

"Licensed Intellectual Property" means any Intellectual Property that any Seller is licensed or otherwise permitted by other Persons to use pursuant to any Intellectual Property License.

"Lien" means any claim, community or other marital property interest, condition, equitable interest, lien, option, encumbrance, pledge, mortgage, deed of trust, security interest, right of way, easement, encroachment, servitude, charge, encumbrance, or similar restriction.

"Marks" has the meaning set forth in the definition of "Intellectual Property."

"Material Contracts" has the meaning set forth in Section 5.7(a).

"Necessary Consent" has the meaning set forth in Section 2.5(a).

"Nereus" means Nereus Insurance Company.

"Non-Owned IT Systems Assets" has the meaning set forth in Section 2.1(f).

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the conduct and operation of the Business, taken as a whole, in the ordinary course, consistent with past practice since July 12, 2024 and in accordance with applicable Law, subject, to the extent applicable to any action to be taken by any Seller on or following the date hereof, to any limitations applicable to such Seller arising as a result of the fact that it is a debtor-in-possession under the Bankruptcy Code and that it is operating under the supervision of the Bankruptcy Court.

"Outside Date" has the meaning set forth in Section 4.4(a).

"Owned Intellectual Property" means the Intellectual Property owned by any Seller, including, for the purpose of avoiding any doubt, the Registered Owned Intellectual Property.

"Party" means and refers to any signatory to this Agreement. Such parties are collectively referred to as the "Parties."

"Permits" means any material approvals, authorizations, consents, registrations, licenses, permits or certificates issued by a Governmental Body, and all pending applications therefor and any renewals thereof.

"Permitted Exceptions" means any Lien granted, preserved, or incurred in connection with the DIP Order or the Sale Order.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personally Identifiable Information" means any information that, alone or in combination with other information, identifies or permits the identification of, or contact with, any individual, including, without limitation, an individual's name, address, date of birth, telephone number, e-mail address, IP address, or mobile device identifier.

"Petition Date" has the meaning set forth in the Recitals hereto.

"Products" means any and all products designed, developed, manufactured, marketed, sold or given away by any Seller.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Avoidance Actions" means all Avoidance Actions against any Critical Vendor or Transferred Employee, in their capacity as such.

"Purchased Contracts" has the meaning set forth in Section 2.5(a).

"Purchased Permits" has the meaning set forth in Section 2.1(i).

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser" has the meaning set forth in the Preamble hereto.

"Purchaser Documents" has the meaning set forth in Section 6.2.

"Purchaser's Prorated Taxes" means the portion of any ad valorem or similar real or personal property-related Taxes that are attributable to a period falling from and after the Closing Date.

"Real Property Lease" has the meaning set forth in Section 5.5(a).

"Receivables" means any and all accounts receivable, credit card receivables, notes and other amounts receivable by any Seller from any third parties, including customers, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered, and any claim, remedy or other right related to any of the foregoing, arising on or before the Closing Date and related to the Business.

"Registered Owned Intellectual Property" has the meaning set forth in Section 5.6(a).

"Sale Order" means, if Purchaser is the Successful Bidder, an order or orders of the Bankruptcy Court in substantially the form attached hereto as Exhibit B, with any revisions required by the Bankruptcy Court that are reasonably acceptable to Sellers and Purchaser, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing the Sellers to consummate the transactions contemplated hereby. Such revisions may not include the removal of an express finding by the Bankruptcy Court that Purchaser is a buyer in good faith under Bankruptcy Code section 363(m).

"Securities Purchase Agreement" means that certain Securities Purchase Agreement dated on or before the closing date by and between Purchaser, the "Purchasers" named therein, and Bison Capital Partners V, L.P. in its capacity as the representative of the "Purchasers" named therein.

"Seller Contract" means any Contract to which Seller is a party or by which Seller is bound.

"Seller Documents" means any agreement, document, instrument or certificate contemplated by this Agreement or which has been or is to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement.

"Sellers" has the meaning set forth in the Preamble hereto.

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding voting securities or other voting Equity Interests of which is owned, directly or indirectly, by such first Person.

"Successful Bidder" means, if an Auction is conducted, the prevailing party with respect to the Purchased Assets at the conclusion of such Auction.

"Tangible Personal Property" means the Equipment, the Inventory and all other items of tangible personal property owned by any Seller and material to the day-to-day operations of the Business. The Tangible Personal Property shall be listed on Schedule 2.1(d).

"Tax Authority" means any federal, state, local or foreign government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, environmental, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes whether computed on a separate or consolidated, unitary or combined basis or in any other manner, and (ii) all interest, penalties, fines, additions to tax or additional amounts, whether disputed or not, imposed by any Tax Authority in connection with any item described in clause (i).

"Trade Secrets" has the meaning set forth in Section 5.6(g).

"Transaction Dispute" has the meaning set forth in Section 11.9.

"Transfer Taxes" has the meaning set forth in Section 8.9(a).

"Transferred Employees" has the meaning set forth in Section 9.1.

"Treasury Regulations" means the income tax regulations promulgated under the Code and effective as of the date hereof.

"WARN Act" means and refers to the Worker Adjustment and Retraining Notification Act of 1988, and all comparable state, local or other Laws, in each case, as amended from time to time.

1.2     Other Definitional and Interpretive Matters. Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to "$" shall mean U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. Notwithstanding anything to the contrary herein or in any Schedule attached hereto, all Schedules to this Agreement will be finalized and agreed upon by Sellers and Purchaser by no later than November 15, 2024.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. Words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets. Pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, and subject to Section 2.5(a) and provided in all events that Purchaser is the Successful Bidder, at the Closing, Purchaser shall purchase, acquire and accept from the Sellers, and the Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser, all of the Sellers' right, title and interest, in, to and under the Purchased Assets, on an "as is" and "where is" and "with all faults" basis and expressly without the benefit of any implied warranty of merchantability or fitness for any particular purpose, but free and clear of all Liens or other interests in such Purchased Assets (except for Permitted Exceptions). "Purchased Assets" shall mean, as of the Closing Date, all of the tangible and intangible properties and assets, wherever and however located, owned, held or used in the conduct of the Business by any of the Sellers (except to the extent constituting the Excluded Assets or as otherwise expressly provided herein), including:

(a)     the Receivables;

(b)     the Owned Intellectual Property;

(c)     the Purchased Contracts;

(d)     the Tangible Personal Property;

(e)     the Purchased Avoidance Actions;

(f)     only that portion of the IT Systems owned by any Seller, it being expressly understood and agreed that any part(s) and/or portion(s) of any IT Systems which are leased, licensed or otherwise held by any Seller other than as the outright owner thereof (such non-owned part(s) and/or portion(s) of any IT Systems are sometimes collectively referred to herein as the "Non-Owned IT Systems Assets") shall only be included among the Purchased Assets if the associated rights and interests pursuant to which Sellers hold such Non-Owned IT Systems Assets are assigned to Purchaser at the Closing as part of the Purchased Contracts;

(g)     all of the Company's Equity Interest in Nereus;

(h)     all Documents that are used in, held for use in or intended to be used in, or that arise out of, the Business or any of the Purchased Assets, irrespective of whether they are available in written, electronic or other form, including without limitation, Documents relating to Products, services, marketing, advertising, promotional materials, Owned Intellectual Property, supplier lists, customer lists, records, literature, business books, price lists, design documents, plans, drawings, other commercial and technical documents, correspondence and financial and tax records, but excluding to the extent (i) such files or portion of such files are subject to attorney-client, work product or similar privilege or may not be transferred under applicable Law, including, without limitation, laws regarding confidentiality and privacy, and (ii) any Documents or portion of such Documents related to any Excluded Assets or required to realize the benefits of any Excluded Assets; provided, that, following the Closing, Purchaser shall provide the Sellers copies of or continued access to all Documents as are necessary or appropriate to administer the Bankruptcy Cases or in connection with any Tax claims or Tax filings of the Sellers;

(i)     all Permits, to the extent assignable or transferable (but if any Permits cannot be transferred, such Seller agrees to cooperate with and reasonably assist Purchaser in obtaining such Permits, in each case at the sole cost of Purchaser and without any assurance that such Permits can or will be obtained

by Purchaser), held by any Seller and required for the conduct of the Business as currently conducted or in connection with the Purchased Assets, including those set forth on <u>Schedule 2.1(i)</u> hereto ("<u>Purchased Permits</u>"), provided that the cost of any such assignment shall be borne by Purchaser;

(j)      to the extent assignable, all rights (including the rights to enforce) of the Sellers under non-disclosure or confidentiality, non-compete, non-solicitation or similar agreements with any Employees and agents of the Sellers or with third parties, other than any such rights of the Sellers to the extent pertaining primarily to any Excluded Assets;

(k)      to the extent assignable, all rights (whether choate or inchoate, known or unknown, contingent or non-contingent) of the Sellers under or pursuant to all warranties, representations, indemnities and guarantees made by suppliers, manufacturers and contractors to the extent relating to Products sold, or services provided, to the Sellers and affecting any Purchased Assets;

(l)      all goodwill associated with the Business and the Purchased Assets;

(m)      to the extent not prohibited or otherwise materially restricted by applicable Law, all personnel files and employment records of the Transferred Employees (including, without limitation, I-9 forms and attachments); and

(n)      any rights, demands, claims, credits, allowances, rebates, or rights of setoff (other than against the Sellers or any of their Affiliates) arising out of or directly relating to any of the Purchased Assets.

2.2      <u>Excluded Assets</u>. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and the Sellers shall retain all right, title and interest to, in and under the Excluded Assets. "<u>Excluded Assets</u>" shall mean each of the following assets of a Seller:

(a)      the insurance claims receivables over one hundred eighty (180) days past due as set forth on <u>Schedule 2.2(a)</u>;

(b)      the Excluded Contracts (including this Agreement and the Ancillary Agreements), including any accounts receivable and other rights arising out of or in connection with any Excluded Contract (including, without limitation, the Purchase Price under this Agreement);

(c)      any (i) books and records that the Sellers are required by Law or Contract to retain or that are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings and other documents subject to attorney-client, work product or similar privilege; (ii) legal entity, minute books, stock ledgers, corporate seals, taxpayer and other identification numbers, stock certificates and similar materials of the Sellers; and (iii) documents primarily relating to the Excluded Assets or Excluded Liabilities or proposals to acquire the Business by Persons other than Purchaser or primarily relating to any employees of the Sellers who are not Transferred Employees;

(d)      all cash, cash equivalents, securities and negotiable instruments of the Sellers;

(e)      all Avoidance Actions except the Purchased Avoidance Actions;

(f)      the Equity Interests or other ownership interest in the Sellers;

(g)      all directors or officers liability insurance policies owned by any Seller (in each case of the foregoing, including any tail policies or coverage thereon), together with all rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(h)     professional retainers paid by any Seller to its advisors or representatives in connection with the Bankruptcy Cases and the transactions contemplated herein;

(i)     the portion of any deposits and prepaid charges and expenses of any Seller primarily related to any Excluded Asset (including any Excluded Contract) or Excluded Liability, including, without limitation, (i) security deposits with third-party suppliers, vendors, or service providers; (ii) rebates, (iii) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes); and (iv) pre-payments;

(j)     any claim, right or interest of any Seller in or to any refund, rebate, abatement or recovery of any Taxes, together with interest thereon and any refund of any penalties in respect thereof;

(k)     all claims or causes of action that relate primarily to any Excluded Asset or Excluded Liability (including without limitation, claims or causes of actions against the equity holders of the Sellers, against the Sellers' current or former directors, officers, managers and employees, against lenders or other third parties, and/or against any of the Affiliates, agents or representatives of the foregoing);

(l)     all prepayments, good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(m)     all other assets listed on Schedule 2.2(m);

(n)     the Purchase Price and any rights of Sellers under this Agreement;

(o)     any other assets of the Sellers that are not lawfully transferable; and

(p)     all contracts with FVIP Owners.

2.3     Assumption of Liabilities. Purchaser shall assume no Liability of the Sellers, or of any predecessor or any Affiliate of any of the Sellers, except the Liabilities expressly set forth in this Section 2.3 (collectively, the "Assumed Liabilities"), which Purchaser or its permitted assignee, as the case may be, shall on the terms and subject to the conditions of this Agreement, assume at the Closing, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto:

(a)     all obligations of the Sellers under the DIP Facility;

(b)     all obligations of the Sellers under the Purchased Assets and the Purchased Contracts arising (i) after the Closing Date or (ii) prior to the Closing Date to the extent such obligations become payable after the Closing Date and do not result from a breach thereof by any Seller or any Affiliate of any Seller; in each case, including all Cure Amounts; and

(c)     Purchaser's Prorated Taxes.

2.4     Excluded Liabilities. Except as specifically set forth in Section 2.3, Purchaser will not assume or be liable for any Liabilities or other obligations of the Sellers, or any predecessor or Affiliate of the Sellers, of any nature whatsoever, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise, including without limitation the following (collectively, the "Excluded Liabilities"):

(a) all Liabilities related to or arising out of the Excluded Assets, including the Excluded Contracts, and the operation and maintenance of the Business and the Purchased Assets prior to the Closing;

(b) except as expressly set forth in ARTICLE IX or assumed by Purchaser pursuant to Section 2.3, any Liability under or relating to any Employee Benefit Plan;

(c) all Indebtedness of any Seller;

(d) all obligations and Liabilities of the Sellers related to the right to or issuance of any capital stock or other Equity Interest of any Seller, including any stock options or warrants;

(e) except as expressly stated otherwise in this Agreement, any obligation or Liability of the Sellers arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement or any Ancillary Agreement and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(f) any claim (as defined in the Bankruptcy Code) arising prior to Closing and not expressly assumed by Purchaser pursuant to this Agreement;

(g) all Excluded Taxes;

(h) all Liabilities of Sellers under contracts with FVIP Owners; and

(i) any other Liabilities of the Sellers not expressly assumed by Purchaser pursuant to Section 2.3 above.

2.5 Assignment and Assumption of Contracts.

(a) Assignment of Contracts. To the maximum extent permitted by Law, at the Closing, pursuant to the Sale Order and the Assignment and Assumption Agreement(s), the Sellers shall assign to Purchaser, those Assignable Contracts that are set forth on Schedule 2.5(a) (the "Purchased Contracts"). Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party, would not be permissible under Section 365 of the Bankruptcy Code. If such consent is not obtained where the need for such consent is not obviated by the effect of the Sale Order or such assignment is not attainable pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, then such Purchased Asset shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price; provided, however, that (i) the Sellers shall use, whether before or after the Closing, their commercially reasonable efforts to obtain all necessary consents (each, a "Necessary Consent") to the assignment and transfer thereof, it being understood that, to the extent the foregoing shall require any action by any Seller that would, or would continue to, have an adverse effect on the business of Purchaser or any of its Affiliates after the Closing, such action shall require the prior written consent of Purchaser, and (ii) in the event that any Purchased Contract is deemed not to be assigned pursuant to clause (i) of this Section 2.5(a), the Sellers shall (A) use commercially reasonable efforts (excluding, without limitation, any obligation to initiate or participate in any action or proceeding or to pay or provide any monetary consideration of any kind to any counterparty) to obtain such Necessary Consents as promptly as practicable after the Closing and (B) use commercially reasonable efforts to cooperate in good faith in any lawful arrangement reasonably proposed by Purchaser, including subcontracting, licensing or sublicensing to Purchaser any or all of any Seller's

rights and obligations with respect to any such Purchased Contract, under which Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits under such Purchased Contract with respect to which such Necessary Consent has not been obtained.

      (b)    <u>Cure Payments</u>. Purchaser will pay all Cure Amounts in connection with the assumption and assignment of Purchased Contracts for which all necessary Consents and Bankruptcy Court approval to transfer have been obtained (as agreed to between Purchaser and the Sellers or as determined by the Bankruptcy Court), and Purchaser will assume and agree to perform and discharge the Assumed Liabilities under the Purchased Contracts, pursuant to the Assignment and Assumption Agreements. The Sellers have provided to Purchaser a schedule set forth on <u>Schedule 2.5(b)</u> setting forth a good faith estimate of all Cure Amounts for all Purchased Contracts ("<u>Cure Schedule</u>"), which schedule the Sellers may update from time to time prior to the date that is three (3) Business Days prior to the Closing Date. If the Cure Amounts for any Purchased Contract exceeds the amount set forth on the Cure Schedule, as may be updated pursuant to the foregoing sentence, by greater than ten percent (10%) of the then scheduled amount (a "<u>Cure Amount Overage</u>"), Purchaser can elect (in its sole discretion) to exclude such contract from the list of Purchased Contracts at which point such contract shall be deemed an Excluded Contract and Purchaser shall have no obligation with respect thereto; <u>provided</u>, <u>however</u>, that Purchaser shall have no other recourse or redress with respect to any Cure Amount Overage. There shall be no adjustment to the Purchase Price as a result of Purchaser's election to designate any one or more of the Purchased Contracts as Excluded Contracts.

      (c)    <u>Preservation of Contracts</u>. The Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Purchased Contracts and use commercially reasonable efforts to take all other actions necessary to cause such Purchased Contracts to be assigned to and assumed by Purchaser pursuant to section 365 of the Bankruptcy Code, and Purchaser shall use commercially reasonable efforts, at or prior to Closing, comply (at Purchaser's sole cost and expense) with all requirements under section 365 of the Bankruptcy Code necessary for the Sellers to assign to Purchaser the Purchased Contracts, including, where applicable, providing such "adequate assurance of future performance" as to any of the Purchased Contracts as the Bankruptcy Court may require. Purchaser shall have no recourse or redress against Sellers or under this Agreement with respect to any Purchased Contracts that are not assigned to Purchaser.

    2.6    <u>Bulk Transfer Laws</u>. The Parties intend that, pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Liens or other interests of any kind in the Purchased Assets (other than Permitted Exceptions), including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "<u>bulk sales</u>," "<u>bulk transfers</u>" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

## ARTICLE III
## CONSIDERATION

    3.1    <u>Purchase Price</u>. In consideration of the sale of the Purchased Assets to Purchaser, upon the terms and subject to the conditions set forth in this Agreement, the purchase price for the Purchased Assets shall be the assumption of the Assumed Liabilities by Purchaser (the "<u>Purchase Price</u>").

**ARTICLE IV**
**CLOSING AND TERMINATION**

4.1     Closing Date. The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in ARTICLE II hereof (the "Closing") shall take place via electronic exchange of closing documents and signature pages as soon as practicable (but in no event later than ten (10) Business Days) after the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver of any condition by the Party entitled to waive that condition). The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of the Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (Mountain time) on the Closing Date.

4.2     Deliveries by the Sellers. At the Closing, the Sellers shall deliver to Purchaser:

(a)     a duly executed Bill of Sale or other transfer documents in customary form for a distressed transaction of the nature provided for herein and otherwise reasonably agreed to by the Parties;

(b)     duly executed Assignment and Assumption Agreement(s);

(c)     the officer's certificate required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(d)     a duly executed and completed IRS Form W-9 with respect to each Seller; and

(e)     such other documents as Purchaser may reasonably request to demonstrate satisfaction of the conditions and compliance with the agreements set forth in this Agreement and which do not in any material respect expand Sellers' obligations beyond those set forth in the other provisions hereof.

4.3     Deliveries by Purchaser. At the Closing, Purchaser shall deliver to the Sellers:

(a)     duly executed Assignment and Assumption Agreement(s);

(b)     duly executed acknowledgment by the DIP Agent and the lenders under the DIP Facility that Sellers are released from all obligations under the DIP Facility;

(c)     the officer's certificate required to be delivered pursuant to Section 10.2(a); and

(d)     such other documents as the Sellers' Representative may reasonably request to demonstrate satisfaction of the conditions and compliance with the agreements set forth in this Agreement and which do not in any material respect expand Purchaser's obligations beyond what they are pursuant to the other provisions hereof.

