**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLAIRE'S HOLDINGS LLC, *et al.*,[1] | ) | Case No. 25-11454 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF DAVID R. SALEMI IN SUPPORT**
**OF (1) MOTION OF DEBTORS FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN**
**POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL,**
**(II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE**
**CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A**
**FINAL HEARING, AND (V) GRANTING RELATED RELIEF AND (2) MOTION OF**
**DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING THE**
**SALE OF GOING-CONCERN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**ENCUMBRANCES AND OTHER INTERESTS AND (II) GRANTING RELATED RELIEF**

I, David R. Salemi, hereby declare under penalty of perjury:

1.      I am a Managing Director in the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("Houlihan"), which is an international investment banking and financial advisory firm headquartered at 10250 Constellation Boulevard, 5th Floor, Los Angeles, California 90067. Houlihan is the proposed investment banker to the above captioned debtors and debtors-in-possession (the "Debtors" and, together with their non-Debtor affiliates the "Company") in these chapter 11 cases.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are:  Claire's Holdings LLC (9619); BMS Distributing Corp. (4117); CBI Distributing Corp. (5574); Claire's (Gibraltar) Holdings Limited (4273); Claire's Boutiques, Inc. (5307); Claire's Canada Corp. (7936); Claire's Intellectual LLC (5274); Claire's Puerto Rico Corp. (6113); Claire's Stores, Inc. (0416); Claire's Swiss Holdings II LLC (7980); Claire's Swiss Holdings LLC (2299); CLSIP Holdings LLC (1950); CLSIP LLC (9769); and CSI Canada LLC (2343).  The Debtors' mailing address is 2400 West Central Road, Hoffman Estates, IL 60192.

2.      I submit this declaration (the "<u>Declaration</u>") in support of the (a) *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* the ("<u>DIP Motion</u>") and (b) *Motion of Debtors for Entry of an Order (I) Authorizing and Approving the Sale of Going-Concern Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests and (II) Granting Related Relief* (the "<u>Sale Motion</u>"), each filed contemporaneously herewith.[2]

3.      The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, (b) information regarding the Debtors' operations and finances that I obtained from the Debtors' advisors or employees, (c) the Debtors' books, records, and relevant documents, (d) information provided to me by employees of Houlihan working under my supervision, and/or (e) my opinions, experience, and knowledge as a restructuring professional. Specifically, I am a senior member of the Houlihan team, which, since May 13, 2025, has been one of the principal restructuring advisors to the Debtors. In that capacity, I have been directly involved in the Debtors' pre- and postpetition sale and marketing process and efforts to identify a going-concern purchaser, which continued through the signing of the Asset Purchase Agreement. I am over the age of 18 years and am authorized to submit this Declaration on behalf of the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

### **Professional Background and Qualifications**

4.      Houlihan is an internationally recognized investment banking and financial

---

[2]    Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to them in the DIP Motion or the Sale Motion, or the Asset Purchase Agreement (as defined in the Sale Motion), as applicable.

