## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MOM CA Investco LLC, *et al.*,[1] | Case No. 25-10321 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 611** |

## DEBTORS' STATEMENT REGARDING CONVERSION

The debtors and debtors in possession (collectively, the "Debtors"), in the above-captioned jointly administered chapter 11 cases (these "Chapter 11 Cases"), hereby submit this statement (this "Statement")[2] in response to the *Emergency Motion of Mohammad Honarkar and 4G Wireless, Inc. for Entry of an Order Dismissing or Converting the Chapter 11 Cases Pursuant to 11 U.S.C. § 1112(b)* [Docket No. 611] (the "Motion to Dismiss") and in support of conversion pursuant to pursuant to section 1112(a) and section 1112(b)(4)(M) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 1017(f) of the Federal Rules of Bankruptcy procedure (the "Bankruptcy Rules"), and Rule 2002-1 of the Local Rules of the United States Bankruptcy Court

---

[1] The Debtors in these chapter 11 proceedings, together with the last four digits of each Debtor's federal tax identification number, are: MOM CA Investco LLC [6263], MOM AS Investco LLC [6049], MOM BS Investco LLC [6180], Retreat at Laguna Villas, LLC [2046], Sunset Cove Villas, LLC [9178], Duplex at Sleepy Hollow, LLC [9237], Cliff Drive Properties DE, LLC [0893], 694 NCH Apartments, LLC [0318], Heisler Laguna, LLC [4709], Laguna Festival Center, LLC [4073], 891 Laguna Canyon Road, LLC [0647], 777 AT Laguna, LLC [8715], Laguna Art District Complex, LLC [8316], Tesoro Redlands DE, LLC [2764], Aryabhata Group LLC [7332], Hotel Laguna, LLC [9580], 4110 West 3rd Street DE, LLC [8641], 314 S. Harvard DE, LLC [2057], Laguna HI, LLC [6408], Laguna HW, LLC [9470], The Masters Building, LLC [6134], 837 Park Avenue, LLC [3229], and Terra Laguna Beach, Inc. [2344] (interim). The Debtors' headquarters are located at 520 Newport Center Drive, Suite 480, Newport Beach, CA 92660.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the DIP Amendment Motion, the Shinderman Declaration, the Global Sale Procedures Motion, and the Tesoro Sale Motion (each defined below), as applicable.

for the District of Delaware (the "Local Rules") rather than dismissal to the extent the Court denies

approval of the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to*

*Amend the DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 583] (the

"Emergency DIP Amendment Motion").  The Debtors respectfully represent as follows:

## STATEMENT

1.      For all its delusions, misstatements, and conspiracy theories, the Motion to Dismiss

gets one thing right:  the Debtors are now hopelessly out of funding should the Court decline to

approve the DIP Amendment Motion at the hearing scheduled for June 30, 2025.  That motion,

which has now been modified to provide significant concessions from the lender, Specialty DIP,

is the Debtors' last grasp at salvaging these cases for the benefit of the Debtors' creditors and other

constituents.  The Debtors continue to believe that there is significant equity in their real estate

assets, but the constant and never-ending attacks by the Honarkar Parties has made third-party

financing impossible and now has even resulted in the loss of the extremely valuable bid for the

Tesoro Property.  Specialty DIP may have ties to one of those equity holders, but unlike the

Honarkar Parties, at least the Continuum Parties are offering to fund at least some of the costs of

these cases with the goal of getting to a value maximizing transaction.

2.      But with Mr. Honarkar unable to provide any funding for operations, while

simultaneously opposing any financing contingent on selling the Debtors' properties, and

objecting to the only available financing because it comes from parties with ties to Mr. Makhijani,

Mr. Honarkar, in his Motion to Dismiss, seeks to achieve a short-term victory in his ultimate goal

of burning the assets to the ground to prevent anyone else from acquiring them.  Yet, whatever

happens next, whether dismissal or conversion, the Real Property Lenders[3] will obtain stay relief to either appoint a receiver over or foreclose upon the SPE Debtors' real property assets, which will likely result in sales at true "fire sale" prices, just as the Honarkar Parties always accused the Debtors of doing. If the Court denied the DIP Amendment Motion, the Debtors, in the exercise of their business judgment, will have no choice but to support conversion, not dismissal.

3. The constant warring between these two parties, both in the Arbitration[4] and in these Chapter 11 Cases, has been to the detriment of the estates and all other creditors, including the Real Property Lenders, who are the only parties that have provided any documentation of funding the Debtors' estates pre-petition. The Debtors have stretched their liquidity as much as possible, and even beyond their initial estimates, to try find a viable path forward amid this contentious ownership dispute, but unfortunately the Debtors have come to the end of the road. The DIP Amendment Motion is the last gasp at preserving these estates for the benefit of all creditors. Without it, the Debtors have determined they have no choice but to convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Doing so would be in the best interest of creditors of the estates because a chapter 7 trustee can complete the administration of the Debtors' estates in a cost-effective manner, while also preserving and pursuing the potentially valuable estate claims and causes of action identified herein and also providing an efficient method to resolve competing and conflicting claims asserted by certain of the Continuum Parties.

---

[3]    "Real Property Lenders" means Enterprise Bank & Trust, PMF CA REIT, LLC, Lone Oak Fund, LLC, Wilshire Quinn Income Fund, LLC, Preferred Bank, Banc of California and Pacific High Yield Fund 1, LLC.

[4]    *Honarkar v. Makhijani*, JAMS Arbitration No. 5220003126, as consolidated with *MOM AS Investco LLC v. Honarkar*, JAMS Arbitration No. 5200001122 (the "Arbitration"). The arbitrator in the Arbitration has issued a partial interim award (the "Partial Interim Award") and a partial final award (the "Partial Final Award" or the "Arbitration Award"). The Partial Interim Award is filed at Docket No. 454-1 as Exhibit 1, and the Partial Final Award is filed at Docket No. 454-2 as Exhibit 2.

