## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| YELLOW CORPORATION, et al., ) | |
| ) | Case No. 23-11069 (CTG) |
| Debtors. ) | |
| ) | Jointly Administered |

## MULTIEMPLOYER PENSION PLANS' SUPPLEMENTAL SUMMARY JUDGMENT MEMORANDUM

SULLIVAN · HAZELTINE · ALLINSON LLC
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
whazeltine@sha-llc.com

GROOM LAW GROUP, CHARTERED
Edward J. Meehan (*pro hac vice*)
Samuel I. Levin (*pro hac vice*)
1701 Pennsylvania Ave., NW
Washington, DC 20006
Tel: (202) 857-0620
Email: emeehan@groom.com
slevin@groom.com

*Special Counsel for the Funds*

Date: December 13, 2024

1.  The Funds[1] submit this supplemental memorandum in response to this Court's *Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider*, Dkt. 4771 ("Questions"), and to the *Amended Order Scheduling Certain Dates and Deadlines in SFA MEPP and Non-SFA MEPP Litigation* entered on December 12, 2024, Dkt. 5156.

2.  Because, for the reasons discussed below, there should not be a discount to present value or subordination of the Funds' claims under Section 4225 of the Employee Retirement Income Security Act ("ERISA"), this Court should enter an order that the Funds' claims are allowed in full, except to the extent already modified by this Court's Amended Memorandum Opinion (Dkt. 4769).

**I.  There Should Not Be a Discount to Present Value Because Debtors Have Defaulted.**

3.  As discussed below, there are at least three independent bases to conclude that Debtors' payment stream has been accelerated, and that, accordingly, there should be no discount to present value.  *First*, defaults occurred automatically with respect to all Funds by virtue of Debtors' bankruptcy filing.  *See infra* at ¶¶ 4-8.  *Second*, four of the Funds' plan documents provide for insecurity defaults.  *See infra* at ¶¶ 9-18.  *Third*, missed payment defaults occurred with respect to all Funds.  *See infra* at ¶ 19.

  A.  <u>Defaults Occurred Automatically with Respect to All Funds by Virtue of the Bankruptcy Filing.</u>

---

[1] The "Funds" are seven multiemployer pension plans: New York State Teamsters Conference Pension and Retirement Fund ("New York State"); Road Carriers Local 707 Pension Fund ("Road Carriers 707"); Management Labor Pension Fund Local 1730; Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund ("Local 701"); Teamsters Local 617 Pension Fund; Trucking Employees of North Jersey Pension Fund ("TENJ"); and Freight Drivers and Helpers 557 Pension Fund.

4.	As the Funds previously argued, it is a "basic bankruptcy law tenet that 'bankruptcy operates as the acceleration of the principal amounts of all claims against the debtor[],'" regardless of whether "a clause in a prepetition agreement provides that a bankruptcy filing accelerates the maturity date." *In re Oakwood Homes Corp.*, 449 F.3d 588, 602 n.19 (3d Cir. 2006) (quoting H.R. Rep. No. 95-595, at 352-54 (1977)) (citing 4-502 Collier on Bankruptcy ¶ 502.03). *See also* Dkt. 4540, ¶ 30. And, as this Court subsequently noted, this "view" is further "reflected" in "the legislative history of § 502," "pre-Code" Supreme Court precedent, and academic literature. *See* Questions at 5-6 & nn. 10-11 (citing H. Rep. No. 595, 95th Cong., 1st Sess., 352-353 (1977); *Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911); David Zarfes and Michael L. Bloom, *Contracts and Commercial Transactions* (2011)). Accordingly, the Funds agree that it "[d]oes [not] matter whether a particular pension plan did or did not declare the 20-year stream of payments to be accelerated[]." Questions at 5.

5.	In prior briefing on this topic, Debtors did not dispute that the Funds' claims were accelerated by virtue of Debtors' bankruptcy filing. *See* Dkt. 4649, ¶¶ 5-6. Instead, Debtors argued that "the SFA MEPPs are advocating for [a] . . . 'general rule' that would render it inappropriate for the Court to discount ***any*** claims to present value." *Id.*, ¶ 6. But the Funds are not seeking any such "general rule." Rather, the Funds are seeking to have their withdrawal liability claims, which have been accelerated, not subject to a discount to present value because, as discussed below, ERISA makes clear that there should not be a discount.

