**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| YELLOW CORPORATION, et al., | ) | |
| | ) | Lead Case No. 23-11069 (CTG) |
| Debtors. | ) | |

**CENTRAL STATES PENSION FUND'S BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
<u>ON ITS WITHDRAWAL LIABILITY AND CONTRIBUTION GUARANTEE CLAIMS</u>**

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
**SULLIVAN HAZELTINE ALLINSON LLC**
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
Email: bsullivan@sha-llc.com
          whazeltine@sha-llc.com

and

Brad R. Berliner, Esq.
Andrew J. Herink, Esq.
Daniel Sullivan, Esq.
Central States Funds
8647 W. Higgins Road
Chicago, IL 60631
Tel: (847) 939-2478
bberliner@centralstatesfunds.org
aherink@centralstatesfunds.org
dsulliva@centralstatesfunds.org

*Attorneys for Central States, Southeast and
Southwest Areas Pension Fund*

## TABLE OF CONTENTS

Introduction ............................................................................................................... 1

Statutory background ................................................................................................. 4

Factual Background ................................................................................................... 7

Relief Requested ..................................................................................................... 15

Argument ................................................................................................................. 16

   I.   Debtors Waived Any Challenge to the Default Determination. ....................... 16

   II.   The Court Need Not Consider Whether There Was an Acceleration Default, as Debtors' Bankruptcy Automatically Accelerated Their Withdrawal Liability .............................. 20

   III.   Debtors' Default Is Not Affected by the *Ipso Facto* Prohibitions of the Bankruptcy Code. .................................................................................................. 20

      A.   The Default Provision at Issue Is Not an Ipso Facto Clause. ..................... 20

      B.   The Fund's Plan Document Is Not a Contract and Does Not Implicate Property of the Estate. ............................................................................................ 21

      C.   29 U.S.C. § 1399(c)(5)(B) Governs the Default. ........................................ 22

   IV.   The Court Should Not Use a Present-Value Analysis to Discount the Withdrawal Liability Claims. ............................................................................. 22

   V.   If the Court Finds that Discounting Is Appropriate, the Correct Rate Would Be the 4.00% Used to Amortize the Withdrawal Liability ............................................ 24

   VI.   Subordination Under 29 U.S.C. § 1405 Is Inappropriate ................................ 25

   VII.   The Court Should Hold Debtors to their Bargain and Allow the Claim for Breach of the Contribution Guarantee. ............................................................... 28

Conclusion .............................................................................................................. 37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Burnett v. Nolen*,
    84 N.E.2d 155 (Ill. App. 4th Dist. 1949) ......................................................................... 29

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988).......................................................................................................... 26

*Concrete Pipe & Prods. of, Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*,
    508 U.S. 602 (1993)............................................................................................................ 5

*Connolly v. Pension Benefit Guar. Cor*p.,

    475 U.S. 211 (1986)............................................................................................................ 4

*Elliot & Frantz, Inc. v. Ingersoll-Rand Co.*,
    457 F.3d 312 (3d Cir. 2006)............................................................................................. 16

*Flying Tiger Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*,
    704 F. Supp. 1277 (D. Del. 1989)..................................................................................... 6

*Ganton Technologies, Inc. v. National Industrial Group Pension Plan*,
    865 F. Supp. 201 (S.D.N.Y. 1994) .................................................................................. 32

*In re AMR Corp.*,
    730 F.3d 88 (2d Cir. 2013)................................................................................................. 2

*In re Asbestos Products Liability Litigation (No. VI)*,
    921 F.3d 98 (3d Cir. 2019)........................................................................................... 1, 19

*In re B456 Sys., Inc.*,
    No. 12-12859 (KJC), 2017 WL 6603817 (Bankr. D. Del. Dec. 22, 2017)...................... 24

*In re Chemtura Corp.*,
    448 B.R. 635 (Bankr. S.D.N.Y. 2011)....................................................................... 24, 35

*In re Marcal Paper Mills, Inc.*,
    650 F.3d 311, 318 (3d Cir. 2011)............................................................................... 20, 23

*In re MTE Holdings LLC*,
    No. 19-12269, 2024 WL 3272224 (Bankr. D. Del. July 1, 2024) .................................... 16

*In re Oakwood Homes Corp.*,
    449 F.3d 588 (3d Cir. 2006)..................................................................................... passim

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ................................................................. 20, 21

*Karimi v. 401 N. Wabash Venture, LLC*,
    952 N.E.2d 1278 (Ill. App. 1st Dist. 2011) ........................................... 29

*Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*,
    513 U.S. 414 (1995) ...................................................................... passim

*Murray v. Silberstein*,
    882 F.2d 61 (3d Cir. 1989) ..................................................................... 26

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ............................................................................... 26

*Pierce v. B & C Elec., Inc.*,
    432 N.E.2d 964 (Ill. App. 1st Dist. 1982) ........................................ 29, 32

*Smart Oil, LLC v. DW Mazel, LLC*,
    970 F.3d 856 (7th Cir. 2020) ............................................................ 29, 30

*SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Emp'rs Pension Fund*,
    500 F.3d 334 (3d Cir. 2007) ................................................................... 16

*United Order of American Bricklayers and Stone Masons Union No. 21 v. Thorleif Larsen & Son, Inc.*,
    519 F.2d 331 (7th Cir. 1975) .................................................................. 32

*XCO Int'l, Inc. v. Pac. Sci. Co.*,
    369 F.3d 998 (7th Cir. 2004) ............................................................ 29, 31

*Connolly v. Pension Benefit Guar. Corp.*,
    475 U.S. 211 (1986) ................................................................................. 5

*Zerjal v. Daech & Bauer Constr., Inc.*,
    939 N.E.2d 1067 (Ill. App. 5th Dist. 2010) .......................................... 29

## Statutes

11 U.S.C. § 502 ........................................................................................... 22

29 U.S.C. § 1381 ........................................................................................... 6

29 U.S.C. § 1383 ......................................................................................... 13

29 U.S.C. § 1391 .................................................................................... 6, 27

29 U.S.C. § 1393 ........................................................................................... 6

29 U.S.C. § 1399............................................................................................. passim

29 U.S.C. § 1401.................................................................................................. 16

29 U.S.C. § 1405............................................................................................. passim

Pub. L. 95–214, 91 Stat 1501 (1977) .................................................................... 5

**Regulations**

Notice and Collection of Withdrawal Liability,
49 Fed. Reg. 22642-01 (1984) ........................................................................ 21

Central States, Southeast and Southwest Areas Pension Fund ("Central States Pension Fund"), by and through its undersigned counsel, moves this Court pursuant to Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056 for summary judgment allowing Central States Pension Fund's claims for withdrawal liability (Claim Nos. 4312–4335) in the amount of $1,579,806,536.80, and allowing Central States Pension Fund's claims in connection with Debtors' breach of a pre-petition contributions guarantee agreement (Claim Nos. 4336–4352) in the amount of $917,028,151.94, or, alternatively, in the amount of $767,996,182.80 using a rate of 4.00% or, in the further alternative, in the amount of $672,233,580.18 using a rate of 7.3%. In support of this motion, Central States Pension Fund sets forth the following:

## INTRODUCTION

1.      As an initial matter, Debtors have waived their arguments that Central States Pension Fund's declaration of a default on the withdrawal liability was improper, as those arguments were not raised in Debtors' objections to Central States Pension Fund's withdrawal liability claims nor in their subsequent discovery responses. *See* Local Rule 3007-1(f)(iii). Here, the Court should heed the Third Circuit's admonition that a party's consistent course of conduct reflects a conscious decision not to pursue a given legal strategy, *see In re Asbestos Products Liability Litigation (No. VI)*, 921 F.3d 98, 110 (3d Cir. 2019), because Debtors consistently and intentionally have chosen to avoid arguing whether a default occurred, including throughout the course of discovery. Indeed, until recently, Debtors have not challenged the default itself at all over the course of nearly a year of litigation, despite Central States Pension Fund making clear that it was a central element of its case as early as January 19, 2024. The Court should not countenance Debtors' failure to raise the default issues in a timely fashion, including by refusing to even identify it as an issue in response to discovery requests.

2.      Even if the Court does consider Debtors' arguments on the merits, they should be rejected. Debtors' argument that their default was impermissibly *ipso facto* fails to engage with the basic tenets of bankruptcy law, under which a bankruptcy petition serves to accelerate all debts. *In re Oakwood Homes Corp.*, 449 F.3d 588, 602 n.19 (3d Cir. 2006). Debtors' argument also fails to engage with the provision of the Plan Document (attached hereto as **Exhibit A**) relied upon by Central States Pension Fund to assess Debtors' default, which was based upon Debtors' undisputed prepetition default by virtue of their failure to pay prepetition contributions, not their bankruptcy filing. (*See* Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider, Dkt. No. 4771, at 3.) Further, Debtors' reliance on the *ipso facto* prohibitions finds no support in the text of the Bankruptcy Code. Indeed, there is no basis whatsoever for concluding that the Bankruptcy Code prohibits a multiemployer pension fund's exercise of its statutory power to declare a default upon the occurrence of "*any* event" that adversely affects the fund's chances of recovering withdrawal liability. 29 U.S.C. § 1399(c)(5)(B) (emphasis added); *In re AMR Corp.*, 730 F.3d 88, 107 (2d Cir. 2013) (observing that there is no "provision of the Bankruptcy Code, however, that provides support for [] a *per se* prohibition" on *ipso facto* clauses, let alone statutory rights).

