**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| YELLOW CORPORATION, et al., | ) | |
| | ) | Case No. 23-11069 (CTG) |
| Debtors. | ) | |
| | ) | Jointly Administered |

**SEVEN SFA MULTIEMPLOYER PENSION PLANS' OPPOSITION TO DEBTORS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON SFA MEPPS' AND NON-SFA
MEPPS' CLAIMS**

SULLIVAN · HAZELTINE · ALLINSON LLC
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
      whazeltine@sha-llc.com


GROOM LAW GROUP, CHARTERED
Edward J. Meehan (*pro hac vice*)
Samuel I. Levin (*pro hac vice*)
1701 Pennsylvania Ave., NW
Washington, DC 20006
Tel: (202) 857-0620
Email: emeehan@groom.com
      slevin@groom.com

*Special Counsel for the Funds*

Date:   January 10, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 3

I.     Debtors Concede That the Funds' Claims Were Accelerated by Virtue of the Bankruptcy Filing.......................................................................................... 3

II.    The Funds' Insecurity Default Provisions Are Enforceable. .............................. 6

III.   Debtors Concede That There Have Been Missed Payment Defaults. ............................ 10

IV.   Debtors Do Not Dispute that the Funds' Claims Should be Viewed as Interest-Free Loans Because the Funds Are Not Able to Collect any Interest. ..................................... 10

V.    If a Discount Were Required, Under Debtors' Own Case Law They Cannot Meet Their Burden of Proof to Establish an Applicable Discount Rate, and Any Such Discount Would be Applied to the Full Amount of Debtors' Allocable UVBs................ 14

VI.   There is No Subordination Available Here Under Section 4225 of ERISA..................... 16

   A.  Debtors Have Not Met Their Burden to Establish Subordination Under Section 4225. ...................................................................................................... 16

   B.  Given the Application of the 20-Year Cap, There is Nothing to Subordinate Under Section 4225. .............................................................................................. 17

CONCLUSION.................................................................................................... 21

# TABLE OF AUTHORITIES

<u>Cases</u>

*Bagsby v. Cent. States, Se. & Sw. Areas Pension Fund*,
   162 F.3d 424 (6th Cir. 1998) ................................................................................ 7

*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*,
   252 F.3d 911 (7th Cir. 2001) ................................................................................ 9

*Christianson v. Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988) ........................................................................................... 19

*Corley v. United States*,
   556 U.S. 303 (2009) ........................................................................................... 20

*Einhorn v. M.L. Ruberton Const. Co.*,
   632 F.3d 89 (3d Cir. 2011) ................................................................................. 20

*GCIU-Emp. Ret. Fund v. Quad/Graphics, Inc.*,
   909 F.3d 1214 (9th Cir. 2018) ............................................................................ 21

*In re AMR Corp.*,
   730 F.3d 88 (2d Cir. 2013) ............................................................................... 2, 8

*In re B456 Sys., Inc.*,
   No. 12-12859 (KJC), 2017 WL 6603817 (Bankr. D. Del. Dec. 22, 2017) ........... 2, 14, 15

*In re CF & I Fabricators of Utah, Inc.*,
   150 F.3d 1293 (10th Cir. 1998) ........................................................................... 4

*In re CSC Industries, Inc.*,
   232 F.3d 505 (6th Cir. 2000) ............................................................................ 4, 5

*In re Durango Georgia Paper Co.*,
   No. 02-21669, 2017 WL 221785 (Bankr. S.D. Ga. Jan. 18, 2017) .......................... 5

*In re EBC I, Inc.*,
   356 B.R. 631 (Bankr. D. Del. 2006) ..................................................................... 9

*In re Loewen Grp. International, Inc.*,
   274 B.R. 427 (Bankr. D. Del. 2002) .................................................................. 4, 5

*In re Mirant Corp.*,
   332 B.R. 139 (Bankr. N.D. Tex. 2005) ............................................................. 2, 15

*In re Oakwood Homes Corp.*,
   449 F.3d 588 (3d Cir. 2006) ......................................................................... *passim*

*In re Rhodes, Inc.*,
   382 B.R. 550 (Bankr. N.D. Ga. 2008) .................................................................... 5

*In re Stone & Webster, Inc.*,
   279 B.R. 748 (Bankr. D. Del. 2002) ................................................................. 3, 16

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ......................................................................... 4, 8, 9

*IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*,
   788 F.2d 118 (3d Cir. 1986) ............................................................................ 20

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
   534 U.S. 124 (2001) ....................................................................................... 8

*Matter of Quanta Res. Corp.*,
   739 F.2d 912 (3d Cir. 1984) ............................................................................. 4

*Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.*,
   474 U.S. 494 (1986) ....................................................................................... 4

*Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*,
   513 U.S. 414 (1995) ........................................................................... 10, 11, 12

*Perfection Bakeries, Inc. v. Retail Wholesale & Dep't Store Int'l Union & Indus. Pension Fund*,
   No. 2:22-CV-573-ACA, 2023 WL 4412165 (N.D. Ala. July 7, 2023) ..................................... 21

*Rowland v. Bissell Homecare, Inc.*,
   73 F.4th 177 (3d Cir. 2023) ............................................................................ 20

*Russello v. United States*,
   464 U.S. 16 (1983) ....................................................................................... 19

*Straumann Co. v. Lifecore Biomedical Inc.*,
   278 F. Supp. 2d 130 (D. Mass. 2003) ................................................................... 15

<u>Statutes</u>

11 U.S.C. § 103(a) ........................................................................................ 13

11 U.S.C. § 502(b) .................................................................................. 4, 5, 13

29 U.S.C. § 1002(37) ...................................................................................... 12

29 U.S.C. § 1381(b) .................................................................................. 17, 21

29 U.S.C. § 1386.................................................................................................... 19, 20

29 U.S.C. § 1389.................................................................................................... 19, 20

29 U.S.C. § 1399(c) ...................................................................................... 6, 13, 18, 20

29 U.S.C. § 1405(a) ........................................................................................................ 20

29 U.S.C. § 1405(b) ................................................................................................... 16, 18

## INTRODUCTION

1.      The Funds[1] submit this Opposition to Debtors' Motion for Partial Summary Judgment on SFA MEPPS' and Non-SFA MEPPS' Claims (Dkt. 5181, "Debtors' Motion").

