IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Related to D.I. 5162, 5370 and 5381** |

**REPLY OF THE TEAMSTERS PENSION TRUST FUND OF PHILADELPHIA &
VICINITY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The Teamsters Pension Trust Fund of Philadelphia & Vicinity (the "Philadelphia Fund"),[2] by and through it undersigned counsel, hereby submits this Reply in Support of its Motion for Summary Judgment. In support of this Reply, the Philadelphia Fund states as follows.

**A. INTRODUCTION**

1. As the briefing on the various challenges to the MEPPs' withdrawal liability assessments comes to a conclusion, it is important to emphasize the broader principles that drove the enactment of ERISA (and later MPPAA). When presented with questions of statutory interpretation, the Third Circuit has advised courts to look beyond the text of ERISA and recall the purpose of the statute:

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 10990 Roe Avenue, Overland Park, Kansas 66211.

[2] The Philadelphia Fund incorporates by reference the: (i) *Opposition of the Teamsters Pension Trust Fund of Philadelphia and Vicinity to Debtors' Motion for Summary Judgment on Non-SFA MEPP's Withdrawal Liability Claims* (the "Opposition") [Docket Item No. 5039]; and (ii) *Response of the Teamsters Pension Trust Fund of Philadelphia and Vicinity to Order Granting Motion for Reconsideration and Posing Further Questions* (the "Response") [Docket Item No. 5162]. Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Response.

1

> To be sure, a court need not rely on the literal language of ERISA in interpreting its provisions, but may also look to the intent of the statute.[3]

2. The Third Circuit emphasized that the Congressional intent behind ERISA's enactment was to protect the retirement of union employees:

> The MPPAA was designed (1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans; and (2)… ensure benefit security to plan participants.[4]

3. In sum, courts interpreting ERISA's provisions are reminded that ERISA is a remedial statute that should be liberally construed to achieve its ends, which include protecting plan participants and beneficiaries.[5]

## B. BACKGROUND

### 1. The Debtors' Cessation of Covered Operations and Triggering of Withdrawal Liability

4. The Philadelphia Fund is administered by Trustees in accordance with the LMRA Section 302(c)(5), 29 U.S.C. § 186(c)(5), and ERISA. The Trustees of the Philadelphia Fund are appointed in equal numbers by management and labor and owe their exclusive fiduciary obligations to the participants and beneficiaries of the Philadelphia Fund.[6]

5. The Philadelphia Fund is a not-for-profit multiemployer pension plan which is operated in accordance with a trust agreement under ERISA. Significantly, all contributions received by the Philadelphia Fund (including any contributions that were previously made by the Debtors) are used for the exclusive purpose of providing pension benefits to beneficiaries of the Philadelphia Fund and for paying administrative expenses.[7]

---

[3] *IUE AFL-CIO Pension Fund v. Baker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986).
[4] *Id*. citing H.R. Rep. No. 869, 96th Cong., 2d Sess. 71, reprinted in 1980 U.S. Code Cong. & Ad. News 2918, 2939.
[5] *Baldwin v. University Pittsburgh Medical Center*, 636 F.3d 69, 77 (3d Cir. 2011); *Edwards v. A.H. Cornell and Son, Inc.,* 610 F.3d 217, 223-24 (3d Cir. 2010) (any ambiguities in ERISA should be resolved in favor of plan participants).
[6] Opposition, ¶ 28.
[7] Opposition, ¶ 29.

**2. The Debtors' Obligation to Contribute to The Philadelphia Fund**

6. Prior to the Petition Date, certain Debtors, including, without limitation, YRC Inc., USF Holland, LLC and New Penn Motor Express, LLC, entered into a collective bargaining agreement with the Teamsters National Freight Industry Negotiating Committee entitled "YRCW National Master Freight Agreement" (together with all amendments, supplements, addenda, exhibits and related agreements and collective bargaining agreements, the "Collective Bargaining Agreement") pursuant to which certain Debtors were obligated to, among other things, make monthly pension fund contributions to the Philadelphia Fund.[8]

**3. The Debtors' Cessation of Business Operations and Bankruptcy Filing**

7. On or about July 31, 2023, the Debtors terminated their business operations. As a result, the Debtors triggered an event of withdrawal from the Philadelphia Fund.[9]

8. On August 6, 2023 and continuing on August 7, 2023 (collectively, the "Petition Date"), Yellow Corporation and certain affiliated companies (collectively, the "Debtors") each filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