4.4     Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or the Sellers' Representative, if the Closing shall not have occurred by the close of business on December 20, 2024(the "Outside Date"); provided, however, that nothing in the preceding clause shall diminish the representations of Purchaser in Section 6.7; provided, further, that if the Closing shall not have occurred on or before the Outside Date due to a breach of any of representations, warranties, covenants or agreements contained in this Agreement by Purchaser or the Sellers to an extent

which would give the other Party a right not to close pursuant to ARTICLE X, then the breaching Party may not terminate this Agreement pursuant to this Section 4.4(a);

(b)      by mutual written consent of the Sellers' Representative and Purchaser;

(c)      prior to November 15, 2024 by Purchaser, at Purchaser's sole option, if (i) there shall be a material breach by any Seller of any representation or warranty, or any covenant or agreement of any Seller, contained in this Agreement; (ii) Purchaser, after exercising good faith efforts, has been unable to enter into a final executed Securities Purchase Agreement, Administration Agreement, employment contract with each Designated Employee, or satisfactory settlement agreements with Critical Vendors (it being expressly understood and agreed, notwithstanding anything to the contrary herein, Purchaser shall be solely responsible for all obligations and liabilities in connection with the performance and satisfaction of any such settlements reached with Critical Vendors); (iii) the applicable Governmental Body has not approved in writing the transfer of the Company's Equity Interest in Nereus Insurance Company; or (iv) Purchaser reasonably determines after conducting due diligence on the Purchased Assets that Purchaser does not intend to go forward with the transaction.

(d)      by Purchaser, if (i) there shall be a material breach by any Seller of any representation or warranty set forth in Section 5.1 (Organization and Good Standing), Section 5.2 (Authorization of Agreement), Section 5.4 (Title to Purchased Assets), or any material covenant or agreement of any Seller contained in any provision of this Agreement other than Article V hereof, or (ii) any Seller shall, notwithstanding commercially reasonable efforts toward satisfying the same, be unable to meet or satisfy the condition to Closing set forth in Section 10.1(a), which breach (as to clause (i)) or inability (as to clause (ii)) cannot be cured or has not been cured by the earlier of (A) five (5) Business Days after the giving of written notice by Purchaser to the Sellers of such breach or inability and (B) one (1) Business Day prior to the Outside Date; provided, however, that if Purchaser shall have committed a breach of any of representations, warranties, covenants or agreements contained in this Agreement to an extent which would give the Sellers the right not to close pursuant to ARTICLE X, then Purchaser may not terminate this Agreement pursuant to this Section 4.4(d);

(e)      by the Sellers' Representative, if there shall be a material breach by Purchaser of any representation or warranty, or any material covenant or agreement of Purchaser contained in this Agreement, which would result in a failure of a condition set forth in Sections 10.2 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) five (5) Business Days after the giving of written notice by the Sellers to Purchaser of such breach and (ii) one (1) Business Day prior to the Outside Date; provided, however, that if any Seller shall have committed a breach of any representations, warranties, covenants or agreements contained in this Agreement to an extent which would give Purchaser the right not to close pursuant to ARTICLE X, then Sellers may not terminate this Agreement pursuant to this Section 4.4(e);

(f)      by the Sellers' Representative or Purchaser, if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, it being agreed that the Parties (in Sellers' case, subject to the availability of funding for such activities) shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence); provided, however, nothing in this Section 4.4(f) shall be deemed to waive or otherwise affect any Party's termination rights pursuant to Section 4.4(a) hereof;

(g)      by Purchaser, if the Bankruptcy Cases are (i) converted to cases under Chapter 7 of the Bankruptcy Code prior to the Closing or (ii) dismissed prior to the Closing;

16

(h)    by Purchaser, if a trustee or examiner with expanded powers is appointed with respect to any Seller or any material portion of the Business or assets of any Seller under section 1104 of the Bankruptcy Code prior to the Closing;

(i)    by Purchaser, if the DIP Facility is terminated as a result of an event of default pursuant to the terms thereof or as set forth in any DIP Order, other than by reason of satisfaction of the DIP Facility through the Closing;

(j)    automatically if Sellers consummate an Alternative Transaction;

(k)    by Purchaser, if Sellers do not proceed to Closing under this Agreement for any reason other than (i) a material breach of this Agreement by Purchaser, (ii) a failure of a condition to Sellers' obligations, or (iii) mutual agreement between Purchaser and Sellers;

(l)    by Purchaser or the Sellers' Representative if Purchaser is neither the Successful Bidder nor a Backup Bidder at the conclusion of the Auction, if one is conducted; or

(m)    by Sellers, as may be required in connection with the discharge of their fiduciary duties in the Bankruptcy Cases.

4.5    <u>Consequences of Termination</u>.

(a)    If either Purchaser, on the one hand, or Sellers' Representative, on the other hand, desires to terminate this Agreement pursuant to <u>Section 4.4</u>, such Party (or Parties, as applicable) shall give written notice of such termination to the other Party (or Parties, as applicable). Upon delivery of a proper notice of termination, or if this Agreement is automatically terminated pursuant to <u>Section 4.4(j)</u>, this Agreement will become void and, except as otherwise set forth in this <u>Section 4.5</u>, have no further force and effect and all further obligations of the Parties to each other under this Agreement will terminate without further obligation or liability of the Parties.

(b)    Notwithstanding anything to the contrary in this Agreement, if this Agreement is terminated pursuant to <u>Sections 4.4(a) (but only if terminated by Seller pursuant to such section)</u>, <u>4.4(c)(i)</u>, <u>4.4(d)</u>, <u>4.4(g)</u>, <u>4.4(i)</u>, <u>4.4(j)</u>, <u>4.4(k)</u>, <u>4.4(l)</u> or <u>4.4(m)</u>, then Purchaser shall be entitled to payment of the Expense Reimbursement owed pursuant to the Bidding Procedures Order, which Expense Reimbursement shall be paid by the Sellers as an administrative priority claim in the Bankruptcy Cases under Section 503(b) of the Bankruptcy Code.

(c)    Notwithstanding the foregoing set forth in this <u>Section 4.5</u>, <u>Section 1.1</u> (Certain Definitions), <u>Section 8.8</u> (Publicity), <u>Section 7.1</u> (Expense Reimbursement), this <u>Section 4.5</u> (Consequences of Termination) and <u>ARTICLE XI</u> (Miscellaneous) shall survive any termination of this Agreement.

(d)    Nothing in this <u>Section 4.5</u> (including <u>Section 4.5(a)</u>) shall relieve any Party of any liability for a breach or violation of this Agreement occurring prior to the effective date of any termination hereof; provided, however, Purchaser expressly acknowledges and agrees that notwithstanding anything else to the contrary in this Agreement, Purchaser's right to receive the Expense Reimbursement as and when provided under this Agreement shall be Purchaser's sole and exclusive remedy by reason of any termination hereof by reason of a breach, default or inability to close by Sellers (or either of them) hereunder.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers severally represent and warrant to Purchaser as to themselves that the following statements contained in this <u>ARTICLE V</u> are true and correct as of the date hereof and as of the Closing Date (as if made on the Closing Date):

5.1    <u>Organization and Good Standing</u>. Each Seller is a limited liability company or corporation duly organized, incorporated or formed, validly existing and, to the Knowledge of Sellers, except as otherwise set forth on <u>Schedule 5.1</u> hereto, in good standing under the laws of the jurisdiction of its organization or incorporation and, except as may otherwise be required by the Bankruptcy Code, has all requisite corporate or limited liability company power and authority to own, lease and operate its properties and to carry on its business as now conducted. To the Knowledge of Sellers, except as otherwise set forth on <u>Schedule 5.1</u> hereto, each Seller is duly qualified or authorized to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or leased by it requires such qualification or authorization.

5.2    <u>Authorization of Agreement</u>. Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Cases, to the Knowledge of Sellers, the execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated by this Agreement are within each Seller's corporate or limited liability company powers and have been duly authorized by all necessary internal actions on the part of the Sellers. Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Cases, and assuming the due authorization, execution and delivery of this Agreement by the other Parties signatory hereto, to the Knowledge of Sellers, this Agreement constitutes a valid and binding agreement of each Seller that is enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    To the Knowledge of Sellers, except as set forth on <u>Schedule 5.3(a)</u>, none of the execution and delivery by any Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will result in the creation of any Lien (other than Permitted Exceptions) upon the Purchased Assets, or conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, revocation, withdrawal, suspension, acceleration or cancellation under any provision of (i) the certificate of incorporation, bylaws, certificate of organization or formation, limited liability company agreement, operating agreement or comparable organizational documents of any Seller; (ii) subject to entry of the Sale Order in the Bankruptcy Cases, any Contract or Permit to which any Seller is a party or by which any of the properties or assets of any Seller are bound; (iii) subject to entry of the Sale Order in the Bankruptcy Cases, any Order of any Governmental Body applicable to any Seller or any of the properties or assets of any Seller; or (iv) subject to entry of the Sale Order in the Bankruptcy Cases, any applicable Law.

(b)    To the Knowledge of Sellers, subject to entry of the Sale Order in the Bankruptcy Cases, except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on <u>Schedule 5.3(b)</u>, there is no Contract binding upon the Sellers requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement the need to obtain which will not be obviated by the effect of the Sale Order.

5.4     Title to Purchased Assets. To the Knowledge of Sellers, except as set forth in Schedule 5.4, the Sellers have sole and exclusive, good and valid title to, or in the case of property held under a lease or other Contract, a sole and exclusive, enforceable leasehold interest in, or adequate rights to use, the Purchased Assets (which, for the avoidance of doubt, do not include Excluded Assets), and, subject to the entry of the Sale Order in the Bankruptcy Cases, free and clear of all Liens, except for Permitted Exceptions. To the Knowledge of Sellers, except as may otherwise be set forth on Schedule 5.4 hereto, all of the Tangible Personal Property that is material to the operation of the Business is (i) adequate and suitable for its present uses in all material respects and (b) in good working order, operating condition and state of repair, ordinary wear and tear excepted.

5.5     Real Property.

(a)     Schedule 5.5(a) sets forth a complete list of all material real property and interests in real property leased, subleased, or otherwise occupied by the Sellers (each Contract providing for such real property or interests in real property, a "Real Property Lease," and collectively, the "Real Property Leases") as lessee, sublessee, lessor or sublessor, together with the parties to, and date of, each Real Property Lease and the full street address of each parcel subject to a Real Property Lease. The Sellers have good and valid leasehold interests in the real property conveyed by the Real Property Leases. Except as set forth in Schedule 5.5(a), such Seller has not assigned its interest under any Real Property Lease, or leased, subleased or sublicensed all or any part of the space demised thereby, to any Person (other than Purchaser).

(b)     Except as a result of the filing of the Bankruptcy Cases or as set forth on Schedule 5.5(b) and/or Schedule 2.5(a) hereto, to the Knowledge of Sellers, such Seller is in compliance in all material respects with the terms of each Real Property Lease and to the Knowledge of Sellers, there has been no material default or event that with notice or lapse of time, or both, would give rise to a right on the part of the landlord thereunder to terminate a Real Property Lease.

5.6     Intellectual Property.

(a)     To the Knowledge of Sellers, (i) Schedule 5.6(a) lists each item of Owned Intellectual Property for which any Seller has received or applied for a registration with any Governmental Body, domain name registrar or other third party ("Registered Owned Intellectual Property"), (ii) all of the Registered Owned Intellectual Property is subsisting, valid and enforceable, and subject to the entry of the Sale Order in the Bankruptcy Cases, will as of the Closing, be free and clear of any Liens, except for Permitted Exceptions.

(b)     To the Knowledge of Sellers, (i) the Sellers own or have the right to use all material Intellectual Property owned or used by them in the Business as currently conducted, and (ii) the Owned Intellectual Property and Licensed Intellectual Property constitutes all Intellectual Property used in the Business.

(c)     To the Knowledge of Sellers, except as may otherwise be set forth on Schedule 5.6(c) hereto, there are no pending or threatened claims against any Seller by any third party contesting the validity, enforceability, or ownership of any Owned Intellectual Property (other than in connection with prosecution during examination of pending Registered Owned Intellectual Property).

(d)     To the Knowledge of Sellers, (i) Schedule 5.6(d) sets forth all Intellectual Property Licenses, and (ii) except as set forth on Schedule 5.6(d), no Seller has received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a material default by any Seller under any material Intellectual Property License.

(e)        To the Knowledge of Sellers, (i) no Seller is currently infringing, misappropriating or otherwise violating, and the operation of the Business as currently conducted does not infringe, misappropriate or violate, any Intellectual Property of any Person, except for any infringement, misappropriation or violation that is not material to the Business, and (ii) no Person is currently infringing, misappropriating or violating any of the Owned Intellectual Property.

(f)        To the Knowledge of Sellers, (i) Schedule 5.6(f) identifies each computer software program owned, held or used in the conduct of the Business that is material to the operation of the Business as presently conducted, other than, without limitation, non-exclusive inbound licenses, terms of service, terms of use and similar agreements for "off-the-shelf" commercially available software, services or software-as-a-service platforms having an annual value of less than $20,000, and (ii) to the Knowledge of Sellers, except as may otherwise be provided on Schedule 5.6(f) hereto, there are no infringement proceedings pending or threatened against any Seller with respect to any software owned or licensed by such Seller or used by such Seller in and that is material to the operation of the Business as presently conducted by Sellers.

(g)        To the Knowledge of Sellers, (i) each Seller has taken commercially reasonable security measures to maintain and protect the confidentiality and value of all (i) trade secrets and other confidential or proprietary information (collectively, "Trade Secrets") included in the Owned Intellectual Property, and (ii) no material Trade Secret included in the Owned Intellectual Property has been authorized to be disclosed or has been actually disclosed to any Person other than pursuant to a valid written confidentiality Contract sufficiently restricting the disclosure and use thereof.

(h)        To the Knowledge of Sellers, (i) the IT Systems are adequate and sufficient (including with respect to working condition and capacity) in all material respects for the operation of the Business as presently conducted by Sellers, and (ii) Schedule 5.6(h) sets forth a list of all material IT Systems used in the Business together with the owner of each such IT System or component thereof, and, for IT Systems or components leased or licensed to any Seller or otherwise not owned by a Seller, a description of the contract associated with such IT System or component. To the Knowledge of Sellers, except as may otherwise be set forth on Schedule 5.6(h) hereto, there have been no material (i) security breaches or a successful unauthorized use, access or intrusions of any material IT Systems which required a notice to be provided to a Governmental Entity or individual, or (ii) outages of any IT Systems that have caused or resulted in a material disruption to the Business.

5.7    Material Contracts.

(a)        To the Knowledge of Sellers, Schedule 5.7(a) sets forth all of the following Seller Contracts that are currently in effect as of the date of this Agreement (collectively, the "Material Contracts"):

(i)        all Personal Property Leases with annual payments by the Sellers in excess of $25,000 or with a term of no less than one year;

(ii)        all Contracts that involve performances of services or delivery of goods or materials by or to any Seller with an amount or value in excess of $25,000;

(iii)        any Contract (A) granting or obtaining any right to use any material Owned Intellectual Property or material Licensed Intellectual Property or (B) materially restricting the Sellers' rights to the use of any material Owned Intellectual Property or material Licensed Intellectual Property not identified in Section 5.6(d);

20

(iv)      all employment Contracts with employees of the Sellers and Contracts with independent contractors or consultants (or similar arrangements) currently engaged in connection with the Business, in each case with annual payments in excess of $100,000;

(v)      each franchise, joint venture, partnership, strategic alliance, co-marketing, co-promotion, or joint development Contract, or other Contract involving a sharing of profits, losses, costs or liabilities by any Seller with any other Person;

(vi)      each Contract containing covenants that in any way purport to restrict the business activity of any Seller or materially limit the freedom of such Seller to engage in any line of business or to compete with any Person or which contain any exclusivity, non-competition, non-solicitation or no-hire provisions restricting such Seller;

(vii)      each material Contract with a Governmental Body; and

(viii)      any material Contract that was not entered into in the Ordinary Course of Business.

(b)      To the Knowledge of Sellers, except as otherwise set forth on Schedule 5.7(b) hereto, Sellers have delivered to Purchaser true and complete copies of all Material Contracts and any and all material amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.

5.8      Litigation. To the Knowledge of Sellers, except as set forth on Schedule 5.8, there are no Legal Proceedings pending or threatened by or against any Seller, affecting or relating to the Business or any Purchased Asset where a claim is made in excess of $100,000.

5.9      Compliance with Laws; Permits.

(a)      To the Knowledge of Sellers, (i) Schedule 5.9(a) sets forth a complete and correct list as of the date of this Agreement of all Permits required for and material to the conduct of the Business as conducted as of the date hereof, together with the name of the Governmental Body issuing such Permits and their respective dates of issuance and expiration, and (ii) to the extent such Permits are Purchased Assets, (i) no Legal Proceeding is pending by any Governmental Body threatened by any Governmental Body, seeking the revocation, limitation or non-renewal of any such Permits, and (b) to the Knowledge of Sellers, no Seller is in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation) of any term, condition or provision of any Permit to which it is a party, except where such default or violation would not be material to the operation of the Business as it is conducted as of the date hereof.

5.10      Insurance. To the Knowledge of Sellers, set forth in Schedule 5.10 is a list of all material insurance policies and all material fidelity bonds held by or applicable to any Seller setting forth, in respect of each such policy, the policy name, policy number, carrier, term, type of coverage and annual premium.

5.11      Related Party Transactions. To the Knowledge of Sellers, except as set forth on Schedule 5.11 hereto, no Seller, executive officer, director, member, manager, equity holder or Affiliate of a Seller is a party to any  Material Contract.

5.12      Customers and Suppliers. Schedule 5.12 lists the ten (10) largest customers (by sales revenue) and ten (10) largest suppliers (by payments) of the Sellers and their subsidiaries during each of (i) the twelve-month period ended December 31, 2023 and (ii) the nine-month period ended September 30, 2024, based upon the Sellers' information systems.

5.13    Excluded Entities. To the Knowledge of Sellers, except as set forth on Schedule 5.13, no Excluded Entity has any material assets used in the operation of the Business other than Edison Coil I and Edison Coil II, which may have material assets used in the operation of the Business but whose liabilities exceed the value of all assets securing such liabilities.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Sellers that:

6.1    Organization and Good Standing. Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Utah and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2    Authorization of Agreement. Purchaser has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or that has been or is to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary action on behalf of Purchaser and no other action on the part of Purchaser is necessary to authorize the execution and delivery of this Agreement or the Purchaser Documents by Purchaser or the consummation of the transaction contemplated hereby and thereby by Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and, subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Cases and assuming the due authorization, execution and delivery by the other Parties hereto and thereto, this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3    No Contravention. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) violate or conflict with any provision of Purchaser's organizational documents, or (b) violate or conflict with any Order, Governmental Entity or arbitrator, or any Law applicable to Purchaser.

6.4    Consents and Approvals. Except for entry of the Sale Order, the execution, delivery and performance by Purchaser of this Agreement and the transactions contemplated hereby, and the legality, validity, binding effect or enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons or Governmental Entities.

6.5    Litigation. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions hereby.

6.6    Financial Advisors. Purchaser does not have any obligation to pay any broker, finder or financial advisor for Purchaser any fee or commission or like payment in connection with the transactions contemplated by this Agreement.

6.7     Sufficient Funds; Adequate Assurances. Purchaser has or will have as of the Closing, immediately available funds sufficient for the satisfaction of all of Purchaser's obligations under this Agreement, including all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated hereby. As of the Closing, Purchaser shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Purchased Contracts and the related Assumed Liabilities.