advisory firm, with offices worldwide and more than 2,500 professionals. Houlihan is a leader in providing investment banking and financial advisory services to debtors, unsecured and secured creditors, acquirers, and other parties in interest involved with financially troubled companies. Houlihan has been retained to provide investment banking and financial advisory services in some of the largest restructurings in the United States, including: *In re Azul S.A.*, Case No. 25-11176 (SHL) (Bankr. S.D.N.Y. Aug. 15, 2025); *In re the Container Store Grp., Inc.*, Case No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 28, 2025); *In re Conn's, Inc.*, Case No. 24-33357 (ARP) (Bankr. S.D. Tex. Aug. 26, 2024); *In re JOANN, Inc.*, Case No. 24-10418 (CTG) (Bankr. D. Del. Apr. 15, 2024); *In re MVK Farmco LLC*, Case No. 23-11721 (Bankr. D. Del. Oct. 13, 2023); *In re David's Bridal, LLC*, Case No. 23-13131 (Bankr. D.N.J. Apr. 16, 2023); *In re Sungard AS New Holdings, LLC*, Case No. 22-90018 (Bankr. S.D. Tex. Apr. 11, 2022); *In re Bristow Group Inc.*, Case No. 19-32713 (Bankr. S.D. Tex. May 11, 2019); *In re PHI, Inc.*, Case No. 19-30923 (Bankr. N.D. Tex. Mar 14, 2019); *In re Walter Investment Management Corporation*, Case No. 17-13446 (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Seadrill Limited*, Case No. 17-60079 (Bankr. S.D. Tex. Sep. 12, 2017); *In re Westinghouse Electric Company LLC*, Case No. 17-10751 (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Roust Corporation*, Case No. 16-23786 (Bankr. S.D.N.Y. Dec. 30, 2016); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (Bankr. D. Del. Mar. 2, 2016); *In re Relativity Fashion, LLC* (a.k.a. Relativity Media), Case No. 15-11989 (Bankr. S.D.N.Y. Jul. 30, 2015); *In re RadioShack Corporation*, Case No. 15-10197 (Bankr. D. Del. Feb. 5, 2015); *In re Caesars Entertainment Operating Company, Inc.*, Case No. 15-01145 (Bankr. N.D. Ill. Jan. 15, 2015); *In re Entegra Power Group LLC*, Case No. 14-11859 (Bankr. D. Del. Aug. 4, 2014); *In re Premier International Holdings Inc.* (a.k.a. Six Flags Theme Parks), Case No. 09-12019 (Bankr. D. Del. June 13, 2009); *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept.

15, 2008); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (Bankr. D. Del. Jan. 22, 2008); *In re Conseco Inc*, Case No. 02-49672 (Bankr. N.D. Ill. Dec. 17, 2002); *In re WorldCom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002); and *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001).

5.      I have approximately twenty-six years of investment banking experience, entirely at Houlihan.  Since joining Houlihan in 1999, I have provided investment banking expertise and financing advice, including with respect to postpetition debtor-in-possession financing, to companies, lenders, and other parties-in-interest, related to companies both in and outside of chapter 11.  My notable restructuring engagements include, without limitation, the following: Conn's, Inc., JOANN Inc., Six Flags, Ahern Rentals, Inc., Magnum Hunter Resources Corp., Payless Holdings, LLC, Constellation Healthcare Technologies, Inc., and Hollander Sleep Products, LLC.

6.      I received a B.S. in Commerce with a concentration in Finance from the University of Virginia's McIntire School of Commerce.

### The Debtors Sale and Marketing Process

7.      On June 2, 2025, the Debtors commenced a prepetition sale and marketing process in order to identify one or more value-maximizing going-concern transactions for the Debtors' businesses.  The Debtors also marketed their intellectual property assets on a standalone basis. These efforts and outreach continued through and after the commencement of the Debtors' chapter 11 cases. Specifically, the Debtors contacted 165 prospective buyers and solicited their interest in a potential acquisition of some or all of the Debtors' assets.  Of those parties contacted, 69 executed non-disclosure agreements ("NDAs").  Once signed, NDA parties were given access to virtual data rooms containing financial models and other financial, operational, and legal

diligence materials.  In my experience, the scope of outreach during the sale and marketing process

was at least comparable to, if not greater than, other distressed processes for comparable debtors.[3]

8.      The parties contacted by the Debtors and Houlihan were a mix of financial buyers

and strategic parties who might be interested in acquiring the Debtors' business.  Numerous parties

received business plan materials and access to a robust data room, held meetings with the Debtors'

management, and engaged with Houlihan and the Debtors on follow-up diligence asks.  Of those

parties who signed NDAs, five submitted LOIs, two of which contemplated the Debtors existing

as a going-concern.  After further discussions, only the Purchaser's bid proved actionable as a

going-concern and as a superior alternative to a full portfolio wind down.  As a result of the

Debtors' exhaustive outreach pursuant to the pre- and postpetition sale and marketing process, I

believe that the market check was exceedingly thorough.