Dismissal, in contrast, would create much uncertainty, with various parties seeking control over the enterprise and no one preserving the estate's litigation claims.

4.      Mr. Honarkar's inability to face reality, whether financially, legally or otherwise, has led him on a crusade to interfere with nearly every action taken by the Debtors in these cases, all based on the mistaken conclusion that he is the current owner of the SPE Debtors.[5]  But Mr. Honarkar lives in an alternate reality.  The Arbitration Award provides him with a choice between rescission and damages, to be made at the conclusion of the accounting process required by the Arbitration Award; until that happens, Mr. Honarkar ***is not the owner of anything*** other than 50% of the MOM Investcos,[6] who themselves continue to own the SPE Debtors until rescission is elected and effectuated.[7]

5.      Mr. Honarkar has opposed the Debtors at every step in these cases.  This includes objections to the DIP Motion, the Global Sale Procedures Motion, the Tesoro Sale Motion, and, most recently, the DIP Amendment Motion.[8]  He also filed limited objections to the standard first day relief motions and to the Debtors' 2004 Procedures Motion.[9]  In addition to the time and

---

[5]    The "SPE Debtors" are: Retreat at Laguna Villas, LLC; Sunset Cove Villas, LLC; Duplex at Sleepy Hollow, LLC; Cliff Drive Properties DE, LLC; 694 NCH Apartments, LLC; Heisler Laguna, LLC; Laguna Festival Center, LLC; 891 Laguna Canyon Road, LLC; 777 AT Laguna, LLC; Laguna Art District Complex, LLC; Tesoro Redlands DE, LLC; Aryabhata Group LLC; Hotel Laguna, LLC; 4110 West 3rd Street DE, LLC; 314 S. Harvard DE, LLC; Laguna, HI, LLC; Laguna HW, LLC; The Masters Building, LLC; 837 Park Avenue, LLC, and Terra Laguna Beach, Inc. (interim).

[6]    The "MOM Investcos" are MOM CA Investco LLC, MOM AS Investco LLC, and MOM BS Investco LLC.

[7]    Critically, for the Honarkar Parties to become the 100% owner of the equity interests in the SPE Debtors, they must (1) have the Arbitration Award approved by the California Superior Court, including defending against any appeals, (2) complete the accounting required by the Arbitration Award (which is estimated to take at least 3 months), (3) elect rescission as their chosen remedy, and (4) effectuate rescission by compensating the Continuum Parties for their contributions made to the enterprise since the formation of the MOM Investcos, whether through payment or offset, which is the subject of the accounting.

[8]    *See* Docket Nos. 96, 455, 460, 483, & 508.  These motions are defined herein.

[9]    *See* Docket Nos. 31 & 369.

resources used to review and address these objections, the Debtors were also required to spend considerable time, effort, and resources on resolving and replying to Mr. Honarkar's frivolous motion to appoint a chapter 11 trustee, a baseless adversary complaint seeking to establish a constructive trust, and a motion to seek relief from the automatic stay that confounded everyone as to what relief was actually sought.[10]

6.      Now, after failing to deliver on his promise to provide DIP financing, Mr. Honarkar claims shock that the Debtors are incurring substantial administrative costs fighting with him.  Mr. Honarkar has had 4 months to provide DIP financing, but he has failed to make **_any_** such offer. All six of his proposed plan term sheets were for exit financing, which even he admits was subject to a diligence out and all of which provided him with 100% of the equity of the Debtors prior to his election of rescission and the entry of a final award in the Arbitration.  And the proposed financing was not enough to even cover all first lien claims and unpaid property taxes, let alone provide a recovery for any other creditor.

7.      These proposals were rejected by the Debtors' Independents on their merits, not due to some imaginary loyalty to Mr. Makhijani and his Continuum allies (collectively, the "Continuum Parties").  As acknowledged in the Motion to Dismiss, the Debtors offered to turn the entire operations of the Debtors over to management by the Honarkar Parties in exchange for DIP financing that Mr. Honarkar testified at his deposition that he could get in 14 days.  Now 24 days later, Mr. Honarkar has nothing, just as he had for the entirety of these Chapter 11 Cases.  This is not bias, it is reality.

---

[10]     *See* Docket Nos. 29, 175, & 454; *see also* Stay Relief Hearing Transcript (an excerpt from the transcript of which is attached hereto as **Exhibit B**) (April 22, 2025) 114:14-137:15 (showing a lengthy discussion of Judge Shannon trying to understand what the Honarkar Parties' stay relief request meant to the estates).

**A. The Debtors were Prevented from Completing the Sale Process.**

8.      These Chapter 11 Cases were filed on an emergency, free-fall basis because of contentious ownership and management disputes. *Declaration of Mark Shinderman in Support of Sale of the Tesoro Property and Motion to Reject Honarkar Agreements*, ¶ 5 [Docket No. 492] (the "Shinderman Declaration"). Because the costs associated with these Chapter 11 Cases were significant, the Debtors' CRO estimated that the estates would have no more than six (6) months to effectuate a plan of reorganization and/or complete the sale of the Debtors' assets. *Id.* at ¶ 8. Accordingly, the Honarkar Parties were approached by the CRO immediately after the Petition Date about potentially proposing a plan of reorganization. *Id.* at ¶ 11. Unfortunately, after numerous communications between the CRO, the Debtors' advisors, and the Honarkar Parties, it became clear that the Honarkar Parties were not able to find a funding source for a plan of reorganization. *Id.* at ¶ 12.