6.	ERISA specifies the circumstances in which a present value calculation is to be made with respect to withdrawal liability. *See, e.g.*, 29 U.S.C. § 1384(a)(3)(A) (providing that, in certain circumstances, a company "shall provide a bond or amount in escrow ***equal to the present value of the withdrawal liability*** the seller would have had but for this subsection") (emphasis

added); 29 U.S.C. § 1405(e) (providing that, in certain circumstances, "the withdrawal liability of the employer to each plan shall be an amount which bears the same ratio *to the present value of the withdrawal liability* payments to all plans") (emphasis added). By contrast, in the case of defaults, ERISA does not provide for a present value calculation to be made with respect to withdrawal liability. *See* 29 U.S.C. § 1399(c)(5). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up).

7. Debtors had previously argued that a discount to present value was required under ERISA—but neither of their cases even discuss, much less support, that erroneous conclusion. *See* Dkt. 3285, ¶ 88; Dkt. 3975, ¶ 148; Dkt. 4011, ¶ 71 & n.33. In *Key Handling*, the court ruled on the issue of whether the 20-year cap should apply in the event of a default—holding, as this Court already has, that it should. *See Trustees of Leather Goods, Plastics, Handbags & Novelty Workers Union Loc. 1 Joint Ret. Fund v. Key Handling Sys. Inc.,* No. CV 14-2675 JS ARL, 2015 WL 5604184, at *4 (E.D.N.Y. June 5, 2015);[2] Dkt. 4769 at 38. The court in *Key Handling* did not have occasion to consider the issue of whether a present value was required in the event of a default, because the fund's demand reflected the present value of 20 years of payments. *Key Handling*, 2015 WL 5604184, at *4.

8. And, in *Div. 1181*, there was no discount to present value at all. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. D & A Bus Co.*, 270 F. Supp. 3d 593 (E.D.N.Y. 2017). Rather, the assessment was "the total withdrawal liability figure of $575,545"

---

[2] *Report and recommendation adopted*, No. 14-CV-2675 JS ARL, 2015 WL 5604178 (E.D.N.Y. Sept. 23, 2015).

4

that represented the full amount of the unfunded vested benefits allocable to the employer prior to the application of any payment schedule. *See id.* at 614-15 (citing Declaration of William D. Sullivan in Support of Multiemployer Pension Plans' Supplemental Summary Judgment Memorandum ("Sullivan Decl."), Ex. A (D'Ulisse Supplemental Declaration) at Ex. 3 (Actuarial Report)); Sullivan Decl., Ex. A (D'Ulisse Supplemental Declaration) at Ex. 3 (showing "575,545" as the "Employer UVB" prior to the application of the payment schedule). *See also* Dkt. 3975, ¶ 148. As the Funds have previously made clear—"what the court approved of in *Div. 1181* is exactly what the Funds contend is proper here: Debtors' withdrawal liability should be the full amount of UVBs allocable to Debtors, without regard to the application of any payment schedule." Dkt. 3975, ¶ 148. Given that *Div. 1181* did not involve a payment schedule at all, nor even mention the concept of a "present value," it obviously says nothing about whether a discount to present value is required if, as this Court has now ruled, there is a payment schedule.[3]

    B.    <u>Four of the Funds' Plan Documents Provide for Insecurity Defaults, Which Are Enforceable in Bankruptcy.</u>

9. Four of the Funds' plan documents provide for insecurity defaults under 29 U.S.C. § 1399(c)(5)(B). One of those four Funds—TENJ—has a plan document which provides for an automatic insecurity default upon the filing of a bankruptcy petition. *See* Sullivan Decl., Ex. B at YELLOW_TENJ 000341; Ex. C at YELLOW_TENJ 000448-449.