3.      Even if the Court finds that Central States Pension Fund's determination of default were improper, the Court should reject Debtors' argument that the withdrawal liability should be reduced to a present value. Debtors' argument fails because it relies on the premise that withdrawal liability is analogous to a conventional commercial loan, which analogy the Supreme Court has explicitly rejected. *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 423 (1995). In a typical mortgage loan, for example, the periodic payment amount is determined based on the total amount of principal and interest that will come due before the loan

matures, such that all principal and interest is paid over the repayment period. *Id.* at 418–19. In contrast, MPPAA provides that the determination of the annual payment amount for withdrawal liability is divorced from the employer's proportionate share of unfunded vested benefits ("UVBs"), which leads to situations (like here) where the sum of the withdrawal liability payments (after application of the 20-year limitation on payments) does not come close to the principal amount (*i.e.*, the proportionate share of UVBs), let alone the amount plus interest. Put another way, Debtors' approach would result in double-discounting, as they have already experienced a more than two-thirds reduction in their payment obligation by virtue of the 20-year limitation on payments (specifically, from $4,827,470,743.87 to $1,579,806,536.80). *In re Oakwood Homes Corp.*, 449 F.3d at 601.[1]

4.      Even if present-value discounting were appropriate, the correct rate would be 4.00%, the rate determined by Central States Pension Fund's actuary for amortizing withdrawal liability assessments in 2023, the year of Debtors' withdrawal. *See* 29 U.S.C. § 1399(c)(1)(A)(ii). That is, any present value discounting should attempt to put Central States Pension Fund in the same position it would have been had Debtors in fact paid all 20 annual payments, such that it makes sense to apply the investment rate that Central States Pension Fund has been projected to earn by its actuaries. Debtors' *ad hoc* contract-based approach does not even attempt to put Central States Pension Fund in this position.

5.      The Court should also reject Debtors' still unexplained argument that 29 U.S.C. § 1405 applies, as that argument contradicts the statutory text, the law of the case, and Debtors' own positions. Specifically, 29 U.S.C. § 1405(a)(1) provides for the reduction of "unfunded vested benefits" allocable to an employer rather than of "withdrawal liability." Here, the Court has already

---

[1]      For the avoidance of doubt, Central States Pension Fund reserves the right to appeal the Court's determination that the 20-year limitation on payments applies here notwithstanding Debtors' default.

determined that "withdrawal liability" equates to "the amount the employer owes after the application of the 20-year cap," as opposed to meaning the employer's allocable share of the plan's UVBs. (Amended Memorandum Opinion, Dkt. No. 4769, at 37.) And Debtors have already successfully argued that these two terms "are not the same thing" such that Debtors should be estopped from changing course now. (Debtors' Motion for Summary Judgment, Dkt. No. 3852, ¶ 77.) Applying 29 U.S.C. § 1405(a)(1) to Debtors' allocable share of UVBs in this case would still result in a withdrawal liability payment schedule in excess of 20 years, thus having no effect on the amount of Central States Pension Fund's withdrawal liability claims.

6.      As to the contributions guarantee claims, the Court should hold Debtors to the bargain they struck in 2014: Central States Pension Fund agreed to extend the payment date of $83 million in deferred contribution obligations and, in exchange, Debtors promised Central States Pension Fund that they would continue participating in the Fund for at least ten years after the aforementioned deferred contributions were paid off. Indeed, Debtors themselves chose the contribution guarantee over a deemed-contribution-rate agreement also offered by Central States Pension Fund, which alternative was substantively identical to the agreements already upheld by the Court. (Amended Memorandum Opinion, Dkt. No. 4769, at 39–41.) The contribution guarantee agreement should be upheld as the product of negotiation between two sophisticated parties, each represented by counsel.

## STATUTORY BACKGROUND

7.      In 1974, Congress enacted the Employee Retirement Income Security Act ("ERISA") to provide comprehensive regulation for private pension plans. *Connolly v. PBGC*, 475 U.S. 211, 214 (1986). In enacting ERISA, Congress sought to guarantee that workers would

receive the pension benefits they were promised. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 607 (1993).

8.      Subsequent to the enactment of ERISA, Congress became concerned about the effect that employer withdrawals had on multiemployer plans. "One of the most serious threats to the security of benefits under a multiemployer plan is an unanticipated decline in employment covered by the plan." Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980 ("Joint Explanation of MPPAA"), 126 Cong. Rec. S20189, S20209 (Jul 29, 1980). With these concerns in mind, Congress directed the PBGC to study "the anticipated financial condition of the program relating to mandatory coverage of multiemployer plans" and recommend changes to the multiemployer pension plan regime, including possible statutory changes. Pub. L. 95–214, 91 Stat 1501 (1977). In the report that followed, the PBGC recommended that Congress address the multiemployer pension crisis by making employers pay, upon their exit from multiemployer plans, withdrawal liability, roughly representing their share of the plan's UVBs, in order to prevent catastrophic reductions to a given plan's contribution base and to discourage employer withdrawals. *Connolly*, 475 U.S. at 216. Congress agreed with the PBGC's recommendations and enacted legislation to address these concerns. *Connolly*, 475 U.S. at 217.

9.      Specifically, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), amending ERISA, 29 U.S.C. §§ 1301–1461. *Connolly*, 475 U.S. at 217. Congress emphasized that withdrawal liability, created pursuant to MPPAA, acts as an important safeguard within Congress' overall regulation of the multiemployer plan system, as Congress determined that such withdrawal liability "removes the present incentive for employer withdrawals," thereby encouraging the maintenance of a robust contribution base for multiemployer pension plans. Report of the Committee on Ways and Means, H.R. Rep. No. 96-

869(II), at 6. Put simply, MPPAA was intended "to reduce the incentive for employers to terminate their affiliation with multiemployer pension plans. The statute was intended to make it onerous and costly for them to withdraw." *Flying Tiger Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 704 F. Supp. 1277, 1281 (D. Del. 1989).

10.     In 29 U.S.C. § 1393, Congress provided that an employer effects a "complete withdrawal from a multiemployer plan" if the employer "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." Following a withdrawal, the plan calculates the amount of the employer's withdrawal liability according to the steps provided in 29 U.S.C. § 1381(b)(1), which in turn directs the plan to other sections of MPPAA for certain adjustments. The first step is to determine the employer's allocable share of the fund's UVBs under 29 U.S.C. § 1391. 29 U.S.C. § 1381(b)(1).

11.     Then, 29 U.S.C. § 1399(c)(1)(A)(i) directs that the amount of an employer's share of UVBs shall be "adjusted over the period of years necessary to amortize the amount in level annual payments determined under subparagraph (C)." 29 U.S.C. § 1399(c)(1)(A)(ii) provides that the interest rate to be used to perform this amortization is "based on the assumptions used for the most recent actuarial valuation for the plan." Importantly, the annual payment amount is determined without reference to the employer's allocable share of UVBs; instead, under 29 U.S.C. § 1399(c)(1)(C)(i), the annual payment is determined based on the contribution rates previously paid by the employer and the employer's average annual contributions.  And, regardless of how many years it takes to amortize the employer's allocable share of UVBs, and assuming the employer is not in default, the employer's withdrawal liability is limited to 20 annual payments under 29 U.S.C. § 1399(c)(1)(B). 29 U.S.C. § 1381(b)(1)(C) (withdrawal liability payment

schedule must be adjusted "to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title.").

12.      Thus, the operation of 29 U.S.C. § 1399(c)(1) is generally as follows:

(1) the statute fixes the amount of each annual payment at a level that (roughly speaking) equals the withdrawing employer's typical contribution in earlier years [under 29 U.S.C. § 1399(c)(1)(C)]; (2) it sets an interest rate, equal to the rate the plan normally uses for its calculations [in 29 U.S.C. § 1399(c)(1)(A)(ii)]; and (3) it then asks how many such annual payments it will take to "amortize" the withdrawal charge at that interest rate [under 29 U.S.C. § 1399(c)(1)(A)(i).

*Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 418–19.

13.      29 U.S.C. § 1399(c)(1)(A)'s discussion of annual payments, however, applies "[e]xcept as provided in . . . paragraph[] . . . (5)." 29 U.S.C. § 1399(c)(1)(A). 29 U.S.C. § 1399(c)(5) deals with the employer's obligations in the event of default, and provides:

In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. For purposes of this section, the term "default" means—

(A)    the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and

(B)    any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability.

**FACTUAL BACKGROUND**

14.      Central States Pension Fund is a multiemployer pension plan covered by ERISA. Central States Pension Fund is primarily funded by contributions remitted by multiple participating employers pursuant to negotiated collective bargaining agreements with local unions affiliated with the International Brotherhood of Teamsters ("IBT") on behalf of employees of those same employers. (Affidavit of Andrew M. Sprau, attached hereto as **Exhibit B**, ¶ 2.) All principal and income from such contributions and investments thereof are held and used for the exclusive

purpose of providing pension benefits to participants and beneficiaries of Central States Pension Fund and paying administrative expenses. (*Id.*)

15.     Pre-petition, Central States Pension Fund provided pension credit to thousands of union employees of Debtors YRC Inc. ("YRC") and USF Holland LLC ("USFH"), both being wholly owned subsidiaries of Debtor Yellow Corporation ("Yellow"). Under collective bargaining agreements and participation agreements applicable to Debtors YRC and USFH, YRC and USFH's obligations to Central States Pension Fund and its union members included regular payments of pension contributions to Central States Pension Fund. Pursuant to participation agreements entered at various times, both YRC and USFH agreed to be bound by the Trust Agreement of Central States Pension Fund (and all amendments thereto), including deference to the decisions of the Pension Fund's Board of Trustees. (*See, e.g.,* March 11, 2021 Participation Agreement of USFH, attached hereto as **Exhibit C**, ¶ 1; March 11, 2019 Participation Agreement of YRC, attached hereto as **Exhibit D**, ¶ 1.)