2.      Debtors' Motion presents no basis for discounting the Funds' withdrawal liability claims to present value or for subordination under Section 4225 of ERISA. Accordingly, this Court should enter an order that the Funds' claims are allowed in full, except to the extent already modified by this Court's Amended Memorandum Opinion (Dkt. 4769, "Opinion").

3.      As explained in the Funds' Supplemental Summary Judgment Memorandum (Dkt. 5165, "Funds Memo"), there are at least four separate reasons to conclude that there should not be a discount to present value (or that a theoretical discount to present value should be done with an "effective discount rate" of "zero"). Debtors' Motion not only confirms that each of these reasons precludes a discount to present value, but also provides a fifth reason there should not be a discount to present value.

4.      *First*, Debtors concede that the Funds' claims were accelerated by virtue of the filing of the bankruptcy petition. *See* Debtors' Motion, ¶ 34 ("[A]s here, claims for a long-term stream of payments were accelerated as due and owing as of the date of the petition . . ."). As this Court previously held, "[t]he predicate" of Debtors' argument "that the 20-year stream of payment[s] should be discounted to . . . present value" is that "as of the petition date . . . those payments have not been accelerated." Opinion at 38. Nevertheless, Debtors claim that this would

---

[1] The "Funds" are seven multiemployer pension plans: New York State Teamsters Conference Pension and Retirement Fund ("New York State"); Road Carriers Local 707 Pension Fund ("Road Carriers 707"); Management Labor Pension Fund Local 1730; Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund ("Local 701"); Teamsters Local 617 Pension Fund; Trucking Employees of North Jersey Pension Fund ("TENJ"); and Freight Drivers and Helpers 557 Pension Fund.

lead to an exception that would "swallow the general rule" of discounting claims to present value. Debtors' Motion, ¶ 34. But as the Funds have previously explained, the Funds are not relying upon any such "general rule," but are rather "seeking to have their withdrawal liability claims, which have been accelerated, not subject to a discount to present value because. . . ERISA makes clear that there should not be a discount." *See* Funds Memo, ¶¶ 5-8.

5.     *Second*, Debtors now concede that the majority of the Funds have insecurity default provisions. Debtors take the untenable position, however, that insecurity default provisions can never be enforced based on a bankruptcy filing (even though ERISA provides that they can be). Debtors' claim that it is "well-settled" that all *ipso facto* clauses are unenforceable is false— as this Court has recognized. *See* Dkt. 4771 ("Questions") at 6; *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013). *See also infra* at ¶¶ 24-28. *AMR* is correctly decided, yet Debtors ignore it, despite this Court's instruction to brief the issue. *See* Questions at 5.

6.     *Third*, Debtors concede there have been missed payment defaults, but claim, without citation, that they are irrelevant because they happened after the petition date.

7.     *Fourth*, Debtors do not dispute that the Funds' claims should be viewed as interest-free loans because the Funds are not able to collect any interest—but wrongly claim that the Third Circuit's *Oakwood Homes* decision still requires discounting.

8.     *Fifth*, in critiquing the rate that the Local 705 Pension Plan ("Local 705") used to discount its claims, Debtors argue that, if there were to be a discount to present value, the rate should be based on "the risk of non-performance . . . *before* bankruptcy" "at the time the parties entered into the Contract." Debtors' Motion, ¶ 85 & n.11 (quoting *In re B456 Sys., Inc*., No. 12-12859 (KJC), 2017 WL 6603817, at *25 (Bankr. D. Del. Dec. 22, 2017); *In re Mirant Corp.*, 332 B.R. 139, 158 (Bankr. N.D. Tex. 2005)). While Debtors claim this topic requires expert testimony,

Debtors' expert did not opine on a rate that reflected "the risk of non-performance . . . *before* bankruptcy*," thereby leaving Debtors' unable to satisfy their self-defined burden of proof.[2] Debtors' case law also makes clear that, if a discount were to apply, the discount should not be based on the application of the 20-year cap, but instead that any such discount should be based on the full amount of the Funds' claims.  *See In re Stone & Webster, Inc.*, 279 B.R. 748, 807 (Bankr. D. Del. 2002); *infra* at ¶ 42.

9.      Finally, there is no basis for subordination under Section 4225 of ERISA.  Debtors have not even asserted, much less put forth any evidence, that their liquidation value is low enough to make a reduction under Section 4225 possible.  Nor do Debtors dispute that, given the magnitude of the impact of the 20-year cap, even if a reduction under Section 4225 were possible, subordination still could not affect the amount of the Funds' allowed claims—instead, Debtors make a frivolous legal argument that conflates unfunded vested benefits ("UVBs") with withdrawal liability.

## ARGUMENT

### I.      Debtors Concede That the Funds' Claims Were Accelerated by Virtue of the Bankruptcy Filing.

10.      As this Court previously held, "[t]he predicate" of Debtors' argument "that the 20-year stream of payment[s] should be discounted to . . . present value" is that "as of the petition date . . . those payments have not been accelerated."  Opinion at 38.

11.      Debtors now concede that "[i]t is almost certain that" the Funds' claims were "accelerate[d]" by the filing of Debtors' bankruptcy petition.  Debtors' Motion, ¶ 33.

---

[2] While Local 705 is not one of the Funds on whose behalf this Opposition is filed, Debtors cannot take inconsistent positions against different multiemployer plans' withdrawal liability claims.

12. Nevertheless, Debtors claim that "[t]he Bankruptcy Code mandates that all claims for future payment must be reduced to present value" in order to "ensure that creditors do not receive more than the value they bargained for and ensure debtors a fair fresh start." Debtors' Motion, ¶ 35 (quoting *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1293, 1300 (10th Cir. 1998)).