**C. ARGUMENT**

**1. Present Value Discounting is not Authorized in this Case**

    **(i) ERISA Does Not Authorize a Discount for Accelerated Withdrawal Liability Payments**

9. Congress has created an explicit framework to be applied in the event that a contributing employer elects to pre-pay its withdrawal liability. Under the Plan, that is precisely what the Debtors have chosen to do: prepay the withdrawal liability owed to all MEPPs at the

---

[8] Opposition, ¶ 34.
[9] Opposition, ¶36.

same time (the Distribution Date) as other Class 5 Claims.[10] Under 28 U.S.C. §1399(c)(4), the Debtors are authorized to prepay the withdrawal liability.

10. However, it is clear from the text of this provision that, when enacting this pre-payment provision, Congress did not require a discount to present value:

> (4)
> The employer shall be entitled to prepay the outstanding amount of the unpaid annual withdrawal liability payments determined under paragraph (1)(C), *plus accrued interest*, if any, in whole or in part, *without penalty*. If the prepayment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in paragraph (1)(D), the withdrawal liability of the employer shall not be limited to the amount of the prepayment.

29 U.S.C. § 1399 (c)(4)(emphasis added).

11. Congress was mindful of the various adjustments that should be made to ensure that the prepayment was made in an equitable manner insofar as the provision recognized that: (i) accrued interest should be paid; and (ii) the employer could pre-pay without penalty. *Id*. In accounting for these various adjustments, Congress elected not to include a present value discount.

12. The legislative history to MPPAA makes clear that this section merely *permits* contributing employers to prepay their withdrawal liability, it says nothing about a present value discount if the employer elects to do so:

> An employer is *permitted* to prepay its withdrawal liability obligations plus accrued interest, if any, in whole or in part without penalty.

---

[10] *Second Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") (providing all Class 5 Claims to receive *pro rata* share of Distributable Proceeds on the applicable Distribution Date). [Docket Item No. 5028, p.20]

4

Senate Comms. On Finance and Human Resources, Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980, 96th Cong. Rec. §20189, S20197 (July 29, 1980)(emphasis added).[11]

### (ii) Section 1405(e) does not Apply to the MEPPs

13. Faced with this statutory deficit, the Debtors suggest that 29 U.S.C. §1405(e) authorizes a present value discount of withdrawal liability payments owed to the MEPPs.[12] There are several reasons why this assertion is incorrect. First, section 1405(e) is a proration provision, providing for a *pro rata* distribution in instances where the withdrawn employer lacks sufficient assets to pay withdrawal liability in full. However, in this bankruptcy case, the allocation of the Debtors' limited assets will be determined under the Plan and the Bankruptcy Code. Applying section 1405(e) to this context would effectively amount to a "double proration."

14. Second, the statute is not intended to discount withdrawal liability claims to present value for purposes of distribution. Rather, present value calculation is employed to determine a *ratio* of each MEPP's liability to the aggregate MEPP liability.

15. Third, interpreting section 1405(e) in the manner the Debtors suggest would be duplicative of section 1405(b), which already provides a reduction framework for withdrawal liability claims asserted against an insolvent employer in certain instances. Fourth, the withdrawal liability in these cases was triggered by the Debtors' cessation of operations, which pre-dated their bankruptcy filing. As such, the withdrawal liability is not *attributable* to a sale, liquidation or dissolution. Therefore, this section does not apply.

---

[11] The Third Circuit has relied on this Joint Explanation, at least in part, as authoritative legislative history for MPPAA. *The Great Atlantic & Pacific Tea Co., Inc. v. Carman,* 781 F. Supp. 1086, 1094 (E.D.Pa. 1992) citing *Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.*, 862 F.2d 1020, 1022 (3d Cir. 1988), *cert. denied*, 490 U.S. 1082, 109 S. Ct. 2104, 104 L.Ed. 2d 665 (1989).
[12] *Debtors' Opposition to the SFA MEPPs' and Non-SFA MEPPs' Motions for Partial Summary Judgment* ("Debtors' Opposition") [Docket No. 5381, p.3].