6.8     Acknowledgements; "As Is" "Where Is" Transaction. In making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of its own independent investigation and the representations and warranties expressly given by the Sellers in ARTICLE V hereof (as modified by the Schedules, as supplemented or amended) and any other Seller Document. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges, understands and agrees that the Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Sellers in ARTICLE V hereof (as modified by the Schedules hereto, as supplemented or amended (and subject in all events to their lapsing at Closing as provided in Section 11.13, below) and any other Seller Document, and Purchaser acknowledges and agrees that, except for the representations and warranties contained in ARTICLE V hereof (as modified by the Schedules hereto, as supplemented or amended (and subject in all events to their lapsing at Closing as provided in Section 11.13, below) and any other Seller Document, and subject to the provisions of Section 11.3, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" and "with all faults" basis.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

7.1     Expense Reimbursement. In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Sellers, if this Agreement is terminated, the Sellers shall pay Purchaser, subject to, and in accordance with, the terms and conditions of this Agreement (including Section 4.5) and the Bidding Procedures Order an aggregate amount equal to the Expense Reimbursement, as set forth in Section 4.5 above. Each of the Parties acknowledges and agrees that the agreements contained in this Section 7.1 are an integral part of this Agreement and the transactions contemplated hereby, and that the Expense Reimbursement is not a penalty, but rather is liquidated damages constituting a reasonable estimate of the damages that Purchaser would be likely to incur in the circumstances in which such Expense Reimbursement is payable for the efforts and resources expended and opportunities foregone by Purchaser while negotiating this Agreement and pursuing the transactions contemplated hereby and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. The Expense Reimbursement constitutes a necessary inducement for Purchaser to enter into this Agreement, and shall be the sole remedy of Purchaser for breach of this Agreement by Sellers (other than for non-payment of the Expense Reimbursement) if this Agreement is terminated under circumstance where the Expense Reimbursement is payable. Sellers shall file with and seek the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Expense Reimbursement. The claim of Purchaser in respect of the Expense Reimbursement shall constitute an allowed administrative expense claim against each of the Sellers under sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Cases (without the need to file a proof of claim), which shall be payable solely in accordance with the Bidding Procedures Order and as set forth in Section 4.5 above. The Expense Reimbursement shall be payable on a joint and several basis by the Sellers.

7.2    <u>Bankruptcy Court Orders and Related Matters.</u>

(a)    The Sellers and Purchaser acknowledge that this Agreement and the transactions contemplated hereby are subject to entry of, as applicable, the Bidding Procedures Order and the Sale Order. In the event of any discrepancy between this Agreement and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and the Sale Order shall govern.

(b)    The Bidding Procedures to be employed with respect to this Agreement and the Auction, if one is conducted, will be those reflected in the Bidding Procedures Order.

(c)    Purchaser shall take all actions as may be reasonably necessary to cause the Bidding Procedures Order and Sale Order to be issued, entered and not stayed, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and Sale Order.

(d)    The Sellers shall, consistent with their respective obligations as fiduciaries under the Bankruptcy Code, cooperate with Purchaser concerning the Bidding Procedures Order, the Sale Order, and any other orders of the Bankruptcy Court relating to the transactions contemplated hereby. The Sellers shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion to all creditors and parties in interest entitled to notice thereof pursuant to the Bidding Procedures Order, the Bankruptcy Code and applicable bankruptcy rules, including all Persons that have asserted Liens on any Seller's assets, and all non-debtor parties to the Material Contracts of the Sellers and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as Purchaser may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Legal Proceedings in the Bankruptcy Court relating to this Agreement, the transactions contemplated hereby, and the Bidding Procedures Motion.

(e)    The Sellers shall provide to Purchaser draft copies of all orders, motions, pleadings, applications and other material documents the Sellers intend to file with the Bankruptcy Court in connection with the sale of the Purchased Assets or transactions contemplated hereby not less than two (2) Business Days prior to the date when the Sellers plan to file such document (<u>provided</u>, that if the delivery of such drafts at least two (2) Business Days is not reasonably practicable, such drafts shall be delivered to Purchaser as soon as reasonably practicable prior to filing). The form and substance of any such document hereunder shall be mutually acceptable to Sellers and Purchaser (provided that no Party shall unreasonably withhold, condition or delay its consent and provided further that, so long as Sellers reasonably cooperate in good faith to reach consensus with Purchaser on any document, Sellers shall not be required to defer filing such document for more than two (2) calendar days following Sellers' initial submission of a draft of same to Purchaser or, to the extent deferring filing for such period is not reasonably practicable under the circumstances, such shorter period as is reasonably practicable).

(f)    Subject to the Sellers exercising their rights pursuant to this <u>Section 7.2</u>, the Sellers shall not, and shall cause their subsidiaries not to, take any action that is intended to result in, or fail to take any action that is intended to result in, or fail to take any action the intent of which failure to act would reasonably be expected to result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or, if applicable, if Purchaser is the prevailing bidder at the Auction, the Sale Order. The Sellers shall, and shall cause their subsidiaries to, comply with the Bidding Procedures Order and the Sale Order.

(g)    For the avoidance of doubt, nothing in this Agreement will restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets (other than Material Contracts, which the Sellers may not terminate, amend or otherwise dispose of, or reject in the Bankruptcy

Cases, without Purchaser's consent) or from settling, delegating or otherwise transferring any Excluded Liabilities, in each case, with the approval of the Bankruptcy Court, or from entering into discussions or agreements with respect to the foregoing.

## ARTICLE VIII
## COVENANTS

8.1     Due Diligence; Access to Information. The Sellers agree to fully cooperate with Purchaser after the signing of this Agreement for Purchaser to conduct legal, financial and accounting due diligence on the Business, the Purchased Assets and/or the Assumed Liabilities (the "Due Diligence"). The Sellers agree that, prior to the Closing Date, Purchaser shall continue to be entitled, through its officers, employees and representatives (including, without limitation, legal advisors and accountants), to make such investigation of the businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as is reasonable (and reasonably requested) and to make extracts and copies of such books and records. The Sellers shall use their commercially reasonable efforts to cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of the Sellers to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and Purchaser's representatives shall cooperate with the Sellers and the Sellers' representatives and, at the sole discretion of the Sellers, take measures to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller to disclose information subject to attorney-client privilege or breach any obligation of confidentiality or to the extent it would entail any so-called Phase II or other invasive environmental testing or the like. For the avoidance of all doubt, nothing in this Section 8.1 shall be deemed to give rise to any contingency or Closing condition relating to Purchaser's approval of or satisfaction with the results of any Due Diligence conducted pursuant to this Section 8.1, except as set forth in Section 4.4(c).

8.2     Conduct of the Business Pending the Closing. Except (v) as limited by virtue of Sellers being debtors in the Bankruptcy Cases, (w) to the extent Sellers do not have adequate funding to engage in such activities, (x) as set forth on Schedule 8.2, (y) to the extent required by applicable Law or as otherwise expressly contemplated by this Agreement, or (z) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed):

(a)     Prior to the Closing, the Sellers shall, provided that such conduct would not result in a Default or Event of Default under the DIP Order:

(i)     conduct the Business only in the Ordinary Course of Business as in effect on the date hereof (taking into account such Seller's status as a debtor-in-possession );

(ii)     otherwise report periodically (in no event more than once every ten (10) days unless agreed to by the Sellers) to Purchaser concerning the status of the Business, including the material operations thereof and finances related thereto, each of which periodic reports may be given to Purchaser orally or in writing, as Sellers in their sole discretion may determine;

(iii)     use commercially reasonable efforts to maintain the material Purchased Assets in a state of repair and condition that complies with applicable Law and is consistent with the Ordinary Course of Business;

(iv)     use commercially reasonable efforts to keep in full force and effect all material rights relating to the Business consistent with the Ordinary Course of Business;

(v)      comply in all material respects with all applicable Law;

(vi)      use commercially reasonable efforts to continue in full force and effect material insurance coverage consistent with the Ordinary Course of Business; and

(vii)      cooperate in commercially reasonable respects with Purchaser and assist Purchaser in identifying the Permits required by Purchaser to operate the Business from and after the Closing Date and either transferring existing Permits of such Seller to Purchaser, where permissible, or obtaining new Permits for Purchaser, in each case at Purchaser's sole cost and expense;

(viii)      upon request from time to time, execute and deliver all documents, make all truthful oaths, testify in any proceedings and do all other acts that may be reasonably necessary to consummate the transactions contemplated hereunder, all without further consideration, including without limitation, collaborate with and assist Purchaser to take control of and transport, if needed, all the Purchased Assets upon the Closing. For the avoidance of doubt, nothing in this provision shall be deemed to require Sellers to take any action which would in any material respect expand Sellers' obligations beyond those arising under the other provisions of this Agreement.

(b)      The Sellers shall not, solely as it relates to the Business, the Purchased Assets and/or the Assumed Liabilities:

(i)      (A) increase the annual level of compensation of any director or executive officer of any Seller, (B) increase the annual level of compensation payable or to become payable by any Seller to any of their respective directors or executive officers, (C) grant any bonus, material benefit or other material direct or indirect compensation to any director or executive officer except in the Ordinary Course of Business, or (D) increase the coverage or benefits available under any (or create any new) Employee Benefit Plan;

(ii)      subject any of the material Purchased Assets to any Lien, except for Permitted Exceptions;

(iii)      sell, assign, license, transfer, convey, lease or otherwise dispose of any material Purchased Assets (except in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets); provided, however, notwithstanding anything to the contrary contained under this Agreement, any sale, assignment, license, transfer, conveyance, lease or other disposition of any or any portion of the Tangible Personal Property or Owned Intellectual Property shall require prior written consent of Purchaser (which consent shall be at Purchaser's sole discretion);

(iv)      waive or release any material right of any Seller that constitutes a Purchased Asset except in the Ordinary Course of Business;

(v)      enter into, materially modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any material commitment or incur any material liability to any labor organization with respect to any Purchased Asset;

(vi)      enter into, materially amend or terminate any Material Contract (or any Contract that would have been a Material Contract had it been in effect on the date hereof);

26

(vii)     make any operational decisions of a material nature outside of the Ordinary Course of Business that Sellers are not required to take or make in performance of their express obligations under this Agreement;

(viii)     make any material tax election inconsistent with past practice or material change in any accounting method used by such Seller other than as required by GAAP, in each case, to the extent it would impact the Business or the Purchased Assets after the Closing; or

(ix)     agree to do anything prohibited by this <u>Section 8.2</u>.

8.3     <u>Consents</u>. Purchaser and Sellers shall use their commercially reasonable efforts to obtain at the earliest practicable date all consents and approvals required of them to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in <u>Section 5.3(b)</u> hereof; <u>provided</u>, <u>however</u>, neither Sellers nor Purchaser shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings to obtain any such consent or approval.

8.4     <u>Further Assurances</u>. Each of Purchaser and each Seller shall, at its own expense, use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement; (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement; and (iii) reasonably cooperate in connection with the transfer, collection or similar realization of the Purchased Assets for the benefit of Purchaser, including by making regulatory or other filings (but, in the case of any such filings, at the sole cost and expense of Purchaser). Notwithstanding anything contained in this Agreement to the contrary, the Sellers shall be entitled to take such actions as are required or appropriate in connection with the discharge of their fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets) and nothing in this <u>Section 8.4</u> shall be deemed to require Sellers to take any action which would in any material respect expand Sellers' obligations beyond those arising under the other provisions of this Agreement.

8.5     <u>Confidentiality</u>. From and after the Closing Date:

(a)     The Sellers will treat and hold as confidential all of the Confidential Information, and will not, directly or indirectly, without the prior written consent of Purchaser, disclose or use any Confidential Information, except as required by Law. The Sellers' obligation not to disclose Confidential Information shall not apply to Confidential Information that any Seller shall be required to disclose by Law (including any Confidential Information that it may be necessary or appropriate for Sellers to disclose in connection with filings or other actions taken by Sellers (or any of them) in the administration of the Bankruptcy Cases or the performance of their obligations in connection with this Agreement and/or the transactions contemplated herein); <u>provided</u>, <u>however</u>, that, other than in connection with actions taken as described in the immediately preceding parenthetical, prior to making such disclosure, the Sellers shall notify Purchaser promptly to the extent not prohibited by Law so that Purchaser may seek confidential treatment or protection of such Confidential Information at Purchaser's sole cost and expense; and

(b)     other than as permitted without notice to Purchaser pursuant to <u>Section 8.5(a)</u>, in the event any Seller is required in any Legal Proceeding to disclose any Confidential Information, such Seller will notify Purchaser promptly of the requirement to the extent not prohibited by Law so that Purchaser may seek an appropriate protective order at Purchaser's sole cost and expense or waive compliance with the provisions of this <u>Section 8.5</u>.

8.6    <u>Preservation of Records</u>.

(a)    The Sellers (subject to their fiduciary duties including the option to convert the Bankruptcy Cases to Chapter 7) and Purchaser agree that each of them shall, and shall cause their respective successors to, (i) preserve and keep the books and records relating to the Purchased Assets held by them or any of their Affiliates for a period of five (5) years from the Closing Date, and (ii) make such books and records (as well as any former employees of any Seller that are then employed by Purchaser) available to the other (and such Party's respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) as may be reasonably required by such other Party in connection with, among other things, any insurance claims by, Legal Proceedings, Tax audits or examinations involving or governmental investigations of such other Party or any of their respective Affiliates, or in order to enable any such other Party to comply with its obligations under this Agreement, any Ancillary Agreement or the Bankruptcy Cases; <u>provided</u>, <u>however</u>, that this <u>Section 8.6</u> shall not apply to any Seller upon completion of the liquidation of such Seller. Each Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall be entitled to inspect and make copies of any such books and records held by the other Party. In the event any Seller or Purchaser wishes to destroy such books and records before or within five (5) years from the Closing Date, it shall first give thirty (30) days' prior written notice to the other Party (and its respective successors and representatives appointed by the Bankruptcy Court, if any) and the other Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall have the right, at their option and expense, upon prior written notice within such thirty (30) day period, to take possession of the records within thirty (30) days after the date of such notice.

(b)    Access pursuant to this <u>Section 8.6</u> shall be afforded by the Party in possession of such records, upon receipt of reasonable advance notice, during normal business hours and at the expense of the Party requesting such access; <u>provided</u>, <u>however</u>, that (i) any review of such records shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any Party, (ii) no Party shall be required to take any action that would constitute a waiver of the attorney-client privilege or breach an obligation of confidentiality, and (iii) no Party shall be required to supply the other Party with any information which such Party is under a legal obligation not to supply. Each Party shall be solely responsible for any costs or expenses incurred by such Party pursuant to this <u>Section 8.6(b)</u>.

8.7    <u>Further Disclosure</u>. From time to time prior to the Closing Date, (i) each Seller shall promptly disclose in writing to Purchaser any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be disclosed as an exception to the representations and warranties of such Seller; and (ii) Purchaser shall promptly disclose in writing to Sellers' Representative any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be disclosed as an exception to the representations and warranties of Purchaser. No such disclosure shall have the effect of curing any misrepresentation or breach of any warranty without the written consent of the non-breaching Party.

8.8    <u>Publicity</u>. Neither the Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of Purchaser or the Sellers, disclosure is otherwise required by applicable Law, by the rules of any stock exchange or listing agency that are applicable to such Party and/or its Affiliates, or by the Bankruptcy Court or Bankruptcy Code with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or pursuant to any contractual reporting requirements to which any Seller may be subject, <u>provided</u>, <u>however</u>, that the Party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court or Bankruptcy Code requirement to consult with the other Party with respect to the text thereof.

Notwithstanding the foregoing, the restrictions set forth in this <u>Section 8.8</u> shall not apply to any filings or other actions necessary or appropriate for Sellers to take in connection with the administration of the Bankruptcy Cases or the performance of their obligations in connection with this Agreement and/or the transactions contemplated herein.

8.9    <u>Tax Matters</u>.

(a)    Purchaser shall be responsible for (and shall indemnify and hold harmless Sellers against) any sales, use, stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest, fine, penalty, additions to Tax or additional amount thereon) payable in connection with the transfer of the Purchased Assets as contemplated by this Agreement solely to the extent not exempt in accordance with section 1146 of the Bankruptcy Code ("<u>Transfer Taxes</u>").

(b)    The Sellers, on the one hand, and Purchaser, on the other hand, will (at the cost of the requesting party) provide each other with such cooperation and information as either of them may reasonably request of the other in connection with filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.

(c)    The Sellers and Purchaser will treat the transactions contemplated hereunder as taxable sales of assets for all federal, state and local income tax purposes. Notwithstanding anything to the contrary herein, Purchaser shall have full and absolute discretion to determine the allocation of the Purchase Price among the Purchased Assets in accordance with section 1060 of the Code and Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as applicable).

8.10    <u>Use of Name</u>. The Sellers agree that they shall (i) immediately after the Closing Date, cease to make any use of the names set forth on <u>Schedule 8.10</u> hereto or any Marks, Internet domain names, identifying symbols, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or Mark confusingly similar thereto , and (ii) immediately after the Closing, cease to hold themselves out as having any affiliation with the Business. For the avoidance of doubt, the foregoing shall not limit Sellers in any way from continuing to use their various names in connection with the administration of their respective Bankruptcy Cases.

8.11    <u>No Control</u>. Except as permitted by the terms of this Agreement, prior to the Closing, Purchaser shall not directly or indirectly control, supervise, direct or interfere with, or attempt to control, supervise, direct or interfere with, the Business or any operations or affairs of any Seller (including, without limitation, with respect to the Purchased Assets). Until the Closing, the operations and affairs of the Business and the Purchased Assets are under the Sellers' complete control, except as otherwise expressly provided in this Agreement.

8.12    <u>WARN Act</u>. Purchaser shall be responsible for (and shall indemnify and hold the Sellers harmless from and against) all Liabilities for any and all WARN Act notices, payments, fines or assessments, including reasonable attorneys' fees incurred by the Sellers in connection therewith, with respect to the employment, discharge or layoff of any Employees.

8.13    <u>Mail and Receivables</u>. Each Seller hereby irrevocably authorizes Purchaser, from and after the Closing, to receive and open all mail and other communications received by Purchaser and relating to the Business or the Purchased Assets and addressed or directed to such Seller and to act with respect to such communications in such manner as Purchaser may elect, and to endorse and cash any checks or instruments payable or endorsed to such Seller or its order which are received by Purchaser and which relate to the Purchased Assets. Each Seller will promptly deliver to Purchaser the original of any mail or other communication received by such Seller after the Closing that relates to the Business or the Purchased

Assets. In addition, in the event that any payment on accounts receivable or other assets included in the Purchased Assets or any other amounts that are property of Purchaser is received by a Seller after the Closing Date, such Seller will hold such amounts received as trustee for, and remit such amounts to, Purchaser by wire transfer of immediately available funds as soon as practicable (and in any event within five (5) Business Days following receipt thereof). Purchaser similarly agrees to the foregoing provisions in this <u>Section 8.13</u> in favor of Sellers with respect to the Excluded Assets.