9.      Based on my experience and involvement with the sale and marketing process for

a potential Sale Transaction, the Debtors conducted a thorough and fair marketing process

transparently and in good faith.  For the duration of the process, the Debtors and their management

team and advisors were focused on ensuring that the sale and marketing process canvassed the

entire market for potentially interested parties who could provide a solution, either alongside other

bidders or independently.

10.     Given the scale and depth of the Debtors' sale and marketing process and the fact

that no other actionable, going-concern offers have materialized, I am confident that entering into

the Asset Purchase Agreement provides the best and likely only chance to achieve a going-concern

---

[3]  *See, e.g.*, *In re Express, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. Jun. 13, 2024) (declarant stating debtor had contacted 57 total parties as part of a marketing process); *In re Bed Bath & Beyond, Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Apr. 23, 2023) (declarant observing that, in the aggregate, across three different forms of prepetition marketing process, the debtor had engaged with over 100 parties, which includes potential DIP lenders); *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. Feb. 17, 2020) (declarant stating that debtor had contacted 95 total parties as part of a marketing process).

transaction in these chapter 11 cases.  Further, because of the number of parties contacted, I believe that no further market check in these chapter 11 cases would yield an offer higher or otherwise better than the offer from Purchaser.

**Entry into the Sale Transaction is a**
**Sound Exercise of the Debtors' Business Judgment**

11.     As further described in the Sale Motion, the Sale Transaction between Claire's Holdings LLC and its subsidiaries listed on the signature pages of the Asset Purchase Agreement (the "Seller"), and  AWS Claire's, LLC (the "Purchaser"), a buyer group led by Ames Watson, LLC ("Ames Watson") involves the sale of a significant portion of the Debtors' assets, which will be operated on a going-concern basis (the "Going-Concern Assets") and the assumption of certain related cure obligations.   The consideration for the Going-Concern Assets is $104 million in cash *plus* $36 million in the form of a seller note.  Additionally, the Sale Transaction will provide for the assumption of certain liabilities, including cure costs with respect to the acquired contracts and leases and employee-related liabilities at the Go-Forward Stores.   Importantly, the Sale Transaction will preserve thousands of jobs and will provide continued business to hundreds of the Debtors' vendors and landlords.

12.     I believe that the consideration for the Going-Concern Assets is reasonable under the circumstances.  The proposed Sale Transaction, if approved, will enhance the Debtors' cash position through the purchase price, which includes $104 million in cash consideration, subject to adjustments related to working capital and inventory.  Further, in addition to fully repaying the Prepetition ABL Facility, the Sale Transaction will deliver considerable value to the Debtors by, among other things, funding distributions under the Debtors' chapter 11 plan and administration of these cases, and reducing the general unsecured claims assertable against the Debtors' estates.

13.     I believe a sale of the Going-Concern Assets versus a continued marketing process and auction is in the best interest of the Debtors' estates.  The alternative to consummating this Sale Transaction is the continued liquidation of all of the Debtors' assets and an auction for the intellectual property as the Debtors lack sufficient liquidity to support the cost of an extended sale and marketing process.  I do not believe that any marginal increase to the sale proceeds (if any) would outweigh the potential harm to the Debtors' estates that would result from the unsupportable cost and delay of running a redundant auction process for the Going-Concern Assets.  I believe the Debtors' constrained liquidity position justifies the need to move quickly towards closing the proposed transaction.