9.      As part of the *Stipulation by and Among the Debtors and the Honarkar Parties Regarding Resolution of Several Contested Matters* [Docket No. 379] (the "Settlement Agreement"), the Debtors were to cease any sale efforts if the Honarkar Parties had committed capital for a confirmable plan by May 15, 2025. In the weeks prior to entering into the Settlement Agreement, the Debtors engaged local real estate listing brokers (each, a "Property-Level Broker," and collectively, the "Property-Level Brokers") and Hilco Real Estate, LLC ("Hilco" or the "Master Broker") and prepared them for a robust marketing effort. Shinderman Decl. ¶ 16. Soft marketing began in the interim, but the full marketing efforts were paused until the May 15, 2025 deadline lapsed. *Id.* The Honarkar Parties failed to meet this deadline. Over the course of the next few weeks following the deadline, the Honarkar Parties provided several proposed plan term sheets to the Debtors, but none of those term sheets were accompanied by committed financing;

rather, the terms sheets repeatedly reflected a need for further diligence, to be funded by the estates, and more time to raise the necessary capital. *Id.* at ¶ 17.

10.     Because of the liquidity constraints and risk of administrative insolvency, the Debtors were required to move on from the Honarkar Parties' wishes to confirm a plan of reorganization and shift focus to the sale of substantially all of the Debtors' assets in addition to ongoing DIP negotiations with multiple potential lenders. *Id.* at ¶ 19. The Debtors' contemplated process to sell certain of the Properties (the "Sale Process") and DIP negotiations go hand-in-hand because of the prospect that the expected sale proceeds could be used to pay down a DIP loan. *Id.* ¶ 20. As discussed in numerous conversations with potential DIP lenders, this would make the junior DIP loan the Debtors were seeking more attractive and attainable since the likelihood of generating sale proceeds reduces risk to a would-be DIP lender. *Id.* Thus, because the Honarkar Parties failed to provide the Debtors with an actionable plan or financing, the Sale Process remained the only pathway for the Debtors that could result in a value maximizing endeavor.

11.     On May 13, 2025, the Debtors filed the *Debtors' Motion for Order (I) Establishing Procedures for the (A) Sale of Real Estate Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Assumption and Assignment of Executory Contracts and Unexpired Leases of Non-Residential Real Property; and (II) Granting Related Relief* [Docket No. 394] (the "Global Sale Procedures Motion"). By the Global Sale Procedures Motion, the Debtors sought approval of the sale procedures therein to govern the marketing and sale of the balance of the Debtors' diverse portfolio of Properties.

12.     On May 15, 2025, the Debtors filed the *Motion of Debtors for Entry of Orders (A)(I) Approving Bidding Procedures for Tesoro Property, (II) Scheduling the Bid Deadlines, (III) Scheduling Hearings and Objection Deadlines with Respect to the Sale of Tesoro Property, (IV)*

*Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief; and (B)(I) Approving the Sale of Tesoro Property Free and Clear of All Interests, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, (III) Request to Adjourn Hearing, and (IV) Granting Related Relief* [Docket No. 280] (the "Tesoro Sale Motion"), pursuant to which the Debtors sought to sell the Tesoro Redlands DE, LLC property (the "Tesoro Property") free and clear of all interests.  The order (the "Tesoro Sale Order") was entered on May 15, 2025 at Docket No. 402.  The sale hearing for the Tesoro Property was originally scheduled for hearing on June 10, 2025, but was later adjourned until June 30, 2025 at 9:30 a.m. (ET), largely due to the Honarkar Parties' refusal to allow the buyer's witness to appear remotely, despite agreeing that all other witnesses could do so.

13.     With the contemplated sale of the Tesoro Property, as well as the proposed sale procedures set forth in the Global Sale Procedure Motion, the Debtors were positioned to move forward with the Sale Process to maximize value for the Debtors' estates, and importantly, provide immediate liquidity to keep these Chapter 11 Cases alive.  In fact, the Debtors received a bid for $55,000,000 from Patrick Theodora (the "Successful Bidder"), and, in the Debtors' reasonable business judgment, determined that this was the best and highest bid for the Tesoro Property. Shinderman Decl. ¶ 51.  The purchase and sale agreement executed between the Debtors and the Successful Bidder for the Tesoro Property provided approximately *$12 million over the secured debt* on the Tesoro Property.  *See* Docket No. 523, ¶ 9.  The Debtors anticipated that if the Tesoro Property sale were to go forward, all secured and most, if not all, unsecured claims of the Tesoro Property would have been paid in full.

14.     However, because neither equity holder will risk the other getting a "win," and because the Continuum Parties support the Debtors' sale process, the Honarkar Parties objected to

both the Global Sale Procedures Motion and the Tesoro Sale Motion, setting up what is likely to prevent the closing of any contemplated sales.[11]  Specifically, if the Court were to approve any of the contemplated sales, the Honarkar Parties have indicated to counsel for the Debtors their unequivocal intent to appeal such orders, which would likely prevent a buyer from securing title insurance.  This action is intended to thwart, or at the very least, significantly delay, the possibility of any successful sale.

15.     Presumably due to the ongoing gamesmanship and delays caused by the Honarkar Parties,[12] on June 27, 2025, the Successful Bidder informed the Debtors that he was withdrawing his bid for the Tesoro Property.  In doing so, the Debtors believe that he is leaving behind a $3 million earnest money deposit.  In short, the Successful Bidder decided that it was better to lose $3 million than to continue to move forward in the face of an opponent who will stop at nothing to make sure no one else owns the Tesoro Property.  Whatever the reason, the Debtors were once again left grasping at straws and were ultimately left with no choice but to seek modifications to the DIP Amendment Motion, which if denied will force them to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

---

[11]   Notably, Mr. Honarkar's counsel said on the record that they will file objections "to each of the sales that [the Debtors are] trying to do."  Tesoro Sale Hearing Transcript (May 14, 2025) 27:9-10.