10. An additional three Funds—New York State, Local 701, and Road Carriers 707—have plan documents which provide discretion to declare an insecurity default, which those Funds

---

[3] Despite all of this having already been briefed, Debtors' last filing on this topic claimed, in a footnote, that the Funds "make much of the fact that the court in *[Div. 1181] Amalgamated Transit* discounted the fund's $1,058,688 claim by straightforwardly excising $500,000 of interest rather than conducting a more present value analysis." Dkt. 4011, ¶ 71 n.33. Debtors offer no citation for this claim because it is pure fiction. The court's opinion contains no discussion of any "discount" or "present value," nor does it mention $500,000 in interest.

exercised in connection with the filing of their proofs of claim. *See* Sullivan Decl., Ex. D at YELLOW_NYST 000326-327; *id.*, Ex. E at YELLOW_701 000231, 243; *id.*, Ex. F at YELLOW_RC707 000493-494.[4] That Debtors' insecurity defaults were declared post-petition for some of the Funds is not preclusive because they relate back to the circumstances as of the petition date. *See United States v. Gerth*, 991 F.2d 1428, 1434 (8th Cir. 1993) ("A debt can be absolutely owing prepetition even though that debt would never have come into existence except for postpetition events."); *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036 (5th Cir. 1987) ("The debt owed . . . does not have to be calculated prior to the filing of the bankruptcy petition[.] . . . The debt was absolutely owed; it just was not due until a calculation of the amount . . . was made.").

11. Even if any of the insecurity default provisions are properly characterized as *ipso facto* clauses, they are enforceable. This Court correctly explained in its initial summary judgment opinion that:

> As the Second Circuit explained in *In re AMR Corp.*, 730 F.3d 88, 105-107 (2d Cir. 2013), while various provisions of the Bankruptcy Code prohibit the enforcement of *ipso facto* clauses in the specific context of executory contracts, the definition of property of the estate, and the trustee's authority to sell or lease property, **the Bankruptcy Code does not prohibit the enforcement of ipso facto clauses outside of those contexts**.

Dkt. 4326 at 36 n.112 (emphasis added). *See also* 11 U.S.C. §§ 363(l), 365(e)(1), 541(c).

12. Under fundamental principles of statutory interpretation, "the specificity of the provisions" prohibiting *ipso facto* clauses "demonstrate that Congress clearly knows how to limit or negate the effect of *ipso facto* clauses when it wants to," and "counsels against the position . . .

---

[4] On December 10, 2024, Debtors asked the Funds to provide supplemental declarations confirming this information. While the Funds do not believe such declarations are necessary or that such discovery was timely requested, the relevant Funds have provided these declarations. *See* Sullivan Decl., Ex. G; *id.*, Ex. H; *id.*, Ex. I.

that *ipso facto* provisions are broadly or categorically denied enforcement by the Code." *In re AMR Corp.*, 730 F.3d at 107. *See also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

13. Debtors have advanced no textual argument to the contrary. Rather, they simply noted, in a footnote, that another court had taken a broader view based on its reading of legislative history. *See* Dkt. 4461 ¶ 21 n.6 (citing *In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012)).[5] And, when the Funds pointed out, for the reasons reiterated below, that the reasoning in *In re W.R. Grace & Co.* could not be defended, *see* Dkt. 4540, ¶¶ 27-28, Debtors chose to completely ignore the issue in their reply. *See generally* Dkt. 4649. *See also Moore v. Davis*, 684 F. Supp. 3d 813, 834 (S.D. Ind. 2023) ("In their reply, the State Defendants do not address the Moores' arguments regarding Mr. Balmer. Failure to respond to an argument results in waiver, and silence leaves us to conclude that the silent party is making a concession. Because the State Defendants did not respond to the Moores' argument regarding Mr. Balmer's personal involvement, they have waived any opposition to that argument.") (cleaned up).

14. *In re W.R. Grace & Co.*, which pre-dates the Second Circuit's decision in *In re AMR Corp.*, is wholly unpersuasive because it expressly acknowledged it was disregarding the text of the Bankruptcy Code in favor of legislative history. *See In re W.R. Grace & Co.*, 475 B.R. at 152–53 (D. Del. 2012) (acknowledging that "[t]he general prohibition against *ipso facto* clauses has its roots in two specific sections of the Bankruptcy Code: §§ 541(c) and 365(e)(1)" but

---

[5] Although, as Debtors noted, *In re W.R. Grace & Co.* resulted in three decisions from the Third Circuit, none of them addressed the enforceability of *ipso facto* clauses.