16.     In the early 2000s, Debtors "faced a series of financial and operational headwinds." (Aug. 7, 2023 Declaration of Matthew A. Doheny, Dkt. 14, ¶¶ 35-36.) On June 17, 2009, certain of the Debtors entered into a Contribution Deferral Agreement (the "Original 2009 CDA") with Central States Pension Fund and similar agreements with the other multiemployer pension funds to which Debtors contributed, whereby the pension funds agreed to defer more than $100 million in contribution payments that Debtors had failed to make in 2009 to such pension funds, including approximately $83 million owed to Central States Pension Fund. (*See* Second Amended and Restated Contribution Deferral Agreement, (the "2014 CDA"), attached hereto as **Exhibit E**, at YELLOW-MEPP_0052612 (recitals), and at YELLOW-MEPP_0052621, § 2.01 (describing

"Deferred Pension Payments"); YRC Worldwide Inc., Current Report (Form 8-K) (June 18, 2009), https://www.sec.gov/Archives/edgar/data/716006/000119312509132916/d8k.htm.)

17.    In connection with the Original 2009 CDA, Debtors YRC and USFH temporarily ceased participation in Central States Pension Fund from 2009 throughout 2010, meaning that their employees in Central States Pension Fund did not accrue any pension credit during this period. (YRC Worldwide Inc., 2011 Annual Report (Form 10-K), at 14 (Feb. 28, 2012), https://investors.myyellow.com/static-files/9f661029-8450-4964-8064-bf6154140bb1.)    And while YRC and USFH ultimately resumed participation in Central States Pension Fund, they did so at only 25% of the contribution rate that they had previously paid, meaning that their employees who participated in Central States Pension Fund were receiving a significantly reduced pension benefit accrual. (Fed. R. Civ. Pro. 30(b)(6) Deposition Transcript of Mr. Darren Hawkins ("Hawkins Transcript"), attached hereto as **Exhibit F**, at 43:2–45:9; *see also* YRC Worldwide Inc., 2011 Annual Report (Form 10-K), at 14 (Feb. 28, 2012), https://investors.myyellow.com/static-files/9f661029-8450-4964-8064-bf6154140bb1.)    Debtors considered Central States Pension Fund's efforts under the Original 2009 CDA to be "unprecedented steps" and "significant sacrifices" which allowed Debtors to "keep the company in business." (Hawkins Transcript, Ex. F, at 33:15–35:3; Dec. 11, 2013 Letter of Jamie Pierson, attached hereto as **Exhibit G**, at CS-0012807–CS0012808.)

18.    Eventually, Debtors sought to extend their contribution deferral again in 2014. Specifically, in late 2013, Debtors made a request to Central States Pension Fund (and several other multiemployer pension funds) to make an "additional shared sacrifice," including further extension of the existing contribution deferral agreement, which would be "absolutely essential to the company's restructuring efforts." (Hawkins Transcript, Ex. F, at 46:23–52:4; Dec. 11, 2013

Letter of Jamie Pierson, Ex. G, at CS-0012807–CS0012808.) Upon receiving the request for the

continued deferral in 2014, and having already deferred payment of the approximately $83 million

in 2009 contributions obligations for nearly five years (and accepting contributions from YRC and

USFH at a significantly lower rate),[2] Central States Pension Fund informed Debtors in 2014 that

Debtors would need to agree to one of two potential alternatives in order for Central States Pension

Fund to agree to the 2014 CDA:

> The execution of a side letter whereby the company guaranties the continued
> participation in the Central States Pension Fund ("CSPF") for a period of 10 years
> after the date upon which the CDA balance is repaid in full and there is no other
> outstanding indebtedness to the CSPF. In the alternative, [Yellow Corporation]
> agrees that for purposes of computing withdrawal liability, the contribution rate
> used for purposes of computing the payment schedule will be deemed to be the
> published contribution rate under the National Master Freight Agreement [rather
> than Debtors' discounted rate] for each year until the CDA is paid in full.

(Letter Agreement Re: Guarantee of Continued Participation (the "2014 Letter Agreement"),

attached hereto as **Exhibit H**, at p. 1; January 21, 2014 Email of Thomas Nyhan, attached hereto

as **Exhibit I**, at CS-0016744–CS-0016745.) Although Debtors entered into an agreement

substantively identical to the "alternative" described in the quoted text above with several other

multiemployer pension funds (Amended Memorandum Opinion, Dkt. No. 4769, at 39–41),

Debtors YRC and USFH (the "Primary Obligors") preferred and chose the former option offered

by Central States: a contribution guarantee. (January 21, 2014 Email of Harry Wilson, attached

hereto as **Exhibit J**, at CS-0011114–CS0011115.)

19.    Accordingly, and following discussion between Central States Pension Fund and

Yellow's counsel Kirkland and Ellis LLP, the parties entered into the 2014 Letter Agreement,

which provided that:

> The undersigned Primary Obligors [*i.e.*, YRC and USFH], and each of them (jointly
> and severally), hereby agree and guarantee that they will continue to participate in

---

[2] Hawkins Transcript, Ex. F, at 76:8–77:18.

and pay contributions to the [Central States] Pension Fund pursuant to collective bargaining agreements for a period of not less than 10 (ten) full years after all balances (including all principal, interest and any applicable expenses or fees) owed to the Pension Fund under the [2014] CDA . . . are completely and fully paid and satisfied by all such Primary Obligors.

(2014 Letter Agreement, Ex. H, ¶ 1(a)). The 2014 Letter Agreement then provided that, if the

Primary Obligors breached their guarantee to continue participating in Central States Pension Fund

for 10 years after repayment of the 2014 CDA, they and certain Guarantors[3] would be required to

pay damages in an amount that corresponds to the amount that would have been paid had the

Primary Obligors continued to participate for those 10 years as promised. (2014 Letter Agreement,

Ex. H, ¶ 2). Specifically, the 2014 Letter Agreement states, in relevant part:

> (2) To the extent that the Primary Obligors, or any of them, are in breach of the Participation Guarantee, or other obligations and undertakings set forth in Paragraph 1. above, the Primary Guarantors, and each of them (jointly and severally), shall be required to pay damages in the following amounts to the Pension Fund, and subject to the following procedures:
>
>> a) In the event of a breach involving a complete failure by one or more of the Primary Obligors to have a contribution obligation to the Pension Fund during the Guarantee Period (or any portion thereof), the Primary Obligors, and each of them, will be required (as an obligation for which they are jointly and severally liable) to pay to the Pension Fund, in addition to any other contribution amounts and obligations owed to the Pension Fund, an amount for each month during the continuation of such breach (payable on or before the 15th day of the following month) that is equivalent to the greater of (i) the amount of contributions that would be owed to the Pension Fund based upon current levels and periods of work and compensation during each month of continuation of the breach, calculated as if the last collective bargaining agreement (including the last agreed contribution rate) requiring contributions to the Pension Fund by the breaching Primary Obligor(s) were still in effect, or (ii) the amount of contributions that would be owed to the Pension Fund based upon the highest monthly levels and periods of work and compensation for which pension contributions were owed measured by CBUs that the breaching Primary Obligor(s)

---

[3] The "Guarantors" are the following Debtors: Yellow Corporation; Express Lane Services, Inc.; New Penn Motor Express LLC; Roadway Express International, Inc.; Roadway LLC; Roadway Next Day Corporation; USF Bestway Inc.; USF Dugan Inc.; USF RedStar LLC; USF Reddaway Inc.; YRC Association Solutions, Inc.; YRC Enterprise Services, Inc.; YRC Logistics Services, Inc.; YRC Mortgages, LLC; and YRC Regional Transportation, Inc.

experienced during the period of July 2009 through and including December 2019, but calculated as if the last collective bargaining agreement requiring contributions on the part of the breaching Primary Obligor(s) to the Pension Fund (including the last contribution rate) were still in effect.

[. . .]

e) The remedies, damages and procedures set forth in Subparagraphs 2.a), 2.b), 2.c) and 2.d) above are non-exclusive in nature and do not preclude any other remedies at law or in equity that may be available to the Pension Fund in the event of a breach of this letter-agreement.

(2014 Letter Agreement, Ex. H, ¶ 2). The 2014 Letter Agreement also provides that it is governed by Illinois law. (*Id.*, ¶ 2(f).) Furthermore, each of the Guarantors agreed to "fully guarantee . . . the Participation Guarantee and other obligations under this letter-agreement of the Primary Obligors." (*Id.* ¶ 3(a)). Following Debtors' entry into certain amendments to the 2014 CDA, the amounts due to Central States Pension Fund under the 2014 CDA (i.*e.*, the contributions owed for periods before 2009, which were originally deferred under the 2009 CDA) were fully paid by the Primary Obligors on January 3, 2023. (*See* Hawkins Transcript, Ex. F, at 56:21–57:9; Yellow Corp., 2022 Annual Report (Form 10-K), at 55 (Feb. 9, 2023), https://www.sec.gov /ix?doc=/Archives/edgar/data/0000716006/000095017023002332/yell-20221231.htm.)