13. But the Third Circuit rejected this holding from *CF & I Fabricators*. *See In re Oakwood Homes Corp.*, 449 F.3d 588, 599 n.13 (3d Cir. 2006) ("acknowled[ging]" that "several" cases, including *CF & I Fabricators*, "made sweeping statements declaring 11 U.S.C. § 502(b) to require discounting all claims to present value" but explaining that "these courts either conducted no inquiry at all into the issue, or concluded (contrary to our holding above) that § 502(b) was clear and unambiguous").[3]

14. The "several" cases with this holding that the Third Circuit rejected include *In re CSC Industries, Inc.*, 232 F.3d 505 (6th Cir. 2000), which Debtors quote for the proposition that "[b]ankruptcy courts must value present claims and reduce claims for future payment to present value . . . ." *See* Debtors' Motion, ¶ 73; *Oakwood Homes*, 449 F.3d at 599 n.13.

15. Indeed, *CSC Industries* and *CF & I Fabricators* were the two primary cases that the decision in *In re Loewen Grp. International, Inc.*, 274 B.R. 427 (Bankr. D. Del. 2002) relied

---

[3] Debtors make a similar "fresh start" argument in their Motion, citing *In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012). *See* Motion, ¶ 34. But *W.R. Grace & Co.* did not address whether "acceleration . . . is unrelated to the issue of discounting claims to present value," *id.*, and, as discussed below, its holding that "because the whole purpose of filing for bankruptcy is to provide the debtor with a 'fresh start,'" such that "enforcement of *ipso facto* clauses would punish debtors by negating this central purpose," 475 B.R. at 152, is incorrect. *See infra* at ¶¶ 24-28. Moreover, "[w]hile it has been held that the old bankruptcy law advanced a second purpose, to provide a fresh start for the debtor . . . that purpose can no longer be said to be advanced in present [corporate] liquidation[s] . . . since the 1978 Act eliminated the provision for discharge of debts of nonindividuals." *Matter of Quanta Res. Corp.*, 739 F.2d 912, 915 (3d Cir. 1984), *aff'd sub nom. Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.*, 474 U.S. 494 (1986).

on for its now overturned (by the Third Circuit *Oakwood Homes*) conclusion that Section 502(b) "is not unclear or ambiguous" because it "clearly requires that [a claim with future payments] be discounted to present value as of the petition date." *Id.* at 434. *See also Oakwood Homes*, 449 F.3d at 601 ("We reject, as detailed above, the *Loewen* court's baseline conclusion that 11 U.S.C. § 502(b) is clear and unambiguous. We decline to follow the approach of *Loewen*.").[4]

16.     Debtors must know that *Loewen* was overturned on this exact point, because Debtors previously relied on it, without disclosing that it had been overturned by the Third Circuit—as the Funds called out in a prior filing with an illustration of *Loewen* being red-flagged on Westlaw. *See* Dkt. 2501, ¶ 19.

17.     Debtors also repeat their argument that "[f]ailing to discount the future stream of ERISA payments merely because they may be accelerated would 'swallow the general rule' of discounting claims to present value . . . ." Debtors' Motion, ¶ 34. *See also* Dkt. 4649, ¶ 6 (claiming that "the SFA MEPPs are advocating for [a] . . . 'general rule' that would render it inappropriate for the Court to discount any claims to present value"). But, as the Funds Memo explained: "the Funds are not seeking any such 'general rule.' Rather, the Funds are seeking to have their withdrawal liability claims, which have been accelerated, not subject to a discount to present value

---

[4] *CSC Industries* is also the apparent basis for Debtors' argument that Section 1123(a)(4) of the Bankruptcy Code mandates the discounting of claims to present value in order to "preserv[e] creditor equality." *See* Debtors' Motion, ¶¶ 74-75. In addition to being inconsistent with *Oakwood Homes*, *CSC Industries*' reliance on Section 1123(a)(4) has been properly rejected by subsequent decisions because "section 1123(a)(4) . . . has a very limited purpose that has nothing to do with the allowance of claims[.]" *In re Rhodes, Inc.*, 382 B.R. 550, 556 (Bankr. N.D. Ga. 2008) (expressly "disagree[ing]" with "the CSC Industries case"). *See also In re Durango Georgia Paper Co.*, No. 02-21669, 2017 WL 221785, at *4 (Bankr. S.D. Ga. Jan. 18, 2017) ("As the court in Rhodes explained, the purpose of § 1123(a)(4) has nothing to do with the correct computation or the allowance of claims."). Debtors' other case law quotes that they claim support a mandatory discounting rule were largely copied and pasted from *Loewen*, even though *Loewen* was overturned on this point. *Compare, e.g.*, Debtors' Motion, ¶ 35 *with Loewen*, 274 B.R. at 435.

because, as discussed below, ERISA makes clear that there should not be a discount." *See* Funds Memo, ¶¶ 5-8.

18.    Just because acceleration does not always mean there should be no discount to present value, *see* Debtors' Motion, ¶ 36 (noting that some cases "have discounted claims to present value even though they were subject to acceleration"), it does not follow, as Debtors claim, that "[t]he purpose of . . . acceleration . . . is unrelated to the issue of discounting claims to present value." Debtors' Motion, ¶ 34.

**II.    The Funds' Insecurity Default Provisions Are Enforceable.**

19.    Even though Debtors now concede that the majority of Funds have insecurity default provisions, Debtors argue they are unenforceable because: (i) they are impossible to enforce based on a bankruptcy filing until after a petition has been filed; and (ii) if they otherwise were enforceable, they would be prohibited *ipso facto* provisions. *See* Debtors' Motion, ¶¶ 39-70. Both theories are without merit.

20.    ERISA contemplates that an insecurity default may be declared based on a bankruptcy filing. *See* 29 U.S.C. § 1399(c)(5)(B) (providing that a plan may declare a default based on "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability"); Notice and Collection of Withdrawal Liability, 49 Fed. Reg. 22,624, 22,644 (May 31, 1984) (identifying "when an employer declares bankruptcy . . . or begins liquidating all of its assets" as events which can establish "a substantial likelihood of the employer's inability to pay its total withdrawal liability" under 29 U.S.C. § 1399(c)(5)(B)).