### (a) Section 1405(e) Does Not Apply in Bankruptcy Proceedings

16. The Debtors contend that *both* 29 U.S.C. § 1405(b) and § 1405(e) authorize a reduction in withdrawal liability owed by an insolvent withdrawn employer. However, closer scrutiny reflects that although section 1405(b) may authorize reduction under certain circumstances, section 1405(e) contemplates present value analysis simply to *prorate* the claims of multiple MEPPs if the withdrawn employer's assets are insufficient to pay all withdrawal liability claims in their entirety. That function will be accomplished under the Debtors' Plan. *See* Plan, Article III, p. 20 (providing that Class 5 creditors will receive *pro rata* distribution of Distributable Proceeds).

17. The touchstone for this analysis begins with the statute, which provides, in relevant part, as follows:

> (e) One or more withdrawals of employer attributable to same sale, liquidation, or dissolution
>
> In the case of one or more withdrawals of an employer attributable to the same sale, liquidation, or dissolution, under regulations prescribed by the corporation—
>
> (1) all such withdrawals shall be treated as a single withdrawal for the purpose of applying this section, and
>
> (2) the withdrawal liability of the employer to each plan shall be an amount which bears the same ratio to the *present value of the withdrawal liability payments to all plans* (after the application of the preceding provisions of this section) as the withdrawal liability of the employer to such plan (determined without regard to this section) bears to the withdrawal liability of the employer to all such plans (determined without regard to this section).

29 U.S.C. § 1405(e) (emphasis added).

18. As an initial matter, section 1405(e) does not apply in Chapter 11 proceedings insofar as it directly contradicts the Bankruptcy Code. Section 1405(e) creates a proration scheme of the available assets of an insolvent contributing employer that, in this case, is already

6

accomplished under the Plan. In the chapter 11 setting, the available assets for distribution are not isolated for MEPPs, but rather are distributed among all creditors in accordance with the requirements of the absolute priority rule consistent with the Bankruptcy Code and the Debtors' Plan.

19. Interpreting section 1405(e) in this fashion is the only logical conclusion insofar as a preceding section of section 1405, specifically 1405(b), already imposes a significant reduction to withdrawal liability in instances where an insolvent contributing employer withdraws from a MEPP while undergoing a liquidation or dissolution. The Debtors' interpretation of this provision begs the question of why Congress would include two separate provisions to reduce withdrawal liability in the case of an insolvent employer undergoing a liquidation or dissolution?

20. Furthermore, had Congress intended this provision to be interpreted in the manner suggested by the Debtors, the statute would simply state that in instances where a withdrawn employer's assets were insufficient to satisfy all withdrawal liability, the withdrawal liability payments owed to each MEPP must be discounted to present value. This language was not included in the statute.

### (b) The Debtors' Withdrawal was not Attributable to the Same Sale, Liquidation or Dissolution

21. The Debtors contend that 29 U.S.C. § 1405(e) mandates a present value discount because the Debtors withdrew from one or more of the MEPPs pursuant to the *same sale, liquidation or dissolution.*

22. However, the Debtors' withdrawal from the MEPPs was not attributable to a "sale, liquidation or dissolution." This holds true because Congress' use of the word "attributable" requires cause and effect relationship and demands a strict temporal connection between the date of withdrawal and the actual sale or liquidation of the Debtors' assets.

7

23. The event of withdrawal occurred when the Debtors ceased operations, pre-petition, in July, 2023. Under ERISA, withdrawal liability accrues upon an event of withdrawal from a multiemployer fund. The statute explains that an event of withdrawal occurs when a contributing employer ceases covered operations:

> (a) Determinative factors
>
> For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer—
>
> (1) permanently ceases to have an obligation to contribute under the plan, or
>
> (2) *permanently ceases all covered operations under the plan.*

29 U.S.C § 1383(a)(emphasis added).

24. The date of a complete withdrawal is defined as "the *date* of the cessation of the obligation to contribute or the *cessation of covered operations*." 29 U.S.C. § 1383(e) (emphasis supplied).

25. Third Circuit precedent, as well as the legislative history of this section, confirms that the Debtors withdrew prior to their bankruptcy filing. In *Crown Cork & Seal, Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* 982 F.2d 857, 864 (3d Cir. 1992), the Third Circuit examined the phrase "cessation of covered operations" to determine the date of a contributing employer's withdrawal within the meaning of this provision. The Third Circuit did not require a complete termination of operations to trigger an event of withdrawal. Rather, the Court concluded that termination or transfer of most of the employees and a significant reduction of production satisfied the threshold. *Id*.