8.14    <u>Communication with FVIP Owners</u>. Each Seller hereby irrevocably authorizes Purchaser to contact each FVIP Owner by telephone, letter and/or email for the purpose of notifying each such FVIP Owner (i) of its option to enter into a new agreement with Purchaser (expressly subject to the occurrence of the Closing) on terms and conditions acceptable to Purchaser, a copy of which terms and conditions (or a summary thereof) shall be provided to each such FVIP Owner by electronic means on or before Closing; provided that each such agreement entered into by Purchaser with any FVIP prior to the Sale Hearing shall, (xx) by its express terms, run in favor of and be enforceable against the applicable FVIP Owner not only by Purchaser, but also by any other Successful Bidder, (yy) not prohibit or otherwise restrict in any way FVIP Owners from entering into agreements with other potential bidders, and (zz) include an express agreement by the applicable FVIP Owner that all amounts received by the FVIP Owner under or in connection with such agreement in respect of claims accruing against Sellers shall be credited in reduction of such FVIP Owner's claims against Sellers in the Bankruptcy Cases, in each of the cases in clauses (xx), (yy) and (zz) pursuant to language in such agreement acceptable to Sellers in their reasonable discretion, and (ii) that Purchaser will not be assuming any of Sellers' contracts with FVIP Owners. Each such agreement shall also include a provision which expressly designates Sellers as intended third party beneficiaries of, and with the right to enforce the provisions described in, clauses (xx), (yy) and (zz) above. Purchaser agrees to provide Sellers with a list of all FVIP Owners that have entered into such new agreements with Purchaser (along with true and correct copies thereof) no later than the date of the hearing to approve the Bidding Procedures, and to update such list (and provide copies of all such additional agreements) at least two (2) calendar days prior to the Auction and again at least two (2) calendar days prior to the Closing.

**ARTICLE IX**
**EMPLOYEES AND EMPLOYEE BENEFITS**

9.1    <u>Transferred Employees</u>. Each Seller shall terminate the employment of all of its Transferred Employees (as defined below) contemporaneous with the Closing. Purchaser shall have the right to offer all Transferred Employees at-will employment on terms and conditions established by Purchaser in Purchaser's sole discretion, which terms may be set forth in an employment agreement in form acceptable to Purchaser in its sole discretion (each, an "<u>Employment Agreement</u>"), such employment to commence immediately after the Closing, subject to Purchaser's standard hiring procedures and criteria. Those employees to whom offers of employment are made and who accept such offers and commence employment as of the Closing Date shall be collectively referred to as the "<u>Transferred Employees</u>," and a list of such Transferred Employees, which list shall include the employees listed on <u>Schedule 9.1</u> (the "<u>Designated Employees</u>"), shall be provided by Purchaser to the Sellers no later than three (3) Business Days before the Closing Date. Notwithstanding anything to the contrary contained under this Agreement, at any time before the Closing, Purchaser shall have the right, at its sole discretion, and the Sellers shall use commercially reasonable efforts to cooperate (at no cost or expense to Sellers and only so long as such cooperation does not materially interfere with Sellers' ongoing operation of the Business or performance of other obligations under this Agreement) with and assist Purchaser, to discuss and negotiate with any or all of Sellers' employees of Purchaser's choice regarding the employment of such employees after the Closing under the employment terms and conditions (including without limitation, the employee benefits) to the satisfaction of the Purchaser. Purchaser expressly acknowledges that Sellers give no assurance of any

kind to Purchaser that any such discussions or negotiations will lead to results or employment arrangements satisfactory to Purchaser.

9.2     <u>Employee Benefits</u>.

(a)     Without limiting the generality of <u>Section 2.4</u>, each Seller shall retain responsibility for, and satisfy all Liabilities with respect to, all payments and benefits of the employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) under the Employee Benefit Plans of the Sellers accrued up to the Closing Date or which relate to events prior to the Closing Date in accordance with the terms thereof and applicable Laws.

(b)     Without limiting the generality of <u>ARTICLE II</u>, each Seller shall be responsible for the following claims or benefit payments of all employees including Transferred Employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) accrued up to the Closing Date or which related to events prior to the Closing Date regardless of whether such claims are filed before or after the Closing Date under each Employee Benefit Plan:

(i)     with respect to death or dismemberment claims, those in respect of which the event occurred prior to the Closing Date;

(ii)     with respect to health claims, those in respect of which the services were provided or the supplies were purchased prior to the Closing Date; and

(iii)     with respect to short term and/or long term disability claims and workers' compensation claims, for those claims resulting from events that occurred prior to the Closing Date, including, to the extent covered under the Employee Benefit Plans, for recurring illnesses which first originated with events occurring prior to the Closing Date, whether or not such claims continue after the Closing Date.

(c)     Nothing herein expressed or implied is intended to (i) require the continued employment or any person for any designated period, (ii) constitute an amendment to any Employee Benefit Plan, or otherwise prohibit the amendment or termination of any Employee Benefit Plan, or (iii) confer on any person other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this <u>ARTICLE IX</u>.

(d)     Nothing contained in this <u>Section 9.2</u> or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any individual Transferred Employee.

**ARTICLE X**
**CONDITIONS TO CLOSING**

10.1     <u>Conditions Precedent to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date (or such earlier date as noted below in connection with any particular condition), of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     (i) the representations and warranties of the Sellers set forth in <u>Section 5.1</u> (Organization and Good Standing), <u>Section 5.2</u> (Authorization of Agreement), <u>Section 5.3</u> (Conflicts; Consents of Third Parties), and <u>Section 5.4</u> (Title to Purchased Assets) shall be materially true and correct at and as of the Closing Date; provided that (i) the knowledge qualifiers in each such section shall be deemed

31

to be removed and not applicable for purposes of this <u>Section 10.1(a)</u>; (ii) the condition set forth in this <u>Section 10.1(a)</u> shall not apply to any of Sellers' other representations and warranties set forth in <u>ARTICLE V</u> hereof, and (ii) Purchaser shall have received a certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the foregoing effect;

(b)     the Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the forgoing effect;

(c)     Five (5) Business Days prior to the Closing Date, the Sellers shall have delivered to Purchaser a complete list of those Purchased Assets that Sellers anticipate will be transferred, assigned and delivered to Purchaser upon the Closing, which list shall be consistent in all material respects with the Schedules to this Agreement; provided, however, such list shall be subject to any assets that Purchaser has included in and excluded from the Purchased Assets pursuant to Purchaser's rights under this Agreement and to any Contracts that may not be assumed and assigned to Purchaser by reason of Purchaser's failure to provide "adequate assurance of future performance" to the Bankruptcy Court's satisfaction under section 365 of the Bankruptcy Code becoming Excluded Assets hereunder. Purchaser shall have reasonable access to the books and records of the Sellers for purposes of assisting Purchaser in its review of the foregoing; any disputes regarding the contents of the foregoing shall be resolved in good faith by the Parties prior to the Closing;

(d)     the Sale Order shall include an express finding by the Bankruptcy Court that Purchaser is a buyer in good faith under Bankruptcy Code section 363(m); and

(e)     on or before November 15, 2024, Purchaser and Bison Capital Partners V, L.P., shall have entered into a Securities Purchase Agreement or other agreement necessary to finance the obligations of Purchaser under this Agreement.

10.2    <u>Conditions Precedent to Obligations of Sellers</u>. The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by the Sellers in whole or in part to the extent permitted by applicable Law, provided that any such waiver does not materially and adversely affect the Sellers' estates):

(a)     (i) the representations and warranties of Purchaser set forth in <u>Section 6.1</u> (Organization and Good Standing), <u>Section 6.2</u> (Authorization of Agreement) and <u>Section 6.7</u> (Sufficient Funds; Adequate Assurances) (collectively, the "<u>Purchaser Core Representations</u>") shall be true and correct at and as of the Closing Date and (ii) the Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect.

10.3    <u>Conditions Precedent to Obligations of Purchaser and Sellers</u>. The respective obligations of Purchaser and the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and the Sellers in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, nor shall there be any statute, rule, regulation, Order or other law promulgated, enacted, entered, enforced or deemed applicable to the Parties which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded; and

(b)     the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed.

10.4     Frustration of Closing Conditions. Neither the Sellers nor Purchaser, as applicable, may rely on the failure of any condition set forth in Sections 10.1, 10.2 or 10.3, as the case may be, if such failure was primarily caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE XI
## MISCELLANEOUS

11.1     Expenses. Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each of Sellers and Purchaser shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with the negotiation and execution of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.

11.2     Attorneys' Fees. The Parties agree that the prevailing Party in any Legal Proceeding relating to or arising out of this Agreement shall be awarded its reasonable attorneys' fees and costs incurred as a result of such Legal Proceeding.

11.3     Risk of Loss. The Sellers will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Date. In the event that any material portion of any Purchased Assets is damaged or destroyed prior to Closing Date, then, with respect to such Purchased Assets, Purchaser may, at Purchaser's option, either (i) proceed to close notwithstanding the damage or destruction of such Purchased Assets or (ii) exclude such Purchased Assets, in which event Purchaser shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in Section 10.1 would not be satisfied unless such loss is covered by insurance or cause of action against a third-party. If Purchaser closes notwithstanding an unrepaired or unrestored loss to a Purchased Asset, the Sellers will deliver and/or assign to Purchaser any insurance proceeds with respect to such damage or destruction and all claims against third parties relating thereto. Notwithstanding the foregoing, there shall be no reduction of the Purchase Price on account of such damage or destruction.

11.4     Dispute Resolution; Consent to Jurisdiction.

(a)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) during the pendency of the Bankruptcy Cases, the Bankruptcy Court shall have and retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.10; provided, however, upon the closing of the Bankruptcy Cases (except for any matter(s) with respect to the Sellers and/or the Bankruptcy Cases in which the Bankruptcy Court retains jurisdiction with respect to such matter with respect to Sellers and/or the Bankruptcy Cases), or if the Bankruptcy Court is unwilling or unable to hear such Transaction Dispute, then, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the District of Delaware or any appellate court from any thereof, for the resolution of any

such Transaction Dispute. In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally: (i) submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts; (ii) agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and (iii) agrees that Notice demand in accordance with <u>Section 11.10</u>, will be effective service of process; <u>provided</u>, <u>however</u>, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of Delaware.

(b)     The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of Delaware for any purpose except with respect to any Transaction Dispute.

11.5     <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) during the pendency of Bankruptcy Cases, the Bankruptcy Court shall have and retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court, including to the entry by the Bankruptcy Court of Final Orders in any such proceedings, and shall receive notices at such locations as indicated in <u>Section 11.10</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been closed, the Parties agree that either Party may seek leave of the Bankruptcy Court to reopen the Bankruptcy Cases, or alternatively may proceed in the United States District Court for the District of Delaware or any appellate court from any thereof, for the resolution of any such claim or dispute, to which the other Party irrevocably submits for jurisdictional purposes. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 11.10</u>.

11.6     <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING ANY TRANSACTION DISPUTE.

11.7     <u>Specific Performance</u>. Each Party acknowledges and agrees that each other Party would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Purchaser or the Sellers may have under law or equity, each Party shall be entitled to seek injunctive relief to prevent any breaches of the provisions of this Agreement by the other Parties and to enforce specifically this Agreement and the terms and provisions hereof.

11.8     <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the schedules and exhibits hereto) and the Ancillary Agreements represent the entire understanding and agreement among the Parties with respect to the subject matter hereof. This Agreement can be amended, supplemented or

changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Parties. Notwithstanding anything to the contrary herein, the Schedules may be amended without approval from the Bankruptcy Court by written instrument signed by the Parties. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

11.9    <u>Governing Law</u>. This Agreement, and any Legal Proceeding that may be based upon, arise out of or relate or be incidental to the transactions contemplated by this Agreement, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "<u>Transaction Dispute</u>"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied, except to the extent that such Laws are superseded by the Bankruptcy Code.

11.10    <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile or electronic mail (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier, in each case at the following addresses (or to such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

> **If to a Sellers, to:**
> Fluid Market, Inc.
> Attn: T. Scott Avila
> 3827 Lafayette Street, Suite 149
> Denver, CO 80205
> E-mail: savila@paladinmgmt.com

>> ***With a copy (which shall not constitute notice) to:***
>> Pachulski Stang Ziehl & Jones LLP
>> Attn:  Laura Davis Jones, Esq.
>> 919 North Market Street, 17th Floor
>> Wilmington, DE 19801
>> E-mail: ljones@pszjlaw.com

> **If to Purchaser, to:**
> Kingbee Rentals, LLC
> Attn: Chris Johnson
> 2272 South 5600 West
> West Valley City, UT 84120
> E-mail: chris.johnson@kingbee-vans.com

*With a copy to:*
Bennett Tueller Johnson & Deere, LLC
Attn: Brent Hawkins
3165 East Millrock Drive, Suite 500
Salt Lake City, UT 84121
E-mail: bhawkins@btjd.com

11.11    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.12    Binding Effect; Assignments. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person or entity not a Party except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void and without effect; provided, however, that Sellers shall have the right, without Purchaser's consent, to assign this Agreement to any Trustee appointed or liquidating trust or the like created or established in connection with the Bankruptcy Cases and Purchaser shall have the right, without Sellers' consent, to assign any of Purchaser's rights hereunder to an Affiliate of Purchaser that has sufficient financial wherewithal to satisfy the obligations under this Agreement. No assignment of any obligations hereunder shall relieve the Parties of any such obligations. Upon any such permitted assignment, the references in this Agreement to any such permitted assignor shall apply to any such permitted assignee unless the context otherwise requires.

11.13    Survival. Except as expressly set forth in this Agreement to the contrary, all representations and warranties and covenants of Purchaser and the Sellers, respectively, contained in this Agreement or in any document delivered pursuant hereto shall not survive the Closing Date and thereafter shall be of no further force and effect. Notwithstanding the foregoing, all covenants and agreements set forth in this Agreement, which by their terms would require performance after the Closing Date, shall survive until fully performed or until such covenant or agreement expires by its terms.

11.14    Counterparts; Electronic Signatures. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic means (such as by facsimile or .PDF) will be effective as delivery of a manually executed counterpart to this Agreement.

11.15    No Interpretation Against Drafter. This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and any rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party.

11.16    Appointment of Sellers' Representative. Each Seller does hereby irrevocably appoint the Company as its true and lawful attorney-in-fact and agent (the "Sellers' Representative"), with full power of substitution or re-substitution, to act solely and exclusivity on behalf of such Seller with respect to any matters relating to this Agreement and any related agreements (such appointment being coupled with an

interest and irrevocable). Purchaser shall, to the extent it elects to rely on such actions, if any, taken or authorized by the Sellers' Representative, be entitled to rely on all such actions as being the binding acts of any Seller.

11.17    <u>Non-Recourse</u>. No past, present or future director, officer, employee, member, partner, equity holder, manager, agent, incorporator, attorney, representative or Affiliate of any of the parties hereto will have any liability for any obligations or liabilities of Sellers or Purchaser, as applicable, under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against the Parties hereto, and then only with respect to the specific obligations set forth herein or therein. Other than the Parties, as applicable, no other person or entity will have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of Purchaser or Sellers, as applicable, under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any legal proceeding of any type or kind based on, in respect of, or by reason of, the transactions contemplated herein (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party or another person or entity or otherwise.

11.18    <u>Personally Identifiable Information</u>. Purchaser shall honor and observe Sellers' online privacy policies (last updated January 15, 2021) in effect on the execution date of this Agreement restricting or regarding the transfer of Personally Identifiable Information as shown at *https://fluidtruck .com*.

[*Remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

<u>**SELLERS:**</u>

**FLUID MARKET, INC.**

B _____
Name: T. Scott Avila
Title:  Interim Chief Executive Officer


**FLUID FLEET SERVICES, LLC**

By: _____
Name:  T. Scott Avila
Title:   Interim Chief Executive Officer

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

<u>**PURCHASER**</u>:

**KINGBEE RENTALS, LLC**

By: _____
Name: Scott Haslam
Title: CEO

**<u>EXHIBIT A</u>**

**FORM OF BIDDING PROCEDURES ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FLUID MARKET, INC., *et al.*,[1] | ) | Case No. 24-12363 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (II) SCHEDULING BID DEADLINES AND THE AUCTION, (III) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors") for the entry of an order (this "Order"):   (a) approving bidding procedures, substantially in the form attached hereto as Exhibit 1 (the "Bidding Procedures"), to be used in connection with the sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") to Kingbee Rentals, LLC or its designee (the "Stalking Horse Bidder"), or alternatively, to such other bidder that submits the highest and best bid for the Assets at auction, (b) authorizing the Debtors to designate Kingbee Rentals, LLC or its designee as the Stalking Horse Bidder and to provide expense reimbursement, as provided in the Stalking Horse Agreement (defined below), (c) scheduling an auction of the Assets and scheduling the hearing to approve the Sale, (d) approving the form and manner of notices of the proposed sale hearing, substantially in the form attached to hereto as Exhibit 2, (e) authorizing procedures governing the potential assumption and assignment

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Fluid Market Inc. (1365) and Fluid Fleet Services, LLC (5994).  The location of the Debtors' service address is:  3827 Lafayette St., Suite #149, Denver, CO 80205.

[2]     Capitalized terms used but not defined herein have the meanings given to them in the Bidding Procedures attached hereto as **Exhibit 1** or the Stalking Horse Agreement, as applicable.

of the Debtors' certain executory contracts and unexpired leases in connection with the Sale, (each a "Potential Assumed Contract" and together, the "Potential Assumed Contracts"); and (f) approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under an applicable Potential Assumed Contract and (B) certain other information regarding the potential assumption and assignment of Potential Assumed Contracts in connection with the Sale, substantially in the form attached hereto as Exhibit 3; and (ii) an order (a) authorizing the sale of the Assets free and clear of all liens, claims, interests, and encumbrances provided with such liens, claims, interests and encumbrances to attach to the proceeds of such sale, (b) authorizing the assumption and assignment of Potential Assumed Contracts; and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Bidding Procedures Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Bidding Procedures Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding

pursuant to Bankruptcy Rule 9014.   To the extent that any of the following findings of fact

constitute conclusions of law, they are adopted as such.   To the extent any of the following

conclusions of law constitute findings of fact, they are adopted as such.

B.      The Court has jurisdiction to consider the Motion, the relief requested therein, and

the transaction contemplated by the Stalking Horse Agreement in accordance with 28 U.S.C. §§

157 and 1334 and the *Amended Standing Order of Reference from the United States District Court

for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding under 28

U.S.C. § 157(b). Venue of the Chapter 11 Cases and the Motion in this district is proper under 28

U.S.C. §§ 1408 and 1409.

C.      The bases for the relief requested in the Motion are sections 105, 363, 365, 503,

507, and 1146(a) of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), Rules

2002(a)(2), 6004, 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

and Rules 2002-1, 6004-1, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedures

of the United States District Court for the District of Delaware (the "<u>Local Rules</u>").

D.      The Debtors' proposed notice of the Motion and the hearing thereon, including,

without limitation, the Bidding Procedures and the proposed entry of this Order, is (i) appropriate

and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in

compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and

the Local Rules, and (iii) adequate and sufficient under the circumstances of the Chapter 11 Cases,

such that no other or further notice is required.

E.      The Debtors and their advisors engaged in a sale process before and after the commencement of these Chapter 11 Cases to solicit and develop the highest or best offers for the Assets.

F.      A reasonable opportunity to object or be heard regarding the relief requested in the Motion (including, without limitation, with respect to the Bidding Procedures and the Expense Reimbursement) has been afforded to parties in interest.

G.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Order is in the best interests of the Debtors and their estates, creditors, interest holders, and all other parties in interest herein.