14.     The Debtors' months long pre- and postpetition marketing process did not yield any better offers than the one contemplated by the Asset Purchase Agreement.  To the extent any higher or otherwise better offer presented itself in advance of the Sale Hearing, the Debtors retain a "fiduciary out" to pursue such an alternative transaction.[4]

15.     In recent weeks, the Debtors and their advisors negotiated the terms of the Sale Transaction with the Prepetition ABL Secured Parties, the Consenting PTL Lenders, Consenting ETL Lenders, all of whom are supportive of the Sale Transaction.  Each of the consenting Prepetition Secured Parties made certain material contributions without which the Sale Transaction would not have been possible.  The Prepetition ABL Secured Parties consented to a delay in the repayments they were entitled to under the Original Cash Collateral Order in order to help the Debtors bridge liquidity to sale closing. The Consenting PTL Lenders consented to being primed by the DIP Facility and forgo a standalone auction of the IP Assets.  Additionally, in order to enable the Debtors to procure inventory to support the Go-Forward Stores, the Purchaser is providing debtor in possession financing, which will provide additional necessary liquidity to fund go-forward inventory purchases.  Consummation of the Sale

---

[4]    *See* Asset Purchase Agreement, § 8.1(g).

Transaction will inure to the benefit of all stakeholders and is made possible by the work of these key stakeholders.

16.    I believe that the Purchaser has negotiated the Sale Transaction, including the terms and conditions of the Asset Purchase Agreement, with the Debtors at arm's length and in good faith.  To the best of my knowledge, the Purchaser has not colluded with the other potential bidders on the purchase. Moreover, the Asset Purchase Agreement allows the Debtors to pursue alternative value maximizing transactions, including a higher bid from a potential new purchaser of the Going-Concern Assets, should any arise within a timeframe that is reasonably accommodating to the realities of the Debtors' liquidity position.  At this time, the Debtors have not received a higher or otherwise better offer for the Going-Concern Assets, and I am not aware of any other parties that have expressed a current interest in purchasing the Going-Concern Assets for a higher or otherwise better value to the Debtors.

**The Debtors Would Not Be Able to Find
Debtor in Possession Financing on The Same or More Favorable Terms**

17.    As explained further in the DIP Motion, the Debtors are seeking to access the DIP Facility to provide additional liquidity to bridge to the closing of the Sale Transaction.  The DIP Facility provides advantageous terms to the Debtors, including that the financing (a) is being provided on a junior lien basis relative to the Prepetition ABL Lenders' liens and (b) does not charge interest or impose other fees unless the Debtors exercise a fiduciary out and pursue an alternative restructuring transaction to the Sale Transaction.

18.    Given the compressed timeline to identify financing to support the Sale Transaction and the reality that substantially all of the Debtors' cash and material assets are already encumbered by existing liens under the Debtors' prepetition debt, the Debtors reached out to their existing lenders regarding the possibility of providing debtor-in-possession financing.  None of the Prepetition Secured Parties was willing to provide incremental capital, though they were willing to provide the material

concessions set forth above.  Further, it was impractical to approach a broad range of traditional financing sources with respect to DIP financing given the compressed timeframe of these chapter 11 cases and the Sale Transaction, along with the complexities of the Debtors' business and significant liquidity challenges.  Accordingly, the Debtors sought and obtained financing from the Purchaser.

19.     I do not believe that any other party would provide this financing on equal or better terms than the Purchaser.  *First*, it is highly unlikely that any other DIP lender would provide financing on the same terms, including on a junior basis with respect to the Debtors' inventory and with no fees other than in certain limited circumstances.  *Second*, to the extent that the Debtors sought DIP financing that would prime the Prepetition ABL Lenders with respect to the Priority ABL Collateral, it is unlikely that the Prepetition ABL Lenders would consent to such priming.  I believe that the terms of this DIP Facility are reasonable and appropriate under the circumstances and that no other party would provide financing on the same or more favorable terms.

### Conclusion

20.     Accordingly, for all the foregoing reasons, I believe that the proposed Sale Transaction is a sound exercise of the Debtors' business judgment and that the Sale Transaction was negotiated at arms' length and in good faith by all parties.  Given the details described above and based on my experience as a restructuring professional and involvement in other sale transactions, I believe that the Court should approve the sale of the Going-Concern Assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 20, 2025                    _/s/ David R. Salemi_____
                                          David R. Salemi
                                          Managing Director
                                          Houlihan Lokey Capital, Inc.

                                          *Proposed Investment Banker for the Debtors*