[12]   On multiple occasions, the Honarkar Parties stopped the sale of the Tesoro Property from going forward by refusing to allow the Successful Bidder to testify remotely while outside the country, despite agreeing that every other witness at the hearing could appear remotely via Zoom.  Worse, the loose "affiliations" alleged between Mr. Theodora and Continuum are essentially the same "conflict" claims the Continuum Parties have raised against the Honarkar Parties and their lawyers in the Arbitration, where a much higher neutrality standard applies.  *See Memorandum of Points and Authorities in Support of Petitioners' Petition to Vacate Partial Final Arbitration Award* (the "**Motion to Vacate**"), attached hereto as **Exhibit C**.  In the Motion to Vacate, the Continuum Parties argue that the Arbitration Award should be vacated in its entirety because the Arbitrator had a prior relationship with the Honarkar Parties' counsel, which was not disclosed.  The Continuum Parties believe that this undisclosed relationship was the underlying cause of unfair bias in favor of the Honarkar Parties throughout the entirety of the Arbitration proceeding.  The Debtors take no position on these allegations,

**B.  The Debtors Were Unable to Obtain Approved Debtor-in-Possession Financing.**

16.    At the outset of these Chapter 11 Cases, because of the dire need of financing, the Debtors decided that the best option was to bring in a short-term, smaller loan to stabilize the Debtors' operations and bridge to an end game resolution of these Chapter 11 Cases.  Thus, on March 19, 2025 the Debtors filed the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* [Docket No. 89] (the "DIP Motion") seeking approval of the short-term bridge the gap DIP loan (the "DIP Loan") in the aggregate principal amount of $5 million from Specialty DIP, LLC (the "DIP Lender").  Mr. Honarkar objected to the DIP Motion despite having no alternative financing and understanding that the Debtors had a significant cash need to fund their operations.[13]

17.    On April 4, 2025, the Court entered an order [Docket No. 187] (the "Interim DIP Order") approving the DIP Loan on an interim basis and authorizing the Debtors to, among other things, borrow up to $3.5 million.  On May 1, 2025, the Court entered the final order [Docket No. 316] (the "Final DIP Order" together with the Interim DIP Order, the "DIP Orders"), authorizing among other things, the Debtors to borrow the remaining $1.5 million under the DIP Loan.

18.    Throughout these Chapter 11 Cases, the Debtors have been transparent about the fact that the complexity of the Debtors' business and the issues surrounding these cases would certainly require obtaining a more robust, longer-term DIP loan to consummate either a value maximizing sale process or a plan of reorganization.  *See e.g.*, *Declaration of Mark Shinderman in Support of Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; and (II) Granting Related Relief* [Docket No. 89-4], ¶ 13 (the "Initial DIP Declaration").

---

[13]    Docket No. 96.

19.     Accordingly, the Debtors, who had continued to engage with any and all possible lending sources, re-approached Mr. Makhijani and Specialty DIP to request that it increase the DIP Loan, and thereafter entered into negotiations with respect thereto.  Following extensive arms'-length negotiations, Specialty DIP agreed to provide an additional $14.5 million in immediate additional liquidity.  The Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Amend the DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 475] (the "DIP Amendment Motion"), but the increased financing under the DIP Loan was unexpectedly pulled by the Specialty DIP, and on June 9, 2025, the Debtors were directed to withdraw the DIP Amendment Motion by Specialty DIP.  *See* Docket No. 515.

20.     After this fallout with Mr. Makhijani and Specialty DIP, the Debtors were required to pivot to another DIP lender as soon as possible.  The Debtors re-engaged with a previously interested potential DIP lender, Golden East Investors, LLC ("Golden East").  On June 16, 2025, the Debtors filed the *Notice of Filing of Summary of Proposed Terms and Conditions for Debtor-in-Possession Financing* [Docket No. 538] (the "Golden East Term Sheet"), noting that the Debtors intend to file a DIP motion requesting approval of the terms therewithin on an interim basis.  This Term Sheet was contingent on the approval of the sale of the Tesoro Property, which the Honarkar Parties continued to vehemently oppose.  This contemplated DIP motion was never filed because after further diligence, Golden East proposed new deal terms that were not acceptable to the Debtors.  Consequently, and given the tight liquidity, after exhausting all other alternatives, the Debtors pivoted back to arms-length negotiations with Specialty DIP, LLC to determine if it was willing to improve upon the terms reflected in the DIP Amendment Motion.  Those discussions were successful, and the DIP Lender agreed to provide additional financing on the terms reflected in the Emergency DIP Amendment Motion filed on June 25, 2025.

21.     Since the adjournment of the sale hearing on June 10, 2025, the Debtors have been in communication with counsel to the Honarkar Parties regarding a possible alternative DIP loan. Indeed, a DIP loan from the Honarkar Parties would simplify these cases dramatically. Nevertheless, consistent with his prior failures to provide an actionable plan, and not withstanding Mr. Honarkar's promises in his deposition that if he were put in charge of the Debtors' operations he could secure DIP financing in 14 days, the Honarkar Parties, now 24 days later, still have not provided _**any**_ financing proposal, allegedly due to the large professional fee budget required to prosecute the Honarkar Parties' ongoing fights with Cantor and Coastline regarding their asserted liens and claims.

22.     Despite the Debtors' best efforts to negotiate DIP financing to provide sufficient runway to complete the proposed Sale Process and provide necessary funding to operate the business and administer these Chapter 11 Cases, the Debtors were not presented with a practical solution that would maximize value for the estates.  The Emergency DIP Amendment Motion was thwarted because, among other things, it was a condition precedent that the Debtors obtain entry of an order approving the sale of the Tesoro Property.  Desperate to keep these Chapter 11 Cases alive, and recognizing the increased value to the estates from going concern sales, Specialty DIP ultimately waived the Tesoro condition precedent and agreed to fund the case for another thirty days to allow the Debtors to re-engage with parties interested in the Tesoro Property or to otherwise seek to sell their other real property assets.  If that Motion is denied by the Court, the Debtors cannot, in good faith, move forward in these Chapter 11 Cases.