rejecting the argument that the prohibition on *ipso facto* clauses is limited to those sections because legislative history purportedly suggested that the prohibition applies "without limitation") (citing *Matter of Rose*, 21 B.R. 272, 276 (Bankr. D.N.J. 1982)). Indeed, the bankruptcy court decision in *In re AMR Corp.*, which the Second Circuit affirmed, expressly rejected *In re W.R. Grace & Co.*, as inconsistent "with the plain language of the statute." *In re AMR Corp.*, 485 B.R. 279, 296 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013). *See also* Emil A. Kleinhaus & Peter B. Zuckerman, *The Enforceability of Ipso Facto Clauses in Financing Agreements: American Airlines and Beyond*, 23 No. 2 J. Bankr. L. & Prac. NL Art. 1 (Apr. 2014) ("[T]he [*W.R. Grace*] court's conclusion that 'the ban on *ipso facto* clauses' is 'much broader' than 'the confines of §§ 541(c) and 365(e)(1)' is not well supported.").[6]

15. Under Supreme Court precedent, the approach taken by *In re W.R. Grace & Co.* of allowing its reading of legislative history to control over the actual text of the statute is plainly incorrect. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 186 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous. . . . Because we have held that the text of the statutory reservation [is clear], we have no occasion to resort to legislative history.") (internal citations omitted). Accordingly, this Court should follow the Second Circuit's well-reasoned decision in *In re AMR Corp.* rather than the incorrectly decided *In re W.R. Grace & Co.* decision.[7]

---

[6] *See also id.* (explaining that while "*W.R. Grace* cited several cases in support of its holding that *ipso facto* clauses are unenforceable on non-statutory grounds[,]" those cases "involved notably different factual or legal circumstances from those at issue in *W.R. Grace*," and, in particular, "[t]he corporate bankruptcies cited by *W.R. Grace* all invalidated ipso facto clauses on statutory grounds, relying on section 365(e), 363(l), or 541(c)").

[7] *In re W.R. Grace & Co.* is not binding on this Court because "a bankruptcy court is not bound by the decision of a district court [in its district], since there is no such thing as the law of the district." *In re Raphael*, 238 B.R. 69, 77 (D.N.J. 1999).

16. Finally, the automatic stay did not prevent the Funds from declaring a default after the petition date and notifying Debtors of that default. As the Third Circuit has explained:

> The automatic stay imposed by the Bankruptcy Code has a twofold purpose:
>
> (1) to protect the debtor, by stopping all collection efforts, harassment, and foreclosure actions, thereby giving the debtor a respite from creditors and a chance to attempt a repayment or reorganization plan or simply be relieved of the financial pressures that drove him or her into bankruptcy; and (2) to protect creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors.

*In re Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019) (cleaned up).

17. The automatic stay, therefore, "facilitate[s] the Code's 'orderly and centralized' debt-resolution process." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 391 (2023) (quoting 1 Collier on Bankruptcy ¶ 1.01 (16th ed. 2023)). Accordingly, "the automatic stay serves to protect the bankruptcy estate from actions taken by creditors **outside the bankruptcy court forum**, not legal actions taken within the bankruptcy court." *In re Sammon*, 253 B.R. 672, 681 (Bankr. D.S.C. 2000) (emphasis added). *See also In re Nelson*, 234 B.R. 528, 534 (Bankr. M.D. Fla. 1999) (holding that it would be "the understatement of the year" to describe as "absurd" the argument that the automatic stay was violated by a filing in the bankruptcy court).

18. Consistent with the purposes and text of the automatic stay, an overwhelming majority of courts have concluded that the mere declaration of a default and notice to debtors of that default, standing alone, are not violations of the automatic stay—particularly, where, as here, that notice is delivered in the bankruptcy proceeding itself through proofs of claim and other pleadings. *See, e.g.*, *In re Split Vein Coal Co., Inc.*, No. 1:03-BK-02974MDF, 2009 WL 4937760, at *9 (Bankr. M.D. Pa. Dec. 11, 2009) ("While Gilberton did not violate the automatic stay simply by declaring the default, it was barred from terminating the lease."); *In re War Eagle Const. Co., Inc.*, 283 B.R. 193, 199 (S.D.W. Va. 2002) (holding that there was no violation of the automatic