20.     Despite having finally paid the amounts due to Central States Pension Fund under the 2014 CDA in early 2023, Debtors then failed to pay their pension contributions due to the Fund for June 2023 (that is, the payment due by July 15, 2023) and also informed Central States Pension Fund that they would not pay their contributions due for July 2023 (that is, the payment due by August 15, 2023). (*See* Aug. 7, 2023 Declaration of Matthew A. Doheny, Dkt. 14, ¶ 11; June 14, 2023 Letter of Dan Olivier, attached hereto as **Exhibit K**.) In these communications, Debtors informed Central States Pension Fund that their position was that, absent Central States Pension Fund's agreement to defer the aforementioned contributions, Central States Pension Fund would

suffer "dire financial consequences," specifically the loss of contributions from Debtors. (June 14, 2023 Letter of Dan Olivier, Ex. K; Hawkins Transcript, Ex. F, at 105:6–106:15.) Central States Pension Fund's Board of Trustees decided on July 17, 2023 to conditionally terminate YRC and USFH's participation in Central States Pension Fund, effective July 23, 2023, unless they paid their required pension contributions. (July 18, 2023 Letter of Thomas Nyhan, attached hereto as **Exhibit L**.)

21.     Debtors completely shut down operations on or about July 30, 2023. (Aug. 7, 2023 Declaration of Matthew A. Doheny, Dkt. 14, ¶ 17.)  Debtors permanently ceased all covered operations prior to the August 6, 2023 petition date. (*Id.*)

22.     Because YRC and USFH stopped paying contributions and permanently ceased all covered operations as a result of their July 2023 shutdown, they were in breach of Paragraph 1(a) of the 2014 Letter Agreement, and the damages owed under the Agreement include the remaining 113 months of the guarantee period under Paragraph 2(a) of the Agreement (that is, August 2023 through December 2032). (Affidavit of Andrew M. Sprau, Ex. B, ¶ 15; *see* Yellow Corp., 2022 Annual   Report   (Form   10-K),   at   55   (Feb. 9, 2023),   https://www.sec.gov /ix?doc=/Archives/edgar/data/0000716006/000095017023002332/yell-20221231.htm;  Aug.  7, 2023 Declaration of Matthew A. Doheny, Dkt. 14, ¶ 17.)

23.     When Debtors YRC and USFH permanently ceased to have an obligation to contribute to Central States Pension Fund, they and the other Debtors effected a complete withdrawal from Central States Pension Fund pursuant to 29 U.S.C. § 1383 and incurred withdrawal liability, jointly and severally, pursuant to 29 U.S.C. §§ 1301(b)(1) and 1381.

24.     Thereafter, at its first meeting following Debtors' July 2023 shutdown, Central States Pension Fund's Board of Trustees approved the assessment of withdrawal liability against

Debtors. (September 12, 2023 Minutes of the Pension Board Meeting, attached hereto **Exhibit M**.) In so doing, the Board of Trustees determined that Debtors had defaulted under 29 U.S.C. § 1399(c)(5) and Section 5(e)(2)(F) of Appendix E of the Central States Pension Fund Plan Document because Debtors were delinquent in their contributions to Central States Pension Fund. (Central States Pension Fund Plan Document, Ex. A, at CS-0034827–CS-0034828; Sept. 12, 2023 Minutes of the Pension Board Meeting, Ex. M, at CS-0032738.) Specifically, the Central States Pension Fund Plan Document provides, in relevant part, that:

> (e) In the event of a default, the outstanding amount of the withdrawal liability shall immediately become due and payable. A default occurs if:
>
> [. . .]
>
>> (2) the Trustees, in their discretion, deem the Fund insecure as a result of any of the following events with respect to the Employer:
>>
>> [ . . .]
>>
>>> (f) the existence of a delinquency in any amount owed to the Pension Fund including, without limitation, the payment of contributions or prior withdrawal liability . . . .

(Central States Plan Document, Ex. A, App'x E, § 5(e), at CS-0034827–CS-0034828.)

25.     Relevant for purposes of calculating Debtors' withdrawal liability, Central States Pension Fund's actuary determined that the applicable interest rate for amortizing the withdrawal liability payments for complete withdrawals effected in 2023 is 4.00%, which is Central States Pension Fund's predicted investment return rate for 2023, the year of the complete withdrawal at issue in this case. (Central States Pension Fund December 31, 2022 Actuarial Report for Withdrawal Liability Purposes, attached hereto as **Exhibit N**, at CS-0017084, ("The number of monthly installments is calculated on the basis of the amount of withdrawal liability and interest at the actuarial valuation rate used for funding purposes."); Central States Pension Fund January

1, 2023 Valuation Report, attached hereto as **Exhibit O**, at CS-0017140 (setting forth actuarial valuation rate for funding purposes).)

26.     Pursuant to this Court's bar date order, Central States Pension Fund timely filed proofs of claim that included claims for statutory withdrawal liability in the amount of $4,827,470,743.87 (Claims Nos. 4312 through 4335) and claims for breach of the contribution guarantee in the 2014 Letter Agreement (Claim Nos. 4336 through 4352).  On December 8, 2023, Debtors filed their objections to the proofs of claim filed by Central States Pension Fund (Dkt. No. 1322).

27.     Following the Court's Memorandum Opinion of September 13, 2024 (Dkt. No. 4326), Central States Pension Fund calculated the annual payment amount Debtors would owe under 29 U.S.C. § 1399(c)(1)(C)(i). That amount is $78,990,326.84 per year. (Affidavit of Andrew M. Sprau, Ex. B, ¶ 12.) Amortizing $4,827,470,743.87 (Debtors' allocable share of Central States Pension Fund's UVBs) over equal annual payments of $78,990,326.84 would result in more than 20 annual payments of $78,990,326.84. (*Id.* ¶ 13; *see* Amended Memorandum Opinion, Dkt. No. 4769, at 4 ("Under the statute, an employer's withdrawal liability will never exceed 20 times that annual payment, even if it would take 25 or 50 or 1,000 such payments to repay the employer's allocable share of the fund's unfunded vested benefits.").)

## RELIEF REQUESTED

28.     Central States Pension Fund moves for summary judgment allowing its claims for withdrawal liability in the amount of $1,579,806,536.80.

29.     Central States Pension Fund also moves for summary judgment allowing its claims for breach of the 2014 Letter Agreement in the amount of $917,028,151.94, or alternatively, in the

amount of $767,996,182.80 using a rate of 4.00% or, in the further alternative, in the amount of $672,233,580.18 using a rate of 7.3%.

## ARGUMENT

### I.    Debtors Waived Any Challenge to the Default Determination.

30.    As Central States Pension Fund previously explained (Central States Pension Fund's Response in Opposition to Debtors' Motion for Reconsideration, Dkt. No. 4541, ¶¶ 1–5), Debtors waived any argument that their default was invalid. As an initial matter, no such challenge appears in Debtors' objection (Dkt. Nos. 1322) nor in their reply in support thereof (Dkt. No. 2130), even though Central States Pension Fund's January 19, 2024 response to Debtors' objection made clear that "Debtors are in default under 29 U.S.C. § 1399(c)(5)(B) and therefore . . . their withdrawal liability is owed in a single payment." (Central States Pension Fund's January 19, 2024 Response to Debtors' Objection to Central States Pension Fund's Claims, Dkt. No. 1833, ¶ 54.)[4] Local Rule 3007-1(f)(iii) requires that an "[o]bjection based on substantive grounds, other than incorrect classification of a claim, shall include all substantive objections to such claim." Indeed, in an analogous situation, this Court recently held that a party waived a defense in an adversary proceeding by not putting that defense in its answer. *In re MTE Holdings LLC*, No. 19-12269, 2024 WL 3272224, at *10 (Bankr. D. Del. July 1, 2024) (Goldblatt, J.) (citing *Elliot & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 321 (3d Cir. 2006)).

---

[4] It bears repeating that Debtors had the burden of disputing whether they were properly determined to be in default, as that is a determination under 29 U.S.C. § 1399. *See, e.g., SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Emp'rs Pension Fund*, 500 F.3d 334, 343 n.13 (3d Cir. 2007). Notably, the Court has already held that the same law should apply in this Court as would under MPPAA, which includes the presumption that unchallenged aspects of a withdrawal liability assessment are correct. 29 U.S.C. § 1401(a)(3). (Transcript of March 6, 2024 Hearing, attached hereto as **Exhibit R**, at 55:12–25; *see* Mar. 27, 2024 Memorandum Opinion, Dkt. No. 2765, at 30.)

31.    More critically, Debtors' consistent conduct throughout discovery reflected a conscious choice to waive the issue of whether they were validly defaulted by Central States Pension Fund. Again, by January 19, 2024, Debtors were aware that the fact of default was a key component of Central States Pension Fund's position, not only because of the statements in Central States Pension Fund's response (described above), but also because Central States Pension Fund described the default's impact on the calculation of the withdrawal liability proofs of claim in response to Debtors' interrogatories. Specifically, Central States Pension Fund informed Debtors that "[A] defaulted employer (like Debtors) is liable for the full, lump sum amount of withdrawal liability, not a lesser amount based on a payment schedule." (Central States Pension Fund's January 19, 2024 Response to Debtors' First Set of Interrogatories, attached hereto as **Exhibit Q**, at 25.) But, in response to Central States' Pension Fund's interrogatory requesting that Debtors "identify" "all bases" for disallowing or reducing the withdrawal liability claims, Debtors did not mention any issue with the default itself over the course of seven pages of detailed discussion of their arguments. (Debtors' June 1, 2024 First Amended Responses and Objections to Central States' First Set of Interrogatories, attached hereto as **Exhibit P**, at 32–38.)