21.     Obviously, as Debtors observe, a plan cannot make an "affirmative determination" to "invoke their insecurity default provision[]" based on a bankruptcy filing until "after the bankruptcy petition." *See* Debtors' Motion, ¶ 44.

22.     Debtors even argue that where a fund's plan document provides, ***without discretion***, that an employer automatically "is in default" or "shall be in default" upon the commencement of a bankruptcy proceeding, *see* Debtors' Motion, ¶ 62 (referencing Local 705 and Virginia Teamsters); *id.*, Ex. 30 (Local 705 Withdrawal Liability Rules), at 705 Pension 000164; *id.*, Ex. 36 (Virginia Teamsters Withdrawal Liability Rules), at TJC83_0009035, plans are still also required to "make an affirmative determination as to . . . whether, based on that default . . . to accelerate the full amount of withdrawal liability owed," which is something that could necessarily only be done "*post-petition*." Debtors' Motion, ¶¶ 62-63.[5]

23.     Debtors' conclusion that, accordingly, "the MEPPS failed to validly accelerate their claims" such that "these withdrawal liability claims must be considered . . . long-term stream-of-payment obligations as of the petition date that are thus subject to present value discounting[,]" Debtors' Motion, ¶ 45, would mean that it would be impossible for any plan to ever validly declare an insecurity default based on a bankruptcy filing—even though ERISA provides for such declarations of default in the event of a bankruptcy filing. No authority supports Debtors' attempt

---

[5] As the Funds previously pointed out, TENJ's plan document similarly "provides for an automatic insecurity default upon the filing of a bankruptcy petition." Funds Memo, ¶ 9. *See also* Dkt. 5165-4 ("Any one of the following events ***shall*** demonstrate a substantial likelihood that an Employer will be unable to pay its withdrawal liability: . . . (4) the commencement of any proceeding by or against the Employer . . . pursuant to any bankruptcy or insolvency laws relating to the relief of debtors . . . ."). Debtors' attempt to reinterpret the plan documents of TENJ (and of Local 701, which Debtors claim is vague), *see* Debtors' Motion, ¶¶ 57, 62, is contrary to the well-settled principle that "a court should subject administrators' interpretations to a deferential standard of review" where "a plan endows administrators with discretionary authority to interpret the plan's terms[.]" *Bagsby v. Cent. States, Se. & Sw. Areas Pension Fund*, 162 F.3d 424, 428 (6th Cir. 1998).

to delete this portion of ERISA from the United States Code.  *See J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001) ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.") (citation omitted).[6]

24.    Debtors also take the position that any automatic insecurity default provision would be a prohibited *ipso facto* clause, yet ignore the case law on this point that this Court cited in its September 13, 2024 Memorandum Opinion, Dkt. 4326, and then directed the Parties to address. *See* Debtors' Motion, ¶¶ 67-70.  *See also infra* at ¶¶ 25-28.  In asking for further briefing on this issue, this Court stated that:

> [T]he Court appreciates (in light of the briefing on the motion for reconsideration) that the *ipso facto* issue is ***a question on which there appears to be a division of authority.  Compare In re AMR Corp.***, 730 F.3d 88, 92 (2d Cir. 2013) (enforcing *ipso facto* provisions), *with In re W.R. Grace & Co.*, 475 B.R. 34, 153 (D. Del. 2012) (finding *ipso facto* clauses to be unenforceable).

Questions at 6 & n.12 (emphasis added).

25.    Debtors are aware of this split in authority, not only because this Court directed Debtors to it in ordering this supplemental briefing, but also because: (i) this Court cited *AMR Corp.* in its September 13, 2024 Memorandum Opinion, Dkt. 4326 at 36 n.112; (ii) Debtors cited *AMR Corp.* when they brought this split to this Court's attention in their Motion for

---

[6] Debtors' statement that "[d]espite Debtors' attempts to obtain the additional agreed-upon discovery from the remaining MEPPs . . . these MEPPs have either failed or refused to provide said information[,]" Motion, ¶ 65, is not accurate.  Debtors repeatedly confirmed that they were not seeking any additional discovery, only to then, at the last minute, send the Funds a form declaration to fill out, which the three Funds that declared insecurity defaults promptly completed and filed along with the Funds Memo, as Debtors invited.  For the avoidance of doubt, based on Debtors' position with respect to TENJ, TENJ has now completed a supplemental declaration confirming that, post-petition, it authorized the filing of proofs of claim for the full amount of the withdrawal liability, based upon its automatic default provision.  *See* Ex. A.  *See also supra* at ¶ 22 n.5.

Reconsideration, Dkt. 4461 at ¶ 21 n.6; and (iii) the Funds briefed the merits of this split, including discussing *AMR Corp.*, in their Opposition to Debtors' Motion for Reconsideration, Dkt. 4540 at ¶¶ 24-28.

26.     If Debtors had any good faith basis to argue that *W.R. Grace & Co.* was correctly decided and *AMR Corp.* was incorrectly decided, Debtors should have put it in their current Motion.

27.     Instead, Debtors **falsely** claimed that it was "**well-settled** that *ipso facto* clauses are wholly unenforceable in bankruptcy actions," citing *W.R. Grace & Co.*, and **completely ignoring the existence of *AMR Corp*.** *See* Debtors' Motion, ¶ 67 (emphasis added).

28.     The Funds hereby incorporate their prior briefing as to why *AMR Corp.* is correctly decided and *W.R. Grace & Co.* is incorrectly decided. *See* Dkt. 4540, ¶¶ 27-28; Funds Memo, ¶¶ 11-15.[7] Under the circumstances, Debtors have waived the opportunity to address the issue.[8]

---

[7] Debtors also note that the question of "what effect, if any, the automatic stay has on the [Funds'] ability to declare insecurity defaults and accelerate Debtors' obligations post-petition" is "largely irrelevant." Debtors' Motion, ¶ 70. Yet they proclaim that, if the Court finds that the automatic stay question is relevant, they would argue that the stay applies and would be violated by any post-petition attempt by the Funds to accelerate their withdrawal liability obligations. *Id.* The Funds incorporate their prior briefing on this issue, *see* Funds Memo, ¶¶ 16-18, and will address in their reply brief any arguments that Debtors may make in their opposition brief on this point.