26. In support of its holding, the *Crown Cork* Court relied upon legislative history of this section to clarify the meaning of "all covered operations." *Id*. at 365. For example, the opinion cites a Senate Committee Report which stated:

8

> The committee intends that covered operations be treated as having permanently ceased when business activity substantially ceases or when it continues but no longer gives rise to contributions to the plan.

*Id*. citing S. Rep. 1076, 96th Cong., 2d Sess. at 12,13.

27. As has been readily acknowledged in these cases, the Debtors substantially ceased covered operations prior to their bankruptcy filing. In the First Day Declaration submitted by their CRO, the Debtors stated that they discontinued accepting additional shipments the week of July 24, 2023 and issued layoff notices to 25,500 employees by July 30, 2023.[13] Hence, the event of withdrawal that triggered withdrawal liability to the MEPPs occurred on or before July 30, 2023.

### 1. The Event of Withdrawal was not Attributable to a Sale

28. As of the date of withdrawal, the Debtors had not sold their assets and the withdrawal liability was not triggered as a result of an asset sale. The sale of the Debtors' assets occurred well after the event of withdrawal. Indeed, the Debtors' bidding procedures were not approved until September 15, 2023, over one month after the Petition Date.[14]

### 2. The Withdrawal was not Attributable to a Liquidation because the Debtors Withdrew from the MEPPs Prior their Asset Sales

29. Nor was the event of withdrawal attributable to liquidation proceedings commenced by the Debtors. True, the Debtors filed for bankruptcy protection on August 6, 2023, shortly after the event of withdrawal. However, the event of withdrawal giving rise to the withdrawal liability was triggered by the cessation of operations, not the commencement of the bankruptcy

---

[13] *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, In Support of Debtors' Chapter 11 Petitions and First Day Motions*. [Docket Item No. 14]
[14] *Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Scheduling Auctions and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling Sale Hearings and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances And (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief.* [Docket No. 575].

cases. In short, the withdrawal was not *attributable* to a *liquidation*, it was attributable to the termination of operations.

30. The distinction between the cessation of operations and liquidation within the meaning of this statute is highlighted by the definition of "liquidation." In *Central States, Southeast and Southwest Areas Pension Fund v. Bell Transit Co.,* 821 F. Supp. 1266, 1271 (N.D.Ill. 1993), the Court explained the meaning of liquidation as follows:

> While liquidation of a corporation is usually a step in its dissolution, the latter is not a necessary element of the former…Liquidation means realization on assets and discharge of liabilities or…that all assets have been reduced to cash and the cash has actually been distributed.

*Id.* at 1271 (citations omitted).

31. Corporate treatises have offered similar definitions:

> The term "liquidation" has a fairly defined legal meaning. Liquidation in the context of the dissolution of a corporation means more than a division of assets and liabilities. It means the winding up of its business and affairs, including the collection of assets, the settlement of liabilities, the disposition of its properties, and the distribution of its remaining property…

16A Fletcher Cyc. Corp. § 7968.

32. The Philadelphia Fund recognizes that while the termination of operations may be a precursor to an eventual liquidation, the cessation of operations that triggered withdrawal liability occurred prior to any liquidation of the Debtors' assets. By using the phrase "attributable" in the statute, Congress required a stronger causal connection.

### 3. The Event of Withdrawal Was Not Attributable to a Dissolution

33. Lastly, the event of withdrawal was not triggered by a dissolution commenced by the Debtors. The Debtors did not pursue formal dissolution of the companies. As such, the event of withdrawal was not directly *attributable* to dissolution of the Debtors.

34. Even assuming that section 1405(e) applies, it should not be implemented in the manner the Debtors suggest. This statute does not provide for each MEPP's withdrawal liability to be discounted to present value. Rather, it applies a present value discount to determine a ratio used to ratably allocate the withdrawn employer's insufficient assets among multiple MEPPs.

### (iii) Requiring Lump Sum Payment of Withdrawal Liability Under 29 U.S.C. §1399(c)(5)(B) Does Not Require a Formal Declaration of Default

35. The Debtors argue that the MEPPs fail to present any facts in the record to establish a valid declaration of default or that they accelerated the Debtors' withdrawal liability obligation. Debtors' Opposition, p. 14. However, section 1399 (c)(5)(B) does not mandate a formal declaration of default or, for that matter, notice of default to a contributing employer. Rather, the statute states that, following a default, the plan may require a lump sum payment of withdrawal liability.