H.      Each of the Bidding Procedures comply with the requirements of Local Rule 6004-(1)(c).

I.      The Sale Notice attached hereto as **Exhibit 2** is fair, appropriate, and reasonably calculated to provide proper and sufficient notice to creditors, the Debtors' economic stakeholders, and other parties in interest of the Sale Hearing and the relief requested under the Motion, including, without limitation, the procedures and deadlines by which parties may object to the Motion.  The Potential Assumption and Assignment Notice attached hereto as **Exhibit 3** is fair, appropriate, and reasonably calculated to provide each Counterparty to the Potential Assumed Contracts with proper and sufficient notice of the potential assumption and assignment of such Potential Assumed Contracts by the Successful Bidder or any of their known proposed assignees (if different from the Successful Bidder) and the requirement that each Counterparty assert any objection to the proposed Cure Amounts prior to the Assumption and Assignment Objection Deadline or otherwise be barred from asserting claims arising from events occurring following assumption and assignment of such Potential Assumed Contracts. The Assumption and

Assignment Procedures comply with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

**Bidding Procedures**

J.        The process for selecting the Stalking Horse Bidder was fair and appropriate under the circumstances and in the best interests of the Debtors' estates.  The Debtors have articulated good and sufficient reasons for the Court to: (i) approve the Bidding Procedures; (ii) schedule the Auction and approve the manner of notice of the Auction; (iii) approve the procedures for the assumption and assignment of the Potential Assumed Contracts, including notice of proposed Cure Amounts; and (iv) grant the Bid Protections, to the extent and as provided in that certain *Asset Purchase Agreement*, dated as of October 30, 2024, by and among the Debtors and the Stalking Horse Bidder (including all exhibits and schedules related thereto, the "Stalking Horse Agreement") and in this Order.

K.        The Bidding Procedures and the Stalking Horse Agreement were each negotiated among the Debtors and the Stalking Horse Bidder at arms'-length and in good faith.  The Stalking Horse Agreement represents the highest and otherwise best offer that the Debtors have received to date for the Assets.  Without the Stalking Horse Bid, the Debtors would likely realize a lower price for the Assets. As such, the contributions of the Stalking Horse Bidder to the process have indisputably provided a substantial benefit to the Debtors, their estates, and creditors in these chapter 11 cases. The Stalking Horse Bid will enable the Debtors to continue their operations, preserve jobs, minimize disruption to the Debtors' business, and secure a fair and adequate baseline price for the Assets at the Auction (if any), and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest.

L.      The Bidding Procedures in the form attached hereto as **Exhibit 1** are fair, reasonable and appropriate, are designed to maximize creditor recoveries from a sale of the Assets and permit the Debtors to comply with their obligations and the Milestones provided under the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 41] (the "DIP Order"), and are consistent with the Debtors' exercise of their fiduciary duties under applicable law.

M.      To the extent payable under the terms of the Stalking Horse Agreement, and this Order, the Expense Reimbursement, or the "Bid Protections": (i) shall be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (ii) is commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) is reasonably tailored to encourage, rather than hamper, bidding for the Assets, by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other bidders in the sale process, thereby increasing the likelihood that the Debtors will receive the best possible price and terms for the Assets; (iv) provides a substantial benefit to the Debtors' estates and stakeholders and all parties in interest herein; (v) is reasonable and appropriate; (vi) is a material inducement for, and condition necessary to, ensure that the Stalking Horse Bidder will continue to pursue the Stalking Horse Agreement to purchase the Assets; and (vii) is reasonable in relation to the Stalking Horse Bidder's efforts and to the magnitude of the Sale and the Stalking Horse Bidder's lost opportunities resulting from the time spent pursuing such transaction.

N.      The Stalking Horse Bidder shall act as the "stalking horse bidder" for the Assets in accordance with the Stalking Horse Agreement.  The Expense Reimbursement, as approved by this Order, (i) is fair and reasonable, (ii) has been negotiated by the Stalking Horse Bidder and the Debtors at arm's-length and in good faith, (iii) provides a benefit to the Debtors' estates and stakeholders, and (iv) is necessary to ensure that the Stalking Horse Bidder will continue to pursue its Stalking Horse Agreement and transactions contemplated thereby.

O.      The Debtors have demonstrated a compelling and sound business justification for the Court to enter this Order and thereby: (i) approve of the Bidding Procedures; (ii) authorize the Expense Reimbursement, under the terms and conditions set forth in the Stalking Horse Agreement; (iii) set the dates of the Bid Deadline, Auction (if needed), Sale Hearing, and other deadlines set forth in the Bidding Procedures; (iv) approve the proposed noticing procedures (the "Noticing Procedures") and the forms of notice; and (v) approve the Assumption and Assignment Procedures and the forms of relevant notice.  Such compelling and sound business justification, which was set forth in the Motion, the First Day Declaration, and on the record at the Bidding Procedures Hearing, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      All objections to the relief requested in the Motion, the filing and service of the proposed bidding procedures order approving the relief in the Motion, and the attachments to such order, that have not been withdrawn, waived, or settled as announced to the Court at any hearing on the Motion or by stipulation filed with the Court, are hereby overruled in all respects on the merits.

3.      The Bidding Procedures are hereby approved in their entirety, are incorporated herein by reference, and shall govern the bids and proceedings related to the sale of the Assets and the Auction. The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being the Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order. The Debtors are authorized to take all actions necessary or appropriate to implement the Bidding Procedures.

**Bidding Procedures**

**I.      Approval of Dates and Deadlines Requested in the Motion.**

4.      **Bid Deadline**.  **December [9], 2024, at 12:00 noon  (prevailing Eastern Time)**, is the deadline by which bids for the Assets (as well as the deposit and all other documentation required under the Bidding Procedures for Qualified Bidders) must be submitted in accordance with the terms of the Bidding Procedures.

5.      **Auction**.  In the event the Debtors receive, on or before the Bid Deadline, one or more Qualified Bids in addition to the Stalking Horse Bid, an Auction shall be conducted on **December [11], at 10:00 a.m. (prevailing Eastern Time)** at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (or by videoconference to the live proceedings at this location) (the "Auction").  The Debtors shall provide notice of the date, time, and place of the Auction to the Qualified Bidders no later than one (1) day before such Auction, and will post notice of the date, time, and place of the Auction no later than one business day before such Auction on the website maintained by the Debtors' notice and claims agent, Epiq Corporate Restructuring, LLC, at  https://dm.epiq11.com/case/fluidtruck/info,  (the "Case Information Website"); provided, however that any creditor who wishes to physically attend the

Auction (other than (i) the parties set forth in the Bidding Procedures (including the Qualified Bidders), and (ii) such other parties the Debtors deem appropriate), shall provide at least two (2) days' notice of such attendance prior to the Auction by sending an email to counsel to the Debtors. Such email notice shall identify the name of each party and such party's connection to the Debtors. The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.

6.      As soon as is reasonably practicable following the conclusion of the Auction, if held, the Debtors shall file with the Court a notice of the Auction results and serve such notice by electronic mail (if known), or otherwise by overnight mail, on Counterparties and any other parties that have requested service pursuant to Bankruptcy Rule 2002.  Objections to the conduct of the Auction, the Successful Bidder, or, if applicable, the Sale to the Successful Bidder or the Sale to the Stalking Horse Bidder must be made at the Sale Hearing.

7.      **Sale Hearing**.  The Sale Hearing shall be held in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom No. 6, Wilmington, Delaware 19801, on **December [13], 2024 at ___ _.m. (prevailing Eastern Time)** or such other date and time that the Court may later direct or as agreed upon by the Debtors, the Successful Bidder(s), and the DIP Lender; *provided*, *however*, that the Sale Hearing may be adjourned by the Debtors, from time to time, without further notice to creditors or parties in interest other than by filing a notice on the Court's docket or by announcement of any continued hearing in open Court or on the Court's docket; *provided*, *further*, that no such adjournment shall impair the rights, if any, of the Stalking Horse Bidder under the Stalking Horse Agreement or the DIP Lender under the DIP Order (including with respect to the Milestones set forth in the DIP Documents (as defined in the DIP Order)).

## II.    Sale Objections.

8.    Objections to the Sale of the Assets, if any, must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) be filed with the Court by no later than **December [6], 2024, at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline") and (d) be served on: (1) proposed counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones (ljones@pszjlaw.com); (2) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801, Attn: Attn: Fang Bu (fang.bu@usdoj.gov) and Joseph Cudia (joseph.cudia@usdoj.gov); (3) counsel to the Lenders: (a) (i) Sheppard Mullin Richter & Hampton LLP, Four Embarcadero Center, Seventeenth Floor, San Francisco, California 94111, Attn.: Ori Katz (okatz@sheppardmullin.com) and Robert K. Sahyan (rsahyan@sheppardmullin.com) and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn.: Curtis S. Miller (cmiller@morrisnichols.com) and Echo Yi Qian (eqian@morrisnichols.com), (b)(i) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0060, Attn.: Michael Luskin (michael.luskin@morganlewis.com), (ii) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110-1726, Attn.: Michael K. Gocksch (michael.gocksch@morganlewis.com) and (iii) Morgan, Lewis & Bockius LLP, 1201 North Market Street, Suite 2201, Wilmington, Delaware 19801, Attn.: Jody C. Barillare (jody.barillare@morganlewis.com); (4) counsel to the Stalking Horse Bidder, Bennett Tueller Johnson & Deere, LLC, 3165 East Millrock Drive, Suite 500, Salt Lake City, UT 84121, Attn: Brent Hawkins (bhawkins@btjd.com); (5) counsel to any Committee, and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").  The failure of any objecting person or entity to timely file an objection prior to the Sale

Objection Deadline shall be a bar to the assertion at the Sale Hearing or thereafter of any objection to the relief requested by the Debtors, or the consummation and performance of the Sale of the Assets to the Successful Bidder, including the Sale of the Assets free and clear of all liens, claims, interests, and other encumbrances (with the same to attach to the cash proceeds of the Sale to the same extent and with the same order of priority, validity, force and effect which they previously had against the Assets, subject to the rights and defenses of the Debtors and the Debtors' estates with respect thereto), and the Debtors' assumption and assignment of the Potential Assumed Contracts to the Successful Bidder.

**III.   Auction, Bidding Procedures, and Related Relief.**

9.      The Bidding Procedures, substantially in the form attached hereto as **Exhibit 1**, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to the sale of the Assets.  Any party desiring to submit a Bid for the Assets shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

10.     **Noticing Procedures**.  The Noticing Procedures as set forth in this Order and the Motion, including the form of Sale Notice attached hereto as **Exhibit 2**, are hereby approved. Within three (3) business days after entry of this Order,  the Debtors shall serve the Sale Notice by email (where known) and by first-class mail upon: (a) the U.S. Trustee; (b) counsel to Lenders; (c) counsel to the Stalking Horse Bidder; (d) all known creditors of the Debtors (for whom identifying information and addresses are available to the Debtors); (e) the Internal Revenue Service; (f) all applicable federal, state, and local taxing authorities; (g) all persons and entities known by the Debtors to have expressed an interest to the Debtors in the Assets; (h) all persons and entities

known by the Debtors to have asserted any lien, claim, interest or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors); (i) Counterparties to Potential Assumed Contracts; (j) any governmental authority known to have a claim against the Debtors in the Chapter 11 Cases; (k) the United States Securities and Exchange Commission; (l) the United States Attorney's Office for the District of Delaware; (m) United States Attorney General's Office for the District of Delaware; (n) the Office of the Attorney General and the Secretary of State in each state in which the Debtors operate; (o) all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and (p) all other parties as directed by the Court (collectively, the "Sale Notice Parties").  On or about the same date or as soon as reasonably practicable, the Debtors, in their discretion, shall publish the Sale Notice on the Case Information Website and may publish a notice substantially similar to the Sale Notice in either the national edition of *USA Today* or such publication with similar national circulation.  Service of the Sale Notice on the Sale Notice Parties and publication thereof in the manner described in this Order constitutes good and sufficient notice of the Auction and the Sale Hearing.  No other or further notice is required.

11.    **Cancellation or Adjournment of Auction**.  If the Debtors do not receive any Qualified Bids (other than the Stalking Horse Bid):  (a) the Debtors shall cancel the Auction and will not hold the Auction; (b) the Stalking Horse Bidder will be deemed the Successful Bidder for the Assets; and (c) the Debtors shall be authorized to seek approval of the Stalking Horse Agreement for the Assets at the Sale Hearing; *provided, however*, that the Debtors may, in their discretion, open the Auction solely for the purpose of reflecting on the record that no other Qualified Bids were received other than the Stalking Horse Bid for the Assets.

12.    The Debtors reserve the right, in their business judgment, to adjourn the Auction one or more times, to, among other things, (i) facilitate discussions between the Debtors and

Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Transaction at the prevailing Overbid amount.

13.     **Stalking Horse; Bid Protections**.  KingBee Rentals, LLC is approved as the Stalking Horse Bidder for the Assets, pursuant to the terms of the Stalking Horse Agreement.

14.     The Stalking Horse Bid shall be subject to higher or otherwise better Qualified Bids, in accordance with the terms of the Bidding Procedures; provided that approval of the Stalking Horse Agreement is subject to entry of the Sale Order.

15.     The Stalking Horse Bidder is a Qualified Bidder, and the Stalking Horse Bid as set forth in the Stalking Horse Agreement is a Qualified Bid.

16.     No person or entity, other than the Stalking Horse Bidder, shall, with respect to any bid for the Assets, be entitled to any expense reimbursement, breakup fees, "topping" fee, termination fee, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with the Court any request for expense reimbursement, breakup fees, "topping" fee, termination fee, or other similar fee or payment of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

17.     The Expense Reimbursement is approved on the terms set forth in the Stalking Horse Agreement.  Pursuant to sections 105, 363, 364, 503 and 507 of the Bankruptcy Code, the Debtors are authorized to pay the Expense Reimbursement to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement without further order of the Court. The Expense Reimbursement: (i) shall be deemed an actual and necessary cost and expense of

preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code; (ii) shall survive the termination of the Stalking Horse Agreement and dismissal or conversion of the Chapter 11 Cases, and (iii) shall be paid from the proceeds of the Sale of the Assets to the Successful Bidder if the Successful Bidder is not the Stalking Horse Bidder.

**Approval of the Assumption and Assignment Procedures for Bidding Procedures**

18.     The Assumption and Assignment Procedures set forth in the Motion and herein are hereby approved.  The Potential Assumption and Assignment Notice substantially in the form attached to this Order as **Exhibit 3** is approved.  No other or further notice is required.

19.     No later than two (2) business days after entry of this Order, the Debtors shall file with the Court, and cause to be published on the Case Information Website, the Potential Assumption and Assignment Notice and [serve such notice (a) by overnight delivery service upon the Counterparties at the address set forth in the notice provision of the applicable Potential Assumed Contract (and their counsel, if known)], and (b) by first class mail, email, or fax upon the Objection Notice Parties.  The Potential Assumption and Assignment Notice shall notify the Counterparties that the applicable Contracts and Leases are subject to potential assumption and assignment and of the Debtors' proposed Cure Amounts (payable by the Stalking Horse Bidder pursuant to the Stalking Horse Agreement) relating to such Contracts and Leases.

20.     Any Counterparty may object to the proposed assumption or assignment of its Potential Assumed Contract, the Debtors' proposed Cure Amounts with respect to its Potential Assumed Contract, if any, or the ability of the Stalking Horse Bidder or any other potential bidder to provide adequate assurance of future performance (collectively, an "Assumption and Assignment Objection"). All Assumption and Assignment Objections must (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (c) state, with

specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount the Counterparty believes is required to cure defaults (as that concept is contemplated by section 365 of the Bankruptcy Code) under the relevant Potential Assumed Contract, (d) be filed by no later than **4:00 p.m. (prevailing Eastern Time) on December [6], 2024**.  and (e) be served on the Objection Notice Parties.

21.     If a Counterparty files a timely Assumption and Assignment Objection, the Court will hear and determine such objection at the Sale Hearing or such other date that the Debtors and the Successful Bidder shall determine (subject to the Court's calendar).

22.     If a Counterparty fails to file with the Court and serve a timely Assumption and Assignment Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Potential Assumed Contract; and, notwithstanding anything to the contrary in the Potential Assumed Contract, or any other document, the Cure Amounts set forth in the Potential Assumption and Assignment Notice shall be controlling and shall be the only amount necessary to cure outstanding defaults under the applicable Potential Assumed Contract under section 365(b) of the Bankruptcy Code arising out of or related to the Potential Assumed Contract following the assumption and assignment thereof, whether known or unknown, due or to become due, accrued, absolute, contingent or otherwise; and the Counterparty shall be forever barred from asserting any cure or other pre-assignment amounts in excess of the Cure Amount set forth in the applicable Potential Assumption and Assignment Notice with respect to such Potential Assumed Contract against the Debtors, the Successful Bidder or the property of any of them.

**Miscellaneous Provisions for Bidding Procedures**

23.      The failure to include or reference a particular provision of the Bidding Procedures specifically in this Order shall not diminish or impair the effectiveness or enforceability of such a provision.

24.      In the event of any inconsistencies between this Order and the Motion and/or the Bidding Procedures, this Order shall govern in all respects.

25.      This Order, and the claims granted hereunder in favor of the Stalking Horse Bidder on account of the Expense Reimbursement, shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

26.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

27.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

28.      To the extent the dates and deadlines herein are modified pursuant to the Bidding Procedures and such modification is inconsistent with the requirements of Local Rule 9006-1(b), such requirements shall be deemed satisfied.

29.      Notwithstanding any Bankruptcy Rule (including, without limitation, Bankruptcy Rule 6004(h), 6006(d), 7062 or 9014) or Local Rule that might otherwise delay the effectiveness of this Order, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

30.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

31.      All persons or entities (whether or not Qualified Bidders) that participate in the bidding process, including submitting a bid for any of the Assets during the sale process and/or Auction, shall be deemed to have knowingly and voluntarily (a) submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of the Assets, the Auction, and any Transaction, (b) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes related to the bidding process, or the Auction) to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution, and (c) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

32.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.  The Court has the authority to fashion appropriate relief, on an emergency basis or otherwise, for any violations of this Order or the Bidding Procedures.

**EXHIBIT 1**

**Bidding Procedures**

**EXHIBIT 2**

**Sale Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FLUID MARKET, INC., *et al.*,[1] | ) | Case No. 24-12363 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF SALE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On October 31, 2024 the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion For Entry Of Orders: (I)(A) Approving Bidding Procedures For The Sale Of Substantially All Of Debtors' Assets, (B) Authorizing The Debtors To Enter Into The Stalking Horse Agreement And To Provide Bid Protections Thereunder, (C) Scheduling An Auction And Approving The Form And Manner Of Notice Thereof, (D) Approving The Assumption And Assignment Procedures And (E) Scheduling A Sale Hearing And Approving The Form And Manner Of Notice Thereof; (II)(A) Approving The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of Liens, Claims, Interests And Encumbrances And (B) Approving The Assumption And Assignment Of Executory Contracts And Unexpired Leases; And (III) Granting Related Relief* [Docket No. ● ] (the "Combined Sale/Bidding Procedures Motion"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

The Combined Sale/Bidding Procedures Motion seeks entry of an order (a) approving Bidding Procedures[2] to be used in connection with the sale (the "Sale") of substantially all of the Debtors' assets (the "Assets") to Kingbee Rentals, LLC (the "Stalking Horse Bidder"), or alternatively, to such other bidder that submits the highest and best bid for the Assets at auction; (b) authorizing the Debtors to provide an expense reimbursement, as provided in the Stalking Horse Agreement (defined below); (c) scheduling an auction of the Assets and scheduling the hearing to approve the Sale; (d) approving the form and manner of notices of the proposed sale hearing; (e) authorizing procedures governing the potential assumption and assignment of the Debtors' certain executory contracts and unexpired leases in connection with the Sale, (each a "Potential Assumed Contract" and together, the "Potential Assumed Contracts"); and (f) approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under an applicable Potential Assumed Contract and (B) certain other information regarding the potential assumption and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Fluid Market Inc. (1365) and Fluid Fleet Services, LLC (5994).  The location of the Debtors' service address is:  3827 Lafayette St., Suite #149, Denver, CO 80205.