**C.  Potential Claims Against the Honarkar Parties and Their Affiliates.**

23.     As the Debtors have noted at several hearings, Mr. Honarkar has engaged in an appalling number of bad acts that have harmed both the trajectory of these Chapter 11 Cases and

the maximization of value for the Debtors' estates.  Mr. Honarkar has admitted to many of these bad acts in his own words.  For example, Mr. Honarkar actively opposed the Debtors' Sale Process and testified that he told potential bidders for the Tesoro Property that it was not for sale at the same time the Debtors were working diligently to market the property.  M. Honarkar Dep. (an excerpt of the transcript of which is attached hereto as **Exhibit D**) (June 5, 2025) ("Honarkar Dep.") 136:8-13 ("Anyone calls me on this, I would say it's not for sale . . . [e]nd of story.")  He further testified that he has (i) opened bank accounts at certain properties in the Debtors' name without the Debtors' knowledge, likely in violation of the cash management order (*Id.* 69:4-71:5), (ii) has stolen from the Debtors by instructing tenants living at the Debtors' properties to pay their rent to him rather than to the Debtors (*Id.* 57:14-15), and (iii) is currently living rent free in one of the Debtors' properties and does not intend to pay rent.  *Id.* 194:21-196:13.[14]

24.    In fact, the Debtors sent Mr. Honarkar and his counsel three (3) separate demand letters regarding Mr. Honarkar's unlawful control over the Debtors' properties and theft of the rents that were to be paid to the Debtors' estates (the "Demand Letters").  The Demand Letters, which demand that Mr. Honarkar turn complete control of the Debtors' enterprises to the CRO and compensate the Debtors for all unlawful amounts owed or unlawfully retained, are attached hereto as **Exhibit E**.  These Demand Letters seem to have fallen on deaf ears, as Mr. Honarkar continues to steal rent owed to the Debtors.  *See, e.g.,* Honarkar Dep. 192:16-193:19 (testifying that he lives at Cliff Drive Properties DE, LLC, but neither he nor anyone else pays rent to live here).  Based on information provided to date by the Honarkar Parties, FTI ran a report and has determined that the Honarkar Parties and others associated with them are benefitting, or have

---

[14] Upon information and belief, certain of Mr. Honarkar's relatives are also living in some of the Debtors' properties rent free.

otherwise failed to account for, at least $150,000 *per month* in anticipated rent at these properties because of this theft (the "FTI Report").  The FTI Report is attached hereto as **Exhibit F**.  This is why the Debtors filed their motion seeking to reject any and all contracts with the Honarkar Parties, not anything attributable to Mr. Makhijani, Continuum, or anyone else.  Any rational manager would reject these contracts in his or her business judgment where the counterparty was actively interfering with ongoing operations and stealing rents.

25.    Unsurprisingly, the bad acts committed by Mr. Honarkar and those associated with him go beyond what he was willing to admit to in his deposition.  Mr. Honarkar's intentions to interfere with the Debtors' operations were evident early on in these Chapter 11 Cases when the Debtors were informed that associates of Mr. Honarkar had, on multiple occasions, followed and harassed both Debtor professionals and independent brokers while on site visits at the Debtors' properties.  *See* Docket No. 239, ¶ 15 ("[M]ultiple individuals have reported that Mr. Honarkar or his associates have been following them, taking pictures, or otherwise harassing them while on site at . . . properties belonging to the Debtors' estates.  Even [the CRO] and the Independent Manager were followed while on a site visit at one of the Debtors' properties.").[15]

26.    The bad acts of the Honarkar Parties continued throughout the progression of these Chapter 11 Cases, presenting clear violations of the automatic stay, through and including as recent as June 2025, when Mr. Honarkar's son-in-law, Eric Bostwick, refused to provide access to the Debtors for tours of the properties that the Debtors had prospective buyers for.  *See* **Exhibit G**. These actions occurred after the filing of the Rejection Motion,[16] which put the Honarkar Parties

---

[15]    The Debtors have reason to believe that multiple individuals subject to this harassment did not, and still will not, come forward about this harassment because of their fear of repercussions from Mr. Honarkar given his history with intimidation tactics.

[16]    Docket No. 462.

on explicit notice that the Debtors wished them to have no control over management of any of their assets.  In another blatant violation of the automatic stay, Mr. Bostwick purportedly signed a contract, attached hereto as **Exhibit H**, on behalf of the Debtors after the Rejection Motion had been filed.  That contract was nearly identical to another contract that had been negotiated by the Debtors' CRO with a different party, and upon information and belief, was awarded to a party historically affiliated with the Honarkar Parties.

27.    But perhaps Mr. Honarkar's most egregious violation of the automatic stay was when he ***opened up multiple bank accounts in the name of the Debtors*** and failed to report these actions to the CRO or the United States Trustee for the District of Delaware (the "U.S. Trustee"). Bank statements from these accounts are attached hereto as **Exhibit I**.  This refusal to comply with Court orders is consistent with Mr. Honarkar's historical behavior, going all the way back to the first receivership implemented over the properties he purports to own.

28.    Mr. Honarkar's fraudulent actions, threatening behaviors, and interference with the proceedings throughout these Chapter 11 Cases are not out of the ordinary for him.  In fact, these actions and behaviors are consistent with the observations of Blake Alsbrook, the appointed receiver who oversaw Mr. Honarkar's properties prepetition as part of his divorce proceedings back July 2020.  As a result of those proceedings, Mr. Honarkar took out a $17.5 million loan to pay his former wife for a divorce settlement.  To do this, however, he required all the SPE Debtors to guaranty the repayment of this loan.  In the *Receiver's Final Report and Account, Notice of Motion, and Motion for Issuance of Order* (the "Receiver Report"), an excerpt of which is attached hereto as **Exhibit J**, Mr. Alsbrook noted that Mr. Honarkar frequently took actions to interfere with the receivership, stating that he "repeatedly ignored the Court's orders and interfered with [the receiver's] administration of the Business from the first day to the last day [the receivership]

operated." *Id.* at ¶ 64.   Additionally, Mr. Alsbrook found that Mr. Honarkar and his attorneys'

conduct and interference throughout the matter, such as threatening the receiver that he would be

violating court orders if he were to move funds in accordance with his fiduciary duties, "vastly

increased the difficulty and expense of the receivership." *Id.* at ¶ 64, 67.   The "most brazen act"

Mr. Honarkar took was opening an account in the name of 4G Wireless at a bank without Mr.