9

stay based on "the commonly recognized difference between declaring a . . . default and seeking to collect . . ."); *Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.,* 33 F. Supp. 2d 235, 242 (S.D.N.Y. 1998) ("As to whether this declaration of default in and of itself violated the automatic stay provision, both precedent and logic dictate that it did not."); *In re Sixteen to One Mining Corp.*, 9 B.R. 636, 638 (Bankr. D. Nev. 1981) ("[T]he automatic stay of Section 362 prevents any act to obtain possession of the property of the estate. . . . Does this include the giving of notices of default? The answer is that so long as there is no attempt to obtain possession a notice may be given . . . ."). *See also In re PCH Assocs.*, 122 B.R. 181, 198 (Bankr. S.D.N.Y. 1990) ("Courts have made a distinction between acceleration of a debt upon the filing of the bankruptcy petition for the purpose of the filing of a proof of claim in a case . . . and acceleration for the purpose of taking actions against a debtor in violation of the automatic stay . . . ."); *In re Texaco Inc.*, 73 B.R. 960, 967 (Bankr. S.D.N.Y. 1987) (holding that the automatic stay could be violated by service of "a Notice of Acceleration" if it was an "affirmative step . . . towards the collection of their claims" "beyond the filing of proofs of claim").

   C. <u>Missed Payment Defaults Have Occurred with Respect to All Funds.</u>

  19. There have also been missed payment defaults under 29 U.S.C. § 1399(c)(5)(A). Debtors received their notices and demands for payment upon the filings of the Funds' proofs of claim (all of which were filed in 2023), Debtors have been aware that they were in default since at least February 2024, and Debtors have made no payments to any of the Funds.[8]  As discussed above, the fact that these defaults occurred post-petition is not dispositive. *See supra* at ¶ 10.[9]

---

[8] Under 29 U.S.C. § 1399(c)(5)(A), Debtors are deemed in default if they do not cure any missed payments within 60 days of a written notification which, at the latest, would have occurred 60 days after the Funds' Response to Debtors' Objections, filed on February 16, 2024. *See* Dkt. 2224 at 2.

[9] While the Funds acknowledge this Court's ruling with respect to Debtors' waiver of any challenge to their default, *see* Questions at 4, the Funds continue to believe that Debtors' actions

## II. There Should Not Be A Discount to Present Value Because, Even if Not Accelerated, the Payment Streams Would Only Cover the Principal of the Withdrawal Liability.

20. This Court asked whether "the 20-year stream of payment[s] on withdrawal liability provided for under ERISA . . . [s]hould be viewed as, in effect, an interest-free loan?" Questions at 8. "If so," this Court noted, regardless of whether there has been an acceleration, "the effective discount rate should then be zero." *Id.*

21. The 20-year stream of payments should be viewed as, in effect, an interest-free loan. Interest represents amounts paid on top of the principal amount, and an interest-free loan is a payment structure in which no payments are made on top of the principal amount. By virtue of the application of the 20-year cap, the Funds are only recovering a portion of the principal amount they would otherwise be owed—and what would constitute interest is not recovered at all. Debtors, therefore, are getting the benefit of spacing out their principal payments over time, without paying additional interest—in effect, an interest-free loan.

22. For example, the principal amount allocated to Debtors by Road Carriers 707 was $245,112,440. Sullivan Decl., Ex. J at 17 ln. 7. Based on their contribution history, Debtors' required annual payments were capped at $2,588,224. *Id.* at 17 ln. 9(c). But, by virtue of the application of the 20-year cap, Debtors are only required to make 20 years of annual payments of $2,588,224—which totals $51,764,480, or approximately 21% of the principal amount allocated to Debtors. *See id.* at 18. The total amount that would be paid by the debtors does not exceed the principal, indicating that no interest is being paid.

---

should constitute waiver, particularly given that they were on notice of the issue and did not contest it throughout discovery or at summary judgment.

### III. If the Court Determines That a Discount to Present Value is Required, the Discount Rate is Dictated by ERISA and No Trial is Necessary.