32.    This pattern continued through the discovery that Debtors sought. Although Debtors served extensive discovery requests on Central States Pension Fund, including two sets of interrogatories and three sets of requests for production, Debtors did not at any time request documents or other information relating to the basis or timing of Central States Pension Fund's default determination.[5] Consistent with this approach, on April 26, 2024, Debtors served upon Central States Pension Fund a Federal Rule of Civil Procedure 30(b)(6) deposition notice seeking testimony regarding the "contention that Debtors are not entitled to a 20-year limitation on any

---

[5] The aforementioned discovery requests were previously filed at Docket Nos. 4541-3 through 4541-7 and are attached hereto as **Exhibits T** through **W**.

alleged withdrawal liability payments to CSPF because Debtors are 'in default' as set forth 29

U.S.C. § 1399(c)(5)(B)" but not otherwise seeking specific testimony as to the default itself.

(Debtors' Rule 30(b)(6) Deposition Notice to Central States Pension Fund, Dkt. No. 3190, at 7.)

At the deposition of Central States Pension Fund on June 6, 2024, Debtors' counsel asked Central

States Pension Fund's corporate representative several questions about the withdrawal liability

assessment, and even acknowledged that the assessment was premised on a finding of default, but

did not ask the Pension Fund's witness any questions about the default itself:

> **QUESTION:** But [the twenty-year limitation on payments] can theoretically make a substantial difference; is that fair?
>
> **ANSWER:** Depending on the definition of substantial, there can be a difference, yes.
>
> **QUESTION:** Using your definition of substantial, there can be a substantial difference with the 20-year cap applied; is that fair?
>
> **ANSWER:** It is fair to say that there can be a difference in the amount of withdrawal liability post adjustment for the 20-year payment schedule.
>
> **QUESTION:** In this case I understand Central States didn't calculate Yellow's annual payments in assessing its withdrawal liability, correct?
>
> **ANSWER:** We did not provide an adjustment for annual payments, correct.
>
> **QUESTION:** And that's because Central States believes Yellow was in default, correct?
>
> **ANSWER:** That is correct.
>
> **QUESTION:** Central States believes that it wasn't required to calculate annual payments or apply the 10 20-year cap because Yellow is in default, correct?
>
> **ANSWER:** They are not -- yes, they are not entitled to a payment schedule based on a default.
>
> **QUESTION:** As you're sitting here today, are you aware of any other reason aside from this alleged default that Central States believes it doesn't owe Yellow an annual payment schedule?
>
> **ANSWER:** I cannot think of one right now.

(*See* excerpted transcript of deposition of Mr. Andrew M. Sprau, attached hereto as **Exhibit S**, at 42:14–43:18.) Indeed, despite confirming that there was no "other reason" besides the default for Central States Pension Fund to assert a claim for the entire amount of withdrawal liability, and that the effect of this assertion was "substantial," Debtors chose to waive the issue of whether a valid default occurred. (*Id.*) And Debtors later acknowledged that the issue was worth billions of dollars. (Debtors' Reply in Support of Debtors' Motion for Summary Judgment, Dkt. No. 4012, ¶ 57.)

33.     Third Circuit precedent confirms that Debtors have waived their right to raise an issue as to whether their default was proper under these facts. Specifically, in *Asbestos Products Liability Litigation*, the Third Circuit held that certain defendants had waived their defenses of personal jurisdiction because they were long aware that personal jurisdiction was a potential issue, just as here where Central States Pension Fund established from the very beginning that Debtors' default was a major issue in the case. 921 F.3d 98, 106 (3d Cir. 2019). (Central States Pension Fund's January 19, 2024 Response to Debtors' Objection to Central States Pension Fund's Claims, Dkt. No. 1833, ¶ 54 ("Debtors are in default under 29 U.S.C. § 1399(c)(5)(B) and therefore . . . their withdrawal liability is owed in a single payment. . . .").)

34.     Additionally, in *Asbestos Products Liability Litigation*, the Third Circuit held that it was an abuse of discretion for the trial court to ignore the defendants' "[b]ehavior that is consistent with waiver, and which indicates an intent to litigate the case," notwithstanding the defendants' pro forma attempt to "express an intent to preserve the defense." 921 F.3d at 106–107. The Third Circuit also held that the consistency of the defendants' conduct over time was another factor that the trial court was required to consider. 921 F.3d at 107–108. Here, Debtors chose time and again to focus only on the interaction of default and the twenty-year limitation on payments, rather than raising the issue of whether such a default was improper. As explained above, this

pattern of conduct included a failure to identify the disputes in response to Central States Pension Fund's contention interrogatories or to otherwise pursue the issue in any way during discovery. Moreover, Debtors expressly acknowledged that the issue of default was worth billions of dollars. (Debtors' Reply in Support of Debtors' Motion for Summary Judgment, Dkt. No. 4012, ¶ 57.) As such, the only reasonable conclusion to be drawn from Debtors' failure to argue the default issue was that this was a strategic choice to forfeit the issue and focus on other issues instead. Debtors should be held to the consequences of their actions rather than being allowed to have their cake and eat it too.

## II. The Court Need Not Consider Whether There Was an Acceleration Default, as Debtors' Bankruptcy Automatically Accelerated Their Withdrawal Liability.

35.     It is a "basic bankruptcy law tenet that 'bankruptcy operates as the acceleration of the principal amounts of all claims against the debtor.'" *In re Oakwood Homes Corp.*, 449 F.3d at 602 n.19 (quoting H.R. Rep. No. 95-595, at 352-54 (Sept. 8, 1977)). Accordingly, Debtors get the law wrong to the extent that they claim that their bankruptcy filing *per se* prevented any acceleration of the amounts owed, as the opposite is true. Because Debtors withdrew from Central States Pension Fund prepetition, and because the law of the Third Circuit is that "[t]he liability for unfunded vested benefits represents a pre-existing obligation on the employer's part," *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 318 (3d Cir. 2011), Debtors' withdrawal liability was thus automatically accelerated on the petition date, such that the Court need not consider Debtors' resort to the *ipso facto* provisions of the Bankruptcy Code.

## III. Debtors' Default Is Not Affected by the *Ipso Facto* Prohibitions of the Bankruptcy Code.

### A. The Default Provision at Issue Is Not an Ipso Facto Clause.

36.     Nevertheless, the "event . . . which indicate[d] a substantial likelihood that an employer will be unable to pay its withdrawal liability" for purposes of 29 U.S.C. § 1399(c)(5)(B)

was the "existence of a delinquency" in the form of unpaid contributions, rather than the filing of bankruptcy. (Central States Plan Document, Ex. A, App'x E, § 5(e), at CS-0034827–CS-0034828; Sept. 12, 2023 Minutes of the Pension Board Meeting, Ex. M, at CS-0032738.).

37.     "*Ipso facto* clauses are contractual provisions which expressly state that upon a borrower's filing of a bankruptcy petition, the creditor may accelerate the payment of the entire unpaid balance due under the terms of the contract." *In re W.R. Grace & Co.*, 475 B.R. 34, 152 (D. Del. 2012). The default here was not *ipso facto* for the simple reason that it was not predicated on Debtors' bankruptcy filing, but rather on Debtors' prepetition delinquencies. (Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider, Dkt. No. 4771 at 3.) The Court's analysis can and should end there.

        B.  *The Fund's Plan Document Is Not a Contract and Does Not Implicate Property of the Estate.*

38.     Even ignoring the indisputable fact that Central States Pension Fund did not declare a default because of the bankruptcy filing, any attempt to cast aside Debtors' default as the result of an *ipso facto* clause also fails because it lacks any basis in the statute. Indeed, the Bankruptcy Code does not contain the sort of broad prohibition against defaults that Debtors claim. Instead, and as acknowledged in the *W.R. Grace* opinion cited by the Court in its November 5, 2024 order (Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider, Dkt. No. 4771, at 6 n.12), the *ipso facto* prohibition "has its roots in two specific sections of the Bankruptcy Code: §§ 541(c) and 365(e)(1)." *In re W.R. Grace & Co.*, 475 B.R. at 152. As Debtors have not demonstrated (and cannot demonstrate) how the text of either provision applies here, the Court should not invalidate Debtors' default on the basis of an *ipso facto* prohibition.

### C. 29 U.S.C. § 1399(c)(5)(B) Governs the Default.

39.       Unlike Debtors' approach, which lacks any basis in the text of the Bankruptcy Code, Central States Pension Fund's position is well-supported by the text of 29 U.S.C. § 1399(c)(5). Specifically, 29 U.S.C. § 1399(c)(5)(B) provides that a plan sponsor may require "immediate payment of the outstanding amount of an employer's withdrawal liability" upon "*any* . . . event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." (Emphasis added). Congress' use of the broad word "any" should be understood according to its plain meaning, especially given that Debtors cannot point to any competing language in the Bankruptcy Code that would suggest that statutory default is impermissible. Indeed, this has been the long-held view of the PBGC. Notice and Collection of Withdrawal Liability, 49 Fed. Reg. 22642-01, 22,644 (1984) ("Such a substantial likelihood [under 29 U.S.C. § 1399(c)(5)(B)] would exist, for example, when an employer declares bankruptcy . . . .").