[8] The two cases Debtors cite, in addition to *W.R. Grace & Co.*—both of which also predate *AMR Corp.*—add nothing of substance. *See* Debtors' Motion, ¶ 67. *In re EBC I, Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006), which engaged in no independent analysis of the issue, is simply one of the cases cited by *W.R. Grace & Co. See* 475 B.R. at 152. And the dicta in *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 917 (7th Cir. 2001), also does not substantively engage with the issue of how to interpret the Bankruptcy Code, is in the context of a statute of limitations question, and, if anything, contradicts Debtors' theory of what constitutes an *ipso facto* clause. *Compare id.* (holding that even if a provision authorizing a default was "permissive rather than mandatory" it would still be "an *ipso facto* clause") *with* Debtors' Motion at 28 (arguing that provisions authorizing a default are not "*ipso facto* clauses" because they still require an "affirmative[] determin[ation]").

**III.    Debtors Concede That There Have Been Missed Payment Defaults.**

29.    Debtors concede that there have been missed payment defaults with respect to all Funds, but assert, without citation, that they are irrelevant because they took place after the petition date. *See* Debtors' Motion, ¶ 41. *See also id.*, ¶ 89. As the Funds have argued, "the fact that these defaults occurred post-petition is not dispositive." *See* Funds Memo, ¶ 19. *See also id.*, ¶ 10.

**IV.    Debtors Do Not Dispute that the Funds' Claims Should be Viewed as Interest-Free Loans Because the Funds Are Not Able to Collect any Interest.**

30.    This Court asked whether "the 20-year stream of payment[s] on withdrawal liability provided for under ERISA . . . [s]hould be viewed as, in effect, an interest-free loan?" Questions at 8. "If so," this Court noted, regardless of whether there has been an acceleration, "the effective discount rate should then be zero." *Id.*

31.    As the Funds explained, "[t]he 20-year stream of payments should be viewed as, in effect, an interest-free loan" because "[b]y virtue of the application of the 20-year cap, the Funds are only recovering a portion of the principal amount they would otherwise be owed—and what would constitute interest is not recovered at all." Funds Memo, ¶ 21. In other words, "Debtors . . . are getting the benefit of spacing out their principal payments over time, without paying additional interest—in effect, an interest-free loan." *Id.*

32.    Although Debtors mischaracterize how ERISA works, they do not dispute that, due to ERISA, they are getting, in effect, interest-free loans. *See* Debtors' Motion, ¶ 78 ("ERISA does not provide for interest on annual withdrawal liability payments where it would take more than 20 years of such payments to amortize the employer's allocable share of UVBs."). In reality, as the Supreme Court has made clear, ERISA actually ***does*** provide for interest, but Debtors are correct that, such interest, along with any remaining principal, is "forgive[n] . . . after 20 years." *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 419

(1995). *See also id.* at 419, 426 (explaining that "[t]he practical effect . . . is that any amortization interest . . . is added to the end of the payment schedule" such that if "all annual installment payments after 20 years" are forgiven "the presence or absence of . . . interest (which shows up at the end of the payment schedule . . .) will make no difference (for the last payments will never be made)").

33.     Indeed, rather than argue against "view[ing] the 20-year stream of payment[s] on withdrawal liability . . . as, in effect, an interest-free loan," Questions at 8, Debtors merely argue that "[i]f this Court finds the withdrawal liability payment streams akin to an interest free note, they still must be discounted to present value" "for two reasons." Debtors' Motion, ¶¶ 87, 90. As discussed below, neither reason is persuasive.

34.     *First*, Debtors claim "*Oakwood Homes* was clear that it is appropriate to present value discount non-interest-bearing claims." Debtors' Motion, ¶ 88. But *Oakwood Homes* did not address an analogous situation where interest payments are forgiven after 20 years of payments (much less a situation where Debtors are being given the benefit of forgiveness for making 20 years of payments, even though they are not actually making any payments, much less 20 years of payments in full). Nor did *Oakwood Homes* suggest that discounting is always required in the absence of interest. To the contrary, as this Court noted, "[t]he **dissent** in *Oakwood* would have held that payment streams that do not include interest *should* be discounted and **criticized the majority for suggesting otherwise**." *See* Questions at 7 (first and last emphases added). Debtors ignore this point. Their only citation for their position is a footnote in which the Third Circuit did not announce a new rule of law, but rather merely noted that its holding is not inconsistent with the facts of another case. *See* Debtors' Motion, ¶ 88 (citing *Oakwood Homes*, 449 F.3d at 601 n.17).

11

35.     Even had *Oakwood Homes* held that a discount to present value was required in all cases except where there would be "double discounting" (which it clearly did not), Debtors' argument would still fail.  Debtors claim that the reason "why discounting the MEPPs' Proofs of Claim to present value would not implicate *Oakwood Homes* or the general rule against double discounting . . . is simple:  ERISA does not provide for interest on annual withdrawal liability payments where it would take more than 20 years of such payments to amortize the employer's allocable share of UVBs."  Debtors' Motion, ¶ 78.  As discussed above, however, the Supreme Court has made clear that ERISA actually does provide for interest, but that it ultimately is forgiven if Debtors make 20 years of payments.  *See Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 419, 426; *supra* at ¶ 32.  In other words, just as was the case with the creditor in *Oakwood Homes*, the Funds were owed interest and the Funds have been prevented from collecting interest (by virtue of this Court's ruling with respect to the 20-year cap), such that "discounting the remainder of the claim to present value would inequitably twice penalize the creditor for the time value of money."  *Oakwood Homes*, 449 F.3d at 601.  As *Oakwood Homes* made clear, the mere absence of such a penalty is not "a windfall for creditors."  *Id.*