36. The Debtors criticize the language Philadelphia Fund's Plan Document relating to defaults contending that it fails to authorize an insecurity default within the meaning of this section. True, the provision is simple, but is sufficient insofar as it enables the fund to pursue any remedies permitted by law. Such remedies include the exercise of rights under 29 U.S.C. §1399(c)(5)(B). Again, the Third Circuit instructs that ERISA should be interpreted in favor of protecting plan beneficiaries and construing the Philadelphia Fund's Plan Document to authorize insecurity defaults is consistent with that directive.[15]

---

[15] *Baldwin v. University Pittsburgh Medical Center*, 636 F.3d 69, 77 (3d Cir. 2011); *Edwards v. A.H. Cornell and Son*, Inc., 610 F.3d 217, 223-24 (3d Cir. 2010) (any ambiguities in ERISA should be resolved in favor of plan participants).

### (iv) Present Value Discounting Under Section 502(b) of the Bankruptcy Code is not Justified

37. The Debtors' present value discounting argument is premised on an alleged payment stream that does not exist in this bankruptcy case. The Debtors frame the discounting question as follows:

> Furthermore, as this Court has previously recognized, if what is owed as of the date the petition is filed are long-term streams of payments as opposed to one lump sum, then § 502(b) still allows those long-term obligations to be discounted to present value . . .[16]

38. The question of whether Debtors' liability is a lump sum obligation or a stream of payments is resolved under 29 U.S.C. §1399 and the Bankruptcy Code. The former provides that upon receiving the MEPP's notice and demand for payment, the withdrawn employer is required to begin making interim withdrawal liability payments within *sixty* days of the date of the demand, regardless of whether the withdrawal liability is disputed. Indeed, 29 U.S.C. § 1399(c)(2) provides, in relevant part, as follows:

> (2) Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) beginning *no later than 60 days after the date of the demand* notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

29 U. S. C. §1399(c)(2)(emphasis added).

39. However, in the bankruptcy context, the automatic stay precludes the MEPPs from demanding post-petition payments of withdrawal liability and the Bankruptcy Code precludes the Debtors from making post-petition payments of unsecured claims. Hence, the payment stream argument that is the foundation of the Debtors' discounting argument fails.

---

[16] Debtors' Opposition, p. 7

40. As such, the only way to assess withdrawal liability in this context is through a lump sum assessment. This is what the Philadelphia Fund did when it filed Proofs of Claim for the lump sum withdrawal liability obligation. In so doing, the Pension Fund satisfied the notice and demand requirement of 29 U.S.C. §1399. *See*, *Trustees of the Chicago Truck Drivers Union Pension Fund v. Central Transport, Inc.*, 888 F.2d 1161, 1163-64 (7th Cir. 1989) reh'g denied, 1990 U.S. App. LEXIS 398 (1990)(*en banc*); *Central States S.E. and S.W. Area v. Superior Moving Services, Inc.,* 1990 WL 19890 *1 (N.D. Ill. February 20, 1990).

41. The Debtors argue that the Philadelphia Fund's interpretation is flawed because 29 U.S.C. §1399(c)(1) "says nothing about whether the amortized payment schedule requirement is negated in bankruptcy proceedings." Debtors' Opposition, p. 13, fn.9. That is true. However, the automatic stay provision of the Bankruptcy Code makes clear that the Philadelphia Fund could not demand immediate interim payments of unsecured withdrawal liability obligations. Had the Philadelphia Fund done so, such demand would have been deemed violative of the automatic stay. Further, if the Debtors made such interim payments, those post-petition payments of unsecured obligations would have been deemed unauthorized transfers of estate property and deemed avoidable under 11 U.S.C. §549.

42. In the event that the Court concludes that what is owed is a long term stream of payments, the Debtors contend that section 502(b) of the Bankruptcy Code requires discounting to present value. In *In re Oakwood Homes Corp.,* 449 F.3d 588 (3d Cir. 2006), the Third Circuit addressed whether discounting future payments is required under that section:

> Viewing the Bankruptcy Code holistically, we cannot say that the language of 11 U.S.C. §502(b) clearly and unambiguously requires the same discounting to present value as is required under other section of the Code…We conclude that the language used in *§502 does not clearly and unambiguously require discounting* an interest bearing obligation to present value in light of the words' plan

13

meanings and the language used elsewhere in the Bankruptcy Code…

*Id.* at 508 (citations omitted)(emphasis added).