[2]     A capitalized term used but not defined herein shall have the meaning ascribed to it in the Bidding Procedures and Bidding Procedures Order, as applicable.

assignment of Potential Assumed Contracts in connection with the Sale; and (g) granting related relief.

The Debtors and the Stalking Horse Bidder have entered into that certain *Asset Purchase Agreement* dated October 30, 2024 (the "Stalking Horse Agreement"), pursuant to which the Debtors agreed to sell the Assets to the Stalking Horse Bidder free and clear of all liens, claims, encumbrances, and interests, subject to higher or better bids for the Assets to be determined at the Auction.

## I.    Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for becoming a Qualified Bidder and submitting a Qualified Bid, and any party interested in making an offer to purchase all or certain of the Assets must comply with the Bidding Procedures. Only Qualified Bids will be considered by the Debtors, in accordance with the Bidding Procedures.

**Any party interested in bidding on the Assets should contact, as soon as possible:**

(1) SSG Advisors, LLC, Attn: Michael S. Goodman (mgoodman@ssgca.com) and Matthew Arden (marden@ssgca.com);

(2) Paladin Management Group, LLC, Attn: T. Scott Avila (savila@paladinmgmt.com); or

(3) proposed counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, Attn: Laura Davis Jones, (ljones@pszjlaw.com).

To receive copies of the (i) Combined Sale/Bidding Procedures Motion, including any exhibits thereto, and/or a confidentiality agreement to become a Potential Bidder (as defined below), or (ii) a copy of the Stalking Horse Agreement, kindly submit a request by email to: proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, Attention: Laura Davis Jones (ljones@pszjlaw.com) or, alternatively, you may download such documents at https://dm.epiq11.com/case/fluidtruck/info.

## II.    Bidding Procedures and Auction

On [●], 2024, the Court entered the *Order (I) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially all of the Debtors' Assets, (II) Scheduling Bid Deadlines and the Auction, (III) Approving Form and Manner of Notice thereof, and (IV) Granting Related Relief* [Docket No. ●] (the "Bidding Procedures Order"), approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.

The Bidding Procedures Order also approved payment of the Expense Reimbursement potentially payable to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse Agreement and the Bidding Procedures Order.

The Bidding Procedures Order also establishes the following deadlines for the Assets:

1. **Bid Deadline.** The deadline to submit a Qualified Bid for the Assets is **December [9], 2024 at 12:00 noon (prevailing Eastern Time)**.

2. **Auction.** In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder and subject to the satisfaction of any further conditions set forth in the Bidding Procedures, the Debtors intend to conduct an Auction for the Assets. The Auction, if one is held, will commence on **December [11], 2024 at 10:00 a.m. (prevailing Eastern Time)** the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801 (or by videoconference to the live proceedings at this location). The Debtors shall provide notice of the date, time, and place of the Auction to the Qualified Bidders no later than one (1) day before such Auction, and will post notice of the date, time, and place of the Auction no later than one business day before such Auction on the website of the Debtors' notice and claims agent at https://dm.epiq11.com/case/fluidtruck/info. The Auction shall be only open to (i) Qualified Bidders, (ii) the Consultation Parties, and (iii) the members of the Committee, and each of their respective legal and financial advisors, provided, however that any creditor who wishes to physically attend the Auction (other than (i) the parties set forth in the Bidding Procedures (including the Qualified Bidders), and (ii) such other parties the Debtors deem appropriate, shall provide at least two (2) days' notice of such attendance prior to the Auction by sending an email to counsel to the Debtors. Such email notice shall identify the name of each party and such party's connection to the Debtors.

3. **Auction Objection and Sale Objection Deadlines**. The deadline to file an objection with the Court to the Sale Order, the Stalking Horse Bidder, or the Sale with the Stalking Horse Bidder (collectively, the "Sale Objections") is **December [6], 2024, at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"). If the Auction is held, the deadline to file an objection with the Court to the conduct of the Auction, the Successful Bidder, or the Sale to the Successful Bidder (collectively, the "Auction Objections") at the Sale Hearing (the "Auction Objection Deadline").

## III. Sale Hearing and Closing

A hearing (the "Sale Hearing") to approve and authorize the Sale to the Successful Bidder will be held before the Court on **December [13], 2024 at [●] (prevailing Eastern Time)** or such other date as determined by the Court. The Sale Hearing is being held to approve the highest or otherwise best offer received for the Assets . The Sale Hearing may be adjourned or rescheduled with prior notice filed on the docket of the Chapter 11 Cases or without prior notice by an announcement of the adjourned date at the Sale Hearing or on the Court's docket.

## IV.     Filing Objections

Sale Objections and Auction Objections, if any, must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) be filed with the Court by no later than **the Sale Objection Deadline or Auction Objection Deadline,** as applicable, and (d) be served on (1) proposed counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones (ljones@pszjlaw.com); (2) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801, Attn: Attn: Fang Bu (fang.bu@usdoj.gov) and Joseph Cudia (joseph.cudia@usdoj.gov); (3) counsel to the Lenders: (a) (i) Sheppard Mullin Richter & Hampton LLP, Four Embarcadero Center, Seventeenth Floor, San Francisco, California 94111, Attn.: Ori Katz (okatz@sheppardmullin.com) and Robert K. Sahyan (rsahyan@sheppardmullin.com) and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn.: Curtis S. Miller (cmiller@morrisnichols.com) and Echo Yi Qian (eqian@morrisnichols.com), (b)(i) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0060, Attn.: Michael Luskin (michael.luskin@morganlewis.com), (ii) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110-1726, Attn.: Michael K. Gocksch (michael.gocksch@morganlewis.com) and (iii) Morgan, Lewis & Bockius LLP, 1201 North Market Street, Suite 2201, Wilmington, Delaware 19801, Attn.: Jody C. Barillare (jody.barillare@morganlewis.com); (4) counsel to the Stalking Horse Bidder, Bennett Tueller Johnson & Deere, LLC, 3165 East Millrock Drive, Suite 500, Salt Lake City, UT 84121, Attn: Brent Hawkins (bhawkins@btjd.com); (5) counsel to any Committee, and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002. Auction Objections must also be served on counsel for the Successful Bidder.

## V.     Consequences of Failing to Timely Assert an Objection

*Any party who fails to make a timely Sale Objection on or before the Sale Objection Deadline in accordance with the Bidding Procedures Order and this Notice (i) shall be forever barred from asserting any Sale Objection, including, without limitation, with respect to the transfer of the Assets free and clear of all liens, claims, encumbrances and interests; and (ii) shall be deemed a consent to the Sale to the Stalking Horse Bidder and the other relief requested in the Sale Motion.*

*Any party who fails to make a timely Auction Objection on or before the Auction Objection Deadline in accordance with the Bidding Procedures Order and this Notice shall be forever barred from asserting any Auction Objection, including, without limitation with respect to the transfer of the Assets free and clear of all liens, claims, encumbrances and interests.*

**EXHIBIT 3**

**Form of Potential Assumption and Assignment Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FLUID MARKET, INC., *et al.*,[1] | ) | Case No. 24-12363 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNTS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On [●], 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion For Entry Of Orders: (I)(A) Approving Bidding Procedures For The Sale Of Substantially All Of Debtors' Assets, (B) Authorizing The Debtors To Enter Into The Stalking Horse Agreement And To Provide Bid Protections Thereunder, (C) Scheduling An Auction And Approving The Form And Manner Of Notice Thereof, (D) Approving The Assumption And Assignment Procedures And (E) Scheduling A Sale Hearing And Approving The Form And Manner Of Notice Thereof; (II)(A) Approving The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of Liens, Claims, Interests And Encumbrances And (B) Approving The Assumption And Assignment Of Executory Contracts And Unexpired Leases; And (III) Granting Related Relief* [Docket No. ● ] (the "Combined Sale/Bidding Procedures Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

On [●], 2024, the Court entered the *Order (I) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially all of the Debtors' Assets, (II) Scheduling Bid Deadlines and the Auction, (III) Approving Form and Manner of Notice thereof, and (IV) Granting Related Relief* [Docket No. ● ] (the "Bidding Procedures Order"), which, among other things, approved the (a) Bidding Procedures pursuant to which the Debtors will solicit and select the highest and otherwise best offer for the sale (the "Sale") of substantially all of the Debtors' Assets (the "Assets"), (c) the procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the Sale, including, without limitation, notice of proposed cure amounts (the "Assumption and Assignment Procedures"), and (d) scheduled the hearing (the "Sale Hearing")[2] to enter an order approving the Sale to either Kingbee Rentals, LLC (the "Stalking Horse Bidder") or such other Successful Bidder (the "Sale Order") for **[December 13], 2024 at [●] (prevailing Eastern Time)**.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Fluid Market Inc. (1365) and Fluid Fleet Services, LLC (5994).  The location of the Debtors' service address is:  3827 Lafayette St., Suite #149, Denver, CO 80205.

[2]     A capitalized term used but not defined herein shall have the meaning ascribed to it in the Bidding Procedures and Bidding Procedures Order, as applicable.

The Debtors and the Stalking Horse Bidder have entered into that certain *Asset Purchase Agreement* dated October 30, 2024 (the "Stalking Horse Agreement"), pursuant to which the Debtors agreed to sell the Assets to the Stalking Horse Bidder free and clear of all liens, claims, encumbrances, and interests, subject to higher or better bids for the Assets to be determined at an Auction.

The Combined Sale/Bidding Procedures Motion also provides for the potential assumption and assignment of certain of the Debtors' executory contracts and unexpired leases (each, a "Potential Assumed Contract" and collectively, the "Potential Assumed Contracts") either to the Stalking Horse Bidder or to such other party that submits the highest and best bid for the Assets at an Auction that is accepted by the Debtors and approved by the Bankruptcy Court (the "Successful Bidder").

A schedule listing the Potential Assumed Contracts that may potentially be assumed and assigned as part of the Sale of the Assets is attached hereto as Exhibit A (the "Contracts Schedule") and may also be viewed free of charge on the Debtors' case information website: https://dm.epiq11.com/case/fluidtruck/info (the "Case Management Website"). In addition, the Cure Amounts, if any, necessary for the assumption and assignment of such Contracts and Leases are also set forth on the Contracts Schedule. ***Each "Cure Amount" listed on the Contracts Schedule represents the entire amount payable by the Stalking Horse Bidder to cure all defaults (as that concept is contemplated by section 365 of the Bankruptcy Code) under the applicable Potential Assumed Contract listed on the Contracts Schedule to effectuate the assumption by the Debtors and the assignment to the Successful Bidder of such Potential Assumed Contract pursuant to section 365 of the Bankruptcy Code***.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A POTENTIAL ASSUMED CONTRACT THAT MAY BE ASSUMED AND ASSIGNED AS PART OF THE SALE.** ***The presence of a Potential Assumed Contract listed on Exhibit A attached hereto does not constitute an admission that such Potential Assumed Contract is an executory contract or unexpired lease or that such Potential Assumed Contract will be assumed and assigned as part of the Sale. The Debtors reserve all of their rights, claims and causes of action with respect to the Potential Assumed Contracts listed on Exhibit A attached hereto.***

IF YOU AGREE WITH THE PROPOSED CURE AMOUNTS LISTED IN **EXHIBIT A** WITH RESPECT TO YOUR POTENTIAL ASSUMED CONTRACT(S) AND OTHERWISE DO NOT OBJECT TO THE ASSUMPTION AND ASSIGNMENT OF YOUR POTENTIAL ASSUMED CONTRACT, YOU ARE NOT REQUIRED TO TAKE ANY FURTHER ACTION WITH RESPECT TO THE CURE AMOUNT.

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of a Potential Assumed Contract (an "Assumption and Assignment Objection"), including, without limitation, any objection relating to the Cure Amount or adequate assurance of the Stalking Horse Bidder's future ability to perform, must (a) be in writing, (b)

comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount that the Counterparty believes is required to cure defaults under the relevant Potential Assumed Contract, (d) be filed by no later than **4:00 p.m. (prevailing Eastern Time) on December [6], 2024** and (e) be served on (1) proposed counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones (ljones@pszjlaw.com); (2) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware, 19801, Attn: Attn: Fang Bu (fang.bu@usdoj.gov) and Joseph Cudia (joseph.cudia@usdoj.gov); (3) counsel to the Lenders: (a) (i) Sheppard Mullin Richter & Hampton LLP, Four Embarcadero Center, Seventeenth Floor, San Francisco, California 94111, Attn.: Ori Katz (okatz@sheppardmullin.com) and Robert K. Sahyan (rsahyan@sheppardmullin.com) and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, Wilmington, Delaware 19801, Attn.: Curtis S. Miller (cmiller@morrisnichols.com) and Echo Yi Qian (eqian@morrisnichols.com), (b)(i) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0060, Attn.: Michael Luskin (michael.luskin@morganlewis.com), (ii) Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110-1726, Attn.: Michael K. Gocksch (michael.gocksch@morganlewis.com) and (iii) Morgan, Lewis & Bockius LLP, 1201 North Market Street, Suite 2201, Wilmington, Delaware 19801, Attn.: Jody C. Barillare (jody.barillare@morganlewis.com); (4) counsel to the Stalking Horse Bidder, Bennett Tueller Johnson & Deere, LLC, 3165 East Millrock Drive, Suite 500, Salt Lake City, UT 84121, Attn: Brent Hawkins (bhawkins@btjd.com); and (5) counsel to any Committee, (collectively, the "Assumption and Assignment Objection Notice Parties"). In the event that any previously-stated Cure Amount are modified, the Debtors will promptly serve a Supplemental Assumption and Assignment Notice, by overnight mail and, if known, e-mail, on the applicable Counterparty.

If, following the Auction, the Stalking Horse Bidder is not the Successful Bidder, then the Debtors will (a) file the Notice of Auction Results, which will, among other things, include the identity of the Successful Bidder, (b) post such notice on the Case Management Website, and (c) serve such notice on each Counterparty then identified on the Contracts Schedule. Each such Counterparty will then have an opportunity to object to such Successful Bidder's ability to provide adequate assurance of future performance with respect to the Counterparty's Potential Assumed Contract (a "Post-Auction Objection"). Any Post-Auction Objection may be raised at the Sale Hearing; *provided*, *however*, that any objection to either (i) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance with respect to any Potential Assumed Contract or (ii) to any Cure Amounts that must be cured by either the Stalking Horse Bidder or any Successful Bidder that is not the Stalking Horse Bidder with respect to the Potential Assumed Contract, must be filed by **4:00 p.m. (prevailing Eastern Time) on December [6], 2024**.

The Court will hear and determine any Assumption and Assignment Objections and Post-Auction Objections at the Sale Hearing or such other date that the Debtors and the Successful Bidder shall determine (subject to the Court's calendar).

Any Assumption and Assignment Objection shall not constitute an objection to any of the other relief requested in the Sale Motion to be approved by the Sale Order (*e.g.*, the sale of the Stalking Horse Assets by the Debtors to the Stalking Horse Bidder or Successful Bidder(s), as applicable, free and clear of all liens, claims, encumbrances, and interest). Parties wishing to object to the other relief requested in the Sale/Bidding Procedures Motion (excluding the relief provided in the Bidding Procedures Order) must timely file and serve a separate objection, stating with particularity such party's grounds for objection, in accordance with the objection procedures approved and set forth in the Bidding Procedures Order.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

*UNLESS YOU FILE AN OBJECTION TO THE CURE AMOUNT AND/OR THE ASSUMPTION OR ASSIGNMENT OF YOUR POTENTIAL ASSUMED CONTRACT IN ACCORDANCE WITH THE INSTRUCTIONS AND DEADLINES SET FORTH HEREIN, YOU SHALL BE (A) BARRED FROM OBJECTING TO THE CURE AMOUNT SET FORTH ON EXHIBIT A, (B) ESTOPPED FROM ASSERTING OR CLAIMING ANY CURE AMOUNT AGAINST THE DEBTORS, THE STALKING HORSE BIDDER OR SUCH OTHER SUCCESSFUL BIDDER THAT IS GREATER THAN THE CURE AMOUNT SET FORTH ON EXHIBIT A, AND (C) DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND/OR ASSIGNMENT OF YOUR POTENTIAL ASSUMED CONTRACT.*

Dated:  [●], 2024                              PACHULSKI STANG ZIEHL & JONES LLP

                                                              */s/*
                                                              Laura Davis Jones (DE Bar No. 2436)
                                                              David M. Bertenthal (CA Bar No. 167624)
                                                              Timothy P. Cairns (DE Bar No. 4228)
                                                              919 North Market Street, 17th Floor
                                                              P.O. Box 8705
                                                              Wilmington, Delaware  19899 (Courier 19801)
                                                              Telephone:  (302) 652-4100
                                                              Facsimile:  (302) 652-4400
                                                              Email:  ljones@pszjlaw.com
                                                                          dbertenthal@pszjlaw.com
                                                                          tcairns@pszjlaw.com

                                                              *Proposed Counsel for the Debtors and Debtors in Possession*

# EXHIBIT A

Schedule of Potential Assumed Contracts

| No. | Contract/Lease Party | Contract Counterparty | Contract/Lease Title | Date of Entry | Cure Amount |
|-----|---------------------|----------------------|---------------------|---------------|-------------|
| 1. | [X] | [X] | [X] | [X] | $[X] |

**<u>EXHIBIT B</u>**

**FORM OF SALE ORDER**

**EXHIBIT B**

**FORM OF SALE ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FLUID MARKET INC., *et al.*,[1] | ) | Case No. 24-1263(CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER (I) APPROVING THE SALE OF ASSETS TO KINGBEE RENTALS LLC FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF**

Upon the *Debtors' Motion for Entry of Orders: (I)(A) Approving Bidding Procedures for the Sale of Substantially all of Debtors' Assets, (B) Authorizing the Debtors to Enter Into the Stalking Horse Agreement and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving the Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief*, Docket No. [●] (the "Sale Motion"),[2] filed by the debtors in the above-captioned chapter 11 cases (collectively, the "Debtors"); and the Court having previously entered the *Order (I) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially all of the*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Fluid Market Inc. (1365) and Fluid Fleet Services, LLC (5994).  The location of the Debtors' service address is:  3827 Lafayette St., Suite #149, Denver, CO 80205.

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Sale Motion, the APA, the Bidding Procedures, and the Bidding Procedures Order (each, as defined herein), as applicable.

*Debtors' Assets, (II) Scheduling Bid Deadlines and the Auction, (III) Approving Form and Manner of Notice Thereof, and (IV) Granted Related Relief,* Docket No. [●] (the "<u>Bidding Procedures Order</u>" and the bidding procedures attached as [Exhibit 1] to the Bidding Procedures Order, the "<u>Bidding Procedures</u>") following the hearing on [•], 2024 (the "<u>Bidding Procedures Hearing</u>"); and Kingbee Rentals LLC (the "<u>Purchaser</u>") having submitted the highest or best bid for the Purchased Assets, as defined in that certain *Asset Purchase Agreement*, dated as of October 30, 2024, by and among the Purchaser and the Debtors, each as a seller (together, the "<u>Sellers</u>") (as amended, supplemented or otherwise modified from time to time, the "<u>APA</u>"), a copy of which is attached hereto as **<u>Exhibit 1</u>**; and the auction having taken place on December [•], 2024 (the "<u>Auction</u>") in accordance with the Bidding Procedures Order; and the Purchaser having been chosen as the Successful Bidder for the Purchased Assets; and the Court having conducted a hearing to consider certain relief requested in the Sale Motion on November [•], 2024 (the "<u>Sale Hearing</u>"), at which time all objecting and interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered: (i) the Sale Motion; [(ii) *Declarations in Support of the Sale*;] (iii) the APA; (iv) the Bidding Procedures; (v) the Bidding Procedures Order; (vi) the record of the Bidding Procedures Hearing; (vii) the record of the Auction; (viii) objections, if any, filed with the Court (each, an "<u>Objection</u>" and, collectively with any informal objections received by the Debtors, the "<u>Objections</u>"); and (ix) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and after due deliberation the Court having determined that the legal and factual bases set forth in the Sale Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion and approval of the APA are in the best interest of the Debtors, their estates

and their creditors, and the Debtors having demonstrated good, sufficient and sound business justifications for the relief granted herein;

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.     <u>Jurisdiction and Venue</u>.  This Court has jurisdiction to consider the Sale Motion and the relief requested therein pursuant to 28 U.S.C.  §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C.  § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

B.     <u>Final Order</u>.  This Order constitutes a final order within the meaning of 28 U.S.C.  § 158(a).  Notwithstanding Bankruptcy Rules 6004(j) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, expressly directs that this Sale Order be effective immediately upon entry, and waives any stay of execution or implementation of this Sale Order.