Alsbrook's knowledge, obtaining a $200,000 deposit paid to 4G Wireless, and then fraudulently

transferring all $200,000 to his personal account. *Id.* at ¶ 71.   Mr. Honarkar and his counsel refused

to answer Mr. Alsbrook about the misappropriation until Mr. Alsbrook gave ex parte notice that

he would present the issue to the Court. *Id.*   Immediately thereafter, Mr. Honarkar admitted that

the funds were being held in his personal account and agreed to transfer the funds to the receiver's

possession to avoid the issue being presented to the court. *Id.*   This was not an isolated incident.

By the conclusion of the receivership, Mr. Honarkar had committed numerous actions so egregious

that Mr. Alsbrook said it went "beyond anything [he] has ever previously experienced." *Id.* at ¶

72.

29.    Mr. Honarkar has been singularly focused on reacquiring properties he believes

were stolen from him, notwithstanding the fact that these cases have been pending for more than

four (4) months and he has yet to present any viable path forward to administer the cases.   This is

not due to a lack of opportunity.   Mr. Honarkar has had considerable time to find funding, and

even testified at a deposition on June 5, 2025 that he could get DIP financing together in two

weeks, but only if he was assured that he would take control of the Real Properties.   Honarkar Dep.

162:3-9.   The Debtors gave him that opportunity, but now well beyond that two-week time frame,

the Honarkar Parties still have not offered to provide any DIP financing loan or directed the

Debtors to anyone who would do so to pay current and ongoing expenses to the Debtors.   Although

it was already apparent, this further solidified the Debtors' belief that Mr. Honarkar was not interested in maximizing the value of the Debtors' estates, but instead was solely focused on confirming a plan that puts him in charge of the Debtors' enterprise, with as little out of pocket investment as possible, even if it is detrimental to the Debtors' estates and their creditors.

**D.  The Need to Further Investigate the Claims of the Continuum Parties**

30.    The legitimacy of the purported liens of Cantor and Coastline has been questioned by multiple parties.  Cantor Group ("Cantor") and Coastline Loans, LLC ("Coastline") have not provided loan documents despite repeated requests, such that the Debtors cannot presently reconcile amounts owed to lenders, determining the extent of any liens held by these parties and investigating any loan proceeds that may have been transferred outside the Debtors' control (which would be addressed in the proposed accounting).

31.    Some or all of the Cantor loans may be secured by liens on and security interests in certain of the Real Property, behind the Real Property Lenders.  Per their filed proofs of claim, Cantor currently alleges secured claims against the Debtors in the amount of at most $62,317,177.74 and unsecured claims against the Debtors in the amount of at least $57,328,598.59. *See* Proofs of Claim Nos. 251, 257, 268, 316, 323, 346 & 348.  The validity of the advances by Cantor has been called into question by the Honarkar Parties, the Arbitrator, and other parties in interest in these Chapter 11 Cases, and the validity and extent of those claims, whether secured or unsecured remains in dispute subject to the completion of the forensic accounting.

32.    Additionally, on June 11, 2025, Coastline filed a proof of claim against Debtor MOM CA Investco LLC in the amount of $310,572,711.10.  *See* Proof of Claim No. 358.  The proof of claim did not identify what portions of the claim are secured or unsecured and did not attach the underlying loan documents.  As with the Cantor loans, the validity of the advances by

Coastline has been called into question by the Honarkar Parties, the Arbitrator, and other parties in interest in these Chapter 11 Cases, and the validity and extent of those claims, whether secured or unsecured, remains in dispute subject to the completion of the forensic accounting.[17]

33.     In total, these entities purport to have loaned the Debtors over $500 million since the formation of the MOM Investcos.  Very little of these amounts appear to be broken out by entity; rather, many of the amounts appear to have been improperly accounted for on an aggregate basis.  But there is reason to believe this $500 million number has been inflated, since the Continuum Parties' own expert in the Arbitration has indicated that the number for the Cantor loans was nowhere near the amount they are now seeking.[18]

**E.  Other Potential Assets.**

34.     Adding another layer of complication to these Chapter 11 Cases is the enforceability of the corporate organizational documents of the MOM Investcos (the "Corporate Organization Documents" or the "Documents").  The Arbitrator unquestionably found that these Documents were procured by fraud and that they are voidable by the Honarkar Parties should they elect the remedy of rescission.  The Honarkar Parties latch onto this finding as the foundation of their alternate reality, leading them to argue that not only are these agreements unenforceable, but that the Arbitrator's finding somehow means that he immediately became the 100% owner of all the SPEs, even without electing rescission.  Even more shocking, in their constructive trust complaint, the Honarkar Parties argued that they are also the owners of the real estate owned by the SPE Debtors (despite being the party that formed those entities specifically to own the real

---

[17]    *See* Partial Interim Award, fn. 22 (noting that Coastline suggested they were blocked from withdrawing their deeds of trust because of "pending litigation," but no evidence was ever presented to support this position, and some (but not all) of the deeds of trust have been reconveyed with no explanation).

[18]    *See* Joseph Pohlot's supplemental expert report, attached hereto as **Exhibit K** (suggesting Cantor's secured claim is $23,063,000 and unsecured claim is $26,470,671).

estate) and that the Debtors are required to "turnover" those assets to the Honarkar Parties.  All of these delusions have influenced the Honarkar Parties misguided efforts throughout these Chapter 11 Cases.  They have even misconstrued basic legal principles, such as a voidable contract is still enforceable until it becomes void[19] and that a shareholder is not the owner of the underlying assets of its wholly-owned subsidiary.[20]  Thus, as a matter of black-letter law, the Honarkar Parties are simply wrong, at least until they effectuate rescission in the Arbitration, and that hearing is not scheduled until December 22, 2025, assuming the required accounting can be completed by then.  Without financing, all of which has been made impossible by the Honarkar Parties actions, the Real Property Lenders will foreclose on their collateral long before Mr. Honarkar gets to a position to do anything to implement his strategy.