23. Debtors have conceded that, if a discount to present value is required, it should be determined by reference to non-bankruptcy law—here ERISA. *See* Dkt. 3825, ¶ 88 ("[T]his Court should follow others in allowing claimants to pursue exactly what they would have received **had they been paid in a lump sum outside of bankruptcy**: a lump sum equal, in today's dollars, to 20 years of future payments via discounting.") (emphasis added). *See also Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000) ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.").

24. Notably, in the case cited by Debtors, the discount rate that was used for the present value calculation was 7.50%, which was the same discount rate used to determine the employer's payment schedule. *See* Sullivan Decl., Ex. K (*Key Handling* Complaint) at Ex. A (showing a "7.50%" "Interest" rate used to calculate the "Payment Schedule").[10] The discount rate used to determine an employer's payment schedule is required, as a matter of law, to be the same rate used in the fund's actuarial valuation. *See* 29 U.S.C. § 1399(c)(1)(A)(ii) ("The determination of the amortization period described in clause (i) shall be based on the assumptions used for the most recent actuarial valuation for the plan."); *Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 94-95 (3d

---

[10] As the court noted, the "present value of 20 years of payments" was determined by the fund to be "$107,107." *Key Handling*, 2015 WL 5604184, at *4. The present value of 20 years of annual payments of $9,773.32 at an interest rate of 7.50% is $107,107. *See Key Handling*, Dkt. 1 at page 11 (showing 20 annual payments of "$9,773.32"); https://www.calculatorsoup.com/calculators/financial/present-value-cash-flows-calculator.php (using "Interest Rate: %" of 7.50, "Compounding:" of 1, "Cash Flows at:" beginning, "Number of Lines:" of 1, and 20 "Periods" at "Cash Flows" of 9,773.32).

Cir. 1990) (holding that, under 29 U.S.C. § 1399(c)(1)(A)(ii), "it was appropriate for the Fund to select the rate used to value the vested liabilities").[11]

25.     If a discount to present value is necessary at all (which the Funds dispute), the Funds agree that this Court should follow the approach set forth in *Key Handling* of using the discount rate required to calculate the annual payment schedule—which, under Third Circuit precedent, are the rates that each of the Funds used to calculate their unfunded vested benefits ("UVBs"). *See supra* at ¶ 24. There is no need for expert testimony or a trial to establish what these rates were for each of the Funds, as the rate for each Fund is known and can be stipulated to by the parties if this Court orders that the proofs of claim be discounted to present value.

26.     As this Court observed, Debtors have "suggest[ed] that the [discount rate] may properly be the subject of expert testimony." Questions at 8. *See also* Dkt. 3825, ¶ 89 ("This Court should confirm that the SFA MEPPs are required to reduce their Proofs of Claim to present value, permitting the parties to negotiate an appropriate discount rate or the parties' respective experts to testify on that point at trial for the Court to resolve."). But as discussed above, the legally correct discount rates (if any) are already known as a matter of undisputed fact. *See supra* at ¶¶ 24-25.[12]

### IV.    There is No Subordination Under Section 4225 of ERISA.

A.     <u>Debtors Have Not Met Their Burden to Establish Subordination under Section 4225.</u>

---

[11] *Abrogated on other grounds by Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 421 (1995).

[12] If this case were to proceed to trial, the Funds would file a *motion in limine* to preclude Debtors' expert given that, *inter alia*, his methodology not only ignores ERISA but is impermissible even under bankruptcy law, as confirmed by Debtors' own case law.

27. Given that "the existence of . . . circumstances [giving rise to a limitation under Section 4225] is peculiarly within the knowledge of the withdrawing employer[,]" "in the absence of clear showings by the withdrawing employer as to the applicability and extent of the limitations, a plan may assume that the limitations do not apply." 126 Cong. Rec. 23,038, 23,039 (Aug. 25, 1980). *See also* 29 U.S.C. § 1401(a)(3)(A) (placing the burden of proof on the withdrawing employer to show, by a preponderance of the evidence, that "section 1405 of this title" "clearly" applies).

28. Debtors have made no attempt to meet this burden through either arbitration or the claims objection process—nor have they attempted to show any good cause for their failure to do so—and have, therefore, waived any challenge under 29 U.S.C. § 1405(b).