## IV.     The Court Should Not Use a Present-Value Analysis to Discount the Withdrawal Liability Claims.

40.       In its November 5, 2024 order, the Court also directed the parties to address whether, if "the Court were to conclude that the debtors owed a 20-year stream of payments that is not subject to acceleration . . . the claim should be discounted to present value." (Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider, Dkt. No. 4771 at 7.). As discussed above, the acceleration here was automatic and proper such that there is no 20-year payment stream.

41.       Even if that were not so, the primary case identified by the Court holds that discounting to present value is appropriate under 11 U.S.C. § 502(b)(2) only where the claim includes unmatured interest. *In re Oakwood Homes Corp.*, 449 F.3d at 601. Yet withdrawal liability

differs fundamentally from conventional commercial loans. In a typical loan, the periodic payment amount is determined based on the total amount of principal and interest that will come due during the repayment period, such that all principal and interest will be paid over the course of the payment schedule. In contrast, under MPPAA, the determination of the annual payment amount is divorced from the employer's proportionate share of UVBs. *See Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 418. As the Supreme Court explained:

> The statutory method is unusual in that the statute does not ask the question that a mortgage borrower would normally ask, namely, what is the amount of each of my monthly payments? What size monthly payment will amortize, say, a 7% 30–year loan of $100,000? Rather, the statute fixes the amount of each payment and asks how many such payments there will have to be.

*Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 418. When combined with the 20-year limitation on payments, this structure means that an employer who would otherwise be required to satisfy its withdrawal liability over more than 20 years will often instead pay only a fraction of the principal amount owed to the multiemployer plan in question. And that is the case here, as Debtors' allocable share of Central States Pension Fund's UVBs is $4,827,470,743.87, which is more than three times the sum of their 20 annual payments (that is, $1,579,806,536.80). So, Debtors' payments would not even come close to the amount of withdrawal liability principal, let alone the sum of principal and interest. In this situation, it would make no sense to apply a present value discount.

42.     Put another way, *Oakwood Homes* weighs against applying present-value discounting here because Debtors have already received a significant discount on their obligation to pay their allocable share of Central States Pension Fund's UVBs through application of the 20-year limitation on payments. *See In re Marcal Paper Mills, Inc.*, 650 F.3d at 318 ("The liability for unfunded vested benefits represents a pre-existing obligation on the employer's part . . . ." (internal citations and quotation marks omitted)). Applying a present-value analysis here after

Debtors' future payment obligations were already significantly reduced through the 20-year limitation on payments would be impermissible "double discounting." *In re Oakwood Homes Corp.*, 449 F.3d at 601. Debtors have already received a discount of approximately $3 billion dollars on their liability for Central States Pension Fund's UVBs, such that no further discounting is warranted.

**V.    If the Court Finds that Discounting Is Appropriate, the Correct Rate Would Be the 4.00% Used to Amortize the Withdrawal Liability.**

43.    Even if Central States Pension Fund's withdrawal liability claims were to be reduced using a present-value analysis, Debtors' contract-based approach to determining the discount rate lacks any support in the statute or case law. As an initial matter, withdrawal liability is not a contractual obligation, but rather a statutory one, and Debtors have done nothing to explain why their analogy to conventional commercial loans—which, as discussed, the Supreme Court explicitly rejected in *Jos. Schlitz Brewing*—should persuade the Court. This distinction is critical, as the case law that sets forth a contract-based approach relies upon the conclusion that "the cost of buying a series of futures contracts may best correspond economically to what the injured party (and ultimately the Court) needs to accomplish." *In re Chemtura Corp.*, 448 B.R. 635, 672 (Bankr. S.D.N.Y. 2011); *see In re B456 Sys., Inc.*, No. 12-12859 (KJC), 2017 WL 6603817, at *24–*25 (Bankr. D. Del. Dec. 22, 2017). But this is not a conventional contractual relationship, and economic activity that the Court should seek to emulate in any present value analysis here should instead draw upon the actuarial determinations undertaken in connection with 29 U.S.C. § 1399(c)'s command to ensure the amount of withdrawal liability be amortized over equal annual payments. Put differently, withdrawal liability is not the result of any bargaining between employers and multiemployer funds, but instead a statutory device that reflects the amount of money that an employer must pay to fund its share of a plan's UVBs. Accordingly, to the extent

that withdrawal liability should be discounted to a present value, the logic of *Chemtura* would require that such discounting correspond with the economic objectives of withdrawal liability in the first place, such that the economic benefit to Central States Pension Fund and its beneficiaries following any discounting would be the same as if Debtors had in fact satisfied their 20-year payment obligation. In this case, that calculation is best performed by using a 4.00% discount rate, which is the predicted investment return rate set by Central States Pension Fund's actuary for 2023, the year of the complete withdrawal at issue, and the rate used to amortize Debtors' payment schedule in the first place under 29 U.S.C. § 1399(c)(1)(A)(ii). (Central States Pension Fund December 31, 2022 Actuarial Report for Withdrawal Liability Purposes, Ex. N, at CS-0017084, ("The number of monthly installments is calculated on the basis of the amount of withdrawal liability and interest at the actuarial valuation rate used for funding purposes."); Central States Pension Fund January 1, 2023 Valuation Report, Ex. O, at CS-0017140 (setting forth actuarial valuation rate for funding purposes).)[6]

## VI.    Subordination Under 29 U.S.C. § 1405 Is Inappropriate.

44.    Debtors argue that Central States Pension Fund's withdrawal liability claims should be reduced by as much as 50% under 29 U.S.C. § 1405. But, even if 29 U.S.C. § 1405(b) were found to be applicable, that would not decrease the amount of Central States Pension Fund's withdrawal liability claim (as already reduced by the Amended Memorandum Opinion). Accordingly, 29 U.S.C. § 1405 provides no basis for any genuine dispute as to the allowable amount of Central States Pension Fund's claims.

---

[6] Should the Court disagree with Central States Pension Fund on legal grounds and hold that present value discounting is appropriate and should be conducted on contractual grounds, the parties would be required to complete expert discovery and likely proceed to a trial on the issue. (*See* Proposed Amended Order Scheduling Certain Dates and Deadlines in SFA MEPP and Non-SFA MEPP Litigation, Dkt. No. 5146-1, at 4.)

45.     As an initial matter, 29 U.S.C. § 1405(b) does not use the phrase "withdrawal liability" but rather "unfunded vested benefits":

(b) Unfunded vested benefits allocable to insolvent employer undergoing liquidation or dissolution; maximum amount; determinative factors. In the case of an insolvent employer undergoing liquidation or dissolution, the unfunded vested benefits allocable to that employer shall not exceed an amount equal to the sum of—

(1) 50 percent of the unfunded vested benefits allocable to the employer (determined without regard to this section), and

(2) that portion of 50 percent of the unfunded vested benefits allocable to the employer (as determined under paragraph (1)) which does not exceed the liquidation or dissolution value of the employer determined—

(A) as of the commencement of liquidation or dissolution, and

(B) after reducing the liquidation or dissolution value of the employer by the amount determined under paragraph (1).

46.     Debtors' implicit attempt to interpret "unfunded vested benefits" in 29 U.S.C. § 1405(b) as meaning "withdrawal liability" is contrary to the law of the case. "As most commonly defined, the law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Here, the Court has already determined that "withdrawal liability" equates to "the amount the employer owes after the application of the 20-year cap," as opposed to meaning the employer's allocable share of the plan's UVBs. (Amended Memorandum Opinion, Dkt. No. 4769, at 37.)

47.     Debtors' argument should also be rejected because Debtors previously (and successfully) took the position that an employer's allocable share of UVBs and withdrawal liability "are not the same thing." (Debtors' Motion for Summary Judgment, Dkt. No. 3852, ¶ 77.) Under the doctrine of judicial estoppel, a party cannot adopt a position contrary to one on which a party

previously prevailed before the Court. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see also, e.g.*, *Murray v. Silberstein,* 882 F.2d 61, 66 (3d Cir. 1989). Here, Debtors have changed course entirely by now implicitly claiming that "unfunded vested benefits" and "withdrawal liability" are interchangeable, which the Court should not permit. (Debtors' Motion for Summary Judgment, Dkt. No. 3852, ¶ 77.)

48.    Thus, given the statutory text, the law of this case, and Debtors' own prior statements, Debtors' argument that the withdrawal liability claims should be further reduced by as much as 50% fails, because applying 29 U.S.C. § 1405(b) to Debtors' allocable share of Central States Pension Fund's UVBs would not affect the amount of Debtors' withdrawal liability to Central States Pension Fund, as already reduced by the 20-year limitation on payments applied by the Amended Memorandum Opinion.

49.    Specifically, as reflected in Central States Pension Fund's withdrawal liability proofs of claim, Debtors' allocable share of Central States Pension Fund's UVBs under 29 U.S.C. § 1391(c)(2) is $4,827,470,743.87. (*See, e.g.*, Claim No. 4312, at 5 (stating that the unadjusted share of allocable UVBs is $4,827,470,743.87).) A 50% reduction in the UVBs allocable to Debtors would reduce the amount of the UVBs allocable to Debtors to $2,413,735,371.94. (Affidavit of Andrew M. Sprau, Ex. B, ¶ 11.)