36.     Presumably recognizing that ERISA, in fact, provides for interest, Debtors observe that the creditor in *Oakwood Homes* "bargained for . . . an agreed upon interest rate."  Debtors' Motion, ¶ 85.  But multiemployer plans, are, by definition, collectively bargained.  29 U.S.C. § 1002(37) ("The term 'multiemployer plan' means a plan— . . . (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer . . . .").  Nor did the Funds merely "cho[o]se" an interest rate to "impose[]" on Debtors.  *See* Debtors' Motion, ¶ 85.  To the contrary, as the Funds have previously explained, the discount rate used to determine an employer's payment schedule is required, as a matter of

law, to be the same rate used in the fund's actuarial valuation.  *See* 29 U.S.C. § 1399(c)(1)(A)(ii) ("The determination of the amortization period described in clause (i) shall be based on the assumptions used for the most recent actuarial valuation for the plan.").  *See also* Funds Memo, ¶¶ 24-25; Dkt. 3975, ¶¶ 149-50.  In any event, nothing in *Oakwood Homes* restricts its prohibition on double discounting to interest rates that were specifically bargained for—and it would be nonsensical to distinguish between a rate that was specifically negotiated for as opposed to a rate that is imposed by statute and/or with respect to which the parties were aware at the time of their bargaining, as the penalty to the creditor is the same in each instance.[9]

37.    *Second*, Debtors suggest, without any authority, that the amount of an allowed claim under Section 502(b) of the Bankruptcy Code depends on the type of bankruptcy proceeding that a debtor chooses to pursue.  *See* Debtors' Motion, ¶ 89 (suggesting that "the fact that this is a liquidating Chapter 11 case" rather than a reorganization should impact the amount of a creditors' allowed claim, and incorrectly attributing this theory to this Court).  If that were the case, vulture capitalists like MFN Partners, LP ("MFN") could buy companies on the brink of bankruptcy and order them to make decisions about which type of bankruptcy proceeding to pursue based on what would lower the claims of creditors adverse to MFN's interests.  That is not the law, as Section 502(b) draws no such distinction.  *See* 11 U.S.C. § 502(b).  *See also* 11 U.S.C. § 103(a) ("[C]hapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title[.]").[10]

---

[9] Contrary to Debtors' suggestion, obviously nothing in *Oakwood Homes* authorizes an adjustment to the applicable interest rate that would have applied under non-bankruptcy law.  *See* Debtors' Motion, ¶ 85.  To the contrary, *Oakwood Homes* held that, after the interest that was determined under non-bankruptcy law was disallowed, there was no basis for a discount to present value.  *See also infra* at ¶¶ 39-41 (addressing Debtors' claims about expert testimony on the proper discount rate).

[10] While the Funds do not believe Debtors' argument in this regard is relevant, the Funds further note that Debtors have not identified any provision of the Bankruptcy Code that would have prevented them from petitioning this Court to be allowed to continue to make withdrawal liability

**V.    If a Discount Were Required, Under Debtors' Own Case Law They Cannot Meet Their Burden of Proof to Establish an Applicable Discount Rate, and Any Such Discount Would be Applied to the Full Amount of Debtors' Allocable UVBs.**

38.    As discussed in the Funds Memo (and in prior filings and hearings), the Funds' position is that "if a discount to present value is required, it should be determined by reference to non-bankruptcy law—here ERISA" and, accordingly, the applicable "discount rates (if any) are already known as a matter of undisputed fact" such that a trial would not be necessary.  *See* Funds Memo, ¶¶ 23-26.  The Funds stand by that position.

39.    If, however, this Court were to accept Debtors' argument that this is a topic that requires expert testimony, *see* Dkt. 3825, ¶ 89, Debtors' new position raised in their Motion confirms that they cannot meet their burden of proof on this issue.  In particular, Debtors' position is that the interest rate should be "representative of Debtors' cost of Debt . . . ***at the time the parties entered into the Contract***."  Debtors' Motion, ¶ 85 & n.11 (quoting *B456 Sys., Inc.*, 2017 WL 6603817, at *25) (emphasis added).

40.    But that is not the approach that Debtors' expert, Amit Seru, took.  Rather, Mr. Seru based his report on the legally erroneous premise—rejected in *B456 Systems* and the other case law cited by Debtors—that "[t]he appropriate discount rate to calculate the present value of the Pension Plans' withdrawal liability claims . . . should be determined based on Yellow's contemporaneous cost of debt "***as of the Petition Date***."  Motion, Ex. 14. ¶ 15 (emphasis added).  *See also id.*, ¶ 28 (confirming that Seru focused on the "underlying risks," as of the Petition Date, of "future cash flows"); *In re B456 Sys.*, 2017 WL 6603817, at *25 (holding that "[s]etting the

---

payments to the Funds (prior to their missed payment defaults) in order to "obtain the time benefit of money" by preserving their "below-market rate loan."  *See* Debtors' Motion, ¶ 89 (quoting Questions at 8 n.17).

discount rate solely on the post-petition date may skew toward too high of a risk") (following *In re Mirant Corp.*, 332 B.R. 139, 158–59 (Bankr. N.D. Tex. 2005)); *In re Mirant Corp.*, 332 B.R. at 159 (rejecting the use of a "discount rate that reflects a bankrupt's lack of creditworthiness" as an improper to "penal[ty]" to the creditor).

41.     Because Debtors' expert did not offer any opinion on a rate that reflected "the risk of non-performance . . . *before* bankruptcy," *In re B456 Sys., Inc.*, 2017 WL 6603817, at *25, if this Court accepts Debtors' argument that a discount rate (if there is to be one at all) should be based on expert testimony—instead of, as the Funds contend, based on ERISA—then Debtors cannot meet their burden of proof of establishing a discount rate of anything other than 0%, and summary judgment in favor of the Funds is warranted. *See, e.g.*, *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 135 (D. Mass. 2003) ("Because Dr. Brunski's opinion is . . . based on an erroneous legal standard, [it] cannot defeat summary judgment.") (citation and footnote omitted).[11]

42.     If, however, this Court were to apply a discount to present value, Debtors' case law makes clear that the discount should not be based on the application of the 20-year cap, but instead that any such discount should be based on the full amount of the Funds' claims (which reflect Debtors' allocable share of the Funds' UVBs):

> The parties also seem to dispute whether to apply the present value analysis to [the creditor]'s gross damages amount or to its net damages amount (i.e. after application of the $65 million damages cap . . . .). Debtors argue that the $65 million damages cap itself must be adjusted for present value. The court finds that such an approach is illogical . . . . The only sensible approach to adjusting for present value is to perform the net present value calculation on [the creditor]'s gross damages figure so as to calculate the net present value of [the creditor]'s damages.