43. Although the *Oakwood* decision addressed the application of section 502(b) to debt instruments, the Court seemingly viewed that section as a safeguard against creditor windfalls. *Id.* at 601. The *Oakwood* Court refused to apply a present value discount to future note payments recognizing that the creditor's claim for unmatured interest was disallowed pursuant to section 502(b)(2), hence further discounting was not warranted. *Id.* at 599. The Court reasoned, in part, that "the economic reality of the transaction" did not warrant further discounting. *Id.*

44. Here, the economic reality faced by the MEPPs is that they will receive far less than the face amount of their claims. Unlike the other unsecured creditors in this case, the MEPPs face an onslaught of potential reductions under ERISA. Further discounting, as the Debtors suggest, is inconsistent with the Third Circuit's instructions that: (i) present value discounting must comport with the creditor's economic realities; and (ii) ERISA should be interpreted in a manner that protects beneficiaries and plan participants.[17]

### (v) The Debtors' Cost of Borrowing has No Relationship to Present Value Calculations of MEPP Distributions

45. In the event that the Court concludes that withdrawal liability payments should be discounted to present value, the Court should reject the Debtors' proposed discount rate.

46. Indeed, the Debtors' analysis on discounting misconstrues the nature of present value discounts. The Debtors argue that, outside of bankruptcy, withdrawal liability owed to the MEPPs would have been paid over a twenty-year period or sooner if the 20-year cap does not apply.

---

[17] *Baldwin v. Univ. Pittsburgh Med. Ctr.*, 636 F.3d 69, 77 (3d Cir. 2011).

47. In the event that the general unsecured creditors receive any distributions under the Plan, those distributions will effectively be accelerated and paid on the Distribution Date.  See Plan, Article V.  The argument follows that the MEPPs can invest those funds and receive more than they would had the payments been made over the course of several years.

48. Critically, the present value analysis hinges on the rate of return that the *MEPPs* will earn on the lump sum distribution.  This is evidenced by the simple present value formula often applied when discounting a payment stream to present value:

$PV = FV/(1+R)^N$[18]

PV = present value

FV = future value

R = discount rate, or expected rate of return of recipient

N = duration between present date and date cash flow

49. Notably, the expected rate of return is the rate of return the *recipient* would receive on the investment of the lump sum distributions.  The rate at which the Debtors may borrow funds has no rational relationship to the rate of return that MEPPs may earn on investments. In short, there is no logical nexus between the Debtors cost of debt and the Philadelphia Fund's return of investments.

50. It is also worth highlighting the Debtors' inconsistency with respect to MEPPs' projected rate of return.  Indeed, in valuing unfunded vested benefits for purposes of calculating withdrawal liability, the Debtors have opined that the MEPPs' rate of return should be similar to the minimum funding rate within the meaning of 29 U.S.C. § 1084(c)(3).[19]  In other words, in

---

[18] https://www.investopedia.com/terms/p/presentvalue.asp (site last visited January 16, 2025).
[19] *Debtors' Reply In Support of Motion for Partial Summary Judgment*, [Docket Item No. 5206, pp.2-7].

the case of the Philadelphia Fund, the Debtors contend that fund assets will appreciate at a rate at or near 7%.

51. Now, for purposes of discounting the withdrawal liability payment stream to present value, the Debtors assert that the Philadelphia Fund's assets will grow at a rate established by the Debtors' cost of debt (not the MEPP's projected rate of return) between 13% and 18%.[20]

**D. CONCLUSION**

The Philadelphia Fund respectfully requests the entry of an Order granting it summary judgement on all issues and reserves the right to join in any arguments raised by any other pension fund.

Dated: January 21, 2025                    STEVENS & LEE, P.C.

                                                               /s/ Joseph H. Huston, Jr.
Joseph H. Huston, Jr. (No. 4035)
919 North Market Street, Suite 1300
Wilmington, DE 19801
Telephone: (302) 425-3310
Fax: (610) 371-7972
Email: joseph.huston@stevenslee.com

John C. Kilgannon, Esquire
1500 Market Street, East Tower, Suite 1800
Philadelphia, PA 19012
Telephone: (215) 751-1943
Fax: (610) 371-7954
Email: john.kilgannon@stevenslee.com

*Counsel for the Teamsters Pension Trust Fund of Philadelphia & Vicinity*

---

[20] *Debtors' Omnibus Opposition to the SFA MEPPs' and Non-SFA MEPPs' Motion for Partial Summary Judgment.* [Docket Item No. 5381, p. 28.]