C.     <u>Statutory Predicates</u>.  The statutory and other legal predicates for the relief sought in the Sale Motion and granted herein are sections 105, 363 and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6004, 6006, 9007 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware

---

[3]     The findings and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court during the Sale Hearing.

(the "Local Rules").

D.    Notice and Opportunity to Be Heard.  The Debtors have provided proper, timely, adequate and sufficient notice of, and a fair and reasonable opportunity to object and be heard with respect to, the Sale Motion, the Bidding Procedures, the Bidding Procedures Order, the Auction, the Sale Hearing, the sale of the Purchased Assets pursuant to the APA (the "Transaction") free and clear of any Interests (as defined below) (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order) within the meaning of section 363(f) of the Bankruptcy Code, the *[Notice of Successful Bidder]* [Docket No. [•]], and the assumption and assignment of the executory contracts and unexpired leases to be assumed and assigned to the Purchaser at Closing pursuant to this Order and the terms of the APA (collectively, the "Purchased Contracts"), in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014, Local Rules 2002-1, 6004-1 and 9006-1 and the Bidding Procedures Order, to all persons and entities entitled to such notice, including the Notice Parties and all other persons and entities as directed by the Court.  Such notice was good, sufficient and appropriate under the circumstances, including but not limited to providing each counterparty a full and fair opportunity to object to the assumption and assignment of its Purchased Contract and its proposed Cure Amounts; and no other or further notice of any of the foregoing is required.  The Debtors published the Sale Motion, Bidding Procedures Order, the Bidding Procedures, the APA (and all exhibits and schedules thereto), the Sale Notice, the Assumption and Assignment Notice, and certain other documents relevant to the Sale on the case website.

E.    Sound Business Purpose.  The Debtors have demonstrated good, sufficient and sound business purposes and justifications for approval of the Sale Motion.  The approval of and

entry into the Transaction, the APA and any ancillary agreements thereto (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value and are beneficial to the Debtors' estates, and are in the best interests of the Debtors, their estates and their stakeholders; and (iii) are reasonable and appropriate under the circumstances. Business justifications for entry into the Transaction and the APA include, without limitation, the following: (i) the APA constitutes the highest or best offer received for the Purchased Assets; (ii) the APA presents the best opportunity to maximize the value of the Purchased Assets; (iii) failure to consummate the Transaction expeditiously could materially diminish creditor recoveries; and (iv) the immediate consummation of the Transaction is necessary to maximize the value of the Debtors' estates.

F.    <u>Marketing Process</u>.    As demonstrated by the [Declarations] and testimony adduced at the Bidding Procedures Hearing and the Sale Hearing, the Debtors and their advisors thoroughly marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Sale Motion and Bidding Procedures Order. Based upon the record of these proceedings all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

G.    <u>Compliance with Bidding Procedures</u>. The Debtors conducted an open and fair sale process. The sale process was non-collusive in all respects, and the Debtors (a) afforded all interested parties a full, fair, and reasonable opportunity to qualify as a Qualified Bidder and make an offer to purchase the Purchased Assets, (b) provided Potential Bidders, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets or any of the Debtors' assets or business, and (c) appropriately considered all

Bids that were duly submitted in accordance with the Bidding Procedures.  The Debtors, the Purchaser, and their respective counsel and other advisors have complied with the Bidding Procedures and the Bidding Procedures Order. The Purchaser is the designated Successful Bidder, and the APA is designated the Successful Bid for the Purchased Assets enumerated therein, in each case, in accordance with the Bidding Procedures Order. The Purchaser and its professionals have complied in all material respects with the Bidding Procedures Order, the Bidding Procedures, the Assumption and Assignment Procedures, and all other applicable orders of this Court in negotiating and entering into the APA, and the Transaction and the APA likewise comply with the Bidding Procedures Order and all other applicable orders of this Court.

H.    <u>Highest or Best Value</u>.  Consistent with their fiduciary duties, the Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Sale Transaction and the performance of their obligations under the APA, including, but not limited to, the fact that (a) the total consideration provided by the Purchaser for the Purchased Assets as reflected in the APA is the highest or otherwise best offer for the Purchased Assets; (b) the consideration provided by the Purchaser under the APA will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, including a separate liquidation of the Purchased Assets; (c) there is a substantial risk of depreciation of the value of the Purchased Assets if the Transaction is not consummated promptly; (d) the Transaction contemplated by the APA presents the best opportunity to maximize the value of the Debtors' estates; and (e) unless the Transaction is concluded expeditiously as provided for in the Sale Motion and pursuant to the APA, creditor recoveries will be diminished.

I.    <u>Fair Consideration</u>.  The consideration the Purchaser will pay under the APA constitutes (i) fair and reasonable consideration for the Purchased Assets; and (ii) reasonably

equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act and other laws of the United States, any state, territory, possession thereof or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

J.      Free and Clear Sale.  The Debtors may sell the Purchased Assets free and clear of all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, including the DIP Liens and DIP Obligations (each as defined in the Final DIP Order)), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Any holders of Interests that objected to the Transaction or the Sale Motion and that have an Interest in the Purchased Assets could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Interest pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) and, therefore, are adequately protected by having their Interests on the Purchased Assets attach solely to the proceeds of the Transaction ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with the same validity, force and effect that such Interests had prior to the consummation of the Transaction, subject to any rights, claims or defenses of the Debtors and their estates.  Any Interest holders that did not object, or that withdrew their objections, to the Sale Motion or the Transaction, are deemed to have consented to the sale of the Purchased Assets free and clear of their respective Interests on the Purchased Assets pursuant to section 363(f)(2) of the Bankruptcy Code.

K.      Purchaser Reliance on Free and Clear Sale.  The Purchaser would not have entered into the APA and would not consummate the Transaction or the other transactions contemplated thereby if the sale of the Purchased Assets were not free and clear of all Interests (other than any

Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order),

or if the Purchaser would, or in the future could, be liable for any such Interests.  A sale of the

Purchased Assets other than one free and clear of all Interests would adversely impact the

Debtors, their estates and their creditors, and would yield substantially less value for the

Purchased Assets and the Debtors' estates, with less certainty than provided by the Transaction.

The total consideration to be provided under the APA reflects the Purchaser's reliance on this

Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to,

and possession of, the Purchased Assets free and clear of all Interests (other than any Assumed

Liabilities expressly assumed under, or expressly permitted by, the APA or this Order),

including, without limitation, to the greatest extent permitted by applicable law, any potential

derivative, vicarious, transferee or successor liability Interests.

L.      "Interests".  As used in this Order, the term "Interest" includes, in each case to the

extent against or with respect to any of the Debtors or in, on, or against or with respect to any of

the Purchased Assets: liens (as defined in section 101(37) of the Bankruptcy Code), claims (as

defined in section 101(5) of the Bankruptcy Code), debts (as defined in section 101(12) of the

Bankruptcy Code), encumbrances, obligations, Liabilities, demands, guarantees, actions, suits,

defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual

commitments, rights, or interests of any kind or nature whatsoever, whether known or unknown,

inchoate or not, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or

unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent,

liquidated or unliquidated, matured or unmatured, material or non-material, disputed or

undisputed, whether arising prior to or subsequent to the commencement of these chapter 11

cases, and whether imposed by agreement, understanding, law, equity, or otherwise, including,

but not limited to, (i) mortgages, deeds of trust, pledges, charges, security interests, hypothecations, encumbrances, easements, servitudes, leases, subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, rights of use or possession, subleases, leases, conditional sale arrangements, or any similar rights, (ii) all claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise; (iii) all debts, liabilities, obligations, contractual or tort rights and claims, and labor, employment, and pension claims; (iv) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors', the Purchaser's interest in the Purchased Assets, or any similar rights; (v) any rights under labor or employment agreements; (vi) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA"), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupation disease, or unemployment or

temporary disability claims, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, each as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws of similar effect; (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the assets or businesses of the Debtors prior to the Closing; (x) any unexpired and executory or non-executory contract or unexpired lease to which a Debtor is a party that is not an Assumed Contract; (xi) any environmental liabilities, debts, claims, fines, penalties, or obligations arising from conditions, facts, or circumstances first existing or occurring prior to Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties, or obligations arising under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), or any other environmental, health, and safety laws; and (xii) Interests arising under or in connection

with any acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors, Affiliates, or Subsidiaries, including, but not limited to, Interests arising under any theory, law, or doctrines of successor, transferee, or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable Law or otherwise.  As used in this Order, the term "Interest" shall not include the DIP Liens and DIP Obligations.

M.    No Successor or Other Derivative Liability.  By consummating the Transaction pursuant to the APA, neither the Purchaser is a mere continuation of any of the Debtors or any Debtor's estate, and there is no continuity of enterprise or otherwise or common identity between the Purchaser, on the one hand, and any Debtor, on the other.  The Purchaser is not holding itself out as a continuation of any Debtor.  The Purchaser is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Transaction does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors or any of the Debtors' estates.  Neither the Purchaser, nor its Affiliates or their respective predecessors, designees, successors, assigns, members, partners, principals, officers, directors, or direct or indirect shareholders (or the equivalent thereof), in their capacities as such (collectively, the "Purchaser Related Persons") shall assume or in any way be responsible for any obligation or liability of any Debtor (or any affiliate of any Debtor) or any Debtor's estate, except as expressly provided in the APA.  The sale and transfer of the Purchased Assets to the Purchaser, including the assumption by the Debtors and assignment, transfer and/or sale to the Purchaser of any of the Purchased Contracts, will not subject the Purchaser or any Purchaser Related Persons to any liability with respect to the operation of the Debtors' businesses prior to the Closing or by reason of such

transfer, except that, upon the Closing, the Purchaser shall remain liable for the applicable Assumed Liabilities.

N.      Arm's-Length Sale. The sale process engaged in by the Debtors and the Purchaser, including, without limitation, the Auction, was conducted in accordance with the Bidding Procedures and the Bidding Procedures Order.  The APA was negotiated, proposed, and entered into by the Sellers and the Purchaser in good faith, without collusion of any kind, and from arm's-length bargaining positions, and is substantively and procedurally fair to all parties in interest. The Debtors and the Purchaser and their respective advisors have complied, in good faith, in all material respects with the Bidding Procedures Order and the Bidding Procedures.  The Debtors and their management, board of directors, employees, agents, advisors, and representatives, and the Purchaser and its employees, agents, advisors and representatives, each acted in good faith and without collusion or fraud of any kind.  The Purchaser subjected its bid to competitive bidding in accordance with the Bidding Procedures and was designated the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures and the Bidding Procedures Order. All payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transaction have been disclosed.  The form and total consideration to be realized by the Debtors under the APA constitutes fair and reasonably equivalent value, full and adequate consideration, and reasonable market value for the Purchased Assets.

O.      Good Faith.  The Debtors, the Purchaser and their respective counsel and other advisors have negotiated and entered into the APA and each of the transactions contemplated thereby in good faith, without collusion, from arm's-length bargaining position, and substantively and procedurally fair to all entities.  The Purchaser is a good faith purchaser and is acting in good

faith within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all of the protections afforded thereby. The Debtors were free to deal with any other party interested in acquiring some or all of the Purchased Assets. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Transaction, the APA, or any of the transactions contemplated thereby to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) of the Bankruptcy Code. The Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction. The Purchaser has not acted in a collusive manner with any person or entity. All payments to be made or caused to be made by the Purchaser and all agreements entered into by the Purchaser and the Debtors under the APA in connection with the Transaction have been disclosed and are appropriate. The APA was not entered into, and the Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors under laws of the United States, any state, territory, possession thereof or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser have entered into the APA or are consummating the Transaction with any fraudulent or otherwise improper purpose.

P.    <u>No Collusion</u>. The APA was not controlled by an agreement between potential bidders within the meaning of section 363(n) of the Bankruptcy Code. The Debtors and the Purchaser have not engaged in any conduct that would cause or permit the APA or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. Neither the Debtors nor the Purchaser has entered into the APA or is consummating the Sale with any fraudulent or otherwise improper purpose.

Q.    <u>Assumption and Assignment of Purchased Contracts</u>.    The assumption and assignment of the Purchased Contracts is an integral part of the Transaction, is in the best interests of the Debtors and their estates and represents the valid and reasonable exercise of the Debtors' sound business judgment.    Specifically, the assumption and assignment of the Purchased Contracts (i) is necessary to sell the Purchased Assets to the Purchaser as contemplated by the APA, (ii) allows the Debtors to sell the Purchased Assets to the Purchaser as a going concern, (iii) limits the losses suffered by counterparties to the Purchased Contracts, and (iv) maximizes the recoveries of other creditors of the Debtors by eliminating claims against the Debtors' estates that would arise from the Debtors' rejection of the Purchased Contracts. Any counterparty to any Purchased Contract that has not actually filed with the Court and served on the Objection Notice Parties (as defined in the Bidding Procedures) an Assumption and Assignment Objection, as of the date specified in the Bidding Procedures Order (as such date may have been modified or extended in accordance with the terms of the Bidding Procedures Order) is deemed to have consented to the assumption and assignment of the Contract, and to the applicable Cure Amounts.    Such counterparty shall forever be barred and estopped from objecting to the Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist.

R.    <u>Compliance with Section 365 of the Bankruptcy Code</u>. The Debtors have met all requirements of section 365(b) of the Bankruptcy Code with respect to the assumption and assignment of each of the Purchased Contracts.    The Debtors and Purchaser have provided adequate assurance (within the meaning of section 365(b)(1) of the Bankruptcy Code) of cure of any default existing under any of the Purchased Contracts on or before the Closing Date.    The Purchaser has demonstrated adequate assurance of future performance of and under the

Purchased Contracts within the meaning of sections 365(b) and 365(f)(2) of the Bankruptcy Code. Pursuant to section 365(f) of the Bankruptcy Code, the Purchased Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provision in the Purchased Contracts or other restrictions prohibiting their assignment or transfer.

S.     Property of the Estates.  The Purchased Assets constitute property of the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

T.     Validity of the Transaction.  The consummation of the Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(k), 363(m), 365(b) and 365(f) and all of the applicable requirements of such sections have been complied with in all respects in connection with the Transaction.  As of the Closing, the sale and assignment of the Purchased Assets and the Purchased Contracts to the Purchaser will be a legal, valid and effective transfer of the Purchased Assets and the Purchased Contracts, and will vest the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets and the Purchased Contracts free and clear of all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order).  The Debtors have full corporate or other applicable authority to execute the APA and all other documents contemplated thereby, and the Transaction has been duly and validly authorized by all necessary corporate action of the Debtors.  Upon entry of this Order, other than any consents identified in the APA, no consent or approval from any other person, entity or legal authority is required to consummate the Transaction.

U.     No Sub Rosa Plan.  Neither the Transaction nor the APA impermissibly restructures the rights of any of the Debtors' creditors or impermissibly dictates the terms of a

liquidating plan of reorganization of the Debtors.   Neither the Transaction nor the APA constitutes a *sub rosa* or *de facto* plan of reorganization or liquidation.

V.    <u>No Stay of Order</u>.  Time is of the essence to implement the APA and consummate the Transaction.  The Transaction must be approved and consummated promptly in order to preserve the value of the Purchased Assets and to maximize the value to the Debtors, their estates, their creditors and all other parties in interest and to ensure the Debtors' compliance with their obligations under their post-petition financing agreements.  The Debtors have demonstrated compelling circumstances and sound business justifications for the immediate approval and consummation of the Transaction as contemplated by the APA.  Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), 7062 or any applicable provisions of the Local Rules, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    <u>Sale Motion Granted</u>.  The Sale Motion and the relief requested therein (to the extent not previously granted by the Court pursuant to the Bidding Procedures Order or otherwise) is GRANTED and approved as set forth herein.  The Purchaser is hereby approved as the Successful Bidder under the Bidding Procedures Order.

2.    <u>Objections Overruled</u>.  Unless otherwise provided for herein or in the Bidding Procedures Order, any Objections to or reservation of rights against the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled are hereby OVERRULED on the merits with prejudice.  All persons and entities that failed to timely object thereto are

deemed to consent to the relief sought therein.  All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

3.      <u>Transaction Approved</u>.  The APA and all transactions contemplated thereby, including the Transaction, are hereby APPROVED.  The Debtors are authorized to enter into the APA (and all ancillary documents), all of the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects, including, without limitation, any amendment to the APA that the Debtors and the Purchaser determines is necessary or desirable in connection with the Transaction.  The consummation of the Transaction is hereby approved and authorized under sections 363(b) and 365 of the Bankruptcy Code.

4.      <u>Prior Findings of Fact and Conclusions of Law</u>.  The Court's findings of fact and conclusions of law in the Bidding Procedures Order, including the record of the Bidding Procedures Hearing, and the findings of fact recited above are incorporated herein by reference. In the event that the terms of this Order and the Bidding Procedures Order are in conflict, this Order will control.

5.      <u>Adequate and Reasonable Notice.</u>  Notice of the Bidding Procedures, the Auction, the Transaction, the assumption and assignment of the Purchased Contracts pursuant to the APA, the Cure Amounts, the Sale Hearing, and all deadlines related thereto was good, sufficient, and appropriate under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

6.      <u>Debtors' Performance Authorized</u>.  The Debtors are hereby authorized to enter into and perform their obligations under the APA, and to take such other actions as may be necessary or desirable to effectuate the terms of the APA, including providing transition services, if needed, and other instruments or documents that may be reasonably necessary or desirable to

implement and effectuate the terms of the APA, the Transaction, or this Order, including, without limitation, deeds, assignments, stock powers, transfers of membership interests and any other instruments of transfer, without further order of the Court. The Debtors are hereby further authorized to take all other actions as may reasonably be requested by the Purchaser or otherwise for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, possession any or all of the Purchased Assets and the Purchased Contracts, as may be necessary or appropriate for the Debtors to perform their obligations under the APA and consummate the Transaction, including, without limitation, providing transition services, without further order of the Court.

7.      The Debtors are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases and other documents with respect to the Purchased Assets that are necessary or appropriate to effectuate the APA, the Transaction, or this Order, including, as applicable, amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.

8.      <u>Valid Transfer and Assignment</u>. Effective as of the Closing Date, the sale and assignment of the Purchased Contracts and the Purchased Assets by the Debtors to the Purchaser shall constitute a legal, valid and effective transfer and assignment of the Purchased Contracts and the Purchased Assets, notwithstanding any requirement for approval or consent by any person, and will vest in the Purchaser with all right, title and interest of the Debtors and their respective estates in and to the Purchased Contracts and the Purchased Assets, free and clear of

all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order), pursuant to section 363(f) of the Bankruptcy Code.