35.    Another potential asset of the Debtors that a chapter 7 trustee should investigate is whether Palm Desert Collective Resort, LLC ("PDCR") should now be an asset of the Debtors' estates.  Specifically, under Exhibit E to the Asset Contribution Agreement (the "ACA"), attached hereto as **Exhibit L**, PDCR was a "Held-back LLC," which the Arbitrator has held was not contributed to the Debtors.  However, the ACA provides that if a Held-Back LLC is refinanced, then "the following shall be deemed to have occurred without any further action on the part of any party hereto: (a) . . . ownership of such Held-back LLC shall be restructured . . . so that the sole owner of all of the membership interests in such Held-back LLC is [Mr. Honarkar] and (b) immediately after such restructure, [Mr. Honarkar] shall contribute the membership interests in the Held-back LLC to MOM CA."  ACA § 2(a)(ii).  Based on the article attached hereto as **Exhibit**

---

[19]    "A contract subject to recission, but which has not been rescinded, is not void, but merely voidable." *Maniar v. Capital Bank of California*, 1993 WL 515880 (N.D. Cal. Dec. 6, 1993) (applying California law), *citing* Civ. Code § 1692 and *Harrison v. Connecticut Mutual Life Ins. Co.*, 771 F. Supp. 1053 (1991).

[20]    *See Debtors' Reply in Support of the Debtors' Tesoro Sale Motion* [Docket No. 523-1], ¶ 22.

**M** (the "Peachtree Article"), there may have been a refinancing of PDCR earlier this year, which would make it automatically contributed to MOM CA Investco following that transaction.  The Debtors have been asking for the underlying documents for over a month, but the Honarkar Parties have refused to produce them; instead providing only copies of deed of trust "assignments."  While the Honarkar Parties assert that these assignments are somehow conclusive that there was no refinance transaction, it is unclear why any lender would assign its secured debt to a new lender for no consideration.  Otherwise, one lender paying a second lender to take out over its existing secured debt obligations sounds like a prototypical refinance.  Regardless, the ACA remains enforceable until rescission is achieved, and the chapter 7 trustee should immediately demand the finance documents from the Honarkar Parties to fully evaluate whether PDCR is now an asset of the Debtors or otherwise remains outside the estate.  The Superior Court of California seems to agree, having adjourned a hearing in a dispute between the Honarkar Parties and Cantor based on the Debtors' ex parte motion.[21]

### RELIEF REQUESTED

36.     To be clear, the Debtors strongly urge the Court to enter the Emergency DIP Amendment Motion as the value maximizing path forward in these cases.  However, to the extent the Emergency DIP Amendment Motion is denied, the Debtors respectfully request entry of an order, pursuant to section 1112(a) and 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017(f), (i) converting these Chapter 11 Cases to a cases under chapter 7 of the Bankruptcy Code effective as of the date of entry of the Proposed Order attached hereto as **Exhibit A**, (ii) granting the Real Property Lenders relief from the automatic stay, and (iii) granting related relief.

---

[21]     *See* Exhibit H of Exhibit C attached to the Motion to Dismiss.

A.      **Cause Exists to Convert These Chapter 11 Cases to a Chapter 7 Liquidation under §1112(b)(1).**

37.     Section 1112(b) of the Bankruptcy Code provides that, on request of a party in interest, and after notice and a hearing, "the Court shall convert a case to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause." 11 U.S.C. § 1112(b)(1).  Under section 1112(b), conversion or dismissal is mandatory upon a finding of "cause."  *See* 11 U.S.C. § 1112(b)(1); *DCNC North Carolina I, LLC v. Wachovia Bank, N.A.*, Case No. 09-3775, 09-3776, 2009 WL 3209728, *6 (E.D. Pa. Oct. 5, 2009); *see also In re The Reserves Resort, Spa & Country Club LLC*, No. 12-13316 (KG), 2013 WL 3523289, *2 (Bankr. D. Del. July 12, 2013).

38.     Although "cause" is not defined, section 1112(b)(4) provides a nonexclusive list of 16 "causes" for conversion.  11 U.S.C. § 1112(b)(4)(A)-(P); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 162 n. 10 (3d Cir. 2012) ("the listed examples of cause are not exhaustive"); *In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 386 (E.D. Pa. 1991).  At least one ground under the subsections of § 1112(b)(4) exist here and demand conversion of these cases.  Specifically, there is an inability to effectuate substantial consummation of a confirmed plan.   11 U.S.C. § 1112(b)(4)(M).

39.     If the movant establishes "cause", the burden then shifts to the debtor to prove it falls within the § 1112(b)(2) "unusual circumstances" exception to §1112(b)(1)'s mandatory conversion.  However, the Third Circuit instructs that "[c]ourts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization."  *In re Brown*, 951 F.2d 564, 572 (3d Cir.1991)) (citing *In re Canal Place Ltd. Partnership*, 921 F.2d 569, 577 (5th Cir.1991)); *see also In re Woodbrook Assocs.*, 19 F.E. 312, 317 (7th Cir. 1994) ("The very purpose of

§ 1112(b) is to cut short [the] plan and confirmation process where it is pointless.").  If cause to convert or dismiss is present, the Third Circuit has indicated that it then chooses between conversion and dismissal based on "the best interest of creditors and the estate."  *In re Am. Capital Equip.*, LLC, 688 F.3d at 161.

40.    Conversion is warranted where a debtor presents an "inability to effectuate substantial consummation of a confirmed plan."  11 U.S.C. § 1112(b)(4)(M).  A "debtor's ability to effectuate a plan may well turn on practical considerations, including whether confirmation can be achieved."  *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011); *see Loop Corp.*, 379 F.3d 511, n. 2 (8th Cir. 2004) (discussing bankruptcy court's skepticism about whether any plan would be confirmable as grounds for cause to convert) (citing *In re Fossum,* 764 F.2d 520, 521- 22 (8th Cir. 1985) ("A finding that the [debtors] were unable to effectuate any plan which would be confirmable is a proper basis for dismissal of the [debtors'] chapter 11 case."); *see also In re Lamar Estates, Inc.*, 6 B.R. 933 (Bankr. E.D. N.Y. 1980) (debtors' inability to effectuate plans of reorganization sufficient cause to convert); *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 665 (Bankr. E.D. Pa. 2009) (same).