B. <u>Given the Application of the 20-Year Cap, There is Nothing to Subordinate Under Section 4225.</u>

29. Section 4225 provides for a potential reduction of up to 50 percent of the "***unfunded vested benefits*** allocable to the employer." 29 U.S.C. § 1405(b) (emphasis added). The statute's reference to UVBs as opposed to "withdrawal liability" is important in the context of this case because of this Court's ruling that the 20-year cap applies to the Funds' withdrawal liability assessments. *See* Dkt. 4769 at 38 ("Accordingly, even if the debtors had defaulted on their withdrawal liability obligations, the debtors are entitled to summary judgment on their claim that the plan's claims for withdrawal liability are limited to the amounts that would have been due over 20 years as calculated under ERISA.").[13]

---

[13] The Funds and Central States, respectively, objected to Debtors' First Amended Disclosure Statement in part because Debtors appeared to be taking the position that any subordination under Section 4225 applied to "withdrawal liability" rather than "unfunded vested benefits." *See* Dkt. 4865, ¶¶ 2-5; Dkt. 4777, ¶¶ 10-14. Debtors subsequently confirmed to the Funds that "[w]e are not taking the position that 29 USC § 1405(b)'s reference to 'unfunded vested benefits' should be read as 'withdrawal liability.'"

30. As Central States has already explained, by virtue of the application of the 20-year cap, a reduction of Debtors' allocable share of UVBs by 50% would have no impact on the withdrawal liability owed to Central States by Debtors. *See* Dkt. 4777, ¶¶ 14-17. In particular, while Debtors' share of allocable UVBs was approximately $4.8 billion, their payments are capped at 20 years of annual payments of approximately $79 million. *See id.* ¶¶ 15, 17. Accordingly, a 50% reduction of Debtors' share of allocable UVBs to approximately $2.4 billion would not change Debtors' payment obligation. *See id.* ¶ 17. The same holds true for at least most of the Funds, including, as is clear from the aforementioned example, Road Carriers 707. *See supra* at ¶ 22.

31. This Court, however, need not and should not conduct a fund-by-fund inquiry as to whether a 50% reduction in Debtors' share of UVBs would create the *possibility* of a reduction in their withdrawal liability payment obligations.[14] Rather, where, as here, "one or more withdrawals of an employer [are] attributable to the same sale, liquidation, or dissolution," "all such withdrawals shall be treated as a single withdrawal for the purpose of applying this section." 29 U.S.C. § 1405(e)(1). Given the magnitude of Central States' withdrawal liability claim relative to the withdrawal liability claims of the other multiemployer pension plans, the same conclusion that applies to Central States' claim would apply to any group of claims that includes Central States' claim.

---

[14] Even if a 50% reduction in UVBs created a *possibility* of a reduction in the withdrawal liability claims of any of the Funds, that possibility could still not be realized, unless, *inter alia*, Debtors could show that their "liquidation or dissolution value" was low enough. *See* 29 U.S.C. § 1405(b)(2) (explaining that a reduction can only take place to the extent that 50% of the UVBs are higher than the liquidation or dissolution value). Debtors have not made such an assertion to date, and the Funds do not believe Debtors have any good faith basis to make such an assertion with respect to any of the Funds.

15

| | |
|---|---|
| Date: December 13, 2024<br>Wilmington, Delaware | **SULLIVAN · HAZELTINE · ALLINSON LLC**<br><br>*/s/ William D. Sullivan*<br>William D. Sullivan (No. 2820)<br>William A. Hazeltine (No. 3294)<br>919 North Market Street, Suite 420<br>Wilmington, DE 19801<br>Tel: (302) 428-8191<br>Email: bsullivan@sha-llc.com<br>　　　　whazeltine@sha-llc.com<br><br>**GROOM LAW GROUP, CHARTERED**<br>Edward J. Meehan (*pro hac vice*)<br>Samuel I. Levin (*pro hac vice*)<br>1701 Pennsylvania Ave., NW<br>Washington, DC 20006<br>Tel: (202) 857-0620<br>Email: emeehan@groom.com<br>　　　　slevin@groom.com<br><br>*Special Counsel for the Funds* |