50.    Under 29 U.S.C. § 1399(c)(1)(C)(i), the allocable amount of an employer's UVBs is not considered in calculating the employer's annual withdrawal liability payment amount. Instead, the payment amount is independently determined based on the employer's contribution history and highest contribution rate, such that the payment amount is not affected by the employer's allocable amount of UVBs. That allocable share of UVBs is amortized over the number of years projected to pay off the employer's allocable share using the annual payment amount. If

the resulting payment schedule is longer than 20 years, the employer's obligation is limited to the first 20 years of payments. 29 U.S.C. § 1399(c)(1)(B).

51.     Here, following the Court's Memorandum Opinion, Central States Pension Fund calculated the annual payment amount Debtors would owe under 29 U.S.C. § 1399(c)(1)(C)(i). That amount is $78,990,326.84 per year. (Affidavit of Andrew M. Sprau, Ex. B, ¶ 12.) Amortizing $2,413,735,371.94 (50% of Debtors' allocable share of UVBs) over equal annual payments of $78,990,326.84 would result in more than 20 annual payments of $78,990,326.84, just as amortizing Debtors' full allocable share of $4,827,470,743.87 would. (*Id.*) Either way, then, the 20-year limitation of payments set forth in 29 U.S.C. § 1399(c)(1)(B) would apply under the Amended Memorandum Opinion. (*Id.* ¶ 13; *see* Amended Memorandum Opinion, Dkt. No. 4769, at 4 ("Under the statute, an employer's withdrawal liability will never exceed 20 times that annual payment, even if it would take 25 or 50 or 1,000 such payments to repay the employer's allocable share of the fund's unfunded vested benefits.").) 29 U.S.C. § 1405(b) would not affect the amount of Central States Pension Fund's claim (as reduced by the Amended Memorandum Opinion) even if it did reduce Debtors' allocable share of UVBs, because it would not affect the total amount owed under Debtors' capped withdrawal liability payment schedule. (*See* Affidavit of Andrew M. Sprau, Ex. B, ¶ 13.)

## VII.   The Court Should Hold Debtors to their Bargain and Allow the Claim for Breach of the Contribution Guarantee.

52.     As explained above, the 2014 Letter Agreement was voluntarily chosen by Debtors as a condition of a comprehensive restructuring program that required "sacrifice" by Central States Pension Fund and that was "absolutely essential to the company's restructuring efforts." (Hawkins Transcript, Ex. F, at 46:23–52:4.) Indeed, Debtors chose the contribution guarantee reflected in the 2014 Letter Agreement over an alternative whereby future withdrawal liability would be

assessed according to a higher, deemed rate, which alternative Debtors themselves agreed to with respect to certain other multiemployer funds. (Amended Memorandum Opinion, Dkt. No. 4769, at 39–41; 2014 Letter Agreement, Ex. G, at p. 1.)) As the Court already ruled with respect to similar agreements with other funds, because Debtors voluntarily agreed to the 2014 Letter Agreement there is no reason why "the [D]ebtors should not be held to their bargain." (Amended Memorandum Opinion, Dkt. No. 4769, at 39–41.) Accordingly, the Court upheld the use of a $342.00 per week contribution rate in the calculation of those funds' withdrawal liability claims. (*Id.*; *see, e.g.,* Claim No. 4501.)

53.     As part of holding Debtors to their bargain, the Court should reject Debtors' argument that the damages set forth in the 2014 Letter Agreement are unenforceable as a penalty. The question of whether a contractual provision is an unenforceable penalty clause or a reasonable liquidated damages clause is a question of law. *Smart Oil, LLC v. DW Mazel, LLC,* 970 F.3d 856, 863 (7th Cir. 2020). Under Illinois law,[7] a liquidated damages provision is enforceable if: "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove." *Id.* (citing *Karimi v. 401 N. Wabash Venture, LLC*, 952 N.E.2d 1278, 1285 (Ill. App. 1st Dist. 2011)). The burden of persuasion "rests on the party resisting enforcement of a liquidated damages clause to show that the agreed-upon damages are clearly disproportionate to a reasonable estimate of the actual damages likely to be caused by a breach." *XCO Int'l, Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1003 (7th Cir. 2004) (applying Illinois law).

---

[7] The 2014 Letter Agreement is governed by Illinois law (2014 Letter Agreement, Ex. H, ¶ 2(f).)

54.    As to the first element, whether the parties intended to agree in 2014 to the settlement of damages that might arise from the breach, "the courts of Illinois give effect to such damage provisions and do not treat them as penalties where the parties have expressed their agreement in clear and explicit terms." *Pierce v. B & C Elec., Inc.*, 432 N.E.2d 964, 966 (Ill. App. 1st Dist. 1982) (citing *Burnett v. Nolen*, 84 N.E.2d 155 (Ill. App. 4th Dist. 1949)). Indeed, the tendency to enforce "clear and explicit terms" is especially strong where, as here, both parties are highly sophisticated: "[w]here both parties are substantial commercial enterprises, it is difficult to see why the law should take an interest in whether the estimate of harm underlying the liquidation of damages is reasonable. Courts don't review the other provisions of contracts for reasonableness; why this one?" *Smart Oil, LLC*, 970 F.3d at 863 (citation and ellipsis omitted); *see Zerjal v. Daech & Bauer Constr., Inc.*, 939 N.E.2d 1067, 1074 (Ill. App. 5th Dist. 2010) ("Illinois courts give effect to liquidated-damages provisions so long as . . . there is no evidence of fraud or unconscionable oppression, a legislative directive to the contrary, or a special social relationship between the parties of a semipublic nature." (citation omitted)).

55.    Here, the 2014 Letter Agreement sets forth the consequences for the breach of the contribution guarantee in clear and explicit terms, showing that Debtors and Central States Pension Fund indeed intended to agree in advance to the settlement of damages that might arise from the breach. (2014 Letter Agreement, Ex. H, ¶ 2.) Moreover, indications of consent are particularly strong here, not only because Debtors are sophisticated commercial parties who were represented by sophisticated counsel in connection with the 2014 Letter Agreement, but also because Debtors themselves selected the contribution guarantee provision that Debtors now claim is unenforceable.

(2014 Letter Agreement, Ex. H, at p. 1.)[8] Accordingly, the parties to the 2014 Letter Agreement clearly and explicitly agreed to be bound by the damages provision in question.

56.     The second element, whether the amount of liquidated damages was reasonable, also favors enforcing the 2014 Letter Agreement. As an initial matter, the question is whether the provision was "reasonable at the time of contract." *Smart Oil, LLC*, 970 F.3d at 863. Indeed, "whether [a party] ultimately incurred any actual damages is not relevant to the reasonableness decision, and actual damages are not required under Illinois law before liquidated damages can be assessed." *Id.* at 864. "[T]he predetermined amount may or may not exceed the actual damages and both parties agree to accept this inherent risk." *Id.* at 863 (internal citation omitted). Accordingly, the Court should focus on whether the parties' estimate of damages was reasonable in 2014.

57.     An examination of the relevant provision itself reflects a reasonable and mutual judgment by the parties. In this case, the amount to be paid is to be calculated in one of two ways: (a) looking to the actual amount of work performed by the employer during the breach, or (b) by multiplying a month of the employer's contribution history during the period that Debtors were repaying their contribution deferral obligation (through December 31, 2022) by the last contribution rate in effect. (2014 Letter Agreement, Ex. H, ¶ 2(a)). And, in either event, damages are only to be paid for the duration of the breach. *Id.* Agreeing to a damages formula that awards Central States Pension Fund with an amount roughly equivalent to the amount of contributions that would have been paid absent a breach is reasonable, especially when one considers the sophistication of the parties. *XCO Int'l Inc.*, 369 F.3d at 1004 ("The element common to most

---

[8]  If anything, Debtors are estopped from now arguing that the provision is unenforceable because they are the parties that chose to include that provision in the 2014 Letter Agreement. (2014 Letter Agreement, Ex. H, at 1; January 21, 2014 Email of Harry Wilson, Ex. J, at CS-0011114–CS0011115.)

liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach.")

58.     Indeed, as explained above, Congress has long identified potential reductions in contribution bases for multiemployer plans as a major threat to the health of multiemployer funds: "One of the most serious threats to the security of benefits under a multiemployer plan is an unanticipated decline in employment covered by the plan." Joint Explanation of MPPAA, 126 Cong. Rec. at S20209. At the time that the 2014 Letter Agreement was negotiated, Debtors acknowledged that Central States Pension Fund's efforts up to that point, including the agreement to defer contributions for 2009 and 2010 and to accept significantly reduced contributions amounts thereafter, constituted a "significant sacrifice." (Hawkins Transcript, Ex. F, at 33:15–35:3.) As recently as 2023, Debtors themselves acknowledged that the elimination of contributions received from Debtors would be a "dire financial consequence" for Central States Pension Fund. (June 14, 2023 Letter of Dan Olivier, Ex. K; Hawkins Transcript, Ex. F, at 105:6–106:15.)  Thus, requiring damages in an amount roughly equivalent to the amount of contributions that would have been paid absent a breach was reasonable.