---

[11] Debtors also quote a figure from the Funds' expert, Denis O'Connor. *See* Motion, ¶ 85. But Mr. O'Connor was merely correcting Mr. Seru's errant financial analysis as a rebuttal to Mr. Seru in the event that Mr. Seru's testimony was allowed.

> Subsequently, the court will calculate [the creditor]'s maximum allowable recovery under the Agreement, by applying the damages cap . . . .

*In re Stone & Webster, Inc.*, 279 B.R. 748, 807 (Bankr. D. Del. 2002).  *See also* Debtors' Motion, ¶ 73 n.7.

## VI.    There is No Subordination Available Here Under Section 4225 of ERISA.

### A.    Debtors Have Not Met Their Burden to Establish Subordination Under Section 4225.

43.    As the Funds previously explained, Debtors bear the burden of proof to "clearly" show that subordination under Section 4225 of ERISA applies.  *See* Funds Memo, ¶ 27.

44.    The Funds also argued that "Debtors have made no attempt to meet this burden through either arbitration or the claims objection process—nor have they attempted to show any good cause for their failure to do so—and have, therefore, waived any challenge under 29 U.S.C. § 1405(b)."  Funds Memo, ¶ 28.

45.    Even in their Motion, Debtors still do not even try to meet their burden of proof, which necessarily includes showing that their "liquidation or dissolution value" was low enough to trigger subordination under Section 4225.  *See* 29 U.S.C. § 1405(b)(2) (explaining that a reduction can only take place to the extent that 50% of the UVBs are higher than the liquidation or dissolution value).  Instead, Debtors argue that subordination under Section 4225 should apply "*[i]f* at the time of liquidation, Debtors are insolvent . . . ."  Debtors' Motion, ¶ 91 (emphasis added).  But Debtors present no evidence of their insolvency, much less any evidence of their liquidation value—which is required information for the potential application of Section 4225. The time to do so has come and it has gone.  Debtors cannot rely on Section 4225.[12]

---

[12] Debtors were clearly aware that their liquidation value is a threshold requirement for the potential application of Section 4225 given that they quoted the relevant portion of the statute at

46.    This Court kept jurisdiction of this dispute, "notwithstanding the presumption in favor of arbitration" because, *inter alia*, "the unusual circumstances of this case" included "a scheduling order providing for trial . . . in August [2024]" and that "the risk of a [potential] delay" based on an arbitrator's schedule "counsels strongly in favor of denying stay relief." Dkt. 2765 at 29-30. This Court issued scheduling orders and ruled on complex issues, and it should not allow Debtors to continue to drag out this proceeding. As this Court may recall, the parties agreed—as reflected in a statement in open Court at the hearing on November 21, 2024 which Debtors did not dispute—that: "every issue that the parties believe [is] still outstanding will be included in [this] summary judgment briefing [such] that there aren't any remaining issues that the parties aren't pushing forward." Dkt. 5026 at 15:13-19. And yet, Debtors continue to try to prevent this Court from reaching a final resolution of their Objections to the Fund's withdrawal liability claims.[13]

B.    Given the Application of the 20-Year Cap, There is Nothing to Subordinate Under Section 4225.

47.    As Central States and the Funds have previously explained—given the magnitude of the impact of the 20-year cap on the particular claims at issue in this case—"a reduction of Debtors' allocable share of UVBs by 50% [under Section 4225] would have no impact on the withdrawal liability owed . . . by Debtors." *See, e.g.*, Funds Memo, ¶¶ 30-31.

48.    Rather than address the undisputed facts of this case, Debtors make the unremarkable observation that, if applicable, the 20-year cap is applied before any subordination under Section 4225. *See* Debtors' Motion, ¶¶ 94, 97 (citing 29 U.S.C. § 1381(b)(1)).

---

the beginning of their Statement of Undisputed Facts. *See* Debtors' Motion, ¶ 11. Debtors then, however, willfully ignored that requirement in their argument section. *See id.*, ¶¶ 91-99.

[13] In the meantime, professional fees and expenses are eye-popping and growing, and MFN and Debtors are seeking to open new fronts for litigation in this Court and others. As the Funds have repeatedly urged from the beginning of this case, the parties should resolve the Funds' claims through good faith settlement negotiations.

49.     It is, of course, possible under some circumstances that subordination under Section 4225 could still have some impact after the application of the 20-year cap.  In particular, if a reduction in UVBs under Section 4225 would result in less than 20-years of payments, then subordination under Section 4225 could be relevant.[14]  But the undisputed facts show that is not the case here.

50.     Debtors' position appears to be that because "Section 1405(b) is clear that it is ***just another*** adjustment to an employer's allocable share of UVBs" it must apply to "the allocable UVBs [which] have already been limited by the 20-year cap."  Debtors' Motion, ¶¶ 94, 97 (emphasis added).  That position is inconsistent with the plain text of the statute, which clearly bases the amount of the adjustment on the "unfunded vested benefits allocable to the employer." *See* 29 U.S.C. § 1405(b)(1).

51.     The 20-year cap does not affect Debtors' allocable share of UVBs, but rather only affects their withdrawal liability.  *See* 29 U.S.C. § 1399(c)(1)(B) (in any case in which the amortization period . . . exceeds 20 years, the employer's ***liability*** shall be limited to the first 20 annual payments . . . .") (emphasis added).  As this Court has already held (at Debtors' insistence) in connection with its ruling in Debtors' favor on the application of the 20-year cap, the statute distinguishes between "unfunded vested benefits" and "withdrawal liability."  Opinion at 37.  *See*

---

[14] To illustrate, consider a hypothetical plan where the allocation of UVBs to the employer is $100 million and the 20-year capped payment schedule totals $80 million.  If the company's liquidation value is $20 million, the application of Section 4225 would result in the 20-year capped payment schedule being further shortened to a schedule of less than 20 years that totals $70 million (i.e., 50% of the unfunded benefits allocable to the employer, plus the portion of 50% of the unfunded benefits allocable to the employer that does not exceed the dissolution value, as required by Section 4225(b)(1) and (2)).  Consistent with Section 4201(b)(1), this adjustment is applied after the 20-year payment schedule cap has been applied.  This example shows how the proper application of Section 4225 can result in an adjustment to the withdrawal liability payment schedule, though as Central States has already explained, it does not occur here.