9.       <u>Free and Clear Sale</u>.  Except to the extent specifically provided in the APA, upon the Closing Date, the Debtors shall be, and hereby are, authorized and empowered, pursuant to sections 105, 363(b), 363(f) and 363(k) of the Bankruptcy Code, to sell and transfer to the Purchaser the Purchased Assets.  The sale and transfer of the Purchased Assets to the Purchaser shall vest in the Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets free and clear of any and all Interests of any person or entity to the fullest extent permitted by applicable law (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order), with all such Interests to attach to the net proceeds of the Transaction (subject to the Final DIP Order) ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with the same validity, force and effect that such Interests had prior to the consummation of the Transaction, subject to any rights, claims or defenses of the Debtors or their estates.  Following the Closing, no holder of any Interest on any of the Purchased Assets shall interfere with the Purchaser's use or enjoyment of any of the Purchased Assets based on or related to such Interest or any actions that the Debtors have taken or may take in their chapter 11 cases and no interested party may take any action to prevent or interfere with consummation of the Transaction.

10.      The provisions of this Order authorizing the sale and transfer of the Purchased Assets free and clear of Interests (other than Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order) shall be self-executing, and neither the Debtors, on one hand, nor the Purchaser, on the other, shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate,

consummate, or implement the provisions of this Order.  For the avoidance of doubt, on or after

the Closing Date, the Debtors and the Purchaser shall be authorized, but not directed, to file any

such releases, termination statements, assignments, consents or other instruments in any

jurisdiction to record the release, discharge and termination of Interests on the Purchased Assets

pursuant to the terms of this Order.

11.    <u>Direction to Creditors</u>.  This Order shall be (a) effective as a determination that,

as of the Closing Date, all Interests on the Purchased Assets (except as otherwise expressly

assumed under, or expressly permitted by, the APA ) shall be unconditionally released, discharged

and terminated as to the Purchaser and the Purchased Assets; and (b) binding upon all persons

and entities, including all the Debtors' creditors and any holder of an Interest on any of the

Purchased Assets, and all such persons and entities are hereby authorized and directed to execute

such documents and take all other actions as may be reasonably necessary to release their

respective Interests on the Purchased Assets, if any.  If any person or entity that has filed a

financing statement, mortgage, mechanics lien, *lis pendens* or other document, instrument, notice

or agreement evidencing any Interest on the Purchased Assets has not delivered to the Debtors

on or before the Closing, in proper form for filing and executed by the appropriate parties,

termination statements, releases or instruments of satisfaction that the person or entity has with

respect to the Purchased Assets, the Debtors and the Purchaser are authorized to (x) execute and

file such termination statements, releases, instruments of satisfaction or other documents with

respect to the Purchased Assets on behalf of the applicable person or entity, and (y) file, register

or otherwise record a certified copy of this Order which, once filed, registered or otherwise

recorded, shall constitute conclusive evidence of the release of all Interests on the Purchased

Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or

recording system of each and every federal, state, local, tribal or foreign government agency, department or office.

12.     <u>Authorization of Recording Officers</u>.  This Order shall be binding upon all persons and entities, including filing agents or officers, title agents or companies, recorders of mortgages or deeds, registrars, administrative agencies, governmental units or departments, secretaries of state, governmental officials and all other persons or entities that may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments regarding the Purchased Assets or who may be required to report or insure any title or state of title in or to the Purchased Assets, (collectively, the "<u>Recording Officers</u>").  All Recording Officers are hereby authorized to (a) accept any and all documents or instruments necessary and appropriate to consummate the Transaction or to record and reflect that the Purchaser is the owner of the Purchased Assets free and clear of all Interests (other than Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order) and (b) strike all recorded Interests on the Purchased Assets from their records.

13.     <u>Direction to Surrender the Purchased Assets</u>.  All persons or entities in possession or control of any of the Purchased Assets, either presently or on or before the Closing Date, are authorized to surrender possession or control of the Purchased Assets to the Purchaser on the Closing Date.

14.     <u>No Successor Liability</u>.  The Purchaser and the Purchaser Related Persons are not and shall not be (a) deemed a "successor" in any respect to any of the Debtors or any of their estates as a result of the consummation of the Transaction or any other event occurring in the Debtors' chapter 11 cases under any theory of law or equity; (b) deemed to have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or any of their estates;

(c) deemed to be an alter ego of or have a common identity with any of the Debtors; (d) deemed to have a continuity of enterprise with any of the Debtors; or (e) deemed to be a continuation or substantial continuation of any of the Debtors or any enterprise of any of the Debtors, including (with respect to clause (a) through (e) of this paragraph) within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, health, products liability, safety laws, or other law, doctrine rule or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule or regulation including, without limitation, under COBRA, CERCLA, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, each as amended, the Americans with Disabilities Act of 1990 (as amended), the Federal Rehabilitation Act of 1973 (as amended), and the National Labor Relations Act, 29 U.S.C. § 151, et seq.; or (f) other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, be liable for (i) any environmental liabilities, debts, claims, fines, penalties, or obligations arising from conditions, facts, or circumstances first existing or occurring prior to Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties, or obligations arising under CERCLA, or any other environmental, health, and safety laws, or (ii) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors (A) for any taxes of any kind for any period, (B) under any labor, employment, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), or (C) under any products liability or intellectual property law or

doctrine, or any other law or doctrine, with respect to the Debtors' liability under any law, rule, regulation, or doctrine.

15.     Except as expressly provided in the APA or this Order with respect to the Assumed Liabilities, the Purchaser and the Purchaser Related Persons, in such capacities, shall not (a) assume, nor be deemed to have assumed or in any way be responsible for (i) any liability or obligation (of any kind, character, or description, whether known or unknown, asserted or unasserted, matured or unmatured, liquidated or unliquidated, disputed or undisputed, accrued or unaccrued, due or to become due, fixed, absolute, contingent or otherwise) of any of the Debtors or any of their estates or related to the Purchased Assets including, but not limited to, any Excluded Liabilities, any bulk sales law, successor or vicarious liability, liability or responsibility for any claim against any of the Debtors or against any related person of the Debtors, or any similar liability or obligation, (ii) any remaining claims (as defined in section 101(5) of the Bankruptcy Code) or liens against the Debtors or any of their predecessors or affiliates, (iii) liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to, the operation of the Purchased Assets prior to Closing, or (b) have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or product lines or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, *de facto* merger or substantial continuity, labor and employment, infringement or products liability, whether known or unknown as of such Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, (i) liabilities or obligations under the CERCLA or any other

environmental, health, and safety laws, (ii) liabilities or obligations under ERISA, COBRA, or other similar state or local laws with respect to any pension plan, welfare plan, or other employee benefit plan, (iii) liabilities or obligations under any collective bargaining agreement or employment agreement, or (iv) any liabilities or obligations or any foreign, federal, state, or local labor, employment, or environmental law whether of similar import or otherwise by virtue of such Purchaser's purchase of any Purchased Assets or assumption of the Assumed Liabilities. The Sale Motion and notices provided in accordance with the Bidding Procedures contain sufficient notice of such limitation in accordance with applicable law.  Except for the Purchaser's assumption of the Assumed Liabilities pursuant to the APA and this Order and claims brought by the Debtors to enforce the express terms of the APA and this Order, the transfer of the Purchased Assets and the Purchased Contracts to the Purchaser under the APA will not result in (a) the Purchaser or any Purchaser Related Person having any liability or obligation for any claim made against any of the Debtors (or their respective affiliates, together with their respective predecessors, successors, assigns, members, partners, officers, directors, principals or direct or indirect equityholders), including without limitation in respect of the Excluded Liabilities, nor in any such liability or obligation attaching to the Purchased Assets; (b) the Purchaser or any Purchaser Related Person having any liability or obligation with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, recoupment or otherwise, directly or indirectly, any Interests or Excluded Liabilities, nor in any such liability or obligation attaching to the Purchased Assets; or (c) the Purchaser or any Purchaser Related Person having any liability or obligation to any of the Debtors.

16.     For the avoidance of doubt, except as expressly provided in the APA or this Order with respect to the Assumed Liabilities, nothing shall require the Purchaser or any Purchaser

Related Person to (i) continue or maintain in effect, or assume any liability in respect of, any employee, pension, welfare, fringe benefit or any other benefit plan, trust arrangement, or other agreements to which the Debtors are a party or have any responsibility therefor, including, without limitation, medical, welfare, and pension benefits payable after retirement or other termination of employment, (ii) assume any responsibility as a fiduciary, plan sponsor, or otherwise, for making any contribution to, or in respect of the funding, investment, or administration of any employee benefit plan, arrangement, or agreement (including, but not limited to, pension plans), or the termination of any such plan, arrangement, or agreement, or (iii) hire any employees, or assume or maintain in effect, or assume any liability in respect of, any collective bargaining agreement, employment agreement, wage rate, compensation plan, or arrangement or any other terms and conditions of employment for any employees of the Debtors.

17.    Effective upon the Closing Date, all persons and entities are forever prohibited from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser or any Purchaser Related Person or their assets (including the Purchased Assets) with respect to any (a) Interest in the Purchased Assets or (b) successor, transferee, vicarious or other similar liability or theory of liability, including (i) commencing or continuing any action or other proceeding pending or threatened, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of the Court or the agreements or actions contemplated or taken in respect hereof or thereof; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Interest; (iv) asserting any setoff, right of subrogation or recoupment of any kind; or (v) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of

the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.

18.     <u>Assumption and Assignment of the Purchased Contracts</u>.  Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Transaction, the Debtors' assumption and assignment of the Purchased Contracts to the Purchaser free and clear of all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order) pursuant to the terms of the APA, as modified by the terms of any amendments reached by the Purchaser and the respective counterparty, is hereby approved, and the Debtors are hereby authorized and directed to assume and assign the Purchased Contracts to the Purchaser in accordance with the APA and this Order, and the requirements of sections 365(b) and 365(f)(2) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Any counterparty to a Purchased Contract that has not filed with the Court an objection to the assumption or assignment of such Purchased Contract as of the date specified in the Bidding Procedures Order is deemed to have consented to such assumption and assignment.

19.     Upon the Debtors' assumption and assignment of the Purchased Contracts to the Purchaser, each applicable counterparty shall be forever barred, estopped, and permanently enjoined from (i) raising or asserting against the Debtors, the Purchaser, or their respective property, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, known or unknown, liquidated or unliquidated senior or subordinate), counterclaim, defense, setoff or any other matter arising under or out of, in connection with or in any way related to, the Purchased Contracts existing prior to or as of the Closing Date or arising by reason of the Closing, or (ii) taking any other action against the Purchaser as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the Purchased Contracts

based on acts or occurrences existing prior to or as of the Closing Date or arising by reason of the Closing.  Each Counterparty hereby is also forever barred, estopped, and permanently enjoined from (A) asserting against the Debtors, the Purchaser, or the property of any of them, any default or claim arising out of any indemnity or other obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Date and (B) imposing or charging against the Purchaser or the Purchaser Related Persons any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment of the Purchased Contracts.

20.     Upon the Debtors' assumption and assignment of the Purchased Contracts to the Purchaser, the Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtors in and to the Purchased Contracts and the Purchased Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms for the benefit of the Purchaser, as applicable, notwithstanding any provision in any of the Purchased Contracts that prohibits, restricts, or conditions such assignment or transfer.  The Debtors' assumption and assignment of the Purchased Contracts to the Purchaser shall not constitute a default under or a termination of any Purchased Contract.

21.     Cure Amounts.  Any defaults or other obligations under the Purchased Contracts shall be deemed cured by the Purchaser's payment or other satisfaction of the Cure Amounts, if any, associated with the Purchased Contracts.

22.     Assumption and Assignment Objections.   Except as provided herein, all Assumption and Assignment Objections to the Debtors' calculation of Cure Amounts with respect to any of the Purchased Contracts have been overruled, withdrawn, waived, settled or otherwise resolved.  Any Assumption and Assignment Objections as to applicable Cure Amounts that have not been resolved by the parties may be heard at a later date as set by the Court.  The

pendency of a dispute relating to a particular Purchased Contract shall not prevent or delay the assumption or assignment of any other Purchased Contract or the closing of the Transaction. To the extent a counterparty to any of the Purchased Contracts fails to timely object to the Cure Amounts for any Purchased Contract in accordance with the Bidding Procedures Order, such Cure Amounts shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amounts at any time.

23.    <u>Adequate Assurance</u>. The Purchaser has provided adequate assurance of future performance under the Purchased Contracts within the meaning of sections 365(b) and 365(f)(2)(B) of the Bankruptcy Code. Any Assumption and Assignment Objections related to the adequate assurance of future performance by the Purchaser that have not been withdrawn, waived or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment of the Purchased Contracts to the Purchaser have been satisfied.

24.    <u>Anti-Assignment Provisions Unenforceable</u>. No section or provision of any Purchased Contract that purports to (a) prohibit, restrict or condition the assignment of a Purchased Contract, including, but not limited to, the conditioning of such assignment on the consent of any counterparty to such Contract; (b) authorize the termination, cancellation or modification of a Purchased Contract based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtors; or (d) provide for additional payments, profit sharing, penalties, conditions, renewals, extensions, charges or other financial accommodations in favor

of the counterparty to a Purchased Contract, or modification of any term or condition upon the assignment of a contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force or effect, and any such section or provision constitutes an unenforceable anti-assignment provision under section 365(f) or 365(l), as applicable, of the Bankruptcy Code or is otherwise unenforceable under section 365(e) of the Bankruptcy Code.

25.     No Fees for Assumption and Assignment.  There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser, or any of their respective successors or assigns, or the Debtors as a result of the assumption and assignment of the Purchased Contracts.

26.     Direction to Purchased Contract Counterparties.  All counterparties to Purchased Contracts assigned to the Purchaser in accordance with the terms of this Order and the APA shall cooperate with, and expeditiously execute and deliver upon, any reasonable request of the Purchaser, and shall not charge the Purchaser for any instruments, applications, consents or other documents that may be required or requested by any governmental unit or other public or quasi-public authority or other party to effectuate the applicable transfers in connection with the Debtors' assumption and assignment of the Purchased Contracts to the Purchaser.

27.     Licenses and Permits.  To the extent provided in the APA and available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and any other governmental authorization or approval of the Debtors with respect to the Purchased Assets and the Purchased Contracts, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date.  To the extent any license or permit necessary for the operation of the Purchased Assets is determined not to be an executory

contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Purchaser shall apply for and obtain any necessary license or permit promptly after the Closing Date, and such license or permit of the Debtors shall remain in place for the Purchaser's benefit until a new license or permit is obtained (or, in the case of licenses or permits of Debtors of which the assignment to Purchaser is pending as of the Closing Date (whether pursuant to a notice period that has not expired as of the Closing Date or a required consent from an applicable governmental authority that has not been received as of the Closing Date), shall transfer to Purchaser upon the expiration of such notice period or the receipt of such consent).

28.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Transaction.

29.     <u>Fair Consideration</u>.  The consideration provided by the Purchaser for the Purchased Assets under the APA shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, possession, or the District of Columbia.  The APA was not entered into, and the Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Sellers nor the Purchaser have entered into the APA, any Transaction Document, or any agreement contemplated thereby or are consummating the Transaction with any fraudulent or otherwise improper purpose.  No other person or entity or group of persons or entities

has offered to purchase the Purchase Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Purchaser. This Court's approval of the Sale Motion and the APA are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

30.     <u>Good-Faith Purchaser</u>.   The Purchaser is a good-faith Purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded thereby.  The Transaction and the APA are undertaken and entered into by the Debtors and the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code.  As such, the reversal or modification on appeal of this Order approving the Transaction under subsection (b) or (c) of the Bankruptcy Code shall not affect the validity of the Transaction, whether or not the Purchaser knew of the pendency of the appeal, unless this Order and the Transaction were duly and properly stayed pending appeal.

31.     <u>Section 363(n) of the Bankruptcy Code</u>.   The Transaction approved by this Sale Order is not subject to avoidance and no party is entitled to any recovery of damages pursuant to section 363(n) of the Bankruptcy Code or otherwise.

32.     <u>Bulk Sales</u>.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the Transaction.

33.     <u>Amendments</u>.  Except in the case of a material amendment, the APA and any related agreements may be amended, supplemented, or otherwise modified by the parties thereto and in accordance with the terms thereof, without further action or order of the Court; <u>provided</u>, <u>that</u>, any such amendment, supplement, or modification shall require the prior written consent of the Purchaser and shall not have a material adverse effect on the Debtors' estates.  Any material amendments shall require approval of this Court.  The Committee shall be provided with prior

written notice of any amendments.

34. <u>Binding Order</u>. This Order and the APA shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors, the Purchaser, any of their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these chapter 11 cases is converted from a case under chapter 11 to a case under chapter 7, all creditors of any and all of the Debtors (whether known or unknown), all counterparties to any Purchased Contracts and all Recording Officers. Neither the Transaction nor the APA shall be subject to rejection or avoidance under any circumstances. This Order and the APA shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and their respective successors and assigns. Nothing contained in any chapter 11 plan confirmed in the chapter 11 cases, any order confirming any such chapter 11 plan, or any order approving wind-down or dismissal of the chapter 11 cases or any subsequent chapter 7 cases shall conflict with or derogate from the provisions of APA (including any related agreements), or this Order, and to the extent of any conflict or derogation between this Order or the APA and such future plan or order, the terms of this Order and the APA, including any related agreements, shall control.

35. <u>Failure to Specify Provisions; Conflicts</u>. The failure to specifically include or mention any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and the Purchaser that the APA be authorized and approved in its entirety, including any amendments thereto as may be made by the parties thereto in accordance with the terms thereof and this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

36.     <u>Further Assurances</u>.  From time to time, as and when requested, and subject to the terms of the APA, all parties to the Transaction shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Transaction, including such actions as may be necessary to perfect, confirm, record or otherwise vest in the Purchaser its right, title and interest in and to the Purchased Assets and the Purchased Contracts.

37.     <u>Automatic Stay</u>.  The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified to the extent necessary, without further order of the Court, to allow the Purchaser to deliver any notice provided for in the APA and to take any and all actions permitted or required under the APA in accordance with the terms and conditions thereof.

38.     <u>No Stay of Order</u>.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 and any applicable Local Rules, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.  The provisions of this Order shall be self-executing.  Time is of the essence in implementing the APA and closing the Transaction.

39.     <u>Governing Terms</u>.  To the extent there is any inconsistency between the terms of this Order and the terms of the APA, the terms of this Order shall govern.

40.     <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction to (a) interpret, implement and enforce the terms and provisions of this Order and the APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith; and (b) decide any issues or disputes concerning or related to this Order, the APA, or the rights and duties of the parties hereunder or thereunder, including the interpretation of the terms, conditions and provisions hereof and thereof, and the

status, nature and extent of the Purchased Assets and the Purchased Contracts.

41.     <u>Release</u>.  Effective as of the Closing, other than with respect to obligations arising under this Sale Order or the APA, the Debtors irrevocably, knowingly, and voluntarily release, discharge, and forever waive and relinquishes all claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured, liquidated or unliquidated, direct or indirect, at Law or in equity, derivative or otherwise, which the Debtors have, may have, or may assert now or in the future against Purchaser arising out of, based upon, or resulting from any Purchased Contract, transaction, event, circumstance, action, failure to act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing.

42.     <u>Other Provisions</u>.  The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

43.     The requirements set forth in Bankruptcy Rules 6003(b), 6004, and 6006 and Local Rule 9013-1 have been satisfied or otherwise deemed waived.

**Exhibit 1**

APA