41.    One of the purposes of section 1112(b) is to weed out inappropriate chapter 11 cases at the earliest possible time.  As the Seventh Circuit explained, "The very purpose of § 1112(b) is to cut short [the] plan and confirmation process where it is pointless."  *In re Woodbrook Assocs.*, 19 F.R. 312, 317 (7th Cir. 1994) (citations omitted).  Further, the Supreme Court has noted "[t]he preservation of business enterprises must not be at the expense of creditors."  *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 119 n.14 (1939) (internal citations omitted); *see also In Re Gonic Realty Trust*, 909 F.2d 624, 626-27 (1st Cir. 1990) ("The court [in exercising its discretion under section 1112(b)] must exercise its sound judgment in reaching a determination and must ascertain that the decision is in the best interest of the

creditors.").  "The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. . . . [I]f there is not a potentially viable business in place worthy of protection and rehabilitation, Chapter 11 has lost its *raison d'être.*'"  *In re Whiteshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985) (internal citations omitted).

42.    This Court should convert the Debtors' Chapter 11 Cases to chapter 7 cases because cause for conversion exists and conversion is in the best interest of the Real Property Lenders, other creditors, and the Debtors' estates.  Since these Chapter 11 Cases were filed, the Debtors and their advisors have worked diligently to either obtain approval of a plan of reorganization or complete a sale of substantially all of their assets and negotiate a final DIP order.  The Debtors have also spent substantial resources responding to the Honarkar Parties' aggressive litigation strategy in these cases.

43.    The Debtors find themselves in a dire financial position given that they currently have negative liquidity, and absent additional financing, are unable to fund their cases to enable them to operate beyond June 30, 2025.  The Debtors have no prospect of obtaining additional financing as there is no DIP facility forthcoming if the Court denies the DIP Amendment Motion. Accordingly, in the exercise of their business judgment and in consultation with their advisors, the Debtors have concluded that, if the DIP Amendment Motion is denied, given their negative and declining liquidity, they are administratively insolvent and proceeding with these cases would be untenable and irresponsible.  Among other things, it would create the real risk the Debtors would become unable to make critical ongoing expenses, including payroll, in addition to extensive, unbudgeted administrative expenses that would be necessitated by further operations in chapter 11.

44.     While the Debtors believed (and still believe) that a consensual chapter 11 sale process would have been the best avenue for maximizing the value of the Debtors' estates, the Debtors have determined that continuing to proceed down a contentious path with uncertainty as to whether or not the contemplated sales will close is no longer possible, appropriate, or value maximizing.  Thus, conversion of the Chapter 11 Cases to cases under chapter 7, and not dismissal, is the best choice to maximize value for the benefit of all stakeholders because, among other things, its preserves potentially valuable estate causes of action to be pursued by a chapter 7 trustee for the benefit of all stakeholders.

### B.   The Lenders Should Be Given Relief from the Automatic Stay Pursuant to § 362(d)(1) for "Cause."

45.     Relief from the automatic stay is appropriate "for cause, including the lack of adequate protection of an interest in property."  11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not define "cause," and courts have held that this determination is to be made on a case-by-case basis. *See In re Rexene Products Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).  Courts examine the totality of the circumstances to determine if cause is sufficient to lift the stay.  *In re SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007).  When determining if "cause" exists to grant relief from the stay to continue litigation, Courts typically weigh whether (i) any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit; (ii) the hardship to the movant by maintenance of the stay considerably outweighs the hardship of the debtor, and (iii) the movant has a probability of prevailing on the merits.  *In re Tribune Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009), quoting *In re Rexene Products Co.*, 141 B.R. at 576.

46.     The Debtors have been fully transparent with the Real Property Lenders throughout these Chapter 11 Cases, informing them that if these cases reached the point they are at today— with no DIP facility, assuming the Court denies the DIP Amendment Motion, no viable plan of

reorganization, and uncertainty about the success of the Sale Process— they would be given relief from the automatic stay so that they can, among other things, seek foreclosure on their respective Properties.  Currently, no post-petition payments have been made to any of the Real Property Lenders, and they are not adequately protected.  Additionally, the Honarkar Parties have been mismanaging certain of the SPEs by diverting rents, income, and profits from the Properties. Accordingly, because the Real Property Lenders hold the Properties as collateral, granting relief from the stay will allow the Real Property Lenders to protect their operating assets and exercise their state law foreclosure rights if they so choose.  Many of the Real Property Lenders have already filed their own stay relief motions, and the Debtors consent to that relief.

### C.  Ancillary Relief

47.    The professional fee escrow is held by the Debtors' professionals outside of the Debtors' estates pursuant to the DIP Order.  These funds are not property of the estates, by design, and they should not be required to be turned over to the chapter 7 trustee.

48.    Finally, if the Court orders conversion, the Debtors will need a couple of days to transition operations to make sure that the City of Laguna and employees are not harmed, especially given the start of the Pageant of the Masters and the Festival of the Arts, which are primary revenue drivers for the Debtors.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE** the Debtors respectfully request entry of an order granting the

relief requested herein, and such other and further relief as is just and proper.

Dated: June 30, 2025
       Wilmington, Delaware

Respectfully submitted,

*/s/ R. Stephen McNeill*
Christopher M. Samis (No. 4909)
Aaron H. Stulman (No. 5807)
R. Stephen McNeill (No. 5210)
Gregory J. Flasser (No. 6154)
Sarah R. Gladieux (No. 7404)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com
      astulman@potteranderson.com
      rmcneill@potteranderson.com
      gflasser@potteranderson.com
      sgladieux@potteranderson.com

*Counsel to the Debtors and*
*Debtors in Possession*