59.     It bears noting that Debtors owe less under the contribution guarantee option offered by Central States Pension Fund that they would have had they chosen the alternative whereby the contribution rate for withdrawal liability purposes would be deemed to be the contribution rate due under the relevant CBA. Specifically, using a deemed contribution rate of $342 per week under 29 U.S.C. § 1399(c)(1)(A) would result in an annual payment amount of $253,540,044.86. (Affidavit of Andrew M. Sprau, Ex. B, ¶ 14.) Under the Court's analysis of 29

U.S.C. § 1399(c)(5), multiplying this amount by 20 to determine the withdrawal liability owed would have resulted in a total claim amount of $5,070,800,897.25. (*Id.*)[9]

60.    The third element, whether future damages would have been uncertain in amount and difficult to prove from the parties' perspective in 2014, also favors enforcing the 2014 Letter Agreement's provisions. Indeed, "[t]here is no way to estimate in dollar terms the harm which results when an employer submits late contributions," or, by extension, when the employer fails to submit contributions altogether. *Pierce,* 432 N.E.2d at 967. In addition to the lost contribution base itself, *Ganton Technologies, Inc. v. National Industrial Group Pension Plan*, 865 F. Supp. 201, 207 (S.D.N.Y. 1994), a failure to contribute causes administrative expenses resulting from collection costs as well increased difficulty in financial forecasting, both of which are difficult to estimate. *United Ord. of Am. Bricklayers & Stone Masons Union No. 21 v. Thorleif Larsen & Son, Inc.*, 519 F.2d 331, 333 (7th Cir. 1975). Declines in or cessation of participation (especially from large employers like Debtors) can also result in a "rush to the exits" as additional employers face an incentive to leave a multiemployer plan that has already been weakened by each previous exit. *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 416-17. Accordingly, the 2014 Letter Agreement's damages provision represents the parties' mutual answer in 2014 to the uncertain estimation of future damages, and thus should be upheld.

61.    Here, when Debtors effected a complete withdrawal from the Pension Fund in July 2023, the Primary Obligors YRC and USFH effected "a breach involving a complete failure by one or more of the Primary Obligors to have a contribution obligation to the Pension Fund during

---

[9]    The difference is the result of several additional years of contribution rate increases being included under the deemed contribution rate approach, while the contribution guarantee approach relies upon the contribution rate actually paid. Had Debtors triggered the breach of the contribution guarantee provision earlier (in, say, 2015), the relative cost of the contribution guarantee would have been much higher compared to the deemed-rate alternative.

the Guarantee Period" within the meaning of paragraph 2(a) of the 2014 Letter Agreement. The remaining guarantee period under paragraph 2(a) of the 2014 Letter Agreement was 113 months (that is, August 2023 through December 2032). (Affidavit of Andrew M. Sprau, Ex. B, ¶ 15; *see* Yellow Corp., 2022 Annual Report (Form 10-K), at 55 (Feb. 9, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000716006/ 000095017023002332/yell-20221231.htm; Aug. 7, 2023 Declaration of Matthew A. Doheny, Dkt. 14, ¶ 17.)

62.     As for the amount to be paid for those 113 months, it is the greater of (1) "the amount of contributions that would be owed to the Pension Fund based upon current levels and periods of work and compensation during each month of continuation of the breach, calculated as if the last collective bargaining agreement (including the last agreed contribution rate) requiring contributions to the Pension Fund by the breaching Primary Obligor(s) were still in effect" and (2) "the amount of contributions that would be owed to the Pension Fund based upon the highest monthly levels and periods of work and compensation for which pension contributions were owed measured by CBUs [*i.e.*, contribution base units] that the breaching Primary Obligor(s) experienced during the period of July 2009 through and including December 2019 but calculated as if the last collective bargaining agreement requiring contributions on the part of the breaching Primary Obligor(s) to the Pension Fund (including the last contribution rate) were still in effect." (2014 Letter Agreement, Ex. H, ¶ 2(a).)

63.     For the first Primary Obligor, YRC, the second amount is the higher one. Specifically, the "highest monthly levels and periods of work . . . measured by the CBUs that [YRC] experienced during the period of July 2009 through and including December 2019" is 46,476.38 CBUs (for June 2012) (with a CBU being equivalent to a full-time employee's 5-day work week). (*See, e.g.,* Claim No. 4338, at 7; Affidavit of Andrew M. Sprau, Ex. B, ¶ 17.) Further,

YRC's "last contribution rate" to the Pension Fund was $106.55 per CBU. $106.55 per CBU times 46,476.38 CBUs per month equals $4,952,058.29 per month. (Claim No. 4338, at 7; Affidavit of Andrew M. Sprau, Ex. B, ¶ 17.)

64.    As to the second Primary Obligor, USFH, the second amount is also the higher one. Specifically, the "highest monthly levels and periods of work . . . measured by the CBUs that [USFH] experienced during the period of July 2009 through and including December 2019" is 29,687.80 CBUs (for September 2017). (*See, e.g.,* Claim No. 4338, at 7; Affidavit of Andrew M. Sprau, Ex. B, ¶ 18.) Further, USFH's "last agreed contribution rate" was $106.55 per CBU. $106.55 per CBU times 29,687.80 CBUs per month equals $3,163,235.09 per month. (Claim No. 4338, at 7; Affidavit of Andrew M. Sprau, Ex. B, ¶ 18.)

65.    The sum of $4,952,058.29 and $3,163,235.09 is $8,115,293.38 per month, which is the total monthly amount owed pursuant to paragraph (2)(a) of the 2014 Letter Agreement. (Affidavit of Andrew M. Sprau, Ex. B, ¶ 19.) Here, no present-value discounting is appropriate, because, again, Debtors' guarantee obligation does not contain any unmatured interest, but rather keeps the contribution payment obligation consistent over time. *In re Oakwood Homes Corp.*, 449 F.3d at 601. Accordingly, the proper amount of Central States Pension Fund's claim is the sum of 113 payments of $8,115,293.38, which is $917,028,151.94. (Affidavit of Andrew M. Sprau, Ex. B, ¶ 20.) This amount is a joint and several obligation of the Primary Obligors (as stated in paragraph 2(a) of the 2014 Letter Agreement) and the Guarantors (as stated in paragraphs 2 and 3(a) of the 2014 Letter Agreement).[10]

---

[10]    Again, the "Guarantors" are the following Debtors: Yellow Corporation; Express Lane Services, Inc.; New Penn Motor Express LLC; Roadway Express International, Inc.; Roadway LLC; Roadway Next Day Corporation; USF Bestway Inc.; USF Dugan Inc.; USF RedStar LLC; USF Reddaway Inc.; YRC Association Solutions, Inc.; YRC Enterprise Services, Inc.; YRC Logistics Services, Inc.; YRC Mortgages, LLC; and YRC Regional Transportation, Inc.

66.     In the alternative, should the Court determine that the guarantee obligation should be reduced to a present value notwithstanding the absence of unmatured interest, it should hold that a 4.00% discount rate is appropriate. The 2014 Letter Agreement guarantees contributions, and thus the logic of the *Chemtura* decision (as explained above) would, at most, require that the liquidated damages accordingly be treated in the same way as contributions, their economic equivalent. *In re Chemtura Corp.*, 448 B.R. at 672. As explained above that calculation is best performed by using a 4.00% discount rate, which is the predicted investment return rate set by Central States Pension Fund's actuary for 2023. Central States Pension Fund January 1, 2023 Valuation Report, Ex. O, at CS-0017140 (setting forth actuarial valuation rate for funding purposes).) Reducing 113 such monthly payments to present value using a 4.00% discount rate results in a total lump sum payment amount of $767,996,182.80. (Affidavit of Andrew M. Sprau, Ex. B, ¶ 21.)

67.     7.3% interest rate is appropriate, as that is the agreed-upon interest rate for the amounts owed under 2014 CDA as of the date of the 2014 Letter Agreement. (YRC Worldwide, Inc. Quarterly Report (Form 10-Q) for Quarter Ending March 31, 2014 (May 1, 2014), https://www.sec.gov/Archives/edgar/data/716006/000071600614000009/yrcw-2014331x10q .htm.) Reducing 113 such monthly payments to present value using a 7.3% discount rate results in a total lump sum payment amount of $672,233,580.18. (Affidavit of Andrew M. Sprau, Ex. B, ¶ 22.)

**[Remainder of Page Intentionally Left Blank]**

## CONCLUSION

68.    For the reasons set forth above, Central States Pension Fund moves this Court for summary judgment allowing Central States Pension Fund's claims for withdrawal liability against each one of the Debtors, jointly and severally (Claims Nos. 4312–4335), in the amount of $1,579,806,536.80 and allowing Central States Pension Fund's claims in connection with Debtors' breach of the 2014 Letter Agreement (Claims Nos. 4336–4352) in the amount of $917,028,151.94, or alternatively, in the amount of $767,996,182.80 using a rate of 4.00% or, in the further alternative, in the amount of $672,233,580.18 using a rate of 7.3%.

Date:   December 13, 2024
        Wilmington, Delaware

**SULLIVAN · HAZELTINE · ALLINSON LLC**

 _/s/ William D. Sullivan_
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
            whazeltine@sha-llc.com

Brad R. Berliner, Esq.
Andrew J. Herink, Esq.
Daniel Sullivan, Esq.
Central States Funds
8647 W. Higgins Road
Chicago, IL 60631
(847) 939-2478 - Office
bberliner@centralstatesfunds.org
aherink@centralstatesfunds.org
dsulliva@centralstatesfunds.org

*Attorneys for Central States, Southeast and Southwest Areas Pension Fund*