*also* Dkt. 3825, ¶ 77 (Debtors arguing at summary judgment that "withdrawal liability" and "allocable share of UVBs" "are not the same thing" because "ERISA explicitly defines" them as having separate meaning).  Accordingly, as Central States has persuasively observed, any contrary position by Debtors at this point would be foreclosed by "the law of the case."  Dkt. 4777, ¶ 13 (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)).

52.    That Congress drew an intentional distinction between withdrawal liability and UVBs in connection with the four adjustments listed in Section 4201 is made even more clear by an examination of the differences in how Congress drafted those provisions.

53.    Two of those provisions—the de minimis rule and subordination—explicitly provide for potential changes to an employer's "allocable" "unfunded vested benefits."  *See* 29 U.S.C. §§ 1389(a) (de minimis); 1405(b) (subordination).  By contrast, the other two provisions— for partial withdrawals and the 20-year cap—explicitly provide for potential changes to an "employer's liability."  *See* 29 U.S.C. §§ 1386(a)(1); 1399(c)(1)(B).  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up).

54.    Moreover, if Congress meant in Section 4225(b) to refer to unfunded vested benefits, as modified by other adjustments, it would have done so—as it did in numerous other sections of ERISA.  For example, in describing how the adjustment for partial withdrawals applies, the statute refers to "the amount [of UVBs] determined under section 1391 . . . ***and adjusted under section 1389*** . . . ."  29 U.S.C. § 1386(a)(1) (emphasis added).  And, in describing the determination of the payment schedule on which the 20-year cap is based, the statute refers to "the amount [of

UVBs] determined under section 1391 . . ., **adjusted if appropriate first under section 1389 . . . and then under section 1386** . . . ." 29 U.S.C. § 1399(c)(1)(A) (emphasis added).

55.     Indeed, in Section 4225(a)(1), Congress referred to "unfunded vested benefits allocable to an employer **(after the application of all sections of this part having a lower number designation than this section).**"  29 U.S.C. § 1405(a)(1) (emphasis added).  Because Section 4225 is the last section in "[t]his part" of Subtitle E of ERISA, Congress was specifying that all other adjustments should be taken into consideration for purposes of the reference to UVBs in Section 4225(a)(1).  By contrast, the references to "unfunded vested benefits allocable to an employer" in Section 4225(b) contain no such reference to those adjustments.  Under Debtors' view, this clear distinction between Sections 4225(a)(1) and Section 4225(b) would be rendered superfluous.  *See also Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 181-82 (3d Cir. 2023) (holding that it is "one of the most basic interpretive canons that we construe a statute so that no part of it will be inoperative or superfluous, void or insignificant") (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

56.     Were there any doubt about the correct interpretation of the statute (which, as discussed above, there should not be), under well-established Third Circuit precedent, "ERISA and the MPPAA . . . 'should be liberally construed in favor of protecting the participants in employee benefit plans.'"  *Einhorn v. M.L. Ruberton Const. Co.*, 632 F.3d 89, 98 (3d Cir. 2011) (quoting *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986)).  Obviously, Debtors' interpretation, under which the Funds would be grossly penalized by having Debtors' allocable UVBs reduced **thrice over** in succession—first, by application of the 20-year cap, and then by application of 4225 **on the amount as reduced by the 20-year cap**, and then by virtue of the percentage distribution the Funds ultimately receive—would not be a "liberal

20

constru[ction] in favor of protecting the participants in employee benefit plans." There is no indication anywhere in the text, purpose, or legislative history of ERISA that Congress intended such a punitive regime to apply to the Funds.

57. Finally, none of Debtors' case law is to the contrary. *See* Motion, ¶ 95. Rather, it establishes the unremarkable proposition that the adjustments should be applied, if applicable, in the order they are listed in Section 4201(b)(1) of ERISA. *See GCIU-Emp. Ret. Fund v. Quad/Graphics, Inc.*, 909 F.3d 1214, 1219 (9th Cir. 2018) ("Section 1381(b)(1) plainly dictates the order of operations in calculating withdrawal liability[.]"). And, of course, that means any subordination under Section 4225 must be "final" adjustment, *Perfection Bakeries, Inc. v. Retail Wholesale & Dep't Store Int'l Union & Indus. Pension Fund*, No. 2:22-CV-573-ACA, 2023 WL 4412165, at *10 (N.D. Ala. July 7, 2023)—which makes perfect sense given that information regarding its potential applicability "is peculiarly within the knowledge of the withdrawing employer" and funds need to be able to proceed with the other adjustments, if applicable. *See* 126 Cong. Rec. 23,038, 23,039 (Aug. 25, 1980).

58. But, as discussed above, the order in which the adjustments are applied under Section 4201(b)(1) does not dictate how the adjustments themselves work—which are governed by the specific sections that Section 4201(b)(1) incorporates. *See supra* at ¶¶ 50-56.

## CONCLUSION

This Court should deny Debtors' Motion and enter an order that the Funds' claims are allowed in full, except to the extent already modified by this Court's Opinion.

Date:  January 10, 2025
      Wilmington, Delaware

SULLIVAN · HAZELTINE · ALLINSON LLC

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
      whazeltine@sha-llc.com

GROOM LAW GROUP, CHARTERED
Edward J. Meehan (pro hac vice)
Samuel I. Levin (pro hac vice)
1701 Pennsylvania Ave., NW
Washington, DC 20006
Tel: (202) 857-0620
Email: emeehan@groom.com
     slevin@groom.com

*Special Counsel